Brian Stewart (12677)
**SIEGFRIED & JENSEN**
5664 S. Green Street
Murray, UT 84123
Main Office: 801-266-0999
(801) 743-1569 – Phone
(877) 218-9068 – Fax
Brian@sjatty.com

E. Todd Tracy (Texas State Bar No. 20178650) (*Admitted Pro Hac Vice*)
TTracy@vehiclesafetyfirm.com
Andrew G. Counts (Texas State Bar No. 24036408) (*Admitted Pro Hac Vice*)
ACounts@vehiclesafetyfirm.com
**The TRACY firm**
4701 Bengal Street
Dallas, Texas 75235
Phone: (214) 324-9000
Facsimile: (972) 387-2205

*Attorneys for Plaintiff*

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Kendall Anderson,<br><br>    *Plaintiff,*<br><br>vs.<br><br>BigRentz, Inc. a/k/a Big Renz, and<br>Wheeler CAT a/k/a Wheeler Machinery Co.,<br><br>    *Defendants.* | **PLAINTIFF'S RESPONSE TO DEFENDANT BIGRENTZ, INC.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:17-cv-00205-DN-EJF<br><br>Judge:  David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |

# TABLE OF CONTENTS

I.      Introduction and Relief Sought ........................................................3

II.     Background ..................................................................... 4-6

III.    Response to Statement of Undisputed Material Facts............................. 6-19

        A.  Undisputed Material Facts.................................................. 6-7

        B.  Additional Material Facts .................................................. 8-19

IV.     Argument and Authorities...................................................... 19-38

        A.  Negligence – Duty & Breach ............................................. 19-20

        B.  BigRentz's Motion Addresses Only Some of Plaintiff's Claims .......... 19-20

        C.  Premises Liability Law Does Not Apply............................... 21-22

        D.  BigRentz Owed a Duty Under Common Law (§ 324A Restatement)
            and It Breached Said Duty................................................. 22-29

        E.  BigRentz Owed a Duty Under General Principles (the "Jeffs" test)
            and It Breached Said Duty................................................. 29-36

        F.  BigRentz Was Grossly Negligent ........................................ 36-38

        G.  Plaintiff did Not Contract with BigRentz................................38

V.      Conclusion and Prayer.......................................................38

Signature and Certificate of Service........................................................39

# I. Introduction and Relief Sought

Plaintiff has alleged negligence and gross negligence claims against BigRentz regarding its conduct as to the UTV's component parts and also the doors.

BigRentz seeks summary dismissal just on duty and breach, and just solely on the component parts claims. Thus, BigRentz cannot be granted summary dismissal on all of Plaintiff's claims, as it requests.

Further, this is a general negligence case. BigRentz's motion assumes it is a premises case and cites to premises liability law. This is the wrong standard. BigRentz has not shown it is entitled to summary judgment as a matter of law. Thus, the summary judgment burden of proof does not shift to Plaintiff; and, BigRentz's motion should be denied.

Alternatively, Plaintiff's evidence establishes that BigRentz owed a duty to Plaintiff for (i) the component claims, and/or (ii) the door claims – under common law (§324A of the Restatement (Second) Torts), and/or under the *Jeffs*' five-factor test. Plaintiff's evidence also establishes, or at a minimum raises a genuine issue of material fact, that BigRentz breached such duties and it's conduct constitutes negligence or gross negligence. Thus, BigRentz's motion should be denied.

Plaintiff never entered into an agreement with BigRentz. Plaintiff is not a party to the contract between BigRentz and BattleFrog. Thus, Plaintiff did not waive or release any of his claims against BigRentz.

## II. Background

BigRentz is an online-business that connects buyers with suppliers of utility trail vehicles (utvs). BigRentz sources the utv from a supplier, such as Wheeler, which owns and rents the utv to BigRentz at a discount. BigRentz then rents the utv to the buyer. BattleFrog rented the utv at issue through this process.

On May 14, 2016, BattleFrog's employee, Kendall Anderson (the "Plaintiff") was driving the utv when the utv tipped to the left and rolled-over on the driver's side. Plaintiff's left arm was partially ejected outside the utv, peeling off all his skin and severing his nerves.

Plaintiff filed this lawsuit against BigRentz for its negligent acts and/or omissions regarding the utvs component parts and/or safety features (the doors). When Wheeler purchased the utv, new, from the manufacturer, the utv came <u>with</u> doors. Wheeler knew that persons utilizing its utvs should read and abide all warnings in the owner's manual including several that warn that riding in the utv <u>without</u> the doors increases risk of serious injury or death in an event of an accident or rollover, such is the case here.

Wheeler admits it has a duty to furnish well-maintained utvs. However, contrary to its representation that it had the utv inspected, maintained and repaired prior to Plaintiff's accident, Wheeler did not.

Wheeler has a policy of visually inspecting and taking photographs of the utv before and after each rental. When the doors are missing, Wheeler contacts the customer for return, or buys replacement doors. Wheeler also sends the utv to an

authorized dealer for inspection, repair or maintenance in between each rental.

While Wheeler followed this procedure in December 2015, it fails to mention it rented the utv on 4/25/16-4/28/16, and despite having until 5/6 for the BattleFrog rental, Wheeler did not send the utv to a dealer for inspection, repair, or maintenance. Yet, Wheeler contractually agrees and represents to its customers that Wheeler not only inspects for but repairs damage or abnormalities that may have been caused by a prior rental. Wheeler had a duty to inspect the utv to check the component parts after each rental, because Wheeler did not do so before renting to BattleFrog, Wheeler breached such duty.

As to the doors, Wheeler's photographs taken of the utv prior to delivery to BattleFrog show the doors missing. Wheeler argues that nothing happened from 5/6 until 5/14. However, removal of the safety feature of doors is similar to removing the safety feature of an airbag, just like there is no hazard posed until the car is in an accident and the airbag does not inflate, there is no hazard posed with missing doors until the utv is involved in an accident. Here, Wheeler had a duty to rent the utv equipped with all safety features, including the doors. It breached such duty by proceeding to rent the utv without the doors, with full knowledge the doors were missing and of the hazards posed, and failing to warn BigRentz or BattleFrog.

BigRentz has adopted Wheeler's duties and obligations to provide safe equipment to customers. Because Wheeler had an obligation to provide a safe UTV with operational component parts and with all safety features, BigRentz likewise had the same obligations. Given that Wheeler failed to carry out its obligations, BigRentz did as well. BigRentz does not dispute this; it admits it did absolutely

nothing to determine if the UTV was safe.

### III. Response to Statement of Undisputed Material Facts

**A. Undisputed Material Facts**

1.    Plaintiff does not dispute the Defendant's Undisputed Material Facts in paragraph nos. 1-18, 21-22, and 25.

2.    While Plaintiff does not dispute Defendant's Undisputed Material Facts in paragraph nos. 19 or 20, Plaintiff does dispute the accuracy and completeness of Defendant's Exhibit 10, the rental agreement between Wheeler and BigRentz, as it omits page 2. *Cf.* Ex. 1(Wheeler/BigRentz rental agreement).

3.    Plaintiff disputes paragraph 23 of Defendant's Undisputed Material Facts, stating that Plaintiff was thrown forward through the windshield of the UTV, with the steering wheel preventing Plaintiff's complete ejection from the UTV. Defendant mischaracterizes the accident as a frontal-impact collision, with Plaintiff ejected forward through the windshield. To the contrary, Plaintiff was driving straight, when without explanation, the UTV began to tip to the left and began to roll-over to the left (driver's side). Ex. 2, Pl. depo. 54:4–56:2. He hit his head, knocking him unconscious, and when he came to, he had blood in his eyes from his face hitting the windshield. Plaintiff's face was out the glass windshield, but his body did not go through the windshield; the steering wheel would have been near his groin area. Ex. 2, Pl. depo. 114:21–118:14. Photos show a partial roll-over. Ex. 2, Pl. depo. at exhibit 1 at p. 4 (photos on page marked CLAIMS 000054).

4.    Plaintiff disputes paragraph 24 of Defendant's Undisputed Material Facts,

stating Plaintiff was not wearing his seatbelt at the time of the accident, which had been buckled behind him in such a way as to disable the seatbelt interlock/speed governor of the UTV. Plaintiff believes he was wearing his seatbelt when the accident occurred because wearing his seatbelt was his customary practice. Ex. 2, Pl. depo. 49:7–21, 52:19–53:10. Plaintiff did not know that when the seatbelt is unbuckled, it engages the seatbelt interlock/speed governor which limits the vehicle's speed to 15 m.p.h. Ex. 2, Pl. depo. 53:11–16, 121:21–25.

5.   Plaintiff disputes paragraph 26 of Defendant's Undisputed Material Facts that Plaintiff has only alleged claims in ordinary negligence and gross negligence for failure to inspect, maintain, and service the UTV. Plaintiff asserts negligence and gross negligence claims regarding inspection, maintenance, repair or general upkeep related to the CV joints/component parts. Defendant's motion seeks dismissal just on these claims. *See* Def. Mtn [Dkt.73] at p.12, 18 (CV joint assembly, A-arm, steering); *cf.*Pl.'s Compl. [Dkt.2], at ¶46 (a)-(c), (f), ¶47-55. Plaintiff also asserts negligence and gross negligence for failure to ensure proper safety features (the doors) were in place, allowing certain safety features to be altered, and/or removed; failure to advise Plaintiff of the dangers of using a UTV which does not have proper safety features; failing to remove the UTV from operation until it could be properly repaired/or inspected; and/or permitting the UTV to be rented or utilized with safety features altered and/or missing. BigRentz has not moved for dismissal of the door claims. *See* Pl.'s Compl. [Dkt.2], at ¶46 (d)-(g), ¶47-55; *cf.* Def. Mtn [Dkt.73].

## B. Additional Material Facts

### *Wheeler and BigRentz Business Relationship*

1.    Wheeler is in the business of renting out equipment and utility trail vehicles (utvs). Ex. 3, Wayment depo. 12:22-13:5.

2.    BigRentz is an online equipment rental market place that connects customers looking for equipment to suppliers. Ex. 4, Imbimbo depo. 15:14-16:1.

3.    Wheeler and BigRentz entered an agreement for Wheeler to supply equipment to BigRentz at discount. Ex. 4, Imbimbo depo. 8:14-9:5; Ex. 3, Wayment depo.7:4-14. Wheeler is the owner of the equipment that it rents to BigRentz; BigRentz then rents it to someone else. *Id.*

### *BattleFrog*

4.    BattleFrog hosts obstacle-course races similar to Spartan Race and the Tough Mudder. Ex. 2, Pl. depo.13:3-16.

5.    For BattleFrog's race at the Utah Motorsports Campus on May 14, 2016, where Plaintiff's accident occurred, BattleFrog contacted BigRentz about renting nine utvs for a two-week period. Ex. 4, Imbimbo depo.11:21-12:3. BigRentz sourced two of the nine utvs from Wheeler. Ex. 4, Imbimbo depo.11:21-12:18.

### *Wheeler's / BigRentz' Duty & Moral Obligation is Customer's Safety*

6.    According to Wheeler's mission statement and safety philosophy, "[t]he safety of Wheeler's Associates and customers is always the first consideration in all aspects of [Wheeler's] business. The ongoing consideration of zero accidents and injuries is [Wheeler's] normal level of safety.  Any accident or injury is considered an unacceptable abnormality that must be corrected immediately. Wheeler and every

8

Associate has a moral obligation to do everything possible to ensure each person returns home safely every day." Ex. 5, Webb depo. 4:3-12, 5:25-7:5 and at exhibit 1 (Wheeler's handbook, *The Wheeler Way*).

7.     Because one of BigRentz's core values is safety, BigRentz agrees with Wheeler's safety philosophy – that is, BigRentz has a moral obligation to ensure each person returns home safely every day. Ex. 4, Imbimbo depo. 24:19-25, 28:3-15. BigRentz believes it has a duty and obligation to ensure that the equipment it rents to customers is safe. Ex. 4, Imbimbo depo. 29:14-19.

### *UTV: Doors Required as Serious Injury if in Rollover Accident*

8.     Wheeler has 15 to 20 utvs that it owns and rents to the public. Ex. 3, Wayment depo.12:22-13:5.

9.     In February 2015, Wheeler elected to purchase the UTV at issue from Polaris, as new and with doors instead of cab nets. When Wheeler received the new UTV from Polaris, it was equipped with doors. Ex. 6, Rhoades depo. 27:7-12, 46:22-47:5, 56:15-19 and at exhibit 2 (photo of UTV with doors as purchased from Polaris).

10.   When Polaris delivered the UTV to Wheeler, the UTV came with an Owner's Manual that contains warnings to apprise people about safety with respect to the UTV. Ex. 6, Rhoades depo.17:3-13.

11.   When Wheeler rented the UTV to BigRentz, Wheeler knew that the Owner's Manual states, "[f]ailure to follow the warnings contained in this manual can result in severe injury or death" and "[n]ever permit a guest to operate this vehicle unless the guest has read this manual and all product labels." Ex. 6, Rhoades depo. 22:5-22, 26:18-24 and at exhibit 6, UTV Owner's Manual pp. 5, 16.

12.   Yet, Wheeler never told BigRentz to read the Owner's Manual; nor did Wheeler tell BigRentz to make sure BattleFrog read the Owner's Manual. Ex. 6, Rhoades depo. 22:5-23:3.

13.   Wheeler also knew that the Owner's Manual states "[a]lways use the cab nets (or doors) while riding in this vehicle." Ex. 6, Rhoades depo.23:4-7 and at exhibit 6, UTV Owner's Manual at p. 5. It also warns that "[r]iding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover. Always use the cab nets (or doors) while riding in this vehicle." *Id.* at 26:25-27:6 and at exhibit 6 at p. 17.

14.   Wheeler knows that riding in utvs can be a dangerous activity, and that the actual user of the utv should understand that. Ex. 6, Rhoades depo.17:3-18:3.

15.   Wheeler admits it has a lot more expertise with respect to safety than the ultimate consumers do. Ex. 6, Rhoades depo. 44:7-10.

16.   BigRentz did not do one single thing to ensure that the UTV rented to BattleFrog was safe. Ex. 4, Imbimbo depo. 30:3-11.

### *Wheeler's and BigRentz's Duty and Breach – renting UTV without Doors and Failure to Inspect, Repair or Maintain Component Parts*

17.   Wheeler admits it has a duty to furnish well-maintained utvs. Wheeler agrees it must follow the manufacturer's recommended requirements including either personally inspecting the utvs or having someone else inspect the utvs to make sure they are safe before renting. Ex. 6, Rhoades depo. 43:21-44:7.

18.   Wheeler has a policy of visually inspecting and photographing the utv before and after each rental. When the doors are missing, Wheeler contacts the

customer for return, or buys replacement doors (and bills the customer). Wheeler also sends the utv to an authorized dealer for inspection, repair or maintenance in between each rental. Ex. 6, Rhoades depo. 46:22-54:16, 58:20-60:22; Ex. 3, Wayment depo. 17:18-19:15.

19.   In February or March 2015, Polaris delivered the new UTV equipped with doors to Wheeler. Ex. 6, Rhoades depo. 27:7-12, 46:22-47:5, 56:15-19 and at exhibit 2 (photo of UTV with doors as purchased from Polaris).

20.   Wheeler's first time to rent out the UTV was from March 3, 2015 to September 22, 2015. The UTV was returned with the doors on. Upon the UTV's return, Wheeler photographed the UTV and Wheeler sent the UTV to a Polaris dealer for inspection. Ex. 6, Rhoades depo. 47:6-51:2, 52:23-53:3.

21.   Next, Wheeler rented the UTV on September 23, 2015 to December 14, 2015. The UTV was returned with the doors on. Upon its return, Wheeler photographed the UTV and Wheeler sent the UTV to a Polaris dealer for inspection. Ex. 6, Rhoades depo. 51:3-53:3.

22.   Wheeler then rented the UTV on April 25, 2016 to April 28, 2016. Ex. 6, Rhoades depo. 53:4-54:6.

23.   On May 6, 2016, Wheeler rented the UTV to BigRentz and BigRentz rented it to BattleFrog. Ex. 6, Rhoades depo. 18:21-24.

24.   Contrary to its policy, Wheeler did not send the UTV to a Polaris dealer prior to renting it to BigRentz on May 6, 2016. Based upon Wheeler's visual inspection and photographs of the UTV before it was delivered to BattleFrog, Wheeler knew the doors were missing; yet Wheeler delivered it to BattleFrog with

no doors. Ex. 6, Rhoades depo. 27:7-15, 54:2-10, 58:20-59:25; Ex. 3, Wayment depo. 17:18-19:15 and addressing CLAIMS 133-134 (sic)[1] which are two photos of the UTV without doors as delivered to Battlefrog which are attached as Pl's Ex. 7.

25.   Wheeler delivered the UTV directly to BattleFrog at the Utah Motorsports Complex. Ex. 6, Rhoades depo.18:6-10. Wheeler never communicated any dangers to the Plaintiff. *Id.* 45:21-24.

26.   The rental agreement between Wheeler and BigRentz states:

> 2  Repairs.  [Wheeler] agrees to provide at its own expense, labor and materials for major mechanical repairs on the [UTV] arising from normal use under the terms of this lease. [Wheeler] shall have the sole right to determine what are major repairs under the provisions of the lease and what repairs arise from other than normal use. [...]. [Wheeler] will inspect the [UTV] upon its return by Lessee and invoice Lessee for any damage or abnormal wear.

> 3  Maintenance. [...]. The Lessee shall not make any changes or modifications [in the UTV] without written permission of Lessor.

Ex. 1, Wheeler Rental Agreement p. 2 ¶2-3.

### *The Accident*

27.   In late February 2016, BattleFrog hired Plaintiff to assemble and deconstruct obstacles. Ex. 2, Pl. depo. 12:6-8, 13:19-22. BattleFrog had 7 to 10 days to set up the race course, with race-day usually taking place on a Saturday. Ex. 2, Pl. depo. 13:23-14:8.

28.   BattleFrog always rented utvs for the races. Ex. 2, Pl. depo. 24:17-25:3. Plaintiff had driven BattleFrog's rented utvs in at least five race events. Ex. 2, Pl. depo. 24:17-25:3.

29.   During his on-board process, BattleFrog provided Plaintiff instruction about

---

[1] Photos are labeled CLAIMS 000143-000144.

how to safely operate the utvs. Ex. 2, Pl. depo. 87:7-88:2. Plaintiff also had plenty of prior experience riding utvs, as he grew up driving all brand-name utvs, including Polaris Ranger's utvs similar to the UTV. Ex. 2, Pl. depo. 23:6-25:3.

30.   For BattleFrog's race at the Utah Motorsports Complex, the assembly process took 7 to 10 days prior to the race day on May 14, 2016. Ex. 2, Pl. depo. 108:20-109:5.

31.   During the 7 to 10 day assembly process, Plaintiff was assigned to and only drove a Kawasaki Kubota utv, which was fully enclosed and had doors. Ex. 2, Pl. depo. 25:4-26:11.

32.   On race day of May 14, 2016, it was Plaintiff's job to transport volunteers to the obstacles. Ex. 2, Pl. depo. 19:3-13, 43:1-15. Upon arrival, he was told to take one of the two Polaris Rangers, which BattleFrog had designated for transporting volunteers. Ex. 2, Pl. depo. 43:16-44:1.

33.   Because the UTV had been used during the entire week for the obstacle assembly process, Plaintiff did not inspect the UTV on the morning of race day. Ex. 2, Pl. depo. 44:3-45:13.

34.   Race day was the very first time Plaintiff had driven the Ranger Polaris UTV at issue. Ex. 2, Pl. depo. 25:4-21, 45:14-20.  The UTV was a six-seater, three in the front and three in the back. Ex. 2, Pl. depo. 26:12-15. He recalls getting into the UTV with five volunteers. Ex. 2, Pl. depo. 46:18-47:11.

35.   To get to the obstacles, the path required driving through mostly field areas, as well as some areas of limestone, concrete, and blacktop. Ex. 2, Pl. depo. 49:22-50:6.

36.    After dropping the last volunteer at an obstacle course located in a field, he started to head back to pick-up more volunteers which is when the accident occurred. Ex. 2, Pl. depo. 48:18-25, 50:1-23.

37.    The accident occurred where the dirt-grass field area meets limestone; but after the accident sequence had concluded, the UTV was in the limestone. Ex. 2, Pl. depo. 53:17-54:3. Because the race obstacles are located in field areas, he was driving through a field in order to reach the road to get back to the race-start area. Ex. 2, Pl. depo. 59:20-25, 73:4-74:25, 113:19-25 and at. exhibit 1 at pp. 2, 4 (photographs on page marked CLAIMS 000052, 54).   Plaintiff was not driving through the field to avoid kicking up dust. Ex. 2, Pl. depo. 112:20-113:25.

38.    He was in charge of transporting the volunteers because he was familiar with the pathway, and he had driven that same route with the Kawasaki Kubota quite a few times throughout the obstacle set-up phase, without incident. Ex. 2, Pl. depo. 59:11-19.

39.    Plaintiff was driving straight, approximately 32 to 35 m.p.h., when without explanation and without ever losing control of the UTV, the UTV began to tip to the left and roll-over to the left (driver's side). Ex. 2, Pl. depo. 50:13-51:9, 54:4–56:21, 61:19-62:2, 114:5-20.

40.    As the UTV began to tilt left and roll-over, Plaintiff hit his head, knocking him unconscious, and when he came to, he had blood in his eyes from his face hitting the windshield. He stated that his face was out the glass windshield, but his body did not go through the windshield – that is, the steering wheel would have been near his groin area. Ex. 2, Pl. depo. 114:21–116:14.

41.   He pulled to free his left arm pinned in the dirt, and climbed out through the windshield. Ex. 2, Pl. depo. 116:15-117:15. Upon seeing his bone sticking out from his left arm and shirt, he located his radio to call for help. Ex. 2, Pl. depo. 117:16-25.

42.   The paramedics gave him a shot directly into his left arm wound. He was then airlifted to the hospital where he went straight into emergency surgery. Ex. 2, Pl. depo. 126:19-127:7; see also Ex. 8, Dr. Ziejewski Aff. at ex. 2 (Report) at p. 4 (Accident Scene Photographs of UTV and Plaintiff's Injuries).

43.   Plaintiff suffered lacerations to the face and still has facial scarring. As to his left arm, he had three to four compound fractures, loss of tissue and muscle, and severed nerves. He has had a number of surgeries on his left arm, including insertion of rods and screws to hold the bones together.  He has had nerve taken from his leg to repair the nerves in his left arm. He had flaps taken from the top part of his arm to put over the bottom part of his left arm. He is awaiting another surgery to stitch his arm to his torso in hopes to see if the lost arm muscle will grow back. Ex. 2, Pl. depo. 62:3-70:2.

44.   Plaintiff had no concern the UTV had no doors because he has never had a UTV tilt over. Ex. 2, Pl. depo. 84:2-15.

### Plaintiff's Expert – Dr. Ziejewski

45.   Plaintiff has retained Mariusz Ziejewski, Ph.D., Inż. ("Dr. Ziejewski"), to render expert opinions and testimony on vehicle dynamics (accident reconstruction) and human body dynamics (biomechanics) regarding Plaintiff's UTV accident Ex. 8, Dr. Ziejewski Aff. at pp.1-8 with attachments 1 and 2. His education, experience,

and the materials he has reviewed and his opinions, to date, are set forth in his Report. Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) at pp. 1-2. The tasks he has performed include studying the provided materials; obtaining specifications for the UTV at issue; measuring an exemplar Polaris Ranger 570 Crew; determined the Plaintiff's segments' geometric and mass properties, and the joints' locations range of motion characteristics using the Generator of Body Data (GEBOD) AL/WPAFB computer program; performed vehicle dynamics analyses; and performed Plaintiff's body dynamics analysis. *Id.* at p. 3.

46.  In addressing human body dynamics, Dr. Ziejewski states that occupant kinematics in rollovers may best be described in three phases: lateral motion and trip phase, airborne phase and ground contact phase. During the rollover event, Plaintiff would have moved upward and outward with respect to the vehicle interior unless the impact force from the vehicle structures contact with the ground is greater than the centripetal acceleration. *Id.* at p. 12.

47.  Further, published literature indicates that about 97.4% of belted and 92.2% of unbelted occupants in rollovers had less than an AIS Level 3 injury. When partially or fully ejected from the vehicle, the risk of AIS Level 3+ increases. Funk et al (2012) shows that the risk of fatality is increased by a factor of 91 in occupants who are completely ejected from the vehicle in a rollover crash. *Id.* at p. 14.

48.  Dr. Ziejewski's concludes "having a door on the UTV would have contained Plaintiff within the vehicle and lessened his injuries. Specifically, if the doors would have been available, Plaintiff would not have been partially ejected from the vehicle and his injuries would have been less." *Id.* at p. 14.

49.   Dr. Ziejewski explains that, in essence, what occurred is very similar to a crashworthiness type case involving a motor vehicle. One of the five crashworthiness principles is to prevent ejection. Doors help to prevent ejection. vehicle manufacturers know how important doors are to providing proper occupant protection in the event of an accident or rollover. *Id*. at p. 14.

50. Dr. Ziejewski states that, "[T]he National Highway Traffic Safety Administration (NHTSA) has identified ejection mitigation as a top priority, issuing a notice of proposed ruling making (NPRM) for FMVSS 226,  Ejection Mitigation, in December of 2009. Ejections have  a significant impact  on occupant injuries in motor  vehicle crashes,  representing 8,605 fatalities as  well as  20,000 injuries in 2007." *Id*. at p. 14.

51.   He also states that, "[P]ublished  literature found that for  rollover collisions the door window was the primary ejection route (**door ranked  second**) (Anderson, 1974). In a survey based on approximately 10,000 accidents involving Volvo cars in which 90 occupants were ejected, (Carlsson,  1983) found that in rollover impacts occupants travelling in the rear were ejected mainly through the rear window, and that **front seat occupants were ejected mainly through a door or side window** …" *Id*. at p. 14. (emphasis in original).

52.   Dr. Ziejewski states that in the owner's manual for the UTV, Polaris itself stresses the importance of the doors, and how the vehicle should always be used with doors (or cab nets). In fact, the owner's manual specifically says that "Riding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover." *Id*. at p. 15 (citing to

owner's manual, p. 17 (Bates labeled Polaris 000019)).

53.   Dr. Ziejeski cites to the U.S. Consumer Product Safety Commission's recommendation for installation of half doors in Rhinos, for a safer ride. *Id.* at p. 15.

54.   Dr. Ziejewski also reviewed Plaintiff's medical record, which include among other injuries, "massive crush injury L forearm with ulnar nerve laceration involving highly comminuted fx of proximal ulna/radius." *Id.* at p. 15 and p. 4 (fig. 2 photograph of Mr. Anderson's left arm injury).

55.   Dr. Ziejewski also performed a surrogate fit to relate the geometrical dimensions of the UTV to the height of Plaintiff of 68 inches. He had the surrogate sit in the exemplar wearing a seatbelt as well as not wearing a seatbelt. Dr. Ziejewski concludes that based on the geometry of the safety zone and the anthropometry of Plaintiff, it must be concluded the seat belt would not have prevented his upper extremity excursion. *Id.* at p. 16.

56.   Dr. Ziejewski also provides an illustration, by presenting a quasi-static roll test of a similar vehicle that he was personally involved in. *Id.* at 18. Analysis of various occupant protection effectiveness and containment was conducted using a rotisserie positioned at different roll and pitch angles. The tests were performed for various roll angle. The results showed that the roll event allows the arms and legs to leave the safety of the roll over protective structure (ROPS) even while wearing the provided lap belt. *Id.* at 18-19.

57.   Dr. Ziejewski renders opinions, given to a reasonable degree of engineering and scientific certainty, that:

1. At the time of injury, Plaintiff's left arm was outside the safe perimeter of the UTV, making him partially ejected and violating a fundamental principle of crashworthiness of preventing ejection.

2. Direct blunt trauma to Plaintiff's left arm was the result of interaction between the UTV and the ground.

3. Usage of the available seat belt would not have prevented the excursion of Plaintiff's left arm.

4. Any structure in the door area that would provide support for the left arm would have been beneficial to Plaintiff. This includes the doors for the subject Polaris that were furnished when new, but which were not present when the incident occurred.

Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) at p. 20.

## IV. Argument and Authorities

### A. Negligence – Duty & Breach

For a negligence claim, plaintiff must establish: (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, and (3) the breach was the proximate cause of (4) plaintiff's injuries or damages. *Webb v. Univ. of Utah,* 125 P.3d 906 (Utah 2005).

The threshold question in a negligence claim is whether the defendant owed a duty to the plaintiff. *Mower v. Baird*, 422 P.3d 837, 843 (Utah 2018). An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm. *Id*. Whether a duty exists is a question of law. *Id*. at 842.

If a duty of care is owed, the question becomes whether the required standard of care was breached. *Normandeau v. Hanson Equip., Inc.*, 215 P.3d 152, 157 (Utah 2009). Ordinarily, whether a defendant has breached the required standard of care is a question of fact for the jury. *RJW Media, Inc. v. CIT Group/Consumer Fin.,*

*Inc.*, 202 P.3d 291, 294 (Utah App. 2008). Thus, summary judgment is inappropriate unless the applicable standard of care is 'fixed by law' and reasonable minds could reach but one conclusion as to the defendant's negligence under the circumstances." *Id.*

## B. BigRentz's Motion Addresses Only Some of Plaintiff's Claims

Plaintiff has alleged negligence and gross negligence claims against BigRentz regarding inspection, maintenance, repair or general upkeep related to the CV joints/component parts. Defendant's motion seeks summary judgment just on these claims. *See* Def. Mtn [Dkt.73] at p.12, 18 (CV joint assembly, A-arm, steering); *cf*.Pl.'s Compl. [Dkt.2], at ¶46 (a)-(c), (f), ¶47-55. <u>For the sake of brevity, this motion will refer to these claims as the "components" or the "component parts" claims</u>.

Plaintiff has also alleged negligence and gross negligence against BigRentz for failure to ensure proper safety features were in place, allowing certain safety features to be altered, and/or removed; failure to advise Plaintiff of the dangers of using a UTV which does not have proper safety features; failing to remove the UTV from operation until it could be properly repaired/or inspected; and/or permitting the UTV to be rented or utilized with safety features altered and/or missing. The safety feature at issue are the doors of the UTV. <u>For the sake of brevity, this motion will refer to these claims as the "safety feature" or the "door" claims</u>.

Because BigRentz seeks summary judgment solely on Plaintiff's component parts claims, and as BigRentz has not moved for summary judgment on Plaintiff's door claims, BigRentz's motion for dismissal of all Plaintiff's claims against BigRentz must be denied. *See* Pl.'s Compl. [Dkt.2], at ¶46 (d)-(g), ¶47-55; *cf.* Def.

Mtn [Dkt.73].

## C. Premises Liability Law Does Not Apply

BigRentz moves for summary judgment on just duty and breach, and based solely upon the flawed position that duty and breach must be established under premises liability law.

BigRentz argues it has no duty and it did not breach any duty, because BigRentz did not create the unsafe condition, had no knowledge – actual or constructive – of the unsafe condition, and, without such notice, could not have had sufficient time to remedy the unsafe condition; or, it did remedy the unsafe condition. Def. Mtn [Dkt.73] p. 11, 17 (citing *Goebel v. Salt Lake City* (quoting *Schnuphase v. Storehouse Markets)* and *Matheson v. Marbec Invs*).

*Goebel* involves a bicyclist injured when his tire got stuck in the railroad track, and where the Utah Supreme Court addressed what type of notice a defendant must have when there is a temporary unsafe premises condition as opposed to a permanent unsafe condition. 104 P.3d 1185, 1192-1195 (Utah 2004). Additionally, *Schnuphase* involves a slip-and-fall on ice cream, whereby the Court also addressed unsafe premises condition of a permanent versus temporary nature. 918 P.2d 476, 478 (Utah 1996). Lastly, *Matheson* is a slip-and-fall on a stair, wherein the appellate court cites to *Goebel* and *Schnuphase*. 173 P.3d 199, 201-202 (Utah App. 2007).

BigRentz's cases address duty and breach in a premises context and do not establish the legal standard of duty or breach for Plaintiff's general negligence claims. BigRentz does not cite to any legal authority for general negligence claim, nor has it put forth evidence to show it is entitled to judgment as a matter of law.

Thus, the summary judgment burden of proof does not shift to Plaintiff; and, BigRentz's motion should be denied.

Alternatively, Plaintiff's evidence establishes that BigRentz owed a duty to Plaintiff for (i) the component claims, and/or (ii) the door claims. Plaintiff's evidence establishes, or at a minimum raises a genuine issue of material fact, that BigRentz breached such duties and it's conduct constitutes negligence or gross negligence.

Plaintiff never entered into an agreement with BigRentz. Plaintiff is not a party to the contract between BigRentz and BattleFrog. Thus, Plaintiff did not waive or release any of his claims against BigRentz.

## D. BigRentz Owed a Duty Under Common Law (§ 324A Restatement) and It Breached Said Duty

As a matter of common law, BigRentz is subject to liability to Plaintiff for BigRentz's failure to exercise reasonable care in performing its obligations to inspect, maintain, repair, service, or perform general upkeep of the UTV prior to BigRentz's rental and delivery of the UTV to the Utah Motorsports Complex. *See* Restatement (Second) of Torts § 324A.

The Utah Supreme Court affirmed this duty by adopting § 324A. *See Alder v. Bayer Corp.*, 61 P.3d 1068, 1077–81 (Utah 2002); *see also Marland v. Asplundh Tree Expert Co.*, 1:14-CV-40 TS, 2016 WL 7240139, at *1 (D. Utah Dec. 14, 2016) (holding defendant owed a duty under § 324A).

Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the

third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

**i. BigRentz undertook, gratuitously or for payment, to render services to BattleFrog which BigRentz recognized were necessary, at least in part, for the protection of third parties or the public**

Section 324A applies to BigRentz because BigRentz undertook for consideration to render services to BattleFrog which BigRentz recognized as necessary, at least in part, for the protection of third parties or the public.

Wheeler is in the business of renting out utvs. Ex. 3, Wayment depo.12:22-13:5. Wheeler and BigRentz entered an agreement for Wheeler to supply equipment to BigRentz at a discount. Ex. 4, Imbimbo depo. 8:14-9:5; Ex. 3, Wayment depo.7:4-14. Wheeler is the owner of the equipment that it rents to BigRentz; BigRentz then rents it to someone else. *Id*.

Wheeler's core business principle, and moral obligations, is the safety of its customers. Ex. 5, Webb depo. 4:3-12, 5:25-7:5 and at exhibit 1 (Wheeler's handbook, *The Wheeler Way*). Wheeler admits it has a duty to furnish well-maintained utvs. Ex. 6, Rhoades depo. 43:21-44:7. As part of its utv rental service, Wheeler has a policy of visually inspecting and photographing the utv before and after each rental. When the doors are missing, Wheeler contacts the customer for return, or buys

replacement doors. Wheeler also sends the utv to an authorized dealer for inspection, repair or maintenance in between each rental. Ex. 6, Rhoades depo. 46:22-54:16, 58:20-60:22; Ex. 3, Wayment depo. 17:18-19:15.

Wheeler rented the UTV on April 25, 2016 to April 28, 2016. Ex. 6, Rhoades depo. 53:4-54:6. On May 6, 2016, Wheeler rented the UTV to BigRentz and BigRentz rented it to BattleFrog. Ex. 6, Rhoades depo. 18:21-24. Contrary to its policy, Wheeler did not send the UTV to a Polaris dealer prior to renting it to BigRentz on May 6, 2016. Ex. 6, Rhoades depo. 27:7-15, 54:2-10, 58:20-59:25; Ex. 3, Wayment depo. 17:18-19:15. Thus, Wheeler did not inspect the UTV to determine if there was any damage or abnormal issues caused to the component parts as a result of the April rental.

However, based upon Wheeler's visual inspection and photographs of the UTV before it was delivered to BattleFrog, Wheeler knew the doors were missing; yet Wheeler delivering it to BattleFrog with no doors. Ex. 6, Rhoades depo. 27:7-15, 54:2-10, 58:20-59:25; Ex. 3, Wayment depo.17:18-19:15 and addressing CLAIMS 133-134 (sic)[2] which are two photos of the UTV without doors as delivered to Battlefrog attached as Pl.'s Ex 7).

When Polaris delivered the UTV to Wheeler, the UTV came with an Owner's Manual that contains warnings to apprise people about safety with respect to the UTV. Ex. 6, Rhoades depo.17:3-13.

When Wheeler rented the UTV to BigRentz, Wheeler knew that the Owner's Manual states, "[f]ailure to follow the warnings contained in this manual can result

in severe injury or death" and "[n]ever permit a guest to operate this vehicle unless the guest has read this manual and all product labels." Ex. 6, Rhoades depo. 22:5-22, 26:18-24 and attached depo. exhibit 6, UTV Owner's Manual at pp. 5 and 16.

Wheeler also knew that the Owner's Manual states "[a]lways use the cab nets (or doors) while riding in this vehicle." Ex. 6, Rhoades depo. 23:4-7 and attached depo. exhibit 6, UTV Owner's Manual at p. 5.  It further warns that "[r]iding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover. Always use the cab nets (or doors) while riding in this vehicle." *Id.* at 26:25-27:6 and attached depo. exhibit 6 at p. 17.

Wheeler knew the doors were missing from the UTV, but ignored the warnings and delivered the UTV with no doors. *See id.* Wheeler delivered the UTV directly to BattleFrog at the Utah Motorsports Complex. Ex. 6, Rhoades depo.18:6-10. Wheeler did not inform BattleFrog about the missing doors nor about the risk of injury operating the UTV without doors. Ex. 6, Rhoades depo.22:5-23:3. Wheeler never communicated any dangers to the Plaintiff. Ex. 6, Rhoades depo. 45:21-24.

On the date of the accident, Plaintiff was driving the UTV straight, when without explanation and to his surprise, the UTV began to tilt to the left and rollover to the left (driver's side). Ex. 2, Pl. depo.50:13-51:9, 54:4–56:21, 61:19-62:2, 114:5-20.

After dropping the last volunteer at an obstacle course located in a field, he started to head back to pick-up more volunteers when the accident occurred. Ex. 2,

---

[2] Photos are labeled CLAIMS 143-144.

Pl. depo. 48:18-25, 50:1-23.  Plaintiff pulled to free his left arm pinned in the dirt, and climbed out through the windshield. Ex. 2, Pl. depo. 116:15-117:15. Upon seeing his bone sticking out from his left arm and shirt, he located his radio to call for help. Ex. 2, Pl. depo.117:16-25.

The paramedics gave him a shot directly into his left arm wound. He was then airlifted to the hospital where he went straight into emergency surgery. Ex. 2, Pl. depo.126:19-127:7; see also Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) p. 4 (Accident Scene Photographs of UTV and Plaintiff's Injuries).

Based upon the foregoing evidence, Plaintiff has established that section 324A applies to Wheeler. That is, Wheeler rented the UTV to BigRentz, and as part of the rental, Wheeler undertook, gratuitously or for return of BigRentz' rental payment, to render pre-delivery rental services including inspection of component parts and the doors. Wheeler recognized that its pre-delivery rental inspection services was necessary for the protection of third parties or the public.

Because section 324A applies to Wheeler, it similarly applies to BigRentz as BigRentz states that it agrees with and adopts Wheeler's duties and obligations to provide safe equipment to customers. Ex. 4, Imbimbo depo. 24:19-25, 28:3-15. BigRentz believes it has a duty and obligation to ensure that the equipment it rents to customers is safe. Ex. 4, Imbimbo depo. 29:14-19. Here, the UTV was supplied by Wheeler to BigRentz and BigRentz supplied it BattleFrog. Because Wheeler had an obligation to provide a safe UTV with operational component parts as well as with all safety features (such as the doors), BigRentz likewise had the same obligations.

Given that Wheeler failed to carry out its obligations, BigRentz did as well.

BigRentz does not dispute this; it admits it did absolutely nothing to determine if the UTV was safe.  Ex. 4, Imbimbo depo. 30:3-11.

### ii.  BigRentz meets the requirements of subsection (a) of §324A

Because Wheeler failed to exercise reasonable care in its performance of its pre-rental inspection and permitted the UTV to be leased without its doors or a check of its component parts, Wheeler increased the risk of injury to Plaintiff.  §324A (a). Section §324A (a) similarly applies to BigRentz because it adopts Wheeler's duties and obligations to provide safe equipment to customers. By the same token, if Wheeler failed to exercise reasonable care in its performance of pre-rental inspection and permitted the UTV to be leased without the doors or a check of its component parts; and because BigRentz admits it did absolutely nothing to ensure the UTV rented to BattleFrog was safe, section §324A (a) applies to BigRentz.

In his report, Dr. Ziejewski cites to published literature indicating that about 97.4% of belted and 92.2% of unbelted occupants in rollovers had less than an AIS Level 3 injury. When partially or fully ejected from the vehicle, the risk of AIS Level 3+ increases. Funk et al (2012) shows that the risk of fatality is increased by a factor of 91 in occupants who are completely ejected from the vehicle in a rollover crash. Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) at p. 14.

Dr. Ziejewski states that, "[T]he National Highway Traffic Safety Administration (NHTSA) has identified ejection mitigation as a top priority, issuing a notice of proposed ruling making (NPRM) for FMVSS 226,  Ejection Mitigation, in December of 2009. Ejections  have  a  significant  impact  on

occupant injuries in motor vehicle crashes, representing 8,605 fatalities as well as 20,000 injuries in 2007." *Id*. at p. 14.

He also states that, "[P]ublished literature found that for rollover collisions the door window was the primary ejection route (**door ranked second**) (Anderson, 1974). In a survey based on approximately 10,000 accidents involving Volvo cars in which 90 occupants were ejected, (Carlsson, 1983) found that in rollover impacts occupants travelling in the rear were ejected mainly through the rear window, and that **front seat occupants were ejected mainly through a door or side window** …" *Id*. at p. 14. (emphasis in original).

Dr. Ziejewski points out that in the owner's manual for the UTV, Polaris itself stresses the importance of the doors, and how the vehicle should always be used with doors (or cab nets). In fact, the owner's manual specifically says that "Riding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover." *Id*. at p. 15 (citing to owner's manual, p. 17 (Bates labeled Polaris 000019)).

Dr. Ziejewski's concludes: (1) Direct blunt trauma to Plaintiff's left arm was the result of interaction between the UTV and the ground; (2) Plaintiff's usage of the available safety belt (lap and shoulder belt) would not have prevented the excursion of Plaintiff's left arm; and (3) any structure in the door area that would provide support for the left arm would have been beneficial to Plaintiff, this includes the doors for the subject UTV that were furnished when new, but which were not present when the incident occurred. *Id*. at p. 20. Dr. Ziejewski also concludes that "having a door on the UTV would have contained Plaintiff within the vehicle and

lessened his injuries. Specifically, if the doors would have been available, Plaintiff would not have been partially ejected from the vehicle and his injuries would have been less." *Id.* at p. 14.

Plaintiff has established that BigRentz failed to exercise reasonable care in its performance of its pre-rental inspection and permitted the UTV to be leased without its doors or a check of its component parts, thus BigRentz increased the risk of injury to Plaintiff. Thus, BigRentz meets the requirement of subsection (a) of section 324A.

## E. BigRentz Owed a Duty Under General Principles (the "*Jeffs*" test) and It Breached Said Duty

In addition to BigRentz owing a duty to Plaintiff under common law, BigRentz also owes a duty to Plaintiff under the general principles of negligence law, as recognized in *B.R. ex rel. Jeffs v. West*, 275 P.3d 228, 229 (Utah 2012) ("*Jeffs*").

The *Jeffs* court established a five-factor test for determining whether a defendant owes a duty of reasonable care to the plaintiff: (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations. *Id.* at 230. The court must "[...] analyze each pertinent factor in the duty analysis 'at a broad, categorical level for a class of defendants' without focusing on the particular circumstances of a given case." *Id.* at 235.

Further, "[N]ot every factor is created equal, however. ... [S]ome factors are featured heavily in certain types of cases, while other factors play a less important, or different, role." *Id.* at 230. The first two factors are considered "plus" factors used to determine whether a duty would normally exist. *Id.* The final three factors are considered "minus" factors "used to eliminate a duty that would otherwise exist." *Id.*

When determining whether a duty exists under the *Jeffs* factors, the two "plus" factors "are interrelated". *Id.* at 232. The first factor stems from "[t]he long-recognized distinction between acts and omissions—or misfeasance and nonfeasance." *Id.* "Acts of misfeasance, or active misconduct working positive injury to others, typically carry a duty of care." *Id.* In cases of misfeasance, the "plus" factor analysis almost always rests on the first factor—the affirmative misconduct creates a duty of care and a special legal relationship is not required. *Id.* 231-232.

Conversely, "[n]onfeasance—passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant"—only gives rise to a duty when a special legal relationship exists. *Id.* Special relationships "arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection. *Id.* at 231.

### i. The *Jeffs* "plus" factors establish a cognizable duty

### a. BigRentz's Misfeasance gives Rise to a Duty

The Utah Supreme Court has made clear that "[a]ctive misfeasance ... is not confined to situations where an affirmative act directly causes the harm to the plaintiff." *Cope v. Utah Valley State College*, 342 P.3d 243 (Utah 2014) (pointing to

the misfeasance of "a surgeon who fails to sterilize instruments, causing an infection").

This was reiterated recently by the Utah Supreme Court in *Mower v. Baird*, the Utah Supreme Court explained that nonfeasance is "passive inaction, a failure to take positive steps to benefit others, or to protect them from harm *not created by any wrongful act of the defendant*." 422 P.3d 837, 843 (Utah 2018), as corrected (July 11, 2018) (emphasis added). The animating principle is that a tortfeasor may not affirmatively undertake to perform some service, and then, by *failing* to do so with proper precautions, transform such a failure into an omission that does not implicate a duty. *See e.g.*, *K.N. v. Life Time Fitness, Inc.*, No. 2:16-CV-39, 2018 WL 6505395, at *4 (D. Utah Dec. 11, 2018) (holding that plaintiff had alleged misfeasance by alleging that her minor child's sexual assault arose from defendant's inadequate staffing and supervision in the performance of day care service that the defendant affirmatively undertook).

Here, Wheeler's affirmative acts or misfeasance are sufficient to create a duty. As part of the rental of utvs, Wheeler affirmatively undertook pre-delivery rental services including Wheeler sending them to a Polaris dealer for inspection. Ex. 6, Rhoades depo. 46:22-54:16, 58:20-60:22; Ex. 3, Wayment depo. 17:18-19:15. Additionally, Wheeler conducts its own visual inspection and photographs the utvs prior to rental and again upon return. *See id.*

Further based upon Wheeler's rental agreements with lessees, Wheeler affirmatively undertakes duties and responsibilities to inspect utvs to assess repair or maintenance issues after each rental and prior to delivery to the next lessee. Ex.

6, Rhoades depo. 46:22-54:16, 58:20-60:22; Ex. 3, Wayment depo.17:18-19:15.

Wheeler's records reflect it rented out the UTV on April 25, 2016 to April 28, 2016. Ex. 6, Rhoades depo.53:4-54:6. Contrary to its policy and contractual obligations under the Wheeler/BigRentz Rental Agreement, Wheeler did not send the UTV to a Polaris dealer for inspection, repair or maintenance prior to renting it to BigRentz on May 6, 2016. Ex. 6, Rhoades depo.27:7-15, 54:2-10, 58:20-59:25; Ex. 3, Wayment depo.17:18-19:15. Thus, Wheeler did not inspect the UTV to determine if there was any damage or abnormal issues caused to the component parts as a result of the April rental.

Further, upon Wheeler's inspection of the UTV, Wheeler knew the UTV's doors were missing. Yet, Wheeler proceeded with delivering it to BattleFrog with no doors. Ex. 6, Rhoades depo.27:7-15, 54:2-10, 58:20-59:25; Ex. 3, Wayment depo.17:18-19:15 and addressing CLAIMS 133-134 (sic)[3] which are two photos of the UTV without doors as delivered to Battlefrog attached as Pl.'s Ex. 7.

Plaintiff has established Wheeler's affirmative misconduct gives rise to a duty of care to Plaintiff; thus, a legal relationship is not required. *Jeffs,* 275 P.3d at 231. BigRentz adopts Wheeler's duties and obligations to provide safe equipment to customers. Ex. 4, Imbimbo depo. 24:19-25, 28:3-15. By the same token, if Wheeler failed to exercise reasonable care in its performance of pre-rental inspection and permitted the UTV to be leased without the doors or a check of its component parts; and because BigRentz admits it did absolutely nothing to ensure the UTV rented to BattleFrog was safe, BigRentz likewise engaged in affirmative misconduct that

gives rise to a duty of care to Plaintiff.

### b. Legal Relationship Exists

Plaintiff's evidence nonetheless establishes that there was a special legal relationship that also gives rise to a duty. "A special legal relationship between the parties ... acts as a duty-enhancing, 'plus' factor[,]" which will sometimes even give rise to an otherwise non-existent duty in the omission context. *Jeffs*, 275 P.3d at 231. Special relationships "arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection." *Id.*

Based upon its supplier agreement, Wheeler knew it was renting equipment to BigRentz and BigRentz would then rent it to a third-party. Ex. 4, Imbimbo depo.8:14-9:5; Ex. 3, Wayment depo. 7:4-14. Thus, Wheeler knew third parties would be operating Wheeler's equipment. *Id.* Further, Wheeler knew that riding in utvs can be a dangerous activity, and that the actual user of the utv should understand that. Ex. 6, Rhoades depo. 17:3-18:3. Wheeler also knew that the owners manuals for its utvs state that riding in the utvs without the cab doors increases the risk of serious injury or death in the event of an accident or rollover. Ex. 6, Rhoades depo. 23:4-7, 26:25-27:6.

As part of the rental of utvs, Wheeler affirmatively undertook pre-delivery rental services including inspection for doors. Ex. 6, Rhoades depo. 46:22-54:16, 58:20-60:22; Ex. 3, Wayment depo. 17:18-19:15. In essence, because Wheeler represents to its lessees it has made these pre-rental inspections, representing it has supplied all safety features and contractually prohibits lessee from modifying or

---

[3] Photos are labeled CLAIMS 143-144.

changing safety features – Wheeler assumes the responsibility of the customer's safety. And because Wheeler makes these representations and assumes the responsibilities, in those situations where Wheeler inspects and re-lets a utv without the doors, Wheeler deprives the lessee of his normal opportunity of self-protection by being fully-enclosed inside a utv with doors. Thus, a special legal relationship also gives rise to a duty owed by Wheeler to Plaintiff.

Since Wheeler supplied the UTV to BigRentz and BigRentz supplied it to BattleFrog, Plaintiff's employer, BigRentz shares in the same special legal relationship between Wheeler and Plaintiff.

### ii. The *Jeffs* "minus" factors support a cognizable duty

#### a. The foreseeability or likelihood of injury

The foreseeability analysis for duty is distinct from that for breach or proximate cause. *Jeffs,* 275 P.3d at 235. "[F]oreseeability in [a] duty analysis is evaluated at a broad, categorical level." *Id*. This analysis focuses on " 'the general relationship between the alleged tortfeasor and the victim' and 'the general foreseeability' of harm" rather than " 'the specifics of the alleged tortious conduct' such as 'the specific mechanism of the harm.' " *Id*.

Here, the relevant category of cases include owners/lessors/arrangers who carelessly provide utvs to the lessee in exchange for payment. And the foreseeability question is whether there are circumstances within that category in which the owners/lessors/arrangers could foresee injury? There are undoubtedly circumstances with this category which present highly foreseeable risks, such as utvs being involved in frontal and/or side-rollover accidents that will likely injure the

occupants (lessees/guests). *See Mower*, 422 P.3d at 845, n. 9 (Utah Supreme Court recognizing that the foreseeability of the types of injuries cited and discussed may be speculative, but finding them to be sufficiently foreseeable to prevent the foreseeability factor from weighing against imposing a duty); see also Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) pp. 14-15 (risk of injury in rollovers; statistics on ejection via doors; consumer product commission recommendation doors on off-road vehicle Rhino).

Because this category includes circumstances where a risk of physical injury to the occupant is reasonably foreseeable, the foreseeability factor does not weigh against imposing a duty on owners/lessors/arrangers of utvs to rent them equipped with the safety features called for by the manufacturer.

### b. Which party best bears the loss.

"[T]his factor considers whether the defendant is best situated to take reasonable precautions to avoid injury." *Jeffs*, 275 P.3d at 236. Only when the "victim or some other third party is in a superior position of knowledge or control to avoid the loss in question" would this factor favor rejecting a duty. *Id*.

Here, Wheeler has a policy and practice of inspecting its utvs between each rental, and prohibiting its customers from modifying the utv's safety features or component parts. Wheeler is in the best position to prevent the loss at issue here. Because Wheeler and BigRentz entered into a supplier agreement whereby Wheeler would supply the UTV to BigRentz at a discount, and BigRentz adopts Wheeler's duties and obligations, BigRentz is in the best position to prevent the loss at issue.

### c.  General Policy Considerations

There are general policy considerations that support the imposition of a duty in this case. The public policy behind tort law is to hold tortfeasors accountable for harms occasioned by their fault. See *Normandeau v. Hanson Equip., Inc.*, 233 P.3d 546, 548 (citing e.g., *Nabors Drilling, U.S.A., Inc. v. Escoto,* 288 S.W.3d 401, 404 (Tex.2009) ("Liability is grounded in the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission."). Accordingly, as between an innocent party and a negligent tortfeasor, public policy requires that any loss should be born by the tortfeasor.

### iii.  BigRentz Breached its Duty

Plaintiff has established that BigRentz owes a duty under the *Jeffs'* five-factor test. Plaintiff incorporates herein by reference Plaintiff's arguments and evidence in Section D (duty and breach under common law), which establishes BigRentz breached its duty to Plaintiff to use reasonable care. Or, Plaintiff has established that there are genuine issues of material fact regarding BigRentz's breach of duty, which should be decided by the jury. *See Jeffs,* 275 P.3d at 235 ("[B]reach...[is a] question[ ] for the fact finder determined on a case-specific basis.").

## F. BigRentz Was Grossly Negligent

"In Utah, gross negligence is 'the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.' " *Penunuri v. Sundance Partners, Ltd.*, 423 P.3d 1150, 1159 (Utah 2017), *cert. denied sub nom. Penunuri v. Redford*, 138 S. Ct. 1285,

200 L. Ed. 2d 471 (2018). "[T]he standard for granting summary judgment dismissing a gross negligence claim is whether, based on the undisputed material facts, reasonable minds could reach but one conclusion as to whether the defendant 'observe[d] even slight care' and did not demonstrate 'carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.' " *Id.* (second alteration in original) (citation omitted).

As discussed at length above and incorporating all above sections herein by reference, despite being in the business of renting utvs, having knowledge of their dangerousness, having knowledge of the warnings in the owner's manual to heed the manufacturer's requirements of equipping with doors and making inspection between rentals, and having superior knowledge about the safety of utvs over consumers, Wheeler ignored all of this. Wheeler shirked all duties and responsibilities it had while simultaneously representing it had completed inspection, repair or maintenance of the component parts or safety feature before delivering the UTV to BattleFrog.

Wheeler's conduct unquestionably falls below slight care. Even more so when considering Dr. Ziejewski's opinion that "having a door on the UTV would have contained Plaintiff within the vehicle and lessened his injuries. Specifically, if the doors would have been available, Plaintiff would not have been partially ejected from the vehicle and his injuries would have been less." Ex. 8, Dr. Ziejewski Aff. at attachment 2 (Report) at p. 14.

BigRentz has adopted Wheeler's duties and obligations to provide safe equipment. Given that Wheeler shirked all responsibilities, and BigRentz also did

nothing to ensure the UTV was safe, BigRentz did not exercise even slight care and BigRentz was careless or reckless to a degree that shows utter indifference to the consequences that may result. Or, at a minimum Plaintiff's evidence raises a genuine issue of material fact that BigRentz was grossly negligent. Thus, BigRentz's motion on gross negligence should be denied.

## G. Plaintiff did not contract with BigRentz

BigRentz argues that it is entitled to summary dismissal of Plaintiff's negligence and gross negligence claims based on the contract that BigRentz entered with BattleFrog. *See* Def. Mtn [Dkt.73] at p.13-17 and Def.'s Ex. 7. Plaintiff is not a party to that agreement. Def.'s Ex. 7. Plaintiff has not contracted with BigRentz or BattleFrog for Plaintiff to relinquish Plaintiff's claims against BigRentz. Thus, Plaintiff did not waive or release any of his claims against BigRentz.

## V. Conclusion Prayer

For the reasons set forth above, Plaintiff Kendall Anderson prays that the Court enter an order denying Defendant BigRentz's motion for summary judgment, and for such other relief the Court deems just, at law or in equity.

Dated this 15th day of February, 2019.

**The TRACY firm**

  /s/ E. Todd Tracy
E. Todd Tracy (Lead Counsel)
Andrew G. Counts

*And*

**SIEGFRIED & JENSEN**
Brian Stewart
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with the provisions of the Federal Rules of Civil Procedure, he has caused to be served a copy of this document on February 15, 2019, to all parties hereto by serving a copy on the following counsel of record:

Michael G. Brady
mbrady@eberle.com
Kyle D. Duren
kduren@eberle.com
**EBERLE, BERLIN, KADING,**
**TURNBOW & McKLVEEN, CHARTERED**
1111 W. Jefferson Street, Suite 530
P.O. Box 1368
Boise, Idaho  83701
Facsimile:  (208) 344-8542

*Attorneys for Defendant*

  /s/ E. Todd Tracy
Andrew G. Counts