Brian Stewart (12677)
**SIEGFRIED & JENSEN**
5664 S. Green Street
Murray, UT 84123
Main Office: 801-266-0999
(801) 743-1569 – Phone
(877) 218-9068 – Fax
Brian@sjatty.com

E. Todd Tracy (Texas State Bar No. 20178650) (*Admitted Pro Hac Vice*)
TTracy@vehiclesafetyfirm.com
Andrew G. Counts (Texas State Bar No. 24036408) (*Admitted Pro Hac Vice*)
ACounts@vehiclesafetyfirm.com
**The TRACY firm**
4701 Bengal Street
Dallas, Texas 75235
Phone: (214) 324-9000
Facsimile: (972) 387-2205

*Attorneys for Plaintiff*

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Kendall Anderson,<br><br>    *Plaintiff,*<br><br>vs.<br><br>BigRentz, Inc. a/k/a Big Renz, and<br>Wheeler CAT a/k/a Wheeler Machinery Co.,<br><br>    *Defendants.* | **PLAINTIFF'S APPENDIX OF EVIDENCE IN SUPPORT OF RESPONSE TO DEFENDANT BIGRENTZ, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00205-DN-EJF<br><br>Judge:  David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |

## PLAINTIFF'S APPENDIX OF EXHIBITS

| <u>Exhibit No.</u> | <u>Description of Exhibit</u> |
|---|---|
| Exhibit 1 | Wheeler / BigRentz Rental Agreement |
| Exhibit 2 | Deposition of Plaintiff Kendall Anderson |
| | *exh.1* photographs CLAIMS000051-55 |
| Exhibit 3 | Deposition of Jessie Wayment (Wheeler's corporate representative) |
| Exhibit 4 | Deposition of Neda Imbimbo (BigRentz' corporate representative) |
| Exhibit 5 | Deposition of Steven Webb (Wheeler's corporate representative) |
| | *exh.1* Wheeler's handbook, *The Wheeler Way* |
| Exhibit 6 | Deposition of Cody Rhoades (Wheeler's corporate representative) |
| | *exh.2* photo of UTV with doors as purchased new from Polaris, the manufacture |
| | *exh. 6* UTV Owner's Manual pages 1-17 |
| Exhibit 7 | Photo of UTV without doors as delivered to BattleFrog marked as CLAIMS 000143-144 (addressed in Jessie Wayment's deposition as photos marked CLAIMS 000133-134 (sic)) |
| Exhibit 8 | Affidavit of Mariusz Ziejewski, Ph.D, Inż. (Plaintiff's expert) |
| | *attachment 1* Curriculum Vitae *attachment 2* Report |

Dated this 15th day of February, 2019.

The TRACY firm

   /s/ E. Todd Tracy
E. Todd Tracy (Lead Counsel)
Andrew G. Counts

*And*

**SIEGFRIED & JENSEN**
Brian Stewart
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with the provisions of the Federal Rules of Civil Procedure, he has caused to be served a copy of this document on February 15, 2019, to all parties hereto by serving a copy on the following counsel of record:

Michael G. Brady
mbrady@eberle.com
Kyle D. Duren
kduren@eberle.com
**EBERLE, BERLIN, KADING,**
**TURNBOW & MCKLVEEN, CHARTERED**
1111 W. Jefferson Street, Suite 530
P.O. Box 1368
Boise, Idaho  83701
Facsimile:  (208) 344-8542

*Attorneys for Defendant*

   /s/ E. Todd Tracy
E. Todd Tracy
Andrew G. Counts

# Exhibit 1

  

# RENTAL AGREEMENT

DEPOSITION EXHIBIT

PENGAD 800-631-6989

Wayment

**4901 West 2100 South**
Salt Lake City, UT 84120 (801) 974-0511

| SOLD TO | SHIP TO |
|---|---|
| BIGRENTZ INC<br>1063 MCGRAW AVE<br>IRVINE CA            92614 | UTAH MOTORSPORTS CAMPUS<br>2901 SHEEP LN<br>ERDA, UT 84074 |

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NO. | CUSTOMER ORDER NUMBER | STORE | DIV | SALESMAN | TERMS | PAGE |
|---|---|---|---|---|---|---|---|---|
| | 5/06/16 | 9A10088 | PO29731.2 | 01 | G | 111 | 4 | 1 |

| AGREEMENT NO. | DOC. DATE | PC | LC | MC | SHIP VIA | YEAR | INV SEQ NO. |
|---|---|---|---|---|---|---|---|
| C54440 | 5/07/16 | | | 10 | WHEELER | 2015 | |

| MAKE | MODEL | SERIAL NUMBER | EQUIPMENT NUMBER | METER READING | MACH ID NO. |
|---|---|---|---|---|---|
| PO | UTV RANGER | 3NSRNA573FE366764 | | 2,165.0 | UTV0010 |

RENTAL INFORMATION

CUSTOMER CONTACT: BRIAN MORGAN          PHONE: (305) 213-7562

| ITEM<br>IDNO: UTV0010    MODEL: UTV RANGER<br>SERIAL NUMBER:  3NSRNA573FE366764 | QTY<br>1.0 | RENTAL RATE<br>600.00<br>200.00<br>50.00 | PERIOD<br>4 WEEK<br>WEEK<br>DAY | OVERTIME<br>4.26<br>6.25<br>7.75 |
|---|---|---|---|---|

DESC: UTILITY VEHICLE
TIME OUT: 09:54     DATE OUT:  5/06/16  EXPECTED RETURN DATE:  5/30/16
METER OUT:   2165.0            SHIP VIA: WHEELER
OPTION PRICE:      18,000   FOB POINT: SLC

| ITEM<br>IDNO: UIV0011    MODEL: UTV RANGER<br>SERIAL NUMBER:  3NSRNA576FE367486 | QTY<br>1.0 | RENTAL RATE<br>600.00<br>200.00<br>50.00 | PERIOD<br>4 WEEK<br>WEEK<br>DAY | OVERTIME<br>4.26<br>6.25<br>7.75 |
|---|---|---|---|---|

DESC: UTILITY VEHICLE
TIME OUT: 09:54     DATE OUT:  5/06/16  EXPECTED RETURN DATE:  5/30/16
METER OUT:   2355.0            SHIP VIA: CUSTOMER
OPTION PRICE:      18,000   FOB POINT: SLC
HAULAGE EXTERNAL                 2          200.00

*On Rent 5/06/16*
*Off Rent 5/16/16*
*♦ Supplier business*

MISCELLANEOUS CHARGES
ENVIRO FEE                       1            9.50

WHEELER STANDARD RENTAL CONDITIONS TO APPLY

| Lessee is responsible for the maintenance of this equipment including service meter while in his possession; any damage to this equipment resulting from improper care or maintenance will be charged directly to lessee. | Standard usage is 8 hours per day, 40 hours per week, or 176 hours per month. Overtime usage is determined by the service meter hour readings. The contract shall extend beyond the term, at the same terms, if the lessee holds the machine over the specified term of the lease. |
|---|---|
| **TIRE CHARGE**<br>In addition to the rental charges, lessee agrees to pay a charge, payable at the end of the lease term, for all wear or damage to rubber tires used on the equipment. Upon return of the equipment the rubber tires will be appraised by the lessor as to their then condition and lessee agrees to pay for any exhaustion through tread wear, cuts, cord separation, or any deterioration whatsoever during the use by lessee. Any new rubber installed by lessee will be taken into account in computing usage on the foregoing basis. | Lessee hereby leases the equipment described above from lessor and agrees to the rental terms and conditions on the reverse side.<br><br>X _____      Zach Senger<br>LESSEE · CUSTOMER SIGNATURE      LESSEE · (Print Name) |
| **UNDERCARRIAGE**<br>Undercarriage wear will be based on a service life of 4,000 hours. Undercarriage components include tracks, rails, shoes, rollers, idlers, and sprockets. Charges for accelerated wear will be assessed upon return of the equipment and lessee agrees to pay for any excessive wear. | LESSOR · WHEELER MACHINERY CO      LESSOR · (Print Name)<br><br>**ORIGINAL** |

Form: WMRENTAGR 110913

1. **Equipment Conditions; Damages:** Unless notified by Lessee in writing to the contrary within forty-eight (48) hours after receipt, the Equipment shall be conclusively presumed to be in good order and repair when shipped by Lessor and when received by Lessee. Upon timely and proper notice Lessor shall, at its expense, put the Equipment in good order and repair or provide substitute Equipment of the same or similar kind. Lessor shall not be responsible for any expenses contracted by Lessee or any repairs done to the Equipment without Lessor's prior written consent. Failure to so timely notify Lessor will constitute unconditional acceptance of the Equipment and lessee shall thereafter maintain all the Equipment in good working condition throughout the term of this lease. Except as provided hereinbefore, LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE EQUIPMENT NOR AS TO VISIBLE OR HIDDEN DEFECTS IN MATERIAL, WORKMANSHIP OR CAPACITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE OR JOB. In no event shall Lessor be liable to Lessee for any injury, delays or damages, consequential or otherwise, resulting from or by reason of, the use or condition of said Equipment, or by reason of any failures or delays in making delivery to Lessee, or for any loss or damage to the Equipment in transit, or from strikes or other contingencies beyond its control, or from any cause whatsoever.

2. **Repairs:** Lessee agrees to provide at its own expense, labor and materials for major mechanical repairs required on the Equipment arising from normal use under the terms of this lease. Lessor shall have the sole right to determine what are major repairs under this provision of the lease and what repairs arise from other than normal use. Cylinder head breakage is the sole responsibility of the Lessee. All labor and materials for normal operating repairs and maintenance including, but not limited to, all expendable items such as cables, and bits, cutting edges, antifreeze, belts, filters, O rings, hoses, repairs to the electrical system, and minor adjustments to the Equipment shall be the responsibility of the Lessee. Lessor will inspect the Equipment upon its return by Lessee and invoice Lessee for any damage or abnormal wear. Lessee will pay for all fuel and oil used during the term of this lease and will MAINTAIN PROPER OIL AND COOLANT LEVELS AT ALL TIMES. Any repair required because of abuse, negligence or abnormal use including, but not limited to speeding, lack of lubrication, or maintenance of necessary fluid levels, damage resulting from lack of normal services, collision, overturning or improper operation shall be at Lessee's sole expense.

3. **Maintenance, Full Value:** The Lessee agrees to take good care of the Equipment, to keep the same free and clear of all liens, claims and encumbrances of any kind whatsoever, and to keep the same in good order and repair at its own expense and cost, except for major mechanical repairs as described above. If as of the end of the guaranteed rental period and any extension thereof the Equipment should be lost, destroyed or rendered unfit for service, or not returned, the Lessee shall thereupon be obligated to pay Lessor the full value thereof, together with interest thereon at the rate of twenty-four percent (24%) per annum from that date until the said sum is paid, less a reasonable and fair credit as determined by Lessor for the lease payments theretofore made. The Lessee shall not make any changes or modifications in any of the Equipment without written permission of Lessor.

4. **Inspection Charges; Removal:** The Lessee agrees to pay all charges for any work or inspection required by any labor union. The Lessor may, at its option, refuse to do any repair work on the Equipment in the event of strikes or for any other cause beyond its control or if such work would be a violation of a federal, state or local statute, ordinance, or regulation. The lessor reserves the right to remove the Equipment from any job or location where it may be found if in its opinion the Equipment is likely to be damaged or immobilized for a significant period, such as in the case of strikes, flood, storms, and other such conditions. The Lessor is likewise entitled to remove the Equipment from any job or location when it is deemed necessary for the purpose of repair or inspection.

5. **Insurance:** During the term of this agreement and all subsequent such agreements, Lessee shall provide and maintain General Liability, Automobile Liability (for licensed vehicles), Worker Compensation and Physical Damage Insurance for the amounts and limits stated below. Lessee's General and/or Automobile liability policies shall be endorsed or amended to name Wheeler Machinery Co. as Additional Insured and state that Lessee's liability is primary and not contributory in any way to insurance coverage maintained by Wheeler Machinery Co. Said coverage shall be certified to Wheeler Machinery Co. and insurance company in a form acceptable to Wheeler Machinery Co.

All Customers are required to have general liability insurance and physical damage insurance as outlined below:

| On-Highway Construction Equipment (Licensed for use on public highways) | Off-Highway Construction Equipment |
|---|---|
| 1. Business auto liability insurance: $1,000,000 per occurrence | 1. Commercial general liability insurance: $1,000,000 per occurrence, $2,000,000 aggregate. |
|    - Statutory Worker Compensation insurance |    - Statutory Workers Compensation insurance |
| 2. Auto physical damage insurance: Full value of the vehicle. | 2. Physical damage insurance: |
|    - Specify on-highway vehicle rented or leased from Wheeler Machinery Co. |    Full value of equipment covering: |
|    - Include coverage for hired and non-owned autos |    - Rented or leased equipment using a contractors equipment floater form |
|    - Name Wheeler Machinery Co. as an additional insured with primary coverage and loss payee |     or comparable form |
|    - Wheeler Machinery's Physical Damage Waiver is not available for trucks licensed for use on public highways. |    - Name Wheeler Machinery Co. as loss payee |
| |    - The physical damage insurance requirement shall not apply if customer participates in and pays for Wheeler Machinery's Physical Damage Waiver. |

6. **Indemnification:** Lessee shall indemnify and hold Lessor harmless from any and all claims, actions, proceedings, expenses, costs and liabilities arising in connection with the Equipment including, without limitation, its selection, purchase, manufacture, delivery, possession, use, operation or return and from any injury to property or to life caused in any way by the Equipment during the lease term or any extensions thereof.

7. **Transportation Charges; Rental Period:** The Lessee agrees to pay all transportation charges on the Equipment from the point of shipment to the point of operation and return therefrom or to such place as Lessor shall designate, it being understood, however, that Lessee shall be put to no greater expense for the return of the Equipment than if the Equipment were returned to Lessor's place of business in Salt Lake City, Utah. The rental period shall begin at the time when the Equipment is loaded at the shipping point for shipment to Lessee and shall cease when the Equipment is received at Lessor's place of business, or authorized alternative site.

8. **Taxes:** In the event that any sales, use or other personal property tax or assessment is hereafter levied by any public authority upon the transaction herein specified, or on the property which is the subject of this transaction, or any part thereof, then the Lessee agrees to pay any such taxes or assessments upon demand and, upon the request of Lessor, submit written proof of having done so.

9. **Location:** The Equipment shall not be used in violation of any federal, state or municipal statute, order or regulation. Lessor shall have the right to inspect the Equipment at any reasonable time. Lessee shall inform Lessor in writing prior to moving the unit to any location other than that indicated on the face of this document.

10. **Return:** Lessee agrees and guarantees that upon the termination of this lease it will promptly return the Equipment to Lessor in as good condition as when received and, if otherwise, to pay the expense of putting it in such condition, less ordinary wear incident to normal use in the hands of a competent operator. This signature is absolute and may not be excused by theft, vandalism, fire, weather, act of God, or for any other reason whatsoever. Lessee shall be liable to Lessor for any loss of Equipment or parts, or damage to or breakage of the same during the lease term, or extension thereof.

11. **Rental Schedule; Standard Conditions:** Lessee acknowledges receipt of Lessor's current Rental Schedule and Standard Conditions which is incorporated herein by reference and made a part of this lease. In the event of a conflict or inconsistency between the terms of this lease and the terms of the Rental Schedule, the terms of this lease shall apply.

12. **Time Of Essence:** Time is the essence of this lease. Acceptance by Lessor of any late payment shall not be construed as a waiver of Lessor's right to have each subsequent payment made on the due date thereof. Similarly, the failure of Lessor to timely notify Lessee of any breach of the terms hereof shall not constitute a waiver by Lessor, of such provisions as to any subsequent breach of the same, or of any other provision hereof. All amounts due under the terms of this lease shall be due on the date of receipt of the invoice or such later date as may be specified on the invoice. Accounts not paid in full prior to the last day of the month when due will incur interest at the highest lawful rate.

13. **Default, Attorney's Fees; Lien:** Lessee agrees that, in the event it shall fail in the payment of rental when due or shall fail to perform any of its obligations hereunder, or bankruptcy, receivership, assignment for benefit of creditors or other insolvency proceedings are commenced by or against Lessee, Lessee shall be in default of this lease and Lessee shall, without notice, immediately be indebted to and hereby agrees to pay Lessor forthwith, all sums due hereunder. All sums not paid within 30 days of the date of invoice shall be considered past due and shall bear a service charge of 2% per month. In the event this lease is placed by Lessor in the hands of an attorney after default for enforcement or collection, Lessee will pay all costs and expenses therefor, including a reasonable attorney's fee. In the event lessor elects to file a notice of lien with respect to the Equipment for its use, either without or without the default of Lessee, Lessee will pay all costs and expenses therefore.

14. **Repossession:** If at any time Lessor, in its sole discretion, determines that its rights to the Equipment are endangered, or that the Equipment is being used improperly or beyond its capacity, or in a manner improperly cared for or abused, or if there shall be any default by Lessee in the payment of any installment of the rental called for hereunder at the time herein provided or in the terms and conditions of this lease, Lessor may REPOSSESS the Equipment, lock or remove the same from the job site and, at its option, terminate this lease. Repossession alone shall not be construed to be an acceptance of surrender of this lease, and neither termination nor repossession shall deprive Lessor of the right to recover unpaid rentals and damages for Lessee's breach of this lease.

15. **Venue:** This lease is made to be performed in, and any liability hereunder arises at, and all sums due hereunder shall be paid to Lessor's office at Salt Lake City, Utah. Venue of any action under this lease shall be in Salt Lake County, State of Utah unless Lessor otherwise elects.

16. **Offsets:** No waivers, counterclaims, or offsets of any kind or nature shall be set up or urged against Lessor unless the same shall be in writing signed by the Lessor.

17. **Assignment:** Lessee shall not assign, transfer, pledge, mortgage, hypothecate, hire out or otherwise dispose of this lease, the Equipment or any interest therein or sublet or lien the Equipment, surrender or part with its possession, custody or control, or permit it to be used by anyone other than Lessee or Lessee's employees.

18. **Renewal:** So long as Lessee is not in default it may renew this Lease from month to month after the guaranteed term by giving at least five (5) days written notice thereof to the Lessor prior to the expiration of the lease term, or any extension thereof, and at the same time paying the rentals called for herein. Any renewal shall be subject to any increase in the rental rate for the Equipment imposed by Lessor on similar leases of similar equipment.

19. **Exposure to Hazardous Material or Waste:** Lessee shall not expose the Equipment to any hazardous material or waste. In the event the Equipment is exposed to any hazardous material or waste, Lessee shall immediately (1) notify Lessor, (2) remove the Equipment from such exposure and (3) completely clean and decontaminate the Equipment. If the Equipment cannot be completely cleaned, decontaminated and otherwise discharge from all adverse effects of such exposure, Lessee shall pay Lessor the full value of the Equipment, together with interest thereon at the rate of twenty-four percent (24%) per annum from that date until the said sum is paid in full. Lessee indemnifies and holds Lessor harmless from any and all claims, actions, expenses, damages, costs and liabilities arising from any such exposure of the Equipment to hazardous material or waste. This indemnification survives and continues after the term of this lease.

20. **Miscellaneous:** If any word, phrase, clause, sentence or paragraph of this lease is or shall be invalid for any reason, the same shall be deemed severable from the remainder hereof and shall in no way affect or impair the validity of this lease or of any other portion thereof. It is agreed that this agreement constitutes neither a sales contract nor an option to purchase, and that title to the Equipment above-described remains with the Lessor and Lessee shall have no rights to the said Equipment other than as specifically provided herein. At the option of Lessor, this lease may be recorded or filed with any appropriate governmental entity to evidence Lessor's interest in the equipment. This lease shall not be considered in full force until accepted by the Lessee and executed by its proper officer in Salt Lake City, Utah. All the terms and conditions of this lease shall be binding upon and shall insure to the benefit of the respective parties and their heirs, successors in interest, personal and/or legal representatives and assigns (where permission to assign has been given by Lessor). In the event that the Equipment is damaged and requires repair by Lessor or by any other service facility, the terms and conditions set forth herein shall continue during the period of repair. All of the covenants between the parties hereto and any representation or understanding not contained here in shall be of no force or effect whatsoever. Performance by Lessor shall be subject to delay by strikes, breakage, fires, unforeseen commercial delays, insurrection, wars, acts of God, or governmental regulations or other actions. All remedies given Lessor hereunder are cumulative and the exercise of any one remedy by Lessor shall not be to the exclusion of any other remedy. All words used herein shall be construed to be of such gender and number as the circumstances may require. This lease shall be governed by the laws of the State of Utah (except for its choice of law rules).

# Exhibit 2





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

2

1        A P P E A R A N C E S
2   For the Plaintiff:      Andrew G. Counts
                       THE TRACY LAW FIRM
3                         4701 Bengal Street
                        Dallas, Texas 75235
4
     For the Defendant        Rick L. Rose
5    Polaris Industries:   RAY QUINNEY & NEBEKER
                          36 South State Street
6                             Suite 1400
                         Salt Lake City, Utah 84111
7
     For the Defendant        Michael G. Brady
8    BigRentz and        BRADY LAW CHARTERED
     Wheeler Machinery:     2537 West State Street
9                             Suite 200
                          Boise, Idaho 83702
10
     For the Intervenor    D. Gregory Anjewierden
11   Specialty Insurance Group:  RENCHER | ANJEWIERDEN
                          460 South 400 East
12                       Salt Lake City, Utah 84111
13   Videographer:          Chad Potts
14                            * * *
15
16
17
18
19
20
21
22
23
24
25

3

### I N D E X

EXAMINATION                                    PAGE

By Mr. Rose                                      5

By Mr. Brady                                   102

By Mr. Counts                                  124

By Mr. Rose                                    128

By Mr. Anjewierden                             132

By Mr. Brady                                   133

EXHIBITS

No. 1      Colored Photographs                  72
           Bates CLAIMS 000051 - 55

No. 2      Colored Photographs                  80

No. 3      CD of Instagram Posts               100

No. 4      SoundCloud Screen Shot              100

No. 5      Criminal Record                     130

4

1              P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Good morning.  We are
3   now on the record.  The time is approximately 9:42
4   a.m.  This is the videotaped deposition of Kendall
5   Anderson in the matter of Kendall Anderson versus
6   Polaris Industries, Inc., et al., being held at Ray,
7   Quinney & Nebeker in Salt Lake City, Utah on June 5,
8   2018.  My name is Chad Potts, the videographer,
9   appearing on behalf of DepomaxMerit.  And the court
10  reporter is Shelly Wadsworth.
11        Counsel will now state their appearance
12  for the record and the witness will be sworn in.
13        MR. COUNTS:  Andrew Counts for the
14  plaintiff.
15        MR. ROSE:  Rick Rose for Polaris.
16        THE VIDEOGRAPHER:  Mike Brady representing
17  BigRentz and Wheeler.
18        MR. ANJEWIERDEN:  Greg Anjewierden for
19  Specialty Insurance Group.
20             KENDALL ANDERSON,
21  called as a witness by and on behalf of the
22  defendants, being duly sworn, was examined and
23  testified as follows:
24
25

5

1               EXAMINATION
2   BY MR. ROSE:
3       Q.   Mr. Anderson, will you please state your
4   name and address.
5       A.   Kendall Chad Anderson, ▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7       Q.   Have you ever had your deposition taken
8   before?
9       A.   No.
10      Q.   We'll just go over a couple of rules with
11  respect to the deposition.  Do you understand that
12  you're under oath today?
13      A.   Uh-huh.
14      Q.   One of the things you have to do is answer
15  "yes" or "no" rather than either nod or say "huh-uh"
16  or "uh-huh."
17      A.   Right.
18      Q.   It's common in typical conversations to do
19  that.  So if you forget, then I'll just ask you to
20  say "yes" or "no," if that's okay.  Do you
21  understand that that's the same oath you'd be given
22  if you were testifying at trial?
23      A.   Yeah.
24      Q.   If you don't understand a question today,
25  please let me know, okay?



6

1    A.   Okay.
2    Q.   And, otherwise, I'll assume that you
3  understood the question and answered accordingly.
4    A.   Okay.
5        MR. COUNTS:  Kendall, can you speak up
6  just a little bit.  I want to make sure the court
7  reporter can hear you, all right?
8        THE WITNESS:  All right.
9    Q.   What is your date of birth?
10   A.   █████████████
11   Q.   You gave an address earlier, the Division
12  Street address.  How long have you been living
13  there?
14   A.   Since the house was built.  I moved
15  afterwards, but I can say I stay there.  It's my mom
16  and dad's house.
17   Q.   So that address is your mom and dad's
18  home?
19   A.   Right.
20   Q.   Is that where you stay, then?
21   A.   That's where I'm staying now since the
22  accident.
23   Q.   Since the accident.  And who lives there
24  with you at your mom and dad's house?
25   A.   Just them right now.  My kids visit back

7

1  and forth.
2    Q.   So you and your mom and dad live there
3  permanently now?
4    A.   Right now.
5    Q.   And what is your mom's name?
6    A.   Angela ███████████
7    Q.   And your dad's name?
8    A.   Davis Anderson.
9    Q.   And where were you living before the
10  accident?
11   A.   Before the accident I was living in Duson,
12  Louisiana.
13   Q.   Do you remember the address there?
14   A.   No.  I can't say I remember the exact
15  address, no.  I think it was Jaubert Street or
16  something.
17   Q.   And how long had you been living at that
18  address before the accident?
19   A.   I would say maybe a year.
20   Q.   During that approximate one-year period
21  before the accident, who was living there with you?
22   A.   My wife and children.
23   Q.   What is your wife's name?
24   A.   Christina ████████
25   Q.   How lon██████████en married?

8

1    A.   Thirteen years.
2    Q.   And are you still married?
3    A.   Yes.
4    Q.   Any other marriages, other than that one?
5    A.   No.
6    Q.   How many children do you have?
7    A.   Five.  Four biological and my oldest
8  stepson.
9    Q.   So your oldest was Christina's son before
10  you married her?
11   A.   Right.
12   Q.   Just give me the names and ages of those
13  five children, please, starting with the oldest.
14   A.   ████████████████████████████
15  ████████████████████████████████ is
16  10.  ████████████████  And I have ████████
17  ████████████████
18   Q.   Do all the kids live with Christina, then?
19   A.   Uh-huh.
20   Q.   That's a yes?
21   A.   Yes.
22   Q.   Where do they live now?
23   A.   In Cyrus Homes in Jennings.
24   Q.   In where?
25   A.   Cyrus Homes in Jennings, Louisiana.  It's

9

1  an apartment complex, basically.
2    Q.   Is there a reason that you're not living
3  In that apartment complex with them instead living
4  with your parents?
5    A.   Yeah.  Things has just . . . I mean,
6  marriage issues, basically, the kids.  It's just
7  normal husband/wife issues.  We're not legally
8  separated or nothing like that.
9    Q.   Before the accident had you ever had that
10  similar situation where you were living one place
11  and your wife and kids were living another?
12   A.   No.
13   Q.   First time that's happened, then, is since
14  the accident?
15   A.   Yeah.
16   Q.   Give me just an idea about your
17  educational background, if you will.  Did you go to
18  high school?
19   A.   Yeah.  Graduated from a Christian academy.
20  Gabriel Christian Academy is where I graduated in
21  2003.
22   Q.   What city is that in?
23   A.   That's in Jennings.
24   Q.   Were you born and raised in Jennings?
25   A.   I was born in Lafayette.  We moved to

10

1   Jennings I was probably 10, nine years old.
2       Q.   So spent most of your life in Jennings?
3       A.   Uh-huh.
4       Q.   Is that a yes?
5       A.   Yeah.
6       Q.   And where is Jennings?  Describe that to
7   someone who is not familiar with the area.
8       A.   Jennings, Louisiana is probably 45 minutes
9   west of Lafayette and maybe 15, 20 minutes east of
10  Lake Charles.
11      Q.   Did you have any formal education after
12  you graduated from high school in 2003?
13      A.   No.  I pretty much got into construction.
14  My dad owned his own flooring business, so I grew up
15  in construction.
16      Q.   Let's take, then, from 2003 and talk about
17  the jobs that you've had between then and the time
18  of the accident.  Did you go right to work for your
19  father, then, in 2003?
20      A.   Yeah.  I was pretty much already working
21  for my dad, like, during the summertime.  So in
22  2003, I pretty much started working with him.  I
23  worked at Walmart part time for a while.  And then I
24  worked with other various contractors because I
25  moved back towards Lafayette with a few of my

11

1   cousins.  We were always in construction.  I have an
2   uncle that does construction.  I worked with him,
3   Duhon Construction.  I worked with Seth's
4   Reconstruction.  I worked with Mike's Construction.
5   A lot of construction companies.  West Builders,
6   Manual Builders.
7       Q.   Let's do this maybe a different way.
8   What's the name of your dad's company?
9       A.   Davis Installation, floor.
10      Q.   And is that company still in business?
11      A.   Yeah.
12      Q.   And is that your father's company?
13      A.   Yes, my father's company.  It has since
14  been taken over by my two younger brothers.  And I
15  believe it is now Anderson & Sons, LLC, I believe it
16  is now.
17      Q.   And is that in Jennings?
18      A.   Uh-huh.
19      Q.   So at the time of the accident -- we're
20  here to talk about an accident that happened in May
21  of 2016.  Do you understand that?
22      A.   Yeah.
23      Q.   At that time you were working for a
24  company called BattleFrog?
25      A.   Yeah.  BattleFrog Races.

12

1       Q.   Let's talk a little bit about your
2   experience with BattleFrog.  How long had you been
3   working for BattleFrog before the accident?
4       A.   Before the accident, I'd say a few months.
5   BattleFrog hired me the end of February.
6       Q.   So you were working with BattleFrog from
7   February 2016 until the accident in May 2016?
8       A.   Uh-huh.
9       Q.   How did you get that job?
10      A.   One of my younger brothers and one of the
11  bosses that was into the company built basically the
12  framing that we were using for our obstacles, and
13  they needed somebody that had construction
14  background to assemble them.  So I got the job
15  pretty much and went to Miami and started.
16      Q.   How many obstacle courses had you actually
17  worked on, then, between the time you started with
18  BattleFrog and the time of the accident?
19      A.   I can't say exactly how many.  We set them
20  up and tore them down often.  And then we had a
21  separate course for the kids.  We had a kids course
22  and we had an adult course.  And I set them both up.
23  I mean, multiple times.  We went to multiple places
24  between Dallas, San Antonio, Kansas.  Basically in
25  the short period of time that I worked there, we get

13

1   basically three to four days off and you work 10 to
2   12.
3       Q.   Tell me a little bit about BattleFrog.
4   It's an obstacle course race that would move from
5   city to city?
6       A.   Basically, yes.  Similar to the Spartan
7   Race and the Tough Mudder.  We would set up obstacle
8   courses from city to city, basically state to state.
9   You had season guests that would go follow the
10  course from state to state.  And then you had people
11  that would just bring the kids out and come from
12  that state and just, I guess, visit or whatever,
13  cross-train.
14      Q.   In each of those races, did you have both
15  an adult course and then a child's course?
16      A.   Yes.
17      Q.   And you've described it a little bit, but
18  what was your role in these races?
19      A.   My role was assembly and deconstruction.
20  We would take them back down, load them on the
21  trailers, and they would be ready for us in the next
22  city.  We would assemble again, basically.
23      Q.   You've identified a few.  How long do
24  these races last?  Would you set up the --
25      A.   We would set up the race.  We would get,

14

1 basically, from seven to 10 days to set up the race.
2 But the race was just one day, the Saturday. And
3 sometimes we'd have an extension into the Sunday.
4 But it was usually a one-day thing.
5    Q.   All right. So the process of setting up
6 would take seven to 10 days. There would be a race
7 usually on a Saturday, but sometimes also on Sunday.
8    A.   Yes.
9    Q.   And then how long would the process to
10 take down be?
11   A.   The take-down process would probably be, I
12 would say, it varies because of how many people we
13 have working. It varies from three to five days.
14   Q.   And then you'd move on to the next city
15 and start over?
16   A.   Most of the time they'd give you a couple
17 of days off, and then you'd have to get ready to
18 head to the next city.
19   Q.   How much were you paid to do that?
20   A.   At the time, they had changed our pay to
21 daily rates, and I was getting $275 daily.
22   Q.   How many hours per day would you normally
23 work?
24   A.   Roughly 10 hours.
25   Q.   So what cities do you remember doing this

15

1 in before you got to Salt Lake City?
2    A.   Like I said, I don't remember all the
3 cities. But, I mean, we did Kansas. I can remember
4 Kansas. San Antonio and Dallas. I did Atlanta,
5 Miami. I don't know what it's called. I can't
6 remember right now. But I'm sure it's on file every
7 race I went to. Basically we have two teams.
8 There's a West and an East Coast team. I was on the
9 East Coast team when I started and switched over to
10 the West Coast team.
11   Q.   So when you were doing the Salt Lake City
12 race, you were on the West team?
13   A.   Uh-huh.
14   Q.   Again, you have to answer yes or no. I'm
15 sorry.
16   A.   Yes.
17   Q.   Who was the supervisor for BattleFrog of
18 the West team?
19   A.   We have a supervisor, a build director and
20 a race director. At the time, I believe the build
21 director was Chris -- I can't remember his last
22 name. I just remember Chris, I believe. Peter was
23 our race director, I believe. I know we had Brian,
24 Brian Morgan, overseeing everything pretty much.
25   Q.   Did you say his last name?

16

1    A.   Brian Morgan.
2    Q.   Morgan?
3    A.   Yeah. After the accident he handled
4 pretty much whatever the doctors and hospitals
5 needed, all the insurance information and things
6 like that.
7    Q.   What do you remember his position to be?
8    A.   Management, field management.
9    Q.   Was Chris in Salt Lake City, then, at the
10 time of the accident?
11   A.   Uh-huh.
12       MR. COUNTS: Is that a yes?
13   A.   Yes. Sorry.
14   Q.   Everybody does it.
15       MR. COUNTS: We're not fussing at you. We
16 want the court reporter to have a clear record.
17       THE WITNESS: I understand. Sorry.
18   Q.   Was Peter in Salt Lake at the time of the
19 accident?
20   A.   Yes.
21   Q.   Was Brian Morgan there at the time?
22   A.   Yes.
23   Q.   Who else was on the West team, then,
24 besides you and these other three that were the
25 supervisors?

17

1    A.   I can't remember everybody. I had a crew
2 that I was supervising. And I remember a few of my
3 guys. I had -- I can't remember his last name, but
4 I had Ryan. And Marcos and Gabe.
5    Q.   Gabe?
6    A.   Yeah, Gabe. I think it's short for
7 Gabriel, Jr. Anthony and Ronnie. That's kind of
8 some of the guys that I can remember right now. And
9 what's his name? Matt Garcia. I remember his whole
10 name.
11   Q.   Matt Garcia?
12   A.   Yeah.
13   Q.   Do you remember anyone else's last name
14 other than Matt?
15   A.   No. I can't say I do. I mean, we would
16 kind of go on nicknames and worked together all the
17 time.
18   Q.   Was there approximately 10 people, then,
19 from BattleFrog in Salt Lake City?
20   A.   No. We were probably approximately at
21 least 30 or 40 people.
22   Q.   30 or 40?
23   A.   Yeah. It's a big crew. That's just the
24 people that I can remember in my crew. Those last
25 guys I named, they were working with my crew. Like

18

1    I said, they had put me to a supervisor, so that was
2    the little handful I was in charge of. Like some of
3    those guys, Chris and Brian Morgan, these were
4    guys in the office or above me. I remember I had to
5    handle business with those. But my crew was just
6    one of many crews, you see what I'm saying?
7    **Q.   Right. Who were some of the other crew**
8    **supervisors that had positions similar to yours?**
9    A.   I could tell you one because we roommated
10   together. Jake Taylor.
11   **Q.   Jake Taylor?**
12   A.   Yeah. Which is one of the guys that
13   worked with us. He was also supervising the other
14   supervisor. He was also above me. He was
15   supervisor over the build crews. And I had one
16   crew. I can't remember who else. We usually would
17   have at least three to four crews of maybe seven to
18   10 people.
19   **Q.   I'll ask you more about the accident and**
20   **your work there. This accident, do you remember it**
21   **happening on a Monday?**
22   A.   No. I don't think it was a Monday when it
23   happened.
24   **Q.   Do you remember what day of the week it**
25   **was?**

19

1    A.   If I could remember correctly, it was race
2    day. It was Saturday.
3    **Q.   Your memory is, then, you would have done**
4    **the process to set everything up, and this was**
5    **actually the race day.**
6    A.   Every was set up, if I can remember
7    correctly. This day was race day. Everything was
8    set. We just come to work to set up the race.
9    Basically position volunteers at each obstacle to
10   monitor the racers. And being I was a supervisor, I
11   was there early. Pretty much my job was to bring
12   the volunteers to the obstacles and leave them with
13   radios to report back whatever was going on.
14   **Q.   On any of these other races that you**
15   **talked about, Kansas, San Antonio, Dallas, Atlanta**
16   **or Miami, were you a supervisor of a crew on any of**
17   **those?**
18   A.   No. I can't say that I remember
19   supervising. I was put pretty much in a position
20   kind of early on. Like I said, I was hired by one
21   of the bosses to help with assembly. I wouldn't say
22   I was a supervisor. But from the beginning I was
23   basically the overseer. I had to go work with a
24   crew that was already assembled from the start when
25   I started. Work with a crew that was already

20

1    assembled but kind of guide them on how to work with
2    these metal pipes that we were using basically to
3    build each obstacle. I can't remember the exact
4    word or term that they would use to describe them,
5    but it was just some long poles with screw holes in
6    them. And they were pipes that could be adjusted at
7    any spot.
8    **Q.   On these prior races, what would your role**
9    **be on race day?**
10   A.   On race day I would pretty much do the
11   same thing I was doing on that day. I would bring
12   people to their posts, their obstacle, drop them off
13   with a radio, and go back and forth to make sure
14   they're hydrated, they've got food, water, all of
15   that the whole time the race is going on. If they
16   need batteries or something for the radio, things
17   like that.
18   **Q.   So you'd done that same job a number of**
19   **times, then, before?**
20   A.   Right. That job there what I was doing on
21   that day, I'd been doing since the beginning the
22   first day. Every race day we would do that.
23   **Q.   Just to finish up your employment. You**
24   **started at BattleFrog in February of 2016. What was**
25   **the job that you were working on before that?**

21

1    A.   Before BattleFrog, let's see, I was
2    probably back working with my dad actually. I was
3    back working with my dad at the time. It was Davis
4    Installation, Davis Floor Installation.
5    **Q.   And how long had you been working with**
6    **your dad before you started at BattleFrog?**
7    A.   Like I said, I worked with my dad
8    basically my entire life, so I can't really say when
9    I started or stopped. I even done construction,
10   like I say, on my own. But I always did go and help
11   him on jobs. I wouldn't say that I started back.
12   But when I would be consistently there every day,
13   which I was basically doing, my two little brothers
14   were trying to take over the company because my dad
15   is getting old. It was a few years that I was back
16   steady with him. If I can remember the job before,
17   that was either with Mike's Construction or I even
18   worked with CMI, which is a cable company in Eunice.
19   I would say maybe a few years with my dad, but I
20   can't really say. I can't give you a definite time.
21   Like I say, I never really stopped.
22   **Q.   What have you done to prepare for your**
23   **deposition? I don't want you to tell me about**
24   **conversations you've had with your counsel, but have**
25   **you looked at anything to prepare for your**

22

1  deposition?
2  A.  No.  I got dressed and came here.
3  Q.  Haven't looked at any photographs at all?
4  A.  No.
5  Q.  And did you drive or fly here?
6  A.  I drove.
7  Q.  Drive in your own vehicle?
8  A.  No, I rented.
9  Q.  A rental?
10  A.  Rental car, yeah.
11  Q.  And did you drive the rental car?
12  A.  No.  I have my brother-in-law and my
13  nephew.
14  Q.  When did you leave to get here?
15  A.  I know it took two days to get here.  We
16  arrived yesterday.
17  Q.  Are you on any medications today?
18  A.  No.
19  Q.  Is there any other reason that you aren't
20  able to understand and answer my questions?
21  A.  No.
22  Q.  Have you had any alcohol or drugs in the
23  last two days?
24  A.  No.
25  Q.  I want to talk about your prior use of

23

1  off-road vehicles for a minute.  At the time of the
2  accident you were driving a Polaris Ranger?
3  A.  Uh-huh.
4  Q.  Is that yes?
5  A.  Yes.
6  Q.  Tell me about your prior experience before
7  the day of the accident driving off-road vehicles?
8  A.  If you look up Jennings, Louisiana, it's
9  in the country.  I mean, I pretty much grew up
10  around them, so I know how to drive them.
11  Q.  Have you ever owned one?
12  A.  No.  Not myself, no.
13  Q.  What sort of off-road vehicles have you
14  driven before?  These are sometimes referred to as a
15  side-by-side like a Ranger.
16  A.  John Deere.  I drove quite a few.  I drove
17  the Kawasakis, the Polaris, of course, the Black Cat
18  ones.
19  Q.  Before this job in Salt Lake City, had you
20  driven --
21  A.  Yes.
22  Q.  -- driven a Polaris Ranger?
23  A.  Yeah.
24  MR. COUNTS:  Again, wait until he finishes
25  the question.  The court reporter, it's hard for her

24

1  to type down two people talking at the same time.
2  Just make sure he's done before you start answering,
3  okay?
4  Q.  So prior to the Salt Lake City job for
5  BattleFrog, had you actually driven a Polaris Ranger
6  similar to the one you were driving in Salt Lake
7  City?
8  A.  Yeah.
9  Q.  How often had you done that?
10  A.  I can't tell you exactly.  Because, like I
11  said, I grew up in the country.  There were
12  countless times you would drive or ride those
13  things.  I have family in Lafayette, my cousin and
14  grandpa, who baby-sitted my whole childhood life.
15  And they have them on the farm, so I grew up around
16  them pretty much.
17  Q.  In the jobs that you've done for
18  BattleFrog in Kansas, San Antonio, Dallas, Atlanta
19  and Miami, would BattleFrog rent off-road vehicles,
20  side-by-sides, for those jobs as well?
21  A.  Yes.
22  Q.  Did you drive them for BattleFrog on those
23  jobs as well?
24  A.  Yes.
25  Q.  Was it typically a Polaris Ranger or did

25

1  the products vary?
2  A.  They did vary.  It did vary from different
3  name brands but similar style of vehicle.
4  Q.  Let's talk about the Ranger that you were
5  driving in Salt Lake City.  Was that the first day
6  that you used the Ranger in Salt Lake City?
7  A.  No.
8  Q.  When was the first day you used that
9  Ranger in Salt Lake City?
10  A.  That particular vehicle?
11  Q.  That's a good clarification.  Did you
12  drive more than one Ranger when you were in Salt
13  Lake City?
14  A.  In Salt Lake City, no.  I drove that
15  particular vehicle that day only.
16  Q.  On the Salt Lake City jobs did you drive
17  other side-by-sides or off-road vehicles?
18  A.  Yes.
19  Q.  But not this particular one?
20  A.  This particular one was used that day,
21  race day, to deliver people basically.
22  Q.  What were the other vehicles, then, that
23  you'd driven on the Salt Lake City job to get ready
24  for race day?
25  A.  I was designated driving a Kawasaki.  It

26

1  was a Kubota, the Kubota with the doors, the
2  enclosed one. For that job I drove that one
3  because, as I said, I was supervising and I was
4  basically back and forth checking things. I wasn't
5  doing as much work.
6   Q.  And the Kubota, was it a two-seater?
7   A.  Uh-huh.
8   Q.  That's a yes?
9   A.  Yeah.
10   Q.  And then it had a cargo area?
11   A.  Cargo bed in the back.
12   Q.  The Ranger you were driving the day of the
13  accident, how many seats did it have?
14   A.  I believe it was a six-seater, three in
15  the front and three in the back.
16   Q.  So on these prior jobs would you also on
17  race day drive a side-by-side to deliver the
18  volunteers just like you were doing?
19   A.  Yes. Uh-huh.
20   Q.  On those prior races, before you drove
21  those side-by-sides, did you look at the warnings
22  that were on the side-by-side?
23   A.  Yeah. I read a lot of things. So, yeah,
24  I read the warnings probably once or twice. I can't
25  say I got in and read the warning every time I got

27

1  in, no.
2   Q.  Was it your practice before you used a
3  product like that to look for the warnings and read
4  the warnings before you used it?
5   A.  Yeah. I would read the operation list,
6  yeah, the warning list that was on the dash just by
7  habit. I mean, I grew up around the vehicles. Some
8  of them operate differently.
9   Q.  In your prior jobs when you'd use the
10  side-by-sides, did you ever look at the user's
11  manual or the owner's manual?
12   A.  No. I can't say that I have. I mean, if
13  I did, like I say, I don't remember. I do like to
14  read. I mean, when I do see something, I read the
15  entire list. I can't guarantee that, yes, I read
16  this owner's manual for this type of vehicle.
17   Q.  Let's start with the trip out to Salt Lake
18  City. Did you leave from Jennings, then, to come to
19  Salt Lake City?
20   A.  Yes.
21   Q.  Do you remember what day you left?
22   A.  To come to the deposition or to the race?
23   Q.  Good question. To come to the race.
24  Let's go back now and talk about the days leading up
25  to the accident.

28

1   A.  Okay. On the days leading up to the
2  accident, I did what I always do. I think I left --
3  I knew it was two days, so we left three days
4  earlier, I believe. It was a rental car. Me and
5  Jake Taylor, because we was basically the only two
6  workers from Louisiana, we rented a car together to
7  drive out there.
8   Q.  So was it just the two of you driving?
9   A.  Yeah. We drove out there.
10   Q.  And the rental car, would BattleFrog pay
11  for the rental car?
12   A.  No.
13   Q.  So the two of you would rent it.
14   A.  Yeah.
15   Q.  Do you know where Jake Taylor is now?
16   A.  I believe I talked to him a while -- I
17  believe he's working in Colorado right now.
18   Q.  Do you have his contact information
19  somewhere?
20   A.  Yeah. I have his cell number.
21   Q.  With respect to your accident, was Jake
22  Taylor there that day?
23   A.  Yeah, he was there.
24   Q.  Do you know where he was in relationship
25  to you?

29

1   A.  Yeah. We were the first people there.
2  Like I said, we arrived first. We both were
3  supervisors. Him and Chris, which we would call him
4  "beard" for the big beard, but Chris and Jake was
5  there. We had just got there. They went in front,
6  which is by the main building by the starting of the
7  race. And I went and dropped people off. So they
8  was still in the front when it happened.
9   Q.  How far would they have been from where
10  the accident happened when it happened?
11   A.  I would say between three quarters of a
12  mile to a mile, mile and a quarter, maybe even a
13  mile and a half. It was a ways.
14   Q.  And do you have contact information for
15  Chris, the guy with the beard?
16   A.  No. The only reason I really have Jake's
17  contact information is because we were friends
18  before the job. We just kind of depended on each
19  other for the job. He's a good friend of my
20  brother. They were some of the guys who helped weld
21  those assembly pipes we talked about.
22   Q.  Which states did you go through to get
23  from Louisiana, then, to Salt Lake City?
24   A.  I can't tell you exactly all of them, but
25  I believe it was Texas, a bit of Oklahoma, a bit of

30

1   Colorado and Utah, I believe.
2        Q.   And do you remember what day you would
3   have arrived in Salt Lake City?
4        A.   I can't remember the exact date, no. We
5   would usually be given a date and time by text
6   message from one of the bosses. I just know I gave
7   myself a three-day head start to get here. And that
8   date would usually be a Saturday or a Sunday. Like
9   I say, at least a week ahead of the race day.
10       Q.   So you think you were here approximately a
11  week, then, before the accident?
12       A.   Yeah. Maybe a little over a week.
13       Q.   Is BattleFrog still in existence?
14       A.   Not that I know of.
15       Q.   I had understood as well that it went out
16  of business. Do you know how long after the
17  accident it continued to do business?
18       A.   I can't say exactly. I corresponded with
19  Mr. Garcia back and forth. He would call me every
20  now and then and check on how I was doing. And he
21  was still working in September/November of the same
22  year. They was still in existence. He was still
23  working last I talked to him.
24       Q.   During this time period -- again, the
25  accident happened, my notes, May 14, 2016. During

31

1   that time period were you a regular pot smoker?
2        A.   Yeah. I smoke pot, yeah. I wouldn't say
3   a regular pot smoker.
4        Q.   Let's take, then, the time that you were
5   in Salt Lake City. Did you smoke any pot on the
6   trip to Salt Lake City?
7        A.   Probably in Colorado. I'm almost sure.
8        Q.   And then what about when you arrived in
9   Salt Lake City before the accident, did you smoke
10  pot in Salt Lake City before the accident?
11       A.   Probably so, I'm sure. Like I say, I
12  can't give you an exact time or exact amount of time
13  that any of this happened. This is two years ago.
14  Like I said, I'm almost sure I did. But on the day
15  of the accident, I remember it was a workday. We
16  were there early. We worked late that night. So
17  prior to the accident I know for sure there was no
18  smoking on that day.
19       Q.   So if we take those days and work back, on
20  the day of the accident had you smoked any pot?
21       A.   No.
22       Q.   What about the day before the accident?
23       A.   Probably so.
24       Q.   Would your typical practice be to smoke
25  pot after work?

32

1        A.   Yeah.
2        Q.   Is it your best memory, then, that on the
3   day before the accident you would have worked a full
4   day and then smoked pot that night?
5        A.   Probably.
6        Q.   Who would you have smoked pot with?
7        A.   Myself.
8        Q.   Do you recall how much pot you smoked the
9   night before the accident?
10       A.   No. I can't say.
11       Q.   On a typical workday like that after
12  you've worked, how much would you typically smoke?
13       A.   I mean, a cigar, a half a gram of
14  whatever.
15       Q.   You roll your own cigars?
16       A.   Uh-huh.
17       Q.   That's a yes?
18       A.   Yeah.
19       Q.   And then smoke that cigar?
20       A.   Yep.
21       Q.   Do you remember what time you would have
22  gone to bed the night before the accident?
23       A.   I can't remember the exact time I went to
24  bed. I know for a fact we worked late because I was
25  supposed to call my kids and I ended up making them

33

1   a little video or something and sending it to them
2   because it was too late to call them. I know we
3   worked late the day before, though. That's pretty
4   much all I remember. I know we worked late and then
5   I was back at work. Like I said, everybody worked
6   late. We were there early because we were
7   supervising and had to set an example, so we were
8   kind of the first ones there the next morning.
9        Q.   When you say you worked late the day
10  before, I don't know whether late means six o'clock
11  or midnight. How late would you have worked the day
12  before?
13       A.   I would not stay until midnight. I think
14  I have a picture of me at work the day before, I
15  believe it was 10 something at night we were still
16  there at work.
17       Q.   So you think the day before the accident
18  you worked until 10, 11 o'clock at night?
19       A.   Roughly around that time.
20       Q.   And then after work smoked a marijuana
21  cigar?
22       A.   No, I can't say that I did. Like I say,
23  we worked late that day. It wasn't a common thing
24  to do if we worked that late. You know what I'm
25  saying? So I probably skipped that night. If I

34

1  did, I might have did after I ate or before I went
2  to bed. I don't know. But I can't say that I did.
3  You know what I'm saying? Like I say, it's two
4  years ago.
5      Q.   And then what time do you remember waking
6  up the next morning, then, to go to work?
7      A.   I believe I remember being to work for
8  6:00. I don't know what time we got up. It wasn't
9  too far from the job site.
10     Q.   Where were you staying?
11     A.   We were staying at a hotel BattleFrog had
12  paid for. I can't remember the exact hotel name.
13     Q.   Do you remember what city it was in?
14     A.   It was right outside of Tooele. I don't
15  remember exactly the city. I know we was working in
16  Tooele.
17     Q.   Did you have any alcohol to drink the day
18  before the accident?
19     A.   No.
20     Q.   What about the day of the accident?
21     A.   No.
22     Q.   Were you on any sort of prescription
23  medications at the time of the accident?
24     A.   No.
25     Q.   Was it pretty typical, then, on these

35

1  trips that you would take for BattleFrog when you
2  would do the setup and the race and whatnot, as
3  we've talked about, for you to smoke pot while you
4  were there on the job site?
5      A.   On the job?
6      Q.   Not during the time you were on the job,
7  but on those trips when you would go to these other
8  cities.
9      A.   I wouldn't say it was a regular thing to
10  do. It's just what I do. If I get a break to relax
11  my mind, that's what I do. It's not like a practice
12  that we would do at work, no.
13     Q.   Have you ever had in your life any alcohol
14  or drug treatment?
15     A.   No. I can't say I did.
16         MR. ROSE: We've been going an hour. Want
17  to take a five-minute break?
18         MR. COUNTS: Sure.
19         THE VIDEOGRAPHER: Going off record. The
20  time is approximately 10:26 a.m. on June 5, 2018.
21         (Recess.)
22         THE VIDEOGRAPHER: Going back on record.
23  The time is approximately 10:41 a.m. on June 5,
24  2018.
25     Q.   Mr. Anderson, I want to switch gears with

36

1  you a little bit. One of the issues in the case,
2  one of the claims in the complaint, deals with
3  whether Polaris gave adequate warnings with respect
4  to the Ranger. And so I want to discuss with you
5  for a minute your habits or practices with respect
6  to following warnings and safety rules.
7          Would you just generally describe for me
8  how you consider yourself to be with respect to
9  following safety rules in that time frame, May of
10  2016.
11     A.   Yeah. I mean, I followed all of the rules
12  basically. But on that particular race and race
13  day, I'm a supervisor. And I had a load of people
14  who are not workers, just public people that are
15  just helping us, so I have to have basically a good
16  impression or whatever. The warnings were, I mean,
17  usually read. Like I said, I read them all the time
18  anyway. And putting on a good impression for the
19  people with me, I'm almost sure I would have
20  followed every warning on the cart, you know, in the
21  book.
22     Q.   I'll ask you more specifically about this
23  Ranger. I'm just talking about generally. Was it
24  your general practice to follow safety rules?
25     A.   Generally, yes. Because, like I said, I

37

1  grew up around them. I already have a habit of
2  reading lists, so yeah.
3      Q.   When you would get a product, would you
4  typically read -- is somebody's phone going? When
5  you would buy some power equipment, something like
6  that, would it be your practice typically to read
7  the owner's manual?
8      A.   Yeah. I'm that guy.
9      Q.   You're that kind of guy?
10     A.   Yeah.
11     Q.   And would you also read the warning
12  labels, whatever warning labels that were on the
13  product?
14     A.   Yeah.
15     Q.   When was the last time that you bought
16  some sort of a power product, a lawn mower or
17  anything like that?
18     A.   I can't say I remember the last item I
19  bought. I'm sure I read the warning labels on it.
20  I can't give you an exact time of when the last item
21  I bought was. It could be a computer. It could be
22  an iPhone.
23     Q.   Would you typically read the owner's
24  manual, then, from cover to cover, read the whole
25  thing?

38

1     A.   I can't say I would read the entire thing
2  word for word. But, yes, I would skim through the
3  entire manual of most everything I get.
4     Q.   In Louisiana is there a seat belt law,
5  that you have to wear a seat belt when you're
6  driving?
7     A.   Yes. The seat belt law came into effect a
8  few years back, I believe.
9     Q.   Do you always follow that law and wear the
10 seat belt when you're driving?
11    A.   Yeah.
12    Q.   In Louisiana, is there a requirement for
13 children to be in car seats when they're riding in a
14 vehicle?
15    A.   Yeah.
16    Q.   Do you know what the law is about that?
17    A.   No. I can't state the exact law. I just
18 know children should be in child restraints or in a
19 car seat.
20    Q.   And when you drive with your children in
21 the car, do you make sure that they're in car seats?
22    A.   Yeah. Really the only one that needs to
23 be in a car seat is my two-year-old. She's the
24 youngest. She's the only one that requires it.
25    Q.   When your in a car with your two-year-old,

39

1  do you always require her to be in a car seat?
2     A.   Pretty much most of the time, yeah. I
3  can't say that every time I get in the car that I
4  put her in the car seat. I mean, I might drive up
5  the driveway and check the mail, you know. But most
6  of the times, yes, she's seat belted.
7     Q.   And then how about the other children, do
8  you make sure that they're in car seats when they're
9  riding in your car?
10    A.   Yep.
11    Q.   We've talked about you and some of your
12 practices smoking pot. Is it illegal to drive a car
13 while you're smoking pot?
14    A.   I can't say that I know. Not that I know
15 of.
16    Q.   Do you sometimes drive while you're
17 smoking pot?
18    A.   Not at work, no. I wouldn't be at work
19 driving and smoking pot.
20    Q.   Just when you're driving your car or
21 otherwise not at work, do you sometimes do that
22 while you're smoking pot?
23    A.   Probably so sometimes.
24    Q.   And you don't know whether that's legal or
25 not legal in Louisiana?

40

1     A.   No. No, I don't. I didn't study the law
2  book. I never had nobody tell me it's against the
3  law.
4     Q.   Is pot legal in Louisiana?
5     A.   I believe it is for medicinal purposes.
6     Q.   Do you have a medical marijuana card?
7     A.   Not at the moment, no.
8     Q.   Have you ever had one?
9     A.   No.
10    Q.   Do you own your own handguns?
11    A.   Yeah.
12    Q.   What do you do to safely secure your
13 handguns when you're at home?
14    A.   I have a gun safe pretty much. Mostly in
15 a gun safe at home when I'm at home.
16    Q.   Do you ever leave your guns out around the
17 children?
18    A.   No.
19    Q.   Do you ever have your guns out and around
20 the children?
21    A.   Yeah. My children know about guns. I
22 educate them on guns, yeah, for gun safety purposes
23 only. As I said, I grew up in the country. I mean,
24 I've been handling a shotgun since probably 12 years
25 old. So I pass that along to my children.

41

1     Q.   Do you know what the laws require in
2  Louisiana with respect to whether it's okay to carry
3  a handgun in a car with a child present in the car?
4     A.   I can't say. Like I said, I never studied
5  the law book or nothing like that. As far as I
6  know, it's not illegal to have a child in the car
7  and still have a firearm in the car. Most of the
8  firearms are okay with having in your vehicle and in
9  your home for self defense, home defense. And in
10 Louisiana you can carry it on your waistline, which
11 I did for years. Open carry, there's nothing
12 illegal about that.
13    Q.   Have you ever been convicted of a felony?
14    A.   No.
15    Q.   What about a misdemeanor that involves
16 dishonesty?
17    A.   You'll have to elaborate more on
18 misdemeanor involving dishonesty.
19    Q.   A theft, those sort of . . .
20    A.   No, no type of thefts.
21    Q.   In Louisiana, do you know whether it's
22 legal to use your cell phone while you're driving?
23    A.   Like I said, I never studied the laws. As
24 far as I know, it's not illegal to use your cell
25 phone while you're driving. I think they're trying

42

1　to get the law passed or something.  As far now, no,
2　you can use your cell phone and drive in Louisiana.
3　There's no texting and driving, but you can talk on
4　the phone.  You don't have to have Bluetooth.  I
5　mean, navigation, whatever, you can use your phone
6　to drive.
7　　　**Q.　Is it okay while you're driving to video**
8　**yourself and video things in the car?**
9　　　A.　I mean, again, it's not illegal.  It's
10　nothing illegal in Louisiana.  But if you make a
11　video and you're driving at the same time, I believe
12　it's up to the driver to pay attention to where he's
13　going.  You know what I'm saying?
14　　　**Q.　So you think that's safe as long as you're**
15　**paying attention, is what you're saying.**
16　　　A.　Yeah.  I feel like, again, it's not
17　illegal.  Not that I know of.  I'm not a lawyer.
18　I'm not what you would call studied in Louisiana law
19　or nothing at all.  A video while driving, there's
20　nothing wrong with that.  I mean, it would probably
21　be easier to just get a dash cam or something like
22　that.  But it would be the same as using your
23　navigation while driving.  If you're staring into
24　the camera or the phone, you're probably not looking
25　at the road.  Like navigation, you look and drive.

43

1　　　**Q.　I see.  Let's talk, then, about the**
2　**morning of the accident then.  Do you remember what**
3　**time you left for work that morning?**
4　　　A.　Like I said, I don't remember the exact
5　time we left.  I know we had to be there for 6:00.
6　And we were there for 6:00, maybe even a little
7　earlier.
8　　　**Q.　Tell me what you remember doing that**
9　**morning.**
10　　　A.　That morning we got ready for work and we
11　drove to work.  To be honest, on that morning that
12　was pretty much the first thing that happened.  When
13　we arrive, we report to Beard.  They had a group of
14　volunteers there ready to go to their post, and they
15　assigned me to drop them.
16　　　**Q.　Then how was it that you ended up using**
17　**the Ranger?  Tell me about that.**
18　　　A.　That was the two cars.  We had two Rangers
19　there that was designed, that was there for that
20　purpose, to bring the people to their obstacle
21　posts.
22　　　**Q.　Do those Rangers require keys?**
23　　　A.　Yeah.
24　　　**Q.　Did someone hand you the keys?**
25　　　A.　The keys was already in the Rangers.  They

44

1　were parked in position waiting for us to arrive to
2　work.
3　　　**Q.　Is that the first that you'd seen those**
4　**Rangers?**
5　　　A.　No, it was not the first time I'd seen
6　those two Rangers.
7　　　**Q.　When had you seen them before?**
8　　　A.　Throughout the work week.  They were used
9　in the fairground part, I believe.  I believe they
10　were used throughout the week.  I mean, I remember
11　one time I seen the rental company, who we rented
12　from, was out there working on them.  When I went to
13　the trailer to get some stuff, I remember seeing
14　them.  So I seen them there.
15　　　**Q.　In the days before the day of the**
16　**accident, had you talked with anyone about the**
17　**Rangers?  Had any instruction or anything like that**
18　**in the days leading up to the accident?**
19　　　A.　No.  There would be no reason for us to
20　discuss the Rangers.  There would be no reason for
21　us to be talking about them.
22　　　**Q.　That morning, then, that you showed up on**
23　**the day of the accident, did you have any**
24　**discussions with anyone about using the Ranger?**
25　　　A.　No.  The Beard, which is Chris, he had

45

1　those two vehicles that were designated, like I
2　said, to deliver the people.  When we got there, I
3　was the only guy there that had done the job.  I
4　wouldn't say only one that had done the job before,
5　but I was the guy in charge of doing it.  So when I
6　got there, that's what they sent me to do,
7　basically.  We didn't discuss anything about Polaris
8　at all.  It was, "Just take this one and bring those
9　guys."
10　　　**Q.　Did you inspect the Polaris to any extent**
11　**before you took off on it that morning?**
12　　　A.　No.  Because it was used, like I said,
13　throughout the whole week.
14　　　**Q.　Was it the first trip, then, that you used**
15　**this Polaris that morning that you had the accident?**
16　　　A.　That actual Polaris vehicle?
17　　　**Q.　Yes.**
18　　　A.　On that day, that individual vehicle, it
19　was my first time getting in that vehicle.  But I
20　have droven Polaris Rangers before many times.
21　　　**Q.　These questions focus on that morning.  It**
22　**sounds like Beard tells you, "There's the Polaris,**
23　**take that one," right?**
24　　　A.　Uh-huh.  Pretty much what he done is we
25　already knew.  I mean, like I said, we have meetings

46

1  with the supervisors. We knew that those two cars
2  would be the ones we were using to bring the people.
3  When I arrived that morning, they were already
4  positioned there. And, of course, like I said, I
5  worked at night, so I wasn't in the front. I work
6  in the field. So I wasn't with those carts when
7  they would have inspected them, maintenance,
8  whatever they did to those carts.
9      I know from other people they might have
10  had a few problems. I don't know. But on that day
11  I arrived to work, I was the one to bring those
12  people. I got there, that was the cart that was
13  available, that was the one I took. I believe they
14  did designate that one to me on that day. I was
15  going to be doing that pretty much all day in that
16  cart. That was pretty much my first day driving
17  that one.
18      Q.   Were the people already there that you
19  were going to give a ride to that morning?
20      A.   They were there too, right.
21      Q.   Did you get in the Ranger and they got in
22  as well?
23      A.   Yep.
24      Q.   How many people were there?
25      A.   Like I said, it was approximately five

47

1  elderly people. It was two couples, a guy and his
2  wife, another guy and his wife, and then there was
3  an elderly lady. That was it.
4      Q.   And where did they sit in the Ranger?
5      A.   I believe we sat three in the back and
6  three in the front.
7      Q.   So there were a total of six people, then,
8  when you left the front area?
9      A.   Uh-huh.
10      Q.   That's a yes?
11      A.   Yeah. Six people when we left.
12      MR. COUNTS:  Let him ask his question.
13  Just wait. It's okay.
14      Q.   Before you jumped in the Polaris with
15  those five other people, did you look at any of the
16  warnings that were on the Polaris?
17      A.   Like I said, it was my practice to look at
18  the warnings because it's right by the keypad before
19  you start it. I can't say that I read the warning
20  that morning on that exact morning because, like I
21  said, it's two years ago. But I usually read the
22  warnings. So if it was visible, I more than likely
23  read it before we took off. Like I said, it was
24  racing day. I have to put up a good impression for
25  everybody else. Like I said, another thing, it was

48

1  elderly people. I don't want nothing to happen to
2  them people.
3      Q.   Do you remember there being more than one
4  warning on the Ranger that day?
5      A.   I can't say I remember how many warnings
6  was on the Ranger. If I can remember right, they
7  had one around the keypad area, I think on the side
8  by the door, on the dash.
9      Q.   Do you remember that day seeing that any
10  of the warnings were covered by heat vents or
11  anything else like that?
12      A.   Like I said, I can't remember exactly. I
13  can't say that I did see it covered. I don't
14  remember.
15      Q.   You don't remember that specifically,
16  then.
17      A.   I don't remember that specifically at all.
18      Q.   Tell me what happened, then, after the
19  five other people got into the Ranger with you.
20      A.   I dropped the man and his wife. I dropped
21  one couple at one obstacle. I dropped another
22  couple at another obstacle. Of course, waters and
23  walkies. I dropped the last lady off at the last
24  obstacle. On my way back to reload is when the
25  accident occurred.

49

1      Q.   What time, approximately, do you think the
2  accident occurred?
3      A.   Like I said, I can't give you the exact
4  time, but I would say somewhere between seven and
5  eight o'clock maybe. I can't give you an exact
6  time.
7      Q.   When you got in the RZR, did you put on
8  the seat belt?
9      A.   I can't remember if I did. I'm almost
10  sure I did, but I can't say definitely that I did.
11  Because, like I said, I was with a group of elderly
12  folks. I was a supervisor. And I actually was the
13  only supervisor there at the time besides Jake. I
14  mean, I was putting on a good impression. So I more
15  than likely did, but I can't say that I did.
16      Q.   Why is the reason you say you more than
17  likely did? Was it your practice to usually --
18      A.   It was my practice to usually do it. And
19  the fact that I had elderly people onboard. I was a
20  supervisor. These are public people coming to our
21  company, so I had to have the right impression.
22      Q.   On the trip out to drop these people off
23  at the obstacles, were you driving on a dirt road?
24  Were you in a field? What do you remember about
25  your path to get to the obstacles?

June 05, 2018

50

1    A.    The path pretty much varies.  We were
2 actually on I think it was some motorsport thing,
3 Ford Motorsport Racetrack or something.  We would
4 cross a racetrack in some areas of concrete,
5 blacktop, or whatever.  Mostly it was field.  We had
6 some area that was limestone.  It varied a lot.
7    Q.    Tell me everything you can remember, then,
8 about the trip back.  After you dropped off these
9 volunteers, tell me everything you remember on the
10 way back.  Were you going back to get more
11 volunteers?
12    A.    Right.
13    Q.    So tell me everything you can remember
14 about going back to get additional volunteers.
15    A.    Dropped the last lady off.  Gave her a
16 walkie-talkie and water and all of that.  And then I
17 just started heading back.  I remember I had a long
18 way to go to get back.  I just started heading back
19 real slow because we were coming through a field.  I
20 mean, I wouldn't say I was going fast.  Good thing.
21 I was just coming from the field from dropping that
22 last lady off, and it just basically -- I remember
23 it starting to roll over.  So I'm guessing that's
24 what happened because --
25        MR. COUNTS:  I don't want you to guess.

51

1 Tell him what you remember.  Tell him what you
2 remember.
3    A.    I remember it starting to roll over.  I
4 mean, blackness pretty much and dirt.  I might have
5 went unconscious maybe because I woke up.  I would
6 say woke up.  When I realized what was going on, I
7 mean, I think the cart was on its side on the roof
8 or something.  I was on the ground.  I think the
9 roll cage, I believe, was up here somewhere.
10    Q.    On your left side?
11    A.    On my arm.  And I think I was kind of
12 halfway out of the front window.  The windshield was
13 out in front of me.  I mean, it didn't break, but it
14 was in front of me.  I believe maybe my adrenalin
15 was pumping.  I might have got ready to just go try
16 to get help and realized my clothing or whatever,
17 something, was holding my arm.  Because it was just
18 hanging or whatever.
19        So then I went back to the cart and I just
20 started radioing for help.  I just tried to stay
21 there and tried to slow down my heart, blood
22 pressure, whatever.  Just tried to stay calm and
23 wait for help.
24    Q.    Let me ask you just a few follow-up
25 questions about that.  You say you had a long way to

52

1 go back.  Approximately how far did you have to go
2 back to pick up other volunteers?
3    A.    Like I said, they was all in the front by
4 Beard and him.  It was at least a mile and a half, I
5 would say, at the least.  You know what I'm saying?
6 I'm saying a mile and a half, mile and a quarter.  I
7 mean, if you have pictures of the place, I can
8 pinpoint exactly.  We went through a fence, around a
9 turn, through the field.  It was a little bit of a
10 drive.
11    Q.    When you're on your way back, do you
12 believe you had your seat belt on?
13    A.    I believe so.  Like I said, I can't say I
14 definitely did, but I'm almost sure I did.  Because
15 the last lady I dropped off was also one of the
16 volunteers.  I'm a supervisor.  I want to make this
17 impression.  I more than likely put it on, but I
18 can't say I definitely had my seat belt on.
19    Q.    The photographs that I've seen show that
20 the seat belt was buckled behind you.
21    A.    That's not my practice.
22    Q.    Do you remember that?
23    A.    No.
24    Q.    Do you have a specific memory of buckling
25 up the seat belt that morning?

53

1    A.    No, I can't say I do.
2    Q.    Do you have a memory of actually buckling
3 it up behind you?
4    A.    No.  To clarify on that, that was never
5 one of my practices, so no.
6    Q.    When you say never one of your practices,
7 it wasn't --
8    A.    It was never something I would do because
9 I'm pretty slim and the seat buckle would agitate
10 the back of my tailbone.
11    Q.    From your prior experience driving Rangers
12 or similar vehicles, did you know that unbuckling
13 the seat belt or driving with the seat belt
14 unbuckled would limit the speed of the side-by-side?
15    A.    I would say no.  That's not something I
16 would know.
17    Q.    Did the accident happen in a field or on a
18 dirt road?
19    A.    I would say it happened right when the
20 dirt starts -- it's not necessarily a road, but it's
21 right where the dirt is a field and meets dirt right
22 here and then it starts with the limestone like
23 trail.  And like right where it comes from the field
24 where the field meets the dirt and coming onto the
25 limestone I believe is where the accident happened.

54

1    It would be like in a little patch of dirt area.
2    Like I said, when I woke up or got from under the
3    cart, it was in limestone.
4        Q.   Do you actually remember losing control of
5    the Ranger?
6        A.   I never did lose control, I would say.
7    Like I said, I wasn't speeding or anything. It just
8    started turning over, started tilting over to the
9    left side. That's all I remember.
10       Q.   Do you remember how fast you were going?
11       A.   I can't say I remember exact speed on the
12   speedometer, but I know I couldn't have been going
13   faster than 40 miles an hour. I feel like I was
14   going maybe 32 to 35 miles an hour at the top.
15       Q.   Is that your best estimate, 32 to 35 miles
16   per hour?
17       A.   That's my best estimate. Like I said,
18   it's not exact because it's two years ago. I
19   remember it was pretty slow because of the fact I
20   had a long way to go. I had just dropped the lady
21   right behind me, and I don't want to be zooming off.
22   You know what I'm saying? I just drove them out
23   there safe, so I want to stay safe.
24       A lot of the reasons why I had made it to
25   supervisor was I did some work -- we done a lot of

55

1    construction work. I did a lot of work for offshore
2    oil companies, so we relied a lot more on safety
3    than the rest of the guys.
4        Q.   Were you going straight or did you start
5    to turn when the Ranger started to tip over?
6        A.   When it started to tip over, I was
7    actually going straight.
8        Q.   So you were driving straight and then all
9    of a sudden the Ranger just tipped over.
10       A.   It started tilting over, yes. To my
11   knowledge, I remember I thought maybe it had hit a
12   hump in the dirt or the rocks. I thought maybe it
13   was a hump or something that made it tilt over.
14   Because, like I said, I've hit a big rock before.
15   It tilts and you just turn the wheel and drop it
16   back down. It happened before. When I turned the
17   wheel, the wheel didn't react to make it tilt back
18   down. It stayed tilting and tilting and tilting.
19       Q.   So you're going straight. Your best
20   estimate is 32 to 35 miles an hour. And you're
21   actually going across a field at the time, right?
22       A.   Uh-huh.
23       Q.   When you're going straight, all of a
24   sudden the Ranger started to tip over?
25       A.   Right.

56

1        Q.   Was it tipping to your left side?
2        A.   To the left, yeah.
3        Q.   Do you know what caused it to start to tip
4    over?
5        A.   No. No, I don't know.
6        Q.   You said something about hitting a bump or
7    something. Do you recall hitting a bump or
8    something like that?
9        A.   No. I can recall that I did not. If I
10   can recall right, I didn't hit a bump. But I
11   thought maybe it had hit a rise or something because
12   it just started to tilt to the left. And usually
13   when it starts to tilt, it's like maybe because you
14   hit a rock or something and it would lift the other
15   side up.
16       That particular time, like I said, usually
17   when you would hit a rock or tilt, you just turn the
18   wheel and it would tilt back down. Now, the wheel
19   did not. It just kept tilting further and further.
20   So I can't say as to what happened to cause it to
21   tilt and roll over. I don't know.
22       Q.   So when it first started to tilt, what did
23   you do?
24       A.   Just like I said, by reaction I tried to
25   tilt it back down. Like if you was to hit a rock

57

1    and it would start to flip this way, you'd turn your
2    wheel this way and it's going to come down.
3    Whichever way it started to tilt, you turn the other
4    way and it would bring it down.
5        Q.   You have to described for the record which
6    way you're . . .
7        A.   Tilting left and I would turn left. If it
8    tilts to the left, you turn it and it will come back
9    down. The right side, basically, will come down.
10   But it didn't. It didn't even react to the wheel
11   turning.
12       Q.   So you're driving straight in the field.
13   It starts to tilt to your left, and your reaction
14   was to turn to the left, correct?
15       A.   Basically, if it was tilting and the
16   steering and all of that was fine, that's what you
17   typically would do.
18       Q.   I'm just wanting your best memory of what
19   actually happened.
20       A.   In my best memory, I can't say that's
21   exactly what I did, but I'm almost sure my reaction
22   would have been instinctively. You know what I
23   mean? Instinctively, that's what I would have done.
24   On that date I'm almost sure I instinctively did
25   that. Nothing happened. It didn't go back down.

58

1    It just continued to tilt and here we are.
2        Q.   I apologize for this, but I want to know
3    what you actually remember.  Not what you're
4    supposing happened.
5        A.   What I actually remember is it tilting to
6    the left and waking up with it on top of me.
7        Q.   So what you actually remember is you're
8    driving straight through a field and it started to
9    tip to the left.
10       A.   Right.
11       Q.   And then the next thing you do remember --
12       A.   is when I got up and the windshield was in
13   front of me.  I was halfway through the cart and it
14   was on top of me on my arm.
15       Q.   When you got into the Ranger that morning,
16   did you look to see if there was an owner's manual
17   in the Ranger?
18       A.   I can't say I did, no.
19       Q.   Do you know if there was an owner's manual
20   in the Ranger?
21       A.   I can't say there was.
22       Q.   Didn't look for one?
23       A.   Right.  I can't say that I did or didn't.
24   Like I said, when I arrived to work, I was the guy
25   designated to do it.  I went about my normal workday

59

1    pretty much.
2        Q.   When you arrived that morning, did you
3    feel like you had enough experience and background
4    to drive the Ranger safely?
5        A.   Yeah.
6        Q.   Have you ever had any formal training on
7    driving off-road vehicles?
8        A.   No.  I didn't get a license for it or
9    nothing like that.  But I was comfortable in driving
10   it.  Like I said, I grew up around them.
11       Q.   The route that you were taking back to
12   pick up other volunteers, is that the first time
13   you'd driven that route since you'd been out there
14   or had you driven that . . .
15       A.   I'd driven that route quite a few times.
16   Like I say, just wasn't that particular vehicle.  My
17   crew, the reason why we were in charge of dropping
18   them there was because we knew the path to get in
19   there and back.
20       Q.   Was there a dirt road that you could have
21   driven from where you dropped the last volunteer off
22   to get back to the front or did you have to drive
23   across the field?
24       A.   It's a field.  You have to go through a
25   field.  There's no roads.  Like I said, it's a

60

1    CrossFit training thing.  There's no trail.  We
2    don't build our obstacle course on a trail.  We make
3    our own, basically.
4        Q.   Do you know whether anyone saw the
5    accident?
6        A.   I can't say anybody did.  The only person
7    that may have had any view of the accident would
8    have been the last lady I dropped off.  I don't know
9    her name or nothing.  It was volunteers.  And she
10   would have been probably the closest one to the
11   accident.  She was maybe, I would say, a hundred
12   yards, 200 yards.
13       Q.   Anyone else from BattleFrog that would
14   have been anywhere even closely remote to that area?
15       A.   No.  Nobody was with me from the company.
16   If I can remember right, I believe Ryan and
17   Mr. Garcia was the first to arrive on the scene
18   after the accident.
19       Q.   Did you say Ryan or Brian?
20       A.   Ryan.
21       Q.   And you don't know his last name?
22       A.   No, I don't.
23       Q.   And then Matt Garcia.  I apologize if I've
24   asked you this.  Do you know where Matt Garcia is
25   now?

61

1        A.   No, sir, I don't.
2        Q.   Did you have any problems with the Ranger
3    on the way out to drop off the volunteers?
4        A.   No, sir.
5        Q.   Were the volunteers wearing their seat
6    belts on the way out?
7        A.   Like I say, I don't really recall.  But
8    I'm almost sure I advised everybody to put their
9    seat belt on because I was the supervisor and we had
10   to ensure safety.  I'm sure I advised them to put
11   their seat belt on.  I can't say I watched
12   everybody.
13       Q.   On the way out to drop off the volunteers,
14   did the Ranger steer properly?
15       A.   On the way to drop the volunteers, yes,
16   everything was fine.  If I can remember right, it
17   squeaked.  It made a lot more squeaky noises
18   probably than the other ones.
19       Q.   On the way back before the time that you
20   felt it start to tip to the left, did you have any
21   problems with steering?
22       A.   I had no problems with the Ranger before.
23       Q.   Is it fair to say that it surprised you
24   that it just started to tip to the left?
25       A.   Yeah.

62

1    Q.   It was unexpected?
2    A.   Yeah.
3    Q.   Have you worked at all since the accident?
4    A.   No.
5    Q.   What injuries did you suffer in the
6  accident?
7    A.   Lacerations to the face. I don't know if
8  I had fractures or not up here in my face and eye
9  socket. I think I had three or four compound
10  fractures on my arm. Loss of tissue, muscle in my
11  arm and forearm. Nerve damage. It cut my nerves
12  and stuff like that.
13    Q.   Is that your left arm?
14    A.   Uh-huh.
15    Q.   It looks like there's some scars on the
16  bridge of your nose. Are those from the accident?
17    A.   Yes.
18    Q.   Other than the scar, have the lacerations
19  on your face healed up or are they still causing you
20  any problems?
21    A.   Like I said, I don't know the extent of
22  the nasal cavity right here. I would say everything
23  is pretty much healed up. Like I say, I never did
24  get the extent of the nasal cavity or whatever
25  checked. It was supposedly fractured or something.

63

1  I guess it self-healed or whatever.
2    Q.   And it sounds like you've had a number of
3  procedures with respect to your left arm, right?
4    A.   Uh-huh.
5    Q.   Is that a yes?
6    A.   Yeah. Yeah, a lot.
7    Q.   Are you right-handed or left-handed?
8    A.   To be honest, I say I'm right-handed, but
9  I'm pretty much both handed. Throw with my left. I
10  kick with my left leg. I'm just one of those guys.
11    Q.   Did you write right-handed before the
12  accident?
13    A.   Yeah. I write right-handed and left-
14  handed, honestly. But mostly right.
15    Q.   Did you play any sports in high school?
16    A.   I played basketball and football, yes.
17    Q.   For your high school team?
18    A.   No. We didn't necessarily have a team.
19  Like I say, we go to a private school. But if you
20  would call it a team, that was the team.
21    Q.   Tell me the current condition of your left
22  arm.
23    A.   I still have muscle loss. I have a few
24  rods and screws holding the bones together, plates.
25  I had a nerve taken from my leg to repair my nerves

64

1  in my arm. I had flaps taken from the top of my arm
2  to put over the bottom part of my arm. I've had
3  scar tissue removed out of the arm a lot of times.
4  Of course, a couple of surgeries cleaning it out.
5  The latest surgery probably they're talking about --
6  because I can't work these parts, the muscle is
7  missing -- is stitching my arm to my torso and
8  helping that muscle grow back or something. I had a
9  lot of operations on the arm. I can't say I
10  remember all of them.
11    Q.   Let's just talk about how you're currently
12  doing with your arm. Is it possible for you to undo
13  your shirt and show on the video what your arm looks
14  like now. And then the other side, can you turn so
15  we can see the other side of it. What about the
16  function of your left arm, maybe while we're doing
17  that? Can you extend your fingers on your left arm?
18    A.   No.
19    Q.   Describe for the record what happens when
20  you try to extend your fingers.
21    A.   When I try to extend them, they get caught
22  basically in here. There's basically not enough
23  muscle/tissue, I guess, for it to extend all the
24  way. There's a lot of scar tissue caught up in
25  here, I'm guessing. I can't tell you why it's not.

65

1  They don't extend. This one here --
2    Q.   That's your pinky.
3    A.   The pinky is mainly like this because of
4  the nerve damage and this muscle loss. Basically
5  it's the muscle that controls this. It stops right
6  here. And it's missing all the way up to right
7  here. Basically, this side of my hand don't work.
8  I can't grip nothing.
9    Q.   Can you clench a fist then, too?
10    A.   No. I can only do this.
11    Q.   Describe for the record what happens when
12  you try to clench a fist.
13    A.   Basically when I try to clench a fist I
14  guess my pointer, my pointer finger, actually closes
15  more than the rest. It don't close all the way. It
16  closes more than the rest. It's, basically, like in
17  a line, if you look at it. The middle finger closes
18  a little less than the pointer but not as much. And
19  it goes down to the ring finger is the same, way
20  less than the middle. And down to the pinky, it
21  just sits up like this, man. It just stays in this
22  curled position.
23    Q.   What do you understand is planned in the
24  future, if anything, to try to treat your arm?
25    A.   Of course, I kind of want my arm back

66

1  working.
2    **Q.   Right.**
3    A.   In the future right now the last surgery I
4  mentioned is a plastic surgeon.  I can't remember
5  his name.  I think it's Dr. Delatte.  He's planning
6  on, like I said, attaching my arm to my torso or
7  putting a block inside of my torso to extend for a
8  muscle flap to put on the arm.  Basically to get
9  this muscle back and hopefully get some motion back
10  in here.
11   **Q.   Is that Robby LeBlanc?**
12   A.   It's Robby LeBlanc's partner.  Dr. Robby
13  LeBlanc is who done the last surgery and most all
14  the surgeries.
15   **Q.   When is the last surgery that you had?**
16   A.   I can't say exact date, but I believe it
17  was in March.  I think it was like March the 6th or
18  something like that.
19   **Q.   And what sort of treatment have you had,**
20  **if any, since then.  Are you doing physical therapy**
21  **or anything like that?**
22   A.   I did physical therapy for a few months
23  since then.  And then I seen Dr. Delatte, who is the
24  plastic surgeon who is trying to reconstruct the
25  bottom half.  And he instructed me, I've been daily

67

1  going through hyperbaric chambers to get the blood
2  flow up as much as he can and to close whatever this
3  scarring that happened from the last surgery, get
4  this closed in and be better prepared for when he do
5  the next surgery.
6    **Q.   So Dr. Delatte is Dr. LeBlanc's partner,**
7  **did you say?**
8    A.   Dr. Delatte is the doctor doing the
9  surgery recommended by Dr. LeBlanc.
10   **Q.   Do you know how to spell Delatte?**
11   A.   Like I say, it might not be the exact
12  spelling.  But if I can remember right, it is
13  D-u-l-a-t-t-e or e-t-t-e.
14   **Q.   Where have you been having the hyperbaric**
15  **treatments?**
16   A.   Our Lady of the Lourdes Hospital in
17  Lafayette.
18   **Q.   And how frequently do you do that?**
19   A.   Five days a week.
20   **Q.   And are you still doing that?**
21   A.   Yes, sir.  I had to stop it to come here,
22  of course.
23   **Q.   Right.**
24   A.   I'm missing.  Yeah, I'm still doing that.
25  I think I have, like, five treatments left.

68

1    **Q.   And then this surgery that you're talking**
2  **about, is that something that's still undecided or**
3  **have you decided to have that surgery?**
4    A.   Yes.  The surgery is in motion.  I've
5  decided to have the surgery.  Because, like I said,
6  I kind of want my arm working again.  He's right
7  now, I believe, trying to get all his equipment
8  ready for the surgery.  He's corresponding with the
9  hospital and hyperbarics to make sure it's
10  thickening up.  I'm kind of small, so he wants
11  enough meat to do the surgery.
12   **Q.   When do you plan to have that surgery?**
13   A.   Anytime now.  I'm waiting on the doctor.
14   **Q.   Do you know whether there will be**
15  **additional procedures after that that will be**
16  **necessary, or is that your last surgery, as far as**
17  **you know?**
18   A.   As far as I know, it may be more
19  procedures.  We're just kind of hoping this one
20  works.  But he said there would probably be more
21  procedures being the fact of scar tissue and the
22  thin skin.  I might have problems with thin skin.
23   **Q.   Let's talk about the ways in which your**
24  **left hand limits what you can do.  What are some of**
25  **the things that you can do with your left hand?  Can**

69

1  **you use it for any purpose?**
2    A.   Now I can kind of hold a glass.  I can
3  drink from a glass.  Like I maybe can, like, hold a
4  lightweight shopping bag maybe or something on my
5  hand, a bag.  I guess it's easier to say things I
6  can do with it than what I can't do with it.
7  There's a few things I can do with it right now.
8  That's kind of why I want to keep going with the
9  surgeries to try to get it better.  I think it can
10  be a little better.
11   **Q.   Can you lift anything of any weight at all**
12  **with your left hand?**
13   A.   No.  Nothing over five, six pounds.  It
14  makes the bones get together with a screw there.
15   **Q.   As far as what we sometimes call the**
16  **activities of daily living as far as getting**
17  **yourself up and showering and cooking and all of**
18  **those sort of things, are you able to do all of**
19  **those sort of things now?**
20   A.   No.  To be honest, my life is completely
21  different.  I mean, buttoning a shirt is difficult.
22  Tying my shoes, I can't tie shoes.  Can't do my
23  kids' hair.  I can't open a door with my left hand,
24  doorknobs.  There's a lot of things I can't.
25  Showering.  Showering, you can't really turn.  It

70

1  don't turn at all.
2      Q.   As far as getting up and ready for the
3  day, showering, getting dressed, that sort of thing,
4  do you do that on your own but it's more difficult
5  or does someone actually have to help you?
6      A.   I would say recently I started doing it on
7  my own.  I mean, for the first year and after the
8  surgeries, of course, I need help.  After being two
9  years, there's a lot of stuff I'm starting to kind
10  of try to do on my own.  I mean, it's not the same
11  way as I used to it.  It's not as fast as I used to
12  do it.  I'm starting to try to do stuff on my own
13  now.  It is complicated.  I mean, daily showering,
14  shave.  Like I always did my own hair lining and
15  cutting, fade, all that.  I can't do that anymore.
16  Of course, you can do one side, but I can't do this
17  side.  Like I said, for the things I can't do, it's
18  a lot.  It's just easier to say a few things that I
19  can do, you know.
20      Q.   And have you worked at all since the
21  accident, made any income at all?
22      A.   No.  I had tried to start my own
23  construction business at one point.  I was going to
24  just have some guys that used to work for me before
25  the accident do the work for me.  But, no, it didn't

71

1  work out.
2      Q.   Did you make any money doing that?
3      A.   No.
4      Q.   We have tax records from I think 2013,
5  2014 and 2015.  Did you file tax returns for the
6  year 2016?
7      A.   Yes, I did, with that company that I was
8  talking about I had started.  But you can see on the
9  tax returns I paid money.  I didn't make nothing.
10      Q.   What source of income do you have now,
11  then?  You're being paid by Workers Compensation?
12      A.   That's it.
13      Q.   And how much do you get paid by the
14  Workers Compensation carrier?
15      A.   649 a week.
16      Q.   $649 per week?
17      A.   Yeah.
18      Q.   Has that been consistent since the
19  accident, then, or has it gone up or down?
20      A.   No, it's been consistent number wise.
21  That number has been consistent, 649.
22      Q.   And do you know how long that's expected
23  to continue?
24      A.   I'm guessing until I can get my hand
25  working and go back to work.

72

1      MR. ROSE:  How long have we been going?
2  Do we need to take another break?
3      MR. COUNTS:  Let's take a break.
4      THE VIDEOGRAPHER:  Going off record.  The
5  time is approximately 11:32 a.m. on June 5, 2018.
6      (Recess.)
7      THE VIDEOGRAPHER:  Going back on record.
8  The time is approximately 11:49 a.m. on June 5,
9  2018.
10      (Exhibit No. 1 was marked.)
11      Q.   Mr. Anderson, let me show you what we've
12  marked as Exhibit 1.  It's a series of photographs
13  and has a small number down there by the exhibit
14  sticker that says CLAIMS and then 000051.  And the
15  documents go from 51 to 55.  Can you just flip
16  through those photographs and see if you've ever
17  seen any of those photographs before?
18      A.   I can't say I've seen these photographs
19  before, no.
20      Q.   Let's go back to the front page.  And then
21  we'll kind of flip page by page, and I want to ask
22  you a few questions.  Do you know anything about
23  what is shown on the first page of Exhibit 1, which
24  has the Bates stamp number 51 on it?
25      A.   The back tire, Polaris tire.

73

1      Q.   Do you have any idea what's trying to be
2  shown in those photographs?
3      A.   No.
4      Q.   If you flip to the second page, please,
5  which is Bates number 52, in the lower left-hand
6  corner you can see the Ranger there.  Is that the
7  Ranger you were driving?
8      A.   I can't say it's the exact Ranger I was
9  in, but it's similar.
10      Q.   And then if you look in the upper
11  right-hand corner, you can see there's a road and
12  then a field.  Do you see that photograph?
13      A.   Uh-huh.
14      Q.   Do you remember as you were driving that
15  day back to pick up additional volunteers that you
16  were driving through a field like the one shown in
17  the upper right-hand photograph?
18      A.   Yeah.
19      Q.   Do you remember that there was a road that
20  kind of wound around that field that would have been
21  an option for you to take to get back to where you
22  were going?
23      A.   No.  There was no road to get back to
24  where I was going.  They have a partial, like I
25  said, path, if you want to call it.  This is

74

1    probably it right here.  I don't know.  It has a few
2    little limestone and dirt on it.  From the obstacle
3    I was coming from, there was no road, though.  I was
4    coming up to this little path when the cart flipped,
5    I guess.
6        Q.    So you don't remember, then, cutting
7    basically across the field to get from one point of
8    the road to another point of the road?
9        A.    The road stopped at the field, if I can
10   remember correctly.  The field, the obstacle where I
11   dropped the lady at, was in the middle of that
12   field.  It wasn't on the road.  So we would have to
13   go through the field to get to the obstacle.  Again,
14   the obstacles are not on a trail.  It's in the
15   field.
16       Q.    And do you remember, as you were heading
17   out across that field, was it smooth?  Was it bumpy?
18   How would you describe the terrain?
19       A.    I would describe it as a normal field.  I
20   mean, it might have been a little bumpy.  It
21   describes the field right here.  It looks like that.
22   I would say it was maybe bumpy, but I wouldn't say
23   it was more than normal.  Like I said, I drove back
24   and forth from that obstacle all week.  I helped set
25   it up, helped build it.

75

1        Q.    Do you know from looking at this page,
2    Bates number 52, the upper right-hand corner, can
3    you tell from that photograph where you were coming
4    from and which direction you were traveling?
5        A.    It seems to be coming opposite to me.  To
6    be honest, I don't recognize this photo at all.  I
7    can't say that this is the exact field.  This road
8    don't seem familiar.
9        Q.    All right.  If you flip a couple pages
10   back to page 54, on the left-hand side you'll
11   actually see, I believe, it's a picture of the
12   Ranger on its side.  Can you tell from either of
13   those pictures which direction you were coming when
14   the accident happened?
15       A.    No.  I can't say which direction I was
16   going.
17       Q.    Was your plan at the time the accident
18   happened to get to the dirt road and then follow the
19   dirt road the rest of the way in?
20       A.    Like I say, the dirt road did not go in.
21   The dirt road went up to the limestone.  And I was
22   going to have to take a right, I believe, and cut
23   across the limestone and go across the racetrack to
24   head back to where we were.  This road did not go
25   back to where we were.  This is like an outskirts

76

1    road, if I remember, just going around the property.
2        Q.    So your memory is you just would have had
3    to be crossing the fields to get back from the
4    obstacle back to where you wanted to be.
5        A.    If I remember correctly, I crossed the
6    field and come to the road which would pass by
7    another obstacle.
8        Q.    Flip one more page back to Bates 55.  The
9    upper left-hand corner, I believe that's a picture
10   of the glove compartment with the owner's manual in
11   it.  Is your memory, then, that you did not see the
12   owner's manual and didn't read it, right?
13       A.    No.  I don't think I would have opened the
14   glove box and read the owner's manual before I went
15   and dropped somebody off.
16       Q.    The bottom left-hand picture, as I
17   understand it, shows that the seat belt -- when the
18   Polaris Ranger was tipped back up, that the seat
19   belt was attached behind you.  Does that picture
20   ring any bells?
21       A.    Like I say, I wouldn't have done it
22   myself.  Because, like I say, the seat belt would
23   have bothered the back of my tailbone.  If it was
24   like that, I don't recall.
25       Q.    I don't think I actually want to mark

77

1    these.  I'll let everybody look at them.  This is
2    what I understand to be your 2013 tax return.  Do
3    you keep copies of your tax returns?
4        A.    All of my tax returns are in my file.
5        Q.    This shows in 2013 it looks like you had
6    total income that year of about $16,230.  Does that
7    seem about right?
8        A.    I can't recall.  But I'm sure if these are
9    my things on file, it is correct.
10       Q.    I believe somewhere it lists you as a
11   floor installer helper.  Would that be income, then,
12   that you made from helping your dad's company?
13       A.    Right.
14       Q.    Do you believe in 2013 you made money from
15   working for anyone other than your dad's company?
16       A.    No, not that I recall in 2013.  Not that I
17   recall.
18       Q.    Same thing with your 2014 tax records.
19   That, again, shows in 2014 that you had total income
20   of $21,000.  And, again, you were working as a floor
21   installer helper.  Does that seem about right that
22   you made $20,000 or so in 2014?
23       A.    I can't recall the exact amount.  Like I
24   said, I usually have a tax preparer do all of my tax
25   work.

78

1    Q.    These say that they're self-prepared.  Do
2  you know who actually would have prepared them?
3    A.    My momma.  My momma is an accountant.  She
4  would do it.
5    Q.    So your mom would take care of your taxes?
6    A.    All of them.
7    Q.    Has that always been the case?
8    A.    Pretty much, yeah.
9    Q.    There's 2015.  So this would have been the
10  year before the accident.  And it shows you had
11  income of $8,832.  Again, as a floor installer
12  helper.  Do you recall in the year before the
13  accident that you only made $8,832?
14    A.    I can't recall the exact amount.  Like I
15  said, I'm not in charge.  The tax people were.  Like
16  I said, my mom does my dad's company.  I'm sure
17  that's probably what they paid me that year if
18  that's what's on file.
19    Q.    Would it be your practice to make sure on
20  your tax returns that you reported all of the income
21  that you made that year?
22    A.    Yeah.
23    Q.    So in determining how much you made in the
24  years leading up to the accident, is it fair for us
25  to rely on your tax returns to see how much you

79

1  made?
2    A.    I mean, some years -- like I say, it's
3  been in construction.  It varies so much.  I
4  wouldn't say that you can rely entirely on that.
5  But that shows, obviously, how it varies from year
6  to year.
7    Q.    I understand that.  For instance, if we
8  look at 2015, is it fair for us to rely on these tax
9  records for 2015?
10    A.    To say that's the amount I made, right.
11    Q.    Did your wife also work during the time
12  before the accident?
13    A.    Yes.
14    Q.    Did she file separate tax returns?
15    A.    Yes.
16    Q.    What did she do before the accident?
17    A.    My wife had multiple jobs.  She worked as
18  a supervisor in Winn-Dixie for some years.  She
19  supervised the Best Western Hotel.  And now she's in
20  the hospital.
21    Q.    Were you wearing a helmet when you were
22  riding in the Ranger that day?
23    A.    No.
24    Q.    Was there a helmet that was available for
25  you to be used?

80

1    A.    No.
2       (Exhibit No. 2 was marked.)
3    Q.    So this next one I've just tried to put
4  some in a group here.  The numbers that I'll refer
5  to on the bottom of Exhibit 2, there's some numbers
6  and then there's a number.  For instance, the first
7  page has a 14.  Do you see that?
8    A.    Uh-huh.
9       MR. BRADY:  You have to answer yes.
10       THE WITNESS:  Yeah.
11    Q.    So you can see the 14 shows the Ranger
12  from the back.  And there's a warning label that's
13  in the middle of the Ranger there.
14    A.    Yeah.
15    Q.    Do you remember seeing that warning?
16    A.    I can't say I remember seeing that warning
17  on that day.  I'm sure I read it before, but I can't
18  say that I did.
19    Q.    What makes you say that you're sure you
20  read it before?
21    A.    Like I said, I have a habit of reading
22  warnings.  I load tools in the back of these things
23  on a day-to-day basis.  So if I didn't read it, it's
24  probably because I read it already.
25    Q.    So you think you read that warning on this

81

1  particular Ranger --
2    A.    I'm almost positive I did.
3       MR. COUNTS:  Hold on.  Listen to his
4  question.  Listen to his question.
5    Q.    On this particular Ranger, the Ranger you
6  were using at the time of the accident, do you think
7  you read that warning that's shown on page 14 of
8  Exhibit 2?
9    A.    I can't say that I did read that warning.
10  It's a possibility, but I don't recall.
11    Q.    Was there anything in the bed of the
12  Ranger at the time of the accident?
13    A.    Yeah.  I had a bucket with the
14  walkie-talkies.  I had waters, a case of waters, for
15  the volunteers.
16    Q.    Anything else?
17    A.    Not that I recall, no.
18    Q.    Flip back to a page that has a 157 on the
19  bottom.  I'm not going to ask you about all of these
20  photos.  Can you see the one that has the 157 on the
21  bottom?
22    A.    Yeah.
23    Q.    And you see there's a warning label that
24  would be just to the left on the dashboard just to
25  the left of the panel there?

82

1    A.   I don't see a warning.
2    Q.   Flip to 151.  I think that has a close-up
3  of that warning.  I asked you earlier, do you
4  remember on the morning of the accident seeing that
5  there was a warning label that was partially covered
6  by a heat vent?
7    A.   On the morning of the accident?  I can't
8  say that I remember this.  If this is the vehicle,
9  that's probably how it was.  I can't say that I
10  remember reading a warning like that, though.  I
11  don't remember no heat vent being on it, no.
12    Q.   You don't remember before the accident
13  seeing that there was a warning label that was
14  partially covered by a heat vent, correct?
15    A.   I can't say that I remember that.
16    Q.   Do you remember reading anything on that
17  warning that was visible?
18    A.   Like I said, this looks familiar.  Like
19  this may have been how the cart was.  But I can't
20  say that I remember, no.  I can't say that I
21  definitely for sure remember that this is how it
22  was.  Like I said, I drove a lot of them.
23    Q.   Flip back a couple more.  There's one that
24  shows the entire thing.  207 is the page.  Do you
25  see that?

83

1    A.   Yes.
2    Q.   Do you remember whether the Ranger had any
3  doors on it at the time that you were driving it
4  that morning?
5    A.   If I can recall right, it did not have
6  doors on it.
7    Q.   Did you have any discussion with anyone
8  before the accident about whether it should have
9  doors or shouldn't have doors?
10    A.   I might have mentioned it to one of the
11  co-workers or something maybe before or after the
12  accident.  Because I did notice it had hinges but no
13  doors.
14    Q.   You did notice that before?
15    A.   I did notice that before, yeah.
16    Q.   And did you mention that to anyone?
17    A.   Like I said, I don't recall mentioning it
18  to anyone.  Because I was not driving this vehicle.
19  I seen this vehicle just like you're showing it
20  here.  I seen it parked in the yard.  I seen it when
21  the maintenance guy had came to work on it a couple
22  of times.  I seen it.  As you can see on the
23  picture, you see the hinges right by the back of the
24  thing.  And that's what I noticed.  That's what made
25  me think it might have had doors at one time.  I

84

1  can't recall mentioning it to nobody.
2    Q.   Did that raise any concerns to you that it
3  looked like it had hinges for doors but didn't have
4  doors?
5    A.   It didn't concern me at all.  Because of
6  the fact, like I said, I've never had one tilt over,
7  ever.  No no-name brand, none of them.
8    Q.   In your prior experience riding these
9  side-by-sides, had you ridden either Rangers or
10  similar other side-by-sides that did have hard doors
11  on them?
12    A.   Yes.
13    Q.   Had you ridden others that had nets, side
14  nets?
15    A.   Yes.
16    Q.   Do you know whether when these Rangers
17  were delivered to the Salt Lake City course location
18  whether they had doors on them?
19    A.   I can't say definitely if they did or
20  didn't.  But to my knowledge, I believe they didn't
21  because every time I seen them on the yard they were
22  just like what we're seeing in the picture.  They
23  did not have doors on them.  And we weren't in the
24  practice of removing them.
25    Q.   You weren't what?

85

1    A.   We weren't in the practice of removing the
2  doors.  After we got the cart, we would work.
3    Q.   In any of the prior BattleFrog jobs, had
4  you driven a Ranger like this one?
5    A.   Yes.
6    Q.   On those prior jobs, did the Ranger have
7  either doors or side nets?
8    A.   Some of them did.  And some were just like
9  this.
10    Q.   When the Rangers that you've driven on
11  other occasions have doors or side nets, did you use
12  the doors and side nets?
13    A.   Yes.
14    Q.   But on some of those prior jobs there were
15  Rangers that didn't have either doors or side nets?
16    A.   Yeah.  Some of those had Rangers similar
17  to what we're looking at.
18    Q.   Do you know whether on any of those prior
19  jobs that it was BattleFrog that had removed the
20  doors or the side nets?
21    A.   To my knowledge, to the best of my
22  knowledge, BattleFrog never removed no side nets or
23  doors.
24    Q.   Who at BattleFrog would best know how this
25  Ranger was delivered to the obstacle course location

86

1  in Salt Lake City, Utah?
2      A.  I would say it would be the higher-ups.
3  It would be like Beard, which is Chris.  A guy named
4  Peter.  A guy named Jim.  I think it was Jim that
5  was ordering most of the equipment.  But the guys in
6  the office would have known how it came.
7      At the time I was working, like I said, it
8  was delivered into the yard.  To my knowledge, this
9  is how it came.
10     Q.  Have you ever received treatment for your
11 accident in Houston, Texas?
12     A.  I was supposed to receive treatment in
13 Houston.  Actually, it was the doctor in Salt Lake
14 who referred me to the doctor in Houston.  The
15 doctor in Houston, I seen him.  And I had to pay for
16 the visit because he didn't have clearance or
17 whatever through the insurance.  I did see him once.
18     Q.  Do you remember that doctor's name?
19     A.  No, sir, I can't say I remember his name.
20 Coplinger, I believe, or something like that.  It
21 was a long name.
22     Q.  Let's talk about this job first.  Did
23 anyone from BattleFrog give you any instructions or
24 directions with respect to operating the Ranger on
25 this job?

87

1      A.  Not on this job.  Because, like I said,
2  I've been to quite a few jobs.  By the time we got
3  to this job, like I say, I was like over a
4  supervisor now.  I had experience.  Of course, the
5  first day working with the company you would get
6  training on all of that.
7      Q.  On prior jobs for BattleFrog, had they
8  given you any instruction about how to safely
9  operate these side-by-sides on the work site?
10     A.  Yes.  On our first.  Like I said, when I
11 started in Miami.
12     Q.  Tell me what you can remember being
13 instructed about that.
14     A.  I mean, pretty much all I can remember is
15 they would just tell you how to safely operate it.
16 We had a guy that went over everything with us
17 before you start.
18     Q.  Who was it that provided you the training?
19     A.  I can't say I remember the guy's name.  I
20 believe it was Karl.  I believe it was Karl.  It was
21 just basically like a once over, you know, how to
22 start, back up, look around, check your
23 surroundings.  Basic safety.
24     Q.  As part of that basic safety training, did
25 he tell you to always make sure you wore your seat

88

1  belt?
2      A.  Yes.
3      Q.  Was any of that basic training directed to
4  making sure you used either side nets or doors on
5  these?
6      A.  No.  Like I said, a lot of them don't even
7  have side nets or doors.
8      Q.  Was it a requirement of BattleFrog for you
9  to be using your seat belt when you were driving a
10 side-by-side like this one?
11     A.  No.  The job is basically like a milkman.
12 You would stop at this location, get out, deliver
13 tools or supplies, get in, go down 50 yards, deliver
14 tools and supplies, get in, go back and get some
15 more, come back.  I mean, we were instructed to put
16 our seat belts on.  But it wasn't like nobody never
17 really, I would say, stayed over it, like, "Put your
18 seat belt on, put your seat belt on."  Because
19 you're getting in and out.
20     Q.  I was asking you questions earlier about
21 just your practice of following safety rules and
22 that sort of thing.  I asked you about whether it's
23 legal to operate a vehicle with a gun in it with
24 your children in the car.  Have you ever been
25 charged with a crime for operating your vehicle with

89

1  a gun in it and your children in the car?
2      A.  No.  In Louisiana, operating a vehicle
3  with a gun in it is no different from operating a
4  vehicle without a gun in it.
5      Q.  Even if you have your children in the car
6  with you?
7      A.  Even if you have your kids in the car.
8  You can have your children.  You can bring your
9  children on hunting trips in Louisiana.
10     Q.  I'm just looking through my notes.  Do you
11 remember in this case being sent written questions
12 that you needed to answer for purposes of the
13 lawsuit?  Do you remember that at all?
14     A.  Written questions I needed to answer to
15 whom?
16     Q.  From your attorney.  Strike that.  Let me
17 ask you this.  I'm just looking at plaintiff's
18 responses to some discovery requests from BigRentz.
19 And the question that asks about how the accident
20 happened, the answer is that, "Plaintiff would state
21 that plaintiff has no memory of how the accident
22 occurred."  And I'm just wondering, is that
23 accurate?  Do you have no memory of how the accident
24 occurred?
25     A.  Because in effect, like I said, I hit my

90

1   head. I woke up with the vehicle on me. So I can't
2   definitely tell you how the accident occurred. See
3   what I'm saying? And from that moment I was air
4   lifted to the hospital into emergency surgery.
5   Three, four weeks later I'm still in the hospital on
6   daily medications and still going through surgeries.
7   By the time I spoke with a lawyer --
8       MR. COUNTS: No, no, no.
9   A.  No memory of that.
10  Q.  You've identified in your discovery
11  answers Dr. Brian Wilder as your primary care
12  physician.
13  A.  Uh-huh.
14  Q.  Had he been your primary care physician
15  for some time before the accident?
16  A.  Yeah.
17  Q.  Had you seen any other doctors prior to
18  your accident?
19  A.  No. I was pretty healthy. That was a
20  family physician that I would see for minor colds
21  and things of that sort.
22      MR. ROSE: It's either a good time for me
23  to pass the witness or to take a lunch break.
24      MR. BRADY: Why don't we take a break.
25      MR. COUNTS: Sounds good.

91

1       THE VIDEOGRAPHER: Going off the record.
2   The time is approximately 12:18 p.m. on June 5,
3   2018.
4       (Noon recess.)
5       THE VIDEOGRAPHER: Going back on the
6   record. The time is approximately 1:33 p.m. on June
7   5, 2018.
8   BY MR. ROSE:
9   Q.  Mr. Anderson, I have just a few additional
10  questions for you. We've talked before and you've
11  testified that you were always a guy that would
12  follow the safety rules, right?
13  A.  Uh-huh.
14  Q.  Is that a yes?
15  A.  Yeah.
16  Q.  Was that the case both before and after
17  your accident?
18  A.  I would say, yeah, mainly before. After
19  the accident, I never drove one again.
20  Q.  I'm just talking about your general
21  practice of following safety rules and safety laws
22  and that sort of thing. Would you say you were a
23  rule follower both before and after the accident?
24  A.  Yeah. I would say I followed the rules
25  just about as much as the next person.

92

1   Q.  You have an Instagram account?
2   A.  Uh-huh.
3   Q.  I just want to go through. If it's
4   possible for the court reporter to get these on
5   here. I just want to make sure that this is you and
6   ask you a few questions about some of your Instagram
7   account.
8   A.  Can I ask how this pertains to this case?
9       MR. COUNTS: Just go ahead and answer.
10  Q.  Is that your Instagram?
11  A.  Yeah.
12  Q.  And how do you pronounce that?
13  A.  Daidaebankrollz.
14  Q.  This looks like it's dated February 6. Is
15  that February 6 of this year?
16  A.  I can't verify that, but more than likely.
17  Q.  What I'm going to do is I'll mark these
18  when we get done with this at the end of the
19  deposition, a CD that has each of these Instagram
20  videos on it. But, generally, to go to your
21  question, this is just about your safety habits, I
22  think is how I would best describe these. Let's
23  just play through this one, and I'll ask you a few
24  questions. Those are your two daughters?
25  A.  Uh-huh.

93

1   Q.  Which two daughters?
2   A.  That's Kaylee and Celina.
3   Q.  And how old are they?
4   A.  Two and six.
5   Q.  And can you tell which vehicle you're
6   driving in here?
7   A.  I'm actually a passenger in my daddy's
8   truck.
9   Q.  This is your dad's truck?
10  A.  That's my dad's truck.
11  Q.  Can you tell where you're driving?
12  A.  I can't tell in the background, no.
13  That's my brother-in-law who is driving. If you see
14  the video, I'm in the passenger seat.
15  Q.  Say that again.
16  A.  I believe it's my brother-in-law driving
17  or whatever. The video is recorded out of the
18  passenger seat. It's not the driver of the car.
19  Q.  Is that a pickup truck?
20  A.  Uh-huh. Yes.
21  Q.  Are you sure that's not a reverse angle of
22  you driving? That your brother-in-law wasn't
23  actually driving at the time?
24  A.  I'm almost completely positive that my
25  brother-in-law was driving at the time.

94

1    Q.    That one was dated February 6th of 2018.
2    We'll look at one that's dated -- that was you and
3    your kids in that Instagram, right?
4    A.    Yeah.
5    Q.    So this one is dated September 5th of
6    2017. Are you driving in that one?
7    A.    I believe I was in that one.
8         MR. COUNTS:  No, you weren't driving.
9    Look where the seat belt is.  The seat belt is over
10   your right shoulder.  It means you're a passenger.
11   A.    I'm a passenger.
12   Q.    Whose vehicle is this?
13   A.    That's my truck.
14   Q.    That's what?
15   A.    That's my F-150.  It's really under my
16   mom's name.  It's my vehicle.  I drive it most of
17   the time.  That's my .40 Glock.  No, that's my .45,
18   I think.
19   Q.    August 27, 2017, is the next one we'll
20   look at.  Is that your daughter?
21   A.    Uh-huh.
22   Q.    What kind of a weapon is that?
23   A.    It's an Airsoft, I believe.  Actually, it
24   might just be a plastic toy.  It's for my son,
25   actually.  It don't shoot nothing at all.  I think

95

1    it might be a Nerf gun.
2    Q.    Not a real weapon?
3    A.    No.  That's a plastic one.  I don't think
4    a two-year-old would be able to carry that.
5    Q.    August 1, 2017, is the next one.  And this
6    one I just want to ask you, it says, "After a hard
7    day work."  And then it looks like it's an Instagram
8    that you take of a hotel or motel room.
9    A.    That brings me back to when I told you I
10   was trying to start up a construction company.  That
11   was those guys that was working with me.  Yeah, we
12   was trying to do some work that day in Arizona.
13   Q.    And did you actually get some work going
14   then and make some money doing some work?
15   A.    I did a few jobs.  Like I said, I did do a
16   job.  I mean, not myself.  They did a job for the
17   company that I had started.  But, no, I did not make
18   no money with that company.  I actually spent money.
19   It should show on my tax return.
20   Q.    Did you file your 2017 tax returns?
21   A.    I did.
22   Q.    2016 and 2017?
23   A.    Yep.
24   Q.    Do you have copies of those?
25   A.    I don't have them here, but I can get

96

1    them.  I have all of that on file, yeah.
2    Q.    This one is June 27, 2017.  That's
3    actually just when you're in one of your recent
4    surgeries, right?  Did you have a surgery around
5    June of 2017?
6    A.    Yeah.  This is right before I'm going back
7    to the surgery.
8    Q.    I don't know that I have any questions
9    about that one.
10        May 15, 2017.  Are you a passenger in this
11   one?
12        MR. COUNTS:  Yes.  You can see the seat
13   belt.
14   A.    That's what I'm saying, all of them I'm in
15   the passenger because of the seat belt.
16   Q.    See, the reason I ask about the driving is
17   it looks like there's an empty seat next to you over
18   here.  What vehicle is that?
19   A.    I don't know.  I can't tell you exactly
20   what vehicle I'm in right there.
21   Q.    See, right there, that looks like that's
22   an empty seat next to you.
23   A.    Maybe.  And, again, the vehicle might not
24   even be moving.  You know what I'm saying?  I'm not
25   the type of guy to video and drive.  If the video is

97

1    there, it's a video like this and back to the road.
2    The camera would be on the side.  I'm looking at the
3    road.  You can tell the ones   they're probably not
4    up here, but you can tell the ones where I'm
5    driving.  It's obvious.  I'm looking at the road.
6    Q.    What vehicle is this again?
7    A.    Like I say, I can't -- it's not none of my
8    vehicles.  It may have been a rental car.  I don't
9    know.
10   Q.    The next one is April 11, 2017.  That one
11   looks like it's showing your daughter standing up in
12   the front seat.
13        MR. COUNTS:  If he's a passenger, you're
14   saying the daughter was driving?  I'm not sure what
15   your question is.
16   Q.    What I'm getting at here is that if you
17   reverse your camera on this, it looks like you're in
18   the passenger side but you're actually driving.  So
19   it's a reverse image.
20        MR. COUNTS:  Where's the seat belt at?
21        MR. ROSE:  If it's reversed, it would look
22   like it's your --
23        MR. COUNTS:  But you can tell from the
24   shoulder.  If you're driving, it comes over your
25   left shoulder.  If you're a passenger, it comes over

98

1 the left shoulder. There's no reverse angle seat
2 belts in any vehicle in the United States.
3    A.   And a lot of times, man, if you see me
4 recording a video --
5      MR. COUNTS: Just let him ask a question.
6 I'm just trying to clarify. The seat belt will show
7 you definitively where he's at because there are no
8 front seat reversed geometry seat belts in the
9 United States. It's clear he's in the passenger
10 seat in all of these videos. Look at the seat belt.
11 He could be in the second row. It could be a
12 three-row SUV.
13      MR. ROSE: Let me just ask some questions.
14      MR. COUNTS: I don't want you
15 misrepresenting what the video shows.
16      MR. ROSE: Right. That's why I'm asking.
17    **Q.   So you think you're a passenger in this as**
18 **well?**
19    A.   More than likely.
20    **Q.   Are there vehicles, then, that you ride in**
21 **that do have three seats like a van or something?**
22    A.   We did have at one time a Sequoia. Right
23 there I'm not positive, but it looks like it's the
24 truck, the same F-150. And it looks like I'm the
25 passenger.

99

1    **Q.   So this is on March 22, 2017. Are you a**
2 **passenger in this one, too?**
3    A.   I don't know. From my memory, she
4 happened to be going to the doctor with me because I
5 had to go back to the doctor every day. I believe
6 she was sleeping on the back seat. She was sleeping
7 and she just woke up.
8    **Q.   March 2, 2017. Is that your daughter in**
9 **the front seat?**
10    A.   Yeah. It looks like -- like I said, we're
11 coming from checking the mail. I'm not even on the
12 street. That's our driveway. My dad's house is
13 like a half mile from the road.
14    **Q.   The next one is February 29, 2017. What**
15 **car is this?**
16    A.   It must be a rental car.
17    **Q.   Does that show your daughter in the front**
18 **seat?**
19      MR. COUNTS: Look at the seat belts. That
20 has to be a second row of a three-row vehicle.
21    A.   I don't even recognize the vehicle. It's
22 not my personal vehicle.
23    **Q.   This might be the last one. February 8,**
24 **2017. So do you think in any of those videos you**
25 **were actually driving or were you the passenger in**

100

1 all of those?
2    A.   Most of them. It looked like to me all
3 the videos I was a passenger. The last video you
4 just showed, I may have been the driver. But I
5 wasn't driving. As you can tell, I'm parked at the
6 house. The guy in the back seat was just getting in
7 the car.
8    **Q.   And do you remember driving a car that had**
9 **three seats, some sort of a van or something?**
10    A.   Like I said, we did have a Sequoia with
11 that. I might have rented vehicles like that
12 because I have kids and we do fill up a car. The
13 only video I can say that I remember anything was I
14 remember my daughter waking up out of her sleep.
15 She was laying across the back seat.
16      (Exhibit No. 3 was marked.)
17      (Exhibit No. 4 was marked.)
18    **Q.   Are you in some sort of a band or**
19 **something?**
20    A.   I started my own music group, yes. I'm in
21 the process.
22    **Q.   And it's called BankRollzMafia Music?**
23    A.   Yeah.
24    **Q.   I've actually listened to some of this**
25 **music, and it's pretty good. Does this have all of**

101

1 the songs, then, that your band has recorded that
2 are listed on this Exhibit 4?
3    A.   These are some of them, yes. Not all of
4 them, no.
5    **Q.   Has that produced any income for you? Are**
6 **you making any money doing that?**
7    A.   No. Not at the moment, no.
8    **Q.   Do you plan to work on that further or**
9 **what's your plan with respect to your band?**
10    A.   To be honest, it had been around. It had
11 been an idea. I had been something we'd been at.
12 When I got hurt, I had time to buy equipment, studio
13 time, basically this. But I did not have time for
14 all of this before.
15    **Q.   So is this a band that you formed after**
16 **the accident, then?**
17    A.   Let's say we did most of our recording and
18 work after the accident, yes. I mean, we were
19 already, I guess, formed as a group before the
20 accident.
21    **Q.   The songs that you see recorded on here,**
22 **were those all recorded after the accident?**
23    A.   Yeah. This account was created after the
24 accident. Everything on here was recorded after the
25 accident. Maybe this one here was recorded before

102

1   the accident, the last one at the bottom. But
2   nothing was put on this website until probably after
3   the accident was when this site came on.
4       Q.   And who else is your band with you?
5       A.   I mean, pretty much a lot of my homeboys,
6   people I grew up with. People younger than me. To
7   be honest, it's my equipment I got from just over
8   time I've accumulated. I always was into music.
9   I've been into music since a child. I don't know.
10  I kind of promoted music, always did. I mean, kids
11  that grew up around me like music, too. I can't say
12  they all signed into some group or nothing, but we
13  all just do music together pretty much.
14      Q.   And you just record at a recording studio
15  or something, or do you actually do your recording?
16      A.   I actually do everything myself. I think
17  maybe one song we went to a recording studio. I
18  think when I was in Arizona we went to a recording
19  studio, Assault Mine Oasis Recording Studio.
20      MR. ROSE: I think I'm done. I'll look at
21  my notes. I'll pass you to Mr. Brady. I think I'm
22  done.
23                  EXAMINATION
24  BY MR. BRADY:
25      Q.   Mr. Anderson, you have had some income tax

103

1   returns produced here. And looking at your 2013 tax
2   return, you had your listed address at 816 DeJean
3   Circle, Crowley, Louisiana. Is that where you were
4   living in 2013?
5       A.   More than likely, yeah. If that's the
6   address on there, that's where I was living.
7       Q.   In 2014, on your tax return you listed
8   2014 Division Street in Jennings, Louisiana as your
9   address. Is that where you were living in 2014?
10      A.   Yeah, probably. And then moved back to my
11  mom.
12      Q.   And in 2015, your tax return indicates
13  that you were at 109 Jaubert Lane in Duson,
14  Louisiana. Is that where you were residing at that
15  time?
16      A.   Yeah.
17      Q.   In your answers to interrogatories filed
18  in this case, you again list the Division Street
19  address as where you were living when these
20  interrogatories were answered in 2017. Is that
21  where you're currently living?
22      A.   Yes.
23      Q.   Where were you living at the time of the
24  accident on May 14, 2016?
25      A.   If I can remember correctly, that was when

104

1   I was in between houses. It was before we moved to
2   Cyrus Circle where my wife still stays now. I was
3   probably between if it wasn't Duson. When I left
4   Duson, I stayed at my mom's a little while before we
5   moved to the Cyrus home. It might have been my
6   mom's because I was there before I moved to the
7   Cyrus home. Like I said, me and my wife had hectic
8   problems, so I can't say if I was staying with her
9   still or if I started staying back at my mom's. But
10  I believe I started staying back to my mom's house.
11      Q.   You previously testified in February 2016
12  you went to work for BattleFrog; is that correct?
13      A.   Yes.
14      Q.   How were you recruited by BattleFrog?
15      A.   Again, my brother did the welding for I
16  think his name was Karl Peluchette. I think it's
17  Peluchette. Karl did hire me. Karl designed the
18  metal rods or pipes we was using. I can't remember
19  the name we called them. He designed it. He needed
20  construction background to build them, so that's how
21  I got recruited.
22      Q.   What was your brother's name?
23      A.   Christopher Anderson.
24      Q.   When you went to work for BattleFrog, did
25  you sign any type of an employment agreement with

105

1   BattleFrog?
2       A.   I did not have no kind of agreement, no.
3   I mean, paperwork when we got hired. Just my bank
4   account for my check pretty much. I did not get a
5   paper with a job description and all that, no.
6       Q.   You indicate at the time of the accident
7   in May 2016 you were being paid on a $275-per-day
8   per diem; is that correct?
9       A.   Yeah.
10      Q.   Were there any withholdings, tax
11  withholdings, taken out of those per diem payments?
12      A.   As far as I know, no. I can't say that it
13  was or it wasn't. If I can remember correctly, I
14  don't think it was. I think we had to pay our own
15  taxes. But I'm not positive on that answer.
16      Q.   Did you ever receive a W-2 from BattleFrog
17  for the income that you earned working for
18  BattleFrog in 2016?
19      A.   I believe I did. I believe if I did it
20  should be in my tax paperwork. It should be filed.
21      Q.   Did you receive a 1099 from BattleFrog?
22  Do you remember? Do you know what a 1099 is?
23      A.   Like I said --
24      MR. COUNTS: He said do you know what a
25  1099 is.

106

1    A.   I know what a 1099 is.  I can't verify if
2  it was a 1099 or a W-2 form.  I don't know which
3  form I got.
4    Q.   Now, with regard to expenses when you
5  traveled for BattleFrog, you mentioned Texas and
6  Kansas, Georgia, Florida.  Who paid your expenses?
7    A.   The expenses came out of -- I mean, we
8  paid our own expenses food wise.  BattleFrog took
9  care of the hotels, the lodging.  That's it.
10    Q.   So BattleFrog paid for the hotels.
11    A.   Yeah, they paid for where you was staying.
12  That's it.
13    Q.   Did BattleFrog pay for your meals?
14    A.   No.  No, they didn't pay for my meals.
15    Q.   What about transportation between job
16  sites, did BattleFrog pay for that?
17    A.   No.  No.
18    Q.   For the Utah job in May of 2016 for
19  BattleFrog, you indicated you drove a rental car to
20  Salt Lake City.
21    A.   Yeah.
22    Q.   Who paid for the rental car?
23    A.   Me and Jake split the difference.
24    Q.   What was Jake's last name again?
25    A.   Taylor.

107

1    Q.   Now, with regard to these programs, these
2  BattleFrog programs or events that you set up for,
3  were they races or what was the program?
4    A.   Basically it was cross training races like
5  cross-fit racing.  I can't say it was basically just
6  for the winner, like run around and race and a
7  winner.  Like I say, people brought their kids out.
8  It was just an exercise thing, a fun thing.
9    Q.   Were motor vehicles involved in the
10  racing?
11    A.   No.  It was a foot race.
12    Q.   Oh, okay.  So you say it was a cross-fit
13  thing where people in different classes would go out
14  and go through different obstacles?
15    A.   Right.
16    Q.   Is this like this pig run, mud run, thing
17  that we see?
18    A.   Right.  Like Tough Mudder or Spartan,
19  basically.
20    Q.   With regard to the obstacles that you
21  would set up with these pipes, what types of
22  obstacles were they?
23    A.   Obstacles varied.  We did what we call
24  jacks.  It would be like the Normandy Beach jacks
25  with wire.  You'd have to go around the jacks and

108

1  under that.  We did six-foot walls, eight-foot
2  walls.  We did ramp walls.  We did various cross-fit
3  things.  Rope climbs.
4    Q.   The obstacle course that was set up down
5  by -- was it by Grantsville that this was set up in
6  May 2016?
7    A.   I can't tell you the exact location.  Like
8  I said, I just remember thinking it was a Ford
9  Motorsports Speedway, something like that, where it
10  was.  I don't remember the exact location.
11    Q.   How long are the obstacle courses?
12    A.   The courses vary.  The adult course was
13  sometimes seven miles.  Sometimes less, like four.
14  And sometimes up to 10.
15    Q.   And the kids courses?
16    A.   Same thing.  It would vary.  One kids
17  course we had indoors one time.  It wasn't too big.
18  In Dallas, actually.  It varies from, say, a mile to
19  two miles to half a mile.  It varied.
20    Q.   With regard to the -- I have a location,
21  the Utah Motorsports Academy.  Does that sound right
22  as to where this was?
23    A.   That sounds right.
24    Q.   Let's just call it the Utah sports area,
25  okay?

109

1    A.   Okay.
2    Q.   Just so we're all talking about the same
3  area.  Is your testimony it took you seven to 10
4  days to set up this course?
5    A.   Yeah.  That would be right.
6    Q.   During that period of time did you use
7  ATVs that were made available to you by BattleFrog?
8    A.   Excuse me?  TVs?
9    Q.   UTVs.  They're called utility travel
10  vehicles.
11    A.   Yes, we did use UTVs.
12    Q.   Were these multi-passenger UTVs that you
13  drove?
14    A.   Yes.
15    Q.   Did you drive any UTVs that had four
16  passenger setups before the day of the accident?
17    A.   Yes.
18    Q.   Did any of those UTVs that you drove prior
19  to the date of the accident have doors on them?
20    A.   Yes.  Some did.
21    Q.   And some did not?
22    A.   Yes.
23    Q.   Did you also drive two-seat UTVs before
24  the date of the accident?
25    A.   Yes.

June 05, 2018

110

1    Q.    Did all of those have doors on them?
2    A.    Some did, some didn't.
3    Q.    Would you look at Exhibit 2. And look at
4  page 54. Exhibit 2 is the multi -- Mr. Anderson,
5  it's this one that has the multi pictures on it.
6         MR. COUNTS: This is 1, I think.
7         THE WITNESS: This is Exhibit 1 that I
8  have.
9    Q.    Exhibit 1. Will you look at page 54. Do
10 you see the UTV by the overturned UTV?
11   A.    Yes.
12   Q.    Does that have a door on it?
13   A.    I didn't hear you.
14   Q.    Pardon?
15   A.    I didn't hear the question.
16   Q.    Did the UTV parked by the overturned UTV
17 have a door on it?
18   A.    The one that's parked by the overturned
19 one, I can't say if it has a door or not. That is
20 not ours. That's not one of the UTVs we worked on.
21 But it looks like it don't have a door on it.
22   Q.    Do you know whose UTV is in that photo on
23 Exhibit 1, page 54?
24   A.    It looks to be maybe the medical guys'
25 UTV.

111

1    Q.    Excuse me?
2    A.    It might be the UTV for the medical.
3  Medical did use their own UTVs. It might be one of
4  theirs.
5    Q.    And before the date of this accident, your
6  testimony is you drove UTVs that did not have doors
7  on them in your work at the Utah Motorsports center.
8    A.    We did use UTVs with no doors. I didn't
9  drive none on that race in Utah.
10   Q.    Let's back up. I'm just talking about the
11 Utah race now. On the seven to 10 days you were
12 setting up the course, did you operate UTVs that did
13 not have doors on them?
14   A.    On that course, no. On the day in Utah,
15 the race day in Utah, I was in a Kubota with doors,
16 windows, completely enclosed.
17   Q.    Was the Kubota the only UTV you drove
18 before the date of this accident?
19   A.    In Salt Lake City, yes. I mean, not in
20 Salt Lake. In Utah, yes.
21   Q.    I believe you testified that prior to the
22 Utah trip you had operated Polaris Ranger UTVs.
23   A.    Yes.
24   Q.    And you were familiar with the operation?
25   A.    Yes.

112

1    Q.    Familiar with the use of the seat belts?
2    A.    Yes.
3    Q.    The volunteers that you took out to the
4  obstacles, were those volunteers there just as
5  referees to see that the people went through all of
6  the obstacles?
7    A.    Basically. Similar to referees. They
8  would report back to the race directors if somebody
9  didn't do it right or skipped an obstacle or
10 whatever.
11   Q.    After the accident, did you speak with
12 anyone at the accident scene about what happened?
13   A.    Not that I recall, no.
14   Q.    Did you speak to Robert Garcia, who is one
15 of the BattleFrog employees who first got to you?
16   A.    When he first got there, I mean, he might
17 have spoke to me. If I can remember, he asked me
18 what happened. I was just telling him to calm down.
19 No, I didn't speak to nobody about the accident.
20   Q.    Do you remember giving a statement that
21 you dropped off the volunteers and you were
22 traveling through a grassy area to avoid raising
23 dust?
24         MR. COUNTS: Objection, assumes facts not
25 in evidence.

113

1    A.    No.
2    Q.    Do you remember making that statement to
3  anyone?
4    A.    I never made that statement, no, sir. I
5  don't recall that at all.
6    Q.    Do you remember making a statement that
7  this grassy area had gopher mounds throughout and
8  that you were traveling over that area?
9    A.    No. I don't recall saying that. I'm from
10 Louisiana. We don't have gopher mounds.
11   Q.    Were you traveling through this grassy
12 area to avoid raising dust?
13   A.    No. Because the grassy area is the
14 obstacle I'm coming from. They're sitting in the
15 middle of the field in the grassy area. Where I
16 dropped the lady to was in the middle of the field
17 in the grassy area. I'm coming from dropping the
18 lady when it flipped.
19   Q.    Were you headed back to the road that is
20 shown in those photographs?
21   A.    Yes. I was heading back to the road. The
22 road comes from here and goes around the property.
23 The road would have took me from the field to the
24 opening in the fence so I can get back into the
25 front of the race.

114

1    Q.    Is it your testimony, then, that you were
2  driving to the road shown in the photographs when
3  the vehicle rolled?
4    A.    I was heading to the road, I would say so.
5    Q.    Do you remember giving a statement you
6  felt that the steering was pulling to the right
7  before the accident?
8    A.    No.  I don't recall none of those
9  statements.
10   Q.    Do you remember correcting the steering to
11 the left?
12   A.    No.
13   Q.    Do you remember making a statement that
14 you felt like you hit something before the machine
15 turned over on its left side?
16   A.    No, sir.  To be honest, it sounds like
17 somebody else's statement.
18   Q.    You don't remember making those
19 statements?
20   A.    No, sir.  Not at all.
21   Q.    Tell us what you remember immediately
22 before the rollover.
23   A.    I dropped the lady.  I gave her the
24 equipment, which is waters and a radio.  Made sure
25 her radio worked.  Gave her a test call.  And I was

115

1  headed back to pick up more people.  Like I said, it
2  just tilted.  That's what I remember.  I remember it
3  starting to tilt.  And I would say I'm guessing I
4  was out --
5        MR. COUNTS:  I don't want you to guess.  I
6  want you to tell him what you remember.
7    A.    Again, I remember it tilting.  And I
8  remember waking up, like I said, halfway out the
9  window.  The thing was turned over, as you see.  I
10 went to go get help, and I remember my arm hanging
11 either by my meat or my shirt holding it on.  I
12 don't know what was holding it on.
13   Q.    Did you hit the windshield with your face?
14   A.    Like I said, I'm guessing this is what
15 happened, but I can't tell you this is exactly what
16 happened.  When I woke up and realized what had
17 happened, I was through the windshield.  It was up
18 ahead off of the vehicle.  It was where the phone is
19 at.  This part was on top.  The vehicle was on this
20 part of my body, and I was halfway out of the front
21 of the roll cage where the glass would have been.
22   Q.    So if I understand this, then, after the
23 rollover and you became aware of what was going on,
24 were you over the top of the steering wheel?
25   A.    I would say so.  I mean, I was basically

116

1  tangled up in the roof, if that makes sense.  Like
2  I'm guessing the roll cage had this part this way.
3  I know the roll cage was like right here, so my face
4  was out the glass.  I'm guessing I would be above
5  the steering wheel.  The steering wheel probably
6  would have been by my groin area probably.
7    Q.    So you were out through the front of the
8  vehicle when you came --
9    A.    When I came to.
10   Q.    When you came to.  And the steering wheel
11 was back in your groin area?
12   A.    If I can recall.  Like I say, I can't
13 recall exactly where it was at.  I just can recall
14 where I was.
15   Q.    And then did you crawl out through the
16 front where the broken windshield was?
17   A.    Yeah.
18   Q.    At that time were you pinned in any way?
19   A.    My arm.  I didn't know it was pinned.  I
20 believe it was like this dirt road area right before
21 the limestone.  So maybe I just slid it out through
22 the dirt and the mud.  I didn't have much feeling.
23 I'm guessing adrenalin maybe was pumping.  I don't
24 know.  I just know I had bone coming out of my shirt
25 and clothes.  That just kind of made me wait for

117

1  help.
2    Q.    When you first came to, you were able to
3  get out of the wreck without someone lifting the UTV
4  off from you or anything like that; is that correct?
5    A.    Right.  And, again, I feel like it might
6  have been -- like I say, the dirt may have been
7  loose, so my arm was under enough so I could slide
8  it out.  I pulled really hard on it.  But I didn't
9  get no help getting out from under it.
10   Q.    So you crawled out from where the front
11 windshield would have been, correct?
12   A.    Correct.
13   Q.    Did you have cuts on your face where you
14 hit the windshield?
15   A.    Yes.
16   Q.    And what happened then?
17   A.    Of course, I realized -- that was the
18 first injury I realized.  Blood was in my eye.  I
19 was going to just walk and get help.  I walked a few
20 feet maybe.  Like I said, my arm and bone was
21 sticking out and stuff, so I went back to the cart
22 and dug through for a radio and called for help.
23   Q.    You radioed for help?
24   A.    Yeah.  If I can remember everything, I
25 believe I radioed for help.  I had to find a radio.

118

1  Yeah, I radioed for help.
2      Q.   And you indicated that the windshield was
3  out laying on the ground in front of the UTV.
4      A.   Uh-huh. Yes.
5      Q.   Have you thought that if you were wearing
6  a seat belt why you went through the windshield?
7      A.   I didn't understand.
8      Q.   My question is, have you thought, if you
9  were wearing a seat belt, why you went through the
10 windshield?
11     A.   Well, I wasn't directly through the
12 windshield, I would say. My head was through the
13 windshield. As I said, the dash and all of the
14 steering column was still, like, around this area.
15     Q.   Well, did you have to undo your seat belt
16 to get loose to get out of the vehicle?
17     A.   I don't recall undoing a seat belt. Like
18 I said, all I did was woke up and realized where I
19 was. I knew it flipped or wrecked. Basically
20 survival instinct kicked in maybe. You're just
21 trying to get out of there. So I just did what I
22 can to get out of there.
23     Q.   Would you look at Exhibit 1, page 54. Do
24 you see the seat belt that's pulled out there in the
25 photo?

119

1      A.   Right.
2      Q.   Do you see the dust mark behind it?
3      A.   Yeah.
4           MR. COUNTS: What are you saying, Mike?
5      Q.   Would you look at page 55. You see the
6  seat belt in the retracted position. My question
7  is, do you have an independent recollection of
8  wearing a seat belt?
9           MR. COUNTS: Objection, asked and
10 answered.
11     A.   What was the question again?
12     Q.   Do you have an independent recollection of
13 wearing the seat belt at the time of this accident?
14          MR. COUNTS: Same objection.
15     A.   No. Objection.
16          MR. COUNTS: Mr. Anderson, I have to say
17 certain things for the court reporter to type down
18 for the record so that later on somebody may or may
19 not make a ruling. But unless I instruct you not to
20 answer, you may go ahead and answer his question if
21 you understand it, okay?
22          THE WITNESS: Okay.
23          MR. COUNTS: So can you tell him the same
24 answer you've already told him before.
25     A.   I don't recall. I really don't recall if

120

1  my seat belt was on or not. Like I said, it's not
2  my practice to buckle the seat belt behind me.
3  Because, like I said, the seat belt would dig into
4  the back of my spine. I'm really skinny. If it was
5  strapped like this, I don't know. I don't recall.
6      Q.   Were you operating the Polaris at a speed
7  greater than 15 miles per hour at the time of the
8  accident?
9      A.   I can't recall.
10          MR. COUNTS: Objection, asked and
11 answered.
12          MR. BRADY: Counsel, that is not a proper
13 objection.
14          MR. COUNTS: Asked and answered is not a
15 proper objection?
16          MR. BRADY: No.
17          MR. COUNTS: Since when?
18          MR. BRADY: It is not. I asked him if he
19 was going over 15 miles an hour at the time of the
20 accident.
21          MR. COUNTS: He's already told you that he
22 was going 30 to 35 miles an hour at the time of the
23 accident. Is 30 or 35 greater than 15?
24          MR. BRADY: Do you want me to swear you
25 in?

121

1           MR. COUNTS: Is it?
2           MR. BRADY: Do you want me to swear you
3  in, Counsel?
4           MR. COUNTS: Asked and answered is a
5  proper objection in any state in the union.
6           MR. BRADY: Well, we've got a bunch of
7  requests for admissions here that were being denied,
8  and I'm just getting them cleaned up, okay?
9           MR. COUNTS: I made my objection. You
10 know it's a proper objection. You've probably made
11 it in your entire career. I made the objection.
12 Ask the question again and he'll answer it.
13     Q.   Were you operating the Polaris at a speed
14 greater than 15 miles an hour at the time of the
15 accident?
16          MR. COUNTS: Objection, asked and
17 answered.
18     A.   I believe I was. Like I said, I believe
19 30 to 35 miles per hour is approximately what I was
20 going.
21     Q.   Were you aware that the Polaris Ranger
22 could not go over 15 miles per hour if the seat belt
23 was not fastened?
24     A.   Again, that was something I was not aware
25 of.

122

1       MR. COUNTS:  That's fine if that's your
2    answer.
3       MR. BRADY:  Why are you so touchy about
4    this?
5       MR. COUNTS:  Why am I touchy about what?
6    I simply instructed him that he's answered the
7    question, so we can move on.  Do you want him to
8    answer another question that you haven't asked?
9       MR. BRADY:  I've never had counsel
10   interrupt a client giving an answer before.
11      MR. COUNTS:  I didn't interrupt him giving
12   the answer.  He gave the answer.
13      MR. BRADY:  Would you read the answer
14   back.
15      (Answer read.)
16      MR. COUNTS:  That answered the question,
17   didn't it?  Of course it did.  You know it did.
18   Q.   Mr. Anderson, was the seat belt latched
19   behind you at the time of this accident?
20      MR. COUNTS:  Objection, asked and
21   answered.
22   A.   Again, it's not something I would commonly
23   do, so I don't know.  I don't know if it was
24   strapped behind me.  If it was, I'm sure I would
25   have felt it.

123

1    Q.   Did BattleFrog provide helmets for its
2    employees using UTVs at the Utah --
3       MR. COUNTS:  Objection, asked and
4    answered.
5    A.   No, sir.  As far as I know, we wasn't.
6    Q.   Prior to the setting up the obstacle
7    course in Utah, had BattleFrog ever provided helmets
8    for operating UTVs while setting up its obstacle
9    courses?
10      MR. COUNTS:  Objection, asked and
11   answered.
12   A.   No, sir.  As far as I know, I never was
13   offered helmets.
14   Q.   As you sit here today, do you have any
15   pain in your left arm?
16   A.   Yeah.
17   Q.   Where?
18   A.   It varies locations.  I mean, the wrist is
19   because of the bones grinding on each other because
20   the tendons pulled them down.  And the bone itself
21   where the screw is in, it was broken and the screw
22   is holding it together.  That's just going to be
23   there regardless, like, right here in the forearm.
24   And then the elbow is just torn ligaments.  They
25   hope to reconstruct it.

124

1    Q.   Are you currently taking any pain
2    medication?
3    A.   Not at the moment, no.
4    Q.   When was the last time you took prescribed
5    pain medication?
6    A.   Maybe over a week ago or something.
7    Before I knew about the deposition.  So probably
8    over a week, two weeks.
9    Q.   What type of pain medications were you on
10   or prescribed?
11   A.   Percocet is the only thing that he
12   prescribed.
13   Q.   Does smoking marijuana help you with your
14   pain?
15   A.   Yes.
16      MR. BRADY:  That's all the questions I
17   have.  Thank you.
18      EXAMINATION
19   BY MR. COUNTS:
20   Q.   Mr. Anderson, I think I just have a few
21   questions for you and then maybe we'll be done.
22   Somebody may have a follow-up question or two.
23      On the day of the accident when you were
24   injured, were you under the influence of alcohol or
25   marijuana or any drug?

125

1    A.   No, sir.
2    Q.   The entire time that you worked for
3    BattleFrog, were you ever, while you were working,
4    under the influence of alcohol, marijuana or any
5    drug?
6    A.   No, sir.
7    Q.   Your entire career working at any job,
8    have you ever worked while under the influence of
9    alcohol, marijuana or any drug?
10   A.   No, sir.
11   Q.   The entire time that you worked for
12   BattleFrog, were you ever reprimanded or disciplined
13   or somebody said something to the effect that you
14   weren't a safe worker or you didn't do something
15   safe?
16   A.   No, sir.
17   Q.   Any job you've ever had in your entire
18   life, have you ever been reprimanded or disciplined
19   where someone has suggested that in some way you
20   were not safe in any way?
21   A.   No, sir.
22   Q.   Was one of the reasons why you were
23   promoted to some sort of supervisory position
24   because you were a safe worker?
25   A.   Yes.  Because we had OSHA safety training.

126

1 Me and Jake both worked -- of course, Louisiana is
2 in the offshore industry. So I had worked with a
3 company called LQT in Maurice, Louisiana, Living
4 Quarter. So I had a lot of OSHA training working
5 with them. So we brought some of that onboard with
6 BattleFrog.
7 **Q. Have you ever been investigated by Child**
8 **Protective Services or has anybody ever suggested to**
9 **you that you in any way had endangered your child in**
10 **any way, shape or form?**
11 A. No, sir.
12 **Q. No family, friends, relatives, government**
13 **workers, nobody has ever said that, right?**
14 A. No, sir.
15 **Q. Have you ever been convicted or ever had**
16 **any ticket for driving under the influence of any**
17 **sort?**
18 A. No, sir.
19 **Q. You were air lifted from the scene of the**
20 **accident to the hospital, correct?**
21 A. Yes.
22 **Q. Were you given some sort of pain**
23 **medication at the scene of the accident?**
24 A. I think so. We had medics on scene. I
25 believe when he showed up he gave me -- he told me

127

1 it was going to hurt. He gave me a shot into the
2 wound itself. And a few minutes later the ambulance
3 showed up and recommended that I be air lifted. I
4 think they gave me some more medicine in the
5 helicopter because it was my first time flying.
6 Landed at the University Hospital and went straight
7 into emergency surgery.
8 **Q. Do you remember ever having given any**
9 **written or recorded statement of any type to anybody**
10 **regarding how the accident may or may not have**
11 **happened?**
12 A. No, sir.
13 **Q. While you were working in Utah for**
14 **BattleFrog that week, are you aware of whether any**
15 **company ever came to do any sort of maintenance on**
16 **any of those vehicles?**
17 A. Yeah. The two Polarises were maintenanced
18 on a couple of times. And I know that from
19 overhearing. I witnessed them there working on them
20 once. And when I had told one of the guys about it,
21 he was like, "They keep on having to fix them or
22 something." Obviously somebody in the office knew
23 that they were having problems with them, but I was
24 in the field.
25 **Q. Was one of those Polaris vehicles the one**

128

1 **that you actually were in on the day of the**
2 **accident?**
3 A. Yes, sir. We only had two Polaris
4 vehicles, I think, on scene. And they were the two
5 that was used for that day.
6 MR. COUNTS: Mr. Anderson, I think I'll
7 reverse the rest of my questions for trial. Thank
8 you, sir.
9 MR. ROSE: I have just a few follow-up
10 questions for you.
11 FURTHER EXAMINATION
12 BY MR. ROSE:
13 **Q. I've shown you a number of Instagram**
14 **videos and your counsel has commented that those**
15 **videos would show you were in the passenger seat**
16 **because he seat belt appears to be over your right**
17 **shoulder. Are you aware that when you use your**
18 **phone and take a video where it's a mirror image**
19 **back to yourself that the left side appears to be**
20 **the right side?**
21 MR. COUNTS: Objection, calls for
22 speculation.
23 **Q. Let's just demonstrate. What side of your**
24 **shirt is your pocket on?**
25 A. The left side.

129

1 **Q. If you look at this videoing back towards**
2 **you and appear in the phone, does it not appear that**
3 **your pocket is on the right side?**
4 A. To me, in the phone, it shows the right
5 side. But the reflection is still reflecting the
6 same thing.
7 **Q. You have a regular practice, don't you, of**
8 **while you're driving videoing yourself in your**
9 **vehicle and posting those on Instagram?**
10 A. I do have videos of me driving on
11 Instagram. And, like I said, you can probably tell
12 if I'm driving and if I'm not. In the videos, even
13 the ones you showed here with me in the passenger
14 seat, I'm not the type of guy -- I'm not a
15 picture-taking guy, so I won't be staring in the
16 camera. I'll watch the road. I might look at the
17 camera, but . . .
18 **Q. I've studied those videos, spent some time**
19 **studying those videos, and at least my belief is**
20 **that in each of those videos you're actually**
21 **driving. Do you dispute that?**
22 A. Yeah, I dispute that. Because I don't
23 think I was actually driving. Even one of the
24 videos is in the driveway. I mean, another video,
25 the guy right here, which is DJ, he's getting in the

130

1   car. Unless he's running outside of the car and
2   diving in, I don't see how I was driving.
3      (Exhibit No. 5 was marked.)
4      Q.   Your counsel asked you about criminal
5   charges, and so I just wanted to mark as Exhibit 5
6   some documents related to that. If you flip back to
7   the third page there, it shows the date of Monday,
8   April 6, 2015. Do you remember about that time
9   being charged with possession with intent to
10  distribute marijuana, possession of a firearm in the
11  presence of a child, and a burnt out brake light?
12     A.   Where is this?
13     Q.   Acardia Parish.
14     A.   No, sir. I don't recall none of this.
15  What I do recall of this, this is not my case. This
16  is a case for Tavaris Alexander who was riding in my
17  vehicle. This case is dismissed already.
18     Q.   So you think that case against you has
19  been dismissed?
20     A.   Yeah, it is. It's Tavaris Alexander. I
21  was actually in a vehicle moving furniture. That
22  stuff that they supposedly had found was in
23  furniture.
24     Q.   If you look at the next page, this is from
25  the Parish of Jefferson Davis. Your name is Kendall

131

1   Chad Anderson and your date of birth is 8/20/1985?
2      A.   Yeah.
3      Q.   Do you remember in 2011 being charged for
4   resisting an officer?
5      A.   In 2011?
6      Q.   2011. February 1, 2011. I think you're
7   too far back, sir. It's the fourth page, I believe.
8      A.   Yeah. This officer on this case has since
9   been fired, and all this has been expunged. This is
10  an officer that, basically, went to jail.
11     Q.   So you think that's been disposed of by
12  being dismissed?
13     A.   I don't understand your question. What
14  are you asking?
15     Q.   How did that all resolve? It lists on
16  this document that it's still pending. That's why
17  I'm wondering.
18     A.   No. I have no pending crimes, no pending
19  charges at all. And I live in Jennings. Even right
20  now in the courthouse, my dad do the floors in the
21  courthouse. I know everybody. If I had anything
22  pending, I would be picked up.
23     MR. ROSE:  All right. Those are all the
24  questions I have. Thank you.
25     MR. ANJEWIERDEN:  I have just a couple.

132

1            EXAMINATION
2   BY MR. ANJEWIERDEN:
3      Q.   I may have missed this before. You may
4   have said this. Are you currently employed?
5      A.   No.
6      Q.   These Instagram videos that we watched,
7   this may sound like an obvious question, but none of
8   those are from the accident in the Polaris vehicle,
9   are they?
10     A.   No.
11     Q.   When you were driving the Polaris vehicle
12  that resulted in an accident, you weren't taking
13  video at that time?
14     A.   No.
15     Q.   You weren't smoking?
16     A.   No.
17     Q.   You didn't have your kids with you?
18     A.   No.
19     Q.   Any of the Instagram videos that we saw,
20  were you involved in any rollover accidents when any
21  of those were taken?
22     A.   No.
23     MR. ANJEWIERDEN:  I don't think I have any
24  more questions.
25         FURTHER EXAMINATION

133

1   BY MR. BRADY:
2      Q.   Mr. Anderson, were you in all-wheel drive
3   or two-wheel drive at the time of the accident?
4      A.   At the time of the accident, I don't
5   recall. More than likely, probably in two-wheel.
6   Like I say, I don't recall.
7      Q.   If you're in two-wheel drive, did you have
8   the differential locked?
9      A.   Again, I don't recall. I got in the
10  vehicle just to basically make the delivery of
11  people.
12     Q.   Did the passengers that you were taking
13  out, did they have their seat belts on when you were
14  taking them out to drop them off?
15     A.   Again, like I said, I'm sure I recommended
16  that everybody get buckled up. I did not look to
17  make sure if everybody was buckled up. It was the
18  first delivery of the day. I was kind of the guy
19  who kind of helped bring safety onboard to the
20  company, so I did have to do certain safety things.
21  So, like I said, I may have not looked back and made
22  sure everybody was buckled up, but I did recommend
23  that we all put our seat belts on and head out.
24     Q.   There were six people in the Polaris
25  vehicle when you were taking the volunteers out?

ANDERSON vs POLARIS INDUSTRIES, INC
Kendell Anderson

134

1    A.    Yeah.  If I can recall right, yeah.
2    **Q.    Do you know how many available seat belts**
3    **there were in that Polaris Ranger?**
4    A.    I can't tell you exactly how many seat
5    belts there were, no.
6    MR. BRADY:  Thank you.
7    MR. ROSE:  I don't have anything else.
8    MR. COUNTS:  I think you're done, sir.
9    THE VIDEOGRAPHER:  This concludes the
10   deposition.  The time is approximately 2:39 p.m. on
11   June 5, 2018.
12   (Signature requested.)
13   (Whereupon the taking of this deposition was
14   concluded.)
15                        * * *
16   Original transcript filed with Mr. Rose.
17   Reading copy submitted to Mr. Counts.
18
19
20
21
22
23
24
25

136

C E R T I F I C A T E

2    STATE OF UTAH        )
3    COUNTY OF SALT LAKE  )
4    THIS IS TO CERTIFY that the deposition of KENDALL
5    ANDERSON was taken before me, Shelly Wadsworth, a
6    Registered Professional Reporter in and for the State of
7    Utah.
8    That the said witness was by me, before
9    examination, duly sworn to testify the truth, the whole
10   truth, and nothing but the truth in said cause.
11   That the testimony was reported by me in Stenotype,
12   and thereafter transcribed by computer under my
13   supervision, and that a full, true, and correct
14   transcription is set forth in the foregoing pages,
15   numbered 4 through 134 inclusive.
16   I further certify that I am not of kin or otherwise
17   associated with any of the parties to said cause of
18   action and that I am not interested in the event thereof.
19   WITNESS MY HAND this 15th day of June, 2018.
20
21
22                        *Shelly Wadsworth*
                          Shelly Wadsworth, RPR, CRR
23
24
25

135

C E R T I F I C A T E

2    STATE OF UTAH     )
3    COUNTY OF         )
4    I HEREBY CERTIFY that I have read the foregoing
5    testimony consisting of 131 pages, numbered
6    from 4 through 134 inclusive, and the same is a true
7    and correct transcription of said testimony except as
8    I have indicated said changes on enclosed errata sheet.
9
10
11
12   _____
            KENDALL ANDERSON
13
14
15
16   Subscribed and sworn to at _____
17   this _____ day of _____ 2018.
18
19
20
21
22   _____
            Notary Public
23
24   My commission expires:
25                        * * *

June 05, 2018

ANDERSON vs POLARIS INDUSTRIES, INC
Kendell Anderson

**Exhibits**

**Anderson Exhibit 01**
72:10,12,23 110:7,9,23
118:23

**Anderson Exhibit 02**
80:2,5 81:8 110:3,4

**Anderson Exhibit 03**
100:16

**Anderson Exhibit 04**
100:17 101:2

**Anderson Exhibit 05**
130:3,5

**$**

**$16,230** 77:6
**$20,000** 77:22
**$21,000** 77:20
**$275** 14:21
**$275-per-day** 105:7
**$649** 71:16
**$8,832** 78:11,13

**0**

**000051** 3:12 72:14

**1**

**1** 3:12 72:10,12,23 95:5
110:6,7,9,23 118:23 131:6
**10** 8:16 10:1 13:1 14:1,6,24
17:18 18:18 33:15,18
108:14 109:3 111:11
**100** 3:14,15
**102** 3:4
**109** 103:13
**1099** 105:21,22,25 106:1,2
**10:26** 35:20
**10:41** 35:23
**11** 33:18 97:10
**11:32** 72:5
**11:49** 72:8
**12** 8:15 13:2 40:24
**124** 3:5
**128** 3:6
**12:18** 91:2
**130** 3:16
**132** 3:7
**133** 3:8

**14** 8:14 30:25 80:7,11 81:7
103:24
**1400** 2:6
**15** 10:9 96:10 120:7,19,23
121:14,22
**151** 82:2
**157** 81:18,20
**1714** 5:5
**1:33** 91:6

**2**

**2** 3:13 80:2,5 81:8 99:8
110:3,4
**20** 6:10 10:9
**200** 2:9 60:12
**2003** 9:21 10:12,16,19,22
**2011** 131:3,5,6
**2013** 71:4 77:2,5,14,16
103:1,4
**2014** 71:5 77:18,19,22
103:7,8,9
**2015** 71:5 78:9 79:8,9
103:12 130:8
**2016** 11:21 12:7 20:24
30:25 36:10 71:6 95:22
103:24 104:11 105:7,18
106:18 108:6
**2017** 94:6,19 95:5,20,22
96:2,5,10 97:10 99:1,8,14,
24 103:20
**2018** 4:8 35:20,24 72:5,9
91:3,7 94:1 134:11
**207** 82:24
**22** 99:1
**2537** 2:8
**27** 94:19 96:2
**29** 99:14
**2:39** 134:10

**3**

**3** 3:14 100:16
**30** 17:21,22 120:22,23
121:19
**32** 54:14,15 55:20
**35** 54:14,15 55:20 120:22,
23 121:19

**4**

**4** 3:15 100:17 101:2
**40** 17:21,22 54:13 94:17

**400** 2:11
**45** 10:8 94:17
**4701** 2:3

**5**

**5** 3:3,16 4:7 35:20,23 72:5,8
91:2,7 130:3,5 134:11
**50** 88:13
**51** 72:15,24
**52** 73:5 75:2
**54** 75:10 110:4,9,23 118:23
**55** 3:12 72:15 76:8 119:5
**5th** 94:5

**6**

**6** 92:14,15 130:8
**649** 71:15,21
**6:00** 34:8 43:5,6
**6th** 66:17 94:1

**7**

**72** 3:12
**75235** 2:3

**8**

**8** 99:23
**8/20/1985** 131:1
**80** 3:13
**816** 103:2
**83702** 2:9
**84111** 2:6,12
**85** 6:10

**9**

**9:42** 4:3

**A**

**a.m.** 4:4 35:20,23 72:5,8
**academy** 9:19,20 108:21
**Acardia** 130:13
**accident** 6:22,23 7:10,11,
18,21 9:9,14 10:18 11:19,
20 12:3,4,7,18 16:3,10,19
18:19,20 23:2,7 26:13
27:25 28:2,21 29:10 30:11,
17,25 31:9,10,15,17,20,22
32:3,9,22 33:17 34:18,20,

**23** 43:2 44:16,18,23 45:15
48:25 49:2 53:17,25 60:5,
7,11,18 62:3,6,16 63:12
70:21,25 71:19 75:14,17
78:10,13,24 79:12,16 81:6,
12 82:4,7,12 83:8,12 86:11
89:19,21,23 90:2,15,18
91:17,19,23 101:16,18,20,
22,24,25 102:1,3 103:24
105:6 109:16,19,24 111:5,
18 112:11,12,19 114:7
119:13 120:8,20,23 121:15
122:19 124:23 126:20,23
127:10 128:2 132:8,12
133:3,4
**accidents** 132:20
**account** 92:1,7 101:23
105:4
**accountant** 78:3
**accumulated** 102:8
**accurate** 89:23
**activities** 69:16
**actual** 45:16
**additional** 50:14 68:15
73:15 91:9
**address** 5:4 6:11,12,17
7:13,15,18 103:2,6,9,19
**adequate** 36:3
**adjusted** 20:6
**admissions** 121:7
**adrenalin** 51:14 116:23
**adult** 12:22 13:15 108:12
**advised** 61:8,10
**ages** 8:12
**agitate** 53:9
**agreement** 104:25 105:2
**ahead** 30:9 92:9 115:18
119:20
**air** 90:3 126:19 127:3
**Airsoft** 94:23
**alcohol** 22:22 34:17 35:13
124:24 125:4,9
**Alexander** 130:16,20
**all-wheel** 133:2
**ambulance** 127:2
**amount** 31:12 77:23 78:14
79:10
**Anderson** 4:5,20 5:3,5
7:6,8 8:15,16,17 11:15
35:25 72:11 91:9 102:25
104:23 110:4 119:16
122:18 124:20 128:6 131:1
133:2
**Andrew** 2:2 4:13
**Angela** 7:6

June 05, 2018

**angle** 93:21 98:1
**Anjewierden** 2:10,11 3:7 4:18 131:25 132:2,23
**answering** 24:2
**answers** 90:11 103:17
**Anthony** 17:7
**Antonio** 12:24 15:4 19:15 24:18
**anymore** 70:15
**Anytime** 68:13
**apartment** 9:1,3
**apologize** 58:2 60:23
**appearance** 4:11
**appearing** 4:9
**appears** 128:16,19
**approximate** 7:20
**approximately** 4:3 17:18, 20 30:10 35:20,23 46:25 49:1 52:1 72:5,8 91:2,6 121:19 134:10
**April** 97:10 130:8
**area** 10:7 26:10 47:8 48:7 50:6 54:1 60:14 108:24 109:3 112:22 113:7,8,12, 13,15,17 116:6,11,20 118:14
**areas** 50:4
**Arizona** 95:12 102:18
**arm** 51:11,17 58:14 62:10, 11,13 63:3,22 64:1,2,3,7,9, 12,13,16,17 65:24,25 66:6, 8 68:6 115:10 116:19 117:7,20 123:15
**arrive** 43:13 44:1 60:17
**arrived** 22:16 29:2 30:3 31:8 46:3,11 58:24 59:2
**asks** 89:19
**Assault** 102:19
**assemble** 12:14 13:22
**assembled** 19:24 20:1
**assembly** 13:19 19:21 29:21
**assigned** 43:15
**assume** 6:2
**assumes** 112:24
**ate** 34:1
**Atlanta** 15:4 19:15 24:18
**attached** 76:19
**attaching** 66:6
**attention** 42:12,15
**attorney** 89:16
**ATVS** 109:7

**August** 6:10 94:19 95:5
**avoid** 112:22 113:12
**aware** 115:23 121:21,24 127:14 128:17

**B**

**baby-sitted** 24:14
**back** 6:25 10:25 13:20 19:13 20:13 21:2,3,11,15 26:4,11,15 27:24 30:19 31:19 33:5 35:22 38:8 47:5 48:24 50:8,10,14,17,18 51:19 52:1,2,11 53:10 55:16,17 56:18,25 57:8,25 59:11,19,22 61:19 64:8 65:25 66:9 71:25 72:7,20, 25 73:15,21,23 74:23 75:10,24,25 76:3,4,8,18,23 80:12,22 81:18 82:23 83:23 87:22 88:14,15 91:5 95:9 96:6,17 99:1 99:5,6 100:6,15 103:10 104:9,10 111:10 112:8 113:19,21,24 115:1 116:11 117:21 120:4 122:14 128:19 129:1 130:6 131:7 133:21
**background** 9:17 12:14 59:3 93:12 104:20
**bag** 69:4,5
**band** 100:18 101:1,9,15 102:4
**bank** 105:3
**Bankrollzmafia** 100:22
**basic** 87:23,24 88:3
**basically** 9:1,6 12:11,24 13:1,6,8,22 14:1 15:7 19:9, 23 20:2 21:8,13 25:21 26:4 28:5 36:12,15 45:7 50:22 57:9,15 60:3 64:22 65:4,7, 13,16 66:8 74:7 87:21 88:11 101:13 107:4,5,19 112:7 115:25 118:19 131:10 133:10
**basis** 80:23
**basketball** 63:16
**Bates** 3:12 72:24 73:5 75:2 76:8
**batteries** 20:16
**Battlefrog** 11:24,25 12:2, 3,5,6,18 13:3 15:17 17:19 20:24 21:1,6 24:5,18,19,22 28:10 30:13 34:11 35:1 60:13 85:3,19,22,24 86:23 87:7 88:8 104:12,14,24 105:1,16,18,21 106:5,8,10, 13,16,19 107:2 109:7 112:15 123:1,7 125:3,12 126:6 127:14

**Beach** 107:24
**beard** 29:4,15 43:13 44:25 45:22 52:4 86:3
**bed** 26:11 32:22,24 34:2 81:11
**beginning** 19:22 20:21
**behalf** 4:9,21
**belief** 129:19
**bells** 76:20
**belt** 38:4,5,7,10 49:8 52:12, 18,20,25 53:13 61:9,11 76:17,19,22 88:1,9,18 94:9 96:13,15 97:20 98:6,10 118:6,9,15,17,24 119:6,8, 13 120:1,2,3 121:22 122:18 128:16
**belted** 39:6
**belts** 61:6 88:16 98:2,8 99:19 112:1 133:13,23 134:2,5
**Bengal** 2:3
**big** 17:23 29:4 55:14 108:17
**Bigrentz** 2:8 4:17 89:18
**biological** 8:7
**birth** 6:9 131:1
**bit** 6:6 12:1 13:3,17 29:25 36:1 52:9
**Black** 23:17
**blackness** 51:4
**blacktop** 50:5
**block** 66:7
**blood** 51:21 67:1 117:18
**Bluetooth** 42:4
**body** 115:20
**Boise** 2:9
**bone** 116:24 117:20 123:20
**bones** 63:24 69:14 123:19
**book** 36:21 40:2 41:5
**born** 9:24,25
**bosses** 12:11 19:21 30:6
**bothered** 76:23
**bottom** 64:2 66:25 76:16 80:5 81:19,21 102:1
**bought** 37:15,19,21
**box** 76:14
**Brady** 2:7,8 3:4,8 4:16 80:9 90:24 102:21,24 120:12,16,18,24 121:2,6 122:3,9,13 124:16 133:1 134:6
**brake** 130:11

**brand** 84:7
**brands** 25:3
**break** 35:10,17 51:13 72:2, 3 90:23,24
**Brian** 15:23,24 16:1,21 18:3 60:19 90:11
**bridge** 62:16
**bring** 13:11 19:11 20:11 43:20 45:8 46:2,11 57:4 89:8 133:19
**brings** 95:9
**broken** 116:16 123:21
**Brooklyn** 8:15
**brother** 29:20 104:15
**brother's** 104:22
**brother-in-law** 22:12 93:13,16,22,25
**brothers** 11:14 12:10 21:13
**brought** 107:7 126:5
**bucket** 81:13
**buckle** 53:9 120:2
**buckled** 52:20 133:16,17, 22
**buckling** 52:24 53:2
**build** 15:19,20 18:15 20:3 60:2 74:25 104:20
**Builders** 11:5,6
**building** 29:6
**built** 6:14 12:11
**bump** 56:6,7,10
**bumpy** 74:17,20,22
**bunch** 121:6
**burnt** 130:11
**business** 10:14 11:10 18:5 30:16,17 70:23
**buttoning** 69:21
**buy** 37:5 101:12

**C**

**cable** 21:18
**cage** 51:9 115:21 116:2,3
**call** 29:3 30:19 32:25 33:2 42:18 63:20 69:15 73:25 107:23 108:24 114:25
**called** 4:21 11:24 15:5 100:22 104:19 109:9 117:22 126:3
**calls** 128:21
**calm** 51:22 112:18
**cam** 42:21

**camera** 42:24 97:2,17 129:16,17

**car** 22:10,11 28:4,6,10,11 38:13,19,21,23,25 39:1,3, 4,8,9,12,20 41:3,6,7 42:8 88:24 89:1,5,7 93:18 97:8 99:15,16 100:7,8,12 106:19,22 130:1

**card** 40:6

**care** 78:5 90:11,14 106:9

**career** 121:11 125:7

**cargo** 26:10,11

**carrier** 71:14

**carry** 41:2,10,11 95:4

**cars** 43:18 46:1

**cart** 36:20 46:12,16 51:7, 19 54:3 58:13 74:4 82:19 85:2 117:21

**carts** 46:6,8

**case** 36:1 78:7 81:14 89:11 91:16 92:8 103:18 130:15, 16,17,18 131:8

**Cat** 23:17

**caught** 64:21,24

**caused** 56:3

**causing** 62:19

**cavity** 62:22,24

**CD** 3:14 92:19

**Celina** 8:16 93:2

**cell** 28:20 41:22,24 42:2

**center** 111:7

**Chad** 2:13 4:8 5:5 131:1

**chambers** 67:1

**changed** 14:20

**charge** 18:2 45:5 59:17 78:15

**charged** 88:25 130:9 131:3

**charges** 130:5 131:19

**Charles** 10:10

**CHARTERED** 2:8

**check** 30:20 39:5 87:22 105:4

**checked** 62:25

**checking** 26:4 99:11

**child** 38:18 41:3,6 102:9 126:7,9 130:11

**child's** 13:15

**childhood** 24:14

**children** 7:22 8:6,13 38:13,18,20 39:7 40:17,20, 21,25 88:24 89:1,5,8,9

**Chris** 15:21,22 16:9 18:3 29:3,4,15 44:25 86:3

**Christian** 9:19,20

**Christina** 7:24 8:18

**Christina's** 8:9

**Christopher** 104:23

**cigar** 32:13,19 33:21

**cigars** 32:15

**Circle** 103:3 104:2

**cities** 14:25 15:3 35:8

**city** 2:6,12 4:7 9:22 13:5,8, 22 14:14,18 15:1,11 16:9 17:19 23:19 24:4,7 25:5,6, 9,13,14,16,23 27:18,19 29:23 30:3 31:5,6,9,10 34:13,15 84:17 86:1 106:20 111:19

**claims** 3:12 36:2 72:14

**clarification** 25:11

**clarify** 53:4 98:6

**classes** 107:13

**cleaned** 121:8

**cleaning** 64:4

**clear** 16:16 98:9

**clearance** 86:16

**clench** 65:9,12,13

**client** 122:10

**climbs** 108:3

**close** 65:15 67:2

**close-up** 82:2

**closed** 67:4

**closely** 60:14

**closes** 65:14,16,17

**closest** 60:10

**clothes** 116:25

**clothing** 51:16

**CMI** 21:18

**co-workers** 83:11

**Coast** 15:8,9,10

**colds** 90:20

**Colorado** 28:17 30:1 31:7

**Colored** 3:12,13

**column** 118:14

**comfortable** 59:9

**commented** 128:14

**common** 5:18 33:23

**commonly** 122:22

**companies** 11:5 55:2

**company** 11:8,10,12,13, 24 12:11 21:14,18 44:11 49:21 60:15 71:7 77:12,15

**78:16** 87:5 95:10,17,18 126:3 127:15 133:20

**compartment** 76:10

**Compensation** 71:11,14

**complaint** 36:2

**completely** 69:20 93:24 111:16

**complex** 9:1,3

**complicated** 70:13

**compound** 62:9

**computer** 37:21

**concern** 84:5

**concerns** 84:2

**concluded** 134:14

**concludes** 134:9

**concrete** 50:4

**condition** 63:21

**consistent** 71:18,20,21

**consistently** 21:12

**construction** 10:13,15 11:1,2,3,4,5 12:13 21:9,17 55:1 70:23 79:3 95:10 104:20

**contact** 28:18 29:14,17

**continue** 71:23

**continued** 30:17 58:1

**contractors** 10:24

**control** 54:4,6

**controls** 65:5

**conversations** 5:18 21:24

**convicted** 41:13 126:15

**cooking** 69:17

**copies** 77:3 95:24

**Coplinger** 86:20

**copy** 134:17

**corner** 73:6,11 75:2 76:9

**correct** 57:14 77:9 82:14 104:12 105:8 117:4,11,12 126:20

**correcting** 114:10

**correctly** 19:1,7 74:10 76:5 103:25 105:13

**corresponded** 30:18

**counsel** 4:11 21:24 120:12 121:3 122:9 128:14 130:4

**countless** 24:12

**country** 23:9 24:11 40:23

**Counts** 2:2 3:5 4:13 6:5 16:12,15 23:24 35:18 47:12 50:25 72:3 81:3 90:8,25 92:9 94:8 96:12 97:13,20,23 98:5,14 99:19

**105:24** 110:6 112:24 115:5 119:4,9,14,16,23 120:10, 14,17,21 121:1,4,9,16 122:1,5,11,16,20 123:3,10 124:19 128:6,21 134:8,17

**couple** 5:10 14:16 48:21, 22 64:4 75:9 82:23 83:21 127:18 131:25

**couples** 47:1

**courses** 12:16 13:8 108:11,12,15 123:9

**court** 4:9 6:6 16:16 23:25 92:4 119:17

**courthouse** 131:20,21

**cousin** 24:13

**cousins** 11:1

**cover** 37:24

**covered** 48:10,13 82:5,14

**crawl** 116:15

**crawled** 117:10

**created** 101:23

**crew** 17:1,23,24,25 18:5,7, 16 19:16,24,25 59:17

**crews** 18:6,15,17

**crime** 88:25

**crimes** 131:18

**criminal** 3:16 130:4

**cross** 50:4 107:4

**cross-fit** 107:5,12 108:2

**cross-train** 13:13

**crossed** 76:5

**Crossfit** 60:1

**crossing** 76:3

**Crowley** 103:3

**curled** 65:22

**current** 63:21

**cut** 62:11 75:22

**cuts** 117:13

**cutting** 70:15 74:6

**Cyrus** 8:23,25 104:2,5,7

---

**D**

**D-U-L-A-T-T-E** 67:13

**dad** 7:2 10:14,21 21:2,3,6, 7,14,19 131:20

**dad's** 6:16,17,24 7:7 11:8 77:12,15 78:16 93:9,10 99:12

**daddy's** 93:7

**Daidaebankrollz** 92:13

**daily** 14:21 66:25 69:16 70:13 90:6

June 05, 2018

ANDERSON vs POLARIS INDUSTRIES, INC
Kendell Anderson

**Dallas** 2:3 12:24 15:4 19:15 24:18 108:18

**damage** 62:11 65:4

**dash** 27:6 42:21 48:8 118:13

**dashboard** 81:24

**date** 6:9 30:4,5,8 57:24 66:16 109:19,24 111:5,18 130:7 131:1

**dated** 92:14 94:1,2,5

**daughter** 94:20 97:11,14 99:8,17 100:14

**daughters** 92:24 93:1

**Davis** 7:8 11:9 21:3,4 130:25

**day** 14:2,22 18:24 19:2,5,7 20:9,10,11,21,22 21:12 23:7 25:5,8,15,20,21,24 26:12,17 27:21 28:22 30:2, 9 31:14,18,20,22 32:3,4 33:3,9,11,14,17,23 34:17, 20 36:13 44:15,23 45:18 46:10,14,15,16 47:24 48:4, 9 70:3 73:15 79:22 80:17 87:5 95:7,12 99:5 109:16 111:14,15 124:23 128:1,5 133:18

**day-to-day** 80:23

**days** 13:1 14:1,6,13,17 22:15,23 27:24 28:1,3 31:19 44:15,18 67:19 109:4 111:11

**deals** 36:2

**decided** 68:3,5

**deconstruction** 13:19

**Deere** 23:16

**Defendant** 2:4,7

**defendants** 4:22

**defense** 41:9

**definite** 21:20

**definitively** 98:7

**Dejean** 103:2

**Delatte** 66:5,23 67:6,8,10

**deliver** 25:21 26:17 45:2 88:12,13

**delivered** 84:17 85:25 86:8

**delivery** 133:10,18

**demonstrate** 128:23

**denied** 121:7

**depended** 29:18

**Depomaxmerit** 4:9

**deposition** 4:4 5:7,11 21:23 22:1 27:22 92:19 124:7 134:10,13

**describe** 10:6 20:4 36:7 64:19 65:11 74:18,19 92:22

**describes** 74:21

**description** 105:5

**designate** 46:14

**designated** 25:25 45:1 58:25

**designed** 43:19 104:17,19

**determining** 78:23

**diem** 105:8,11

**difference** 106:23

**differential** 133:8

**differently** 27:8

**difficult** 69:21 70:4

**dig** 120:3

**directed** 88:3

**direction** 75:4,13,15

**directions** 86:24

**directly** 118:11

**director** 15:19,20,21,23

**directors** 112:8

**dirt** 49:23 51:4 53:18,20, 21,24 54:1 55:12 59:20 74:2 75:18,19,20,21 116:20,22 117:6

**disciplined** 125:12,18

**discovery** 89:18 90:10

**discuss** 36:4 44:20 45:7

**discussion** 83:7

**discussions** 44:24

**dishonesty** 41:16,18

**dismissed** 130:17,19 131:12

**disposed** 131:11

**dispute** 129:21,22

**distribute** 130:10

**diving** 130:2

**Division** 5:5 6:11 103:8,18

**DJ** 129:25

**doctor** 67:8 68:13 86:13, 14,15 99:4,5

**doctor's** 86:18

**doctors** 16:4 90:17

**document** 131:16

**documents** 72:15 130:6

**door** 48:8 69:23 110:12,17, 19,21

**doorknobs** 69:24

**doors** 26:1 83:3,6,9,13,25 84:3,4,10,18,23 85:2,7,11, 12,15,20,23 88:4,7 109:19

110:1 111:6,8,13,15

**dressed** 22:2 70:3

**drink** 34:17 69:3

**drive** 22:5,7,11 23:10 24:12,22 25:12,16 26:17 28:7 38:20 39:4,12,16 42:2,6,25 52:10 59:4,22 94:16 96:25 109:15,23 111:9 133:2,3,7

**driven** 23:14,20,22 24:5 25:23 59:13,14,15,21 85:4, 10

**driver** 42:12 93:18 100:4

**driveway** 39:5 99:12 129:24

**driving** 23:2,7 24:6 25:5, 25 26:12 28:8 38:6,10 39:19,20 41:22,25 42:3,7, 11,19,23 46:16 49:23 53:11,13 55:8 57:12 58:8 59:7,9 73:7,14,16 83:3,18 88:9 93:6,11,13,16,22,23, 25 94:6,8 96:16 97:5,14, 18,24 99:25 100:5,8 114:2 126:16 129:8,10,12,21,23 130:2 132:11

**drop** 20:12 43:15 49:22 55:15 61:3,13,15 133:14

**dropped** 29:7 48:20,21,23 50:8,15 52:15 54:20 59:21 60:8 74:11 76:15 112:21 113:16 114:23

**dropping** 50:21 59:17 113:17

**drove** 22:6 23:16 25:14 26:2,20 28:9 43:11 54:22 74:23 82:22 91:19 106:19 109:13,18 111:6,17

**droven** 45:20

**drug** 35:14 124:25 125:5,9

**drugs** 22:22

**dug** 117:22

**Duhon** 11:3

**duly** 4:22

**Duson** 7:11 103:13 104:3, 4

**dust** 112:23 113:12 119:2

**E**

**e-t-t-e** 67:13

**earlier** 6:11 28:4 43:7 82:3 88:20

**early** 19:11,20 31:16 33:6

**earned** 105:17

**easier** 42:21 69:5 70:18

**east** 2:11 10:9 15:8,9

**educate** 40:22

**education** 10:11

**educational** 9:17

**effect** 38:7 89:25 125:13

**eight-foot** 108:1

**elaborate** 41:17

**elbow** 123:24

**elderly** 47:1,3 48:1 49:11, 19

**else's** 17:13 114:17

**emergency** 90:4 127:7

**employed** 132:4

**employees** 112:15 123:2

**employment** 20:23 104:25

**empty** 96:17,22

**enclosed** 26:2 111:16

**end** 12:5 92:18

**endangered** 126:9

**ended** 32:25 43:16

**ensure** 61:10

**entire** 21:8 27:15 38:1,3 82:24 121:11 125:2,7,11, 17

**equipment** 37:5 68:7 86:5 101:12 102:7 114:24

**estimate** 54:15,17 55:20

**et al** 4:6

**Eunice** 21:18

**events** 107:2

**evidence** 112:25

**exact** 7:14 20:3 30:4 31:12 32:23 34:12 37:20 38:17 43:4 47:20 49:3,5 54:11,18 66:16 67:11 73:8 75:7 77:23 78:14 108:7,10

**EXAMINATION** 3:2 5:1 102:23 124:18 128:11 132:1,25

**examined** 4:22

**Excuse** 109:8 111:1

**exercise** 107:8

**exhibit** 72:10,12,13,23 80:2,5 81:8 100:16,17 101:2 110:3,4,7,9,23 118:23 130:3,5

**EXHIBITS** 3:10

**existence** 30:13,22

**expected** 71:22

**expenses** 106:4,6,7,8

**experience** 12:2 23:6 53:11 59:3 84:8 87:4

June 05, 2018

ANDERSON vs POLARIS INDUSTRIES, INC
Kendell Anderson

**expunged** 131:9
**extend** 64:17,20,21,23 65:1 66:7
**extension** 14:3
**extent** 45:10 62:21,24
**eye** 62:8 117:18

**F**

**F-150** 94:15 98:24
**face** 62:7,8,19 115:13 116:3 117:13
**fact** 32:24 49:19 54:19 68:21 84:6
**facts** 112:24
**fade** 70:15
**fair** 61:23 78:24 79:8
**fairground** 44:9
**familiar** 10:7 75:8 82:18 111:24 112:1
**family** 24:13 90:20 126:12
**farm** 24:15
**fast** 50:20 54:10 70:11
**fastened** 121:23
**faster** 54:13
**father** 10:19
**father's** 11:12,13
**February** 12:5,7 20:24 92:14,15 94:1 99:14,23 104:11 131:6
**feel** 42:18 54:13 59:3 117:5
**feeling** 116:22
**feet** 117:20
**felony** 41:13
**felt** 61:20 114:6,14 122:25
**fence** 52:8 113:24
**field** 16:8 46:6 49:24 50:5, 19,21 52:9 53:17,21,23,24 55:21 57:12 58:8 59:23,24, 25 73:12,16,20 74:7,9,10, 12,13,15,17,19,21 75:7 76:6 113:15,16,23 127:24
**fields** 76:3
**file** 15:6 71:5 77:4,9 78:18 79:14 95:20 96:1
**filed** 103:17 105:20 134:16
**fill** 100:12
**find** 117:25
**fine** 57:16 61:16 122:1
**finger** 65:14,17,19
**fingers** 64:17,20
**finish** 20:23

**finishes** 23:24
**firearm** 41:7 130:10
**firearms** 41:8
**fired** 131:9
**FIRM** 2:2
**fist** 65:9,12,13
**five-minute** 35:17
**fix** 127:21
**flap** 66:8
**flaps** 64:1
**flip** 57:1 72:15,21 73:4 75:9 76:8 81:18 82:2,23 130:6
**flipped** 74:4 113:18 118:19
**floor** 11:9 21:4 77:11,20 78:11
**flooring** 10:14
**floors** 131:20
**Florida** 106:6
**flow** 67:2
**fly** 22:5
**flying** 127:5
**focus** 45:21
**folks** 49:12
**follow** 13:9 36:24 38:9 75:18 91:12
**follow-up** 51:24 124:22 128:9
**follower** 91:23
**food** 20:14 106:8
**fool** 107:11
**football** 63:16
**Ford** 50:3 108:8
**forearm** 62:11 123:23
**forget** 5:19
**form** 106:2,3 126:10
**formal** 10:11 59:6
**formed** 101:15,19
**found** 130:22
**fourth** 131:7
**fractured** 62:25
**fractures** 62:8,10
**frame** 36:9
**framing** 12:12
**frequently** 67:18
**friend** 29:19
**friends** 29:17 126:12
**front** 26:15 29:5,8 46:5 47:6,8 51:12,13,14 52:3 58:13 59:22 72:20 97:12 98:8 99:9,17 113:25 115:20 116:7,16 117:10

118:3
**full** 32:3
**fun** 107:8
**function** 64:16
**furniture** 130:21,23
**fussing** 16:15
**future** 65:24 66:3

**G**

**Gabe** 17:4,5,6
**Gabriel** 9:20 17:7
**Garcia** 17:9,11 30:19 60:17,23,24 112:14
**gave** 6:11 30:6 36:3 50:15 114:23,25 122:12 126:25 127:1,4
**gears** 35:25
**general** 36:24 91:20
**generally** 36:7,23,25 92:20
**geometry** 98:8
**Georgia** 106:6
**get all** 68:7
**give** 8:12 9:16 14:16 21:20 31:12 37:20 46:19 49:3,5 86:23
**giving** 112:20 114:5 122:10,11
**glass** 69:2,3 115:21 116:4
**Glock** 94:17
**glove** 76:10,14
**good** 4:2 25:11 27:23 29:19 36:15,18 47:24 49:14 50:20 90:22,25 100:25
**gopher** 113:7,10
**government** 126:12
**graduated** 9:19,20 10:12
**gram** 32:13
**grandpa** 24:14
**Grantsville** 108:5
**grassy** 11:22 113:7,11, 13,15,17
**greater** 120:7,23 121:14
**Greg** 4:18
**Gregory** 2:10
**grew** 10:14 23:9 24:11,15 27:7 37:1 40:23 59:10 102:6,11
**grinding** 123:19
**grip** 65:8

**groin** 116:6,11
**ground** 51:8 118:3
**group** 2:11 4:19 43:13 49:11 80:4 100:20 101:19 102:12
**grow** 64:8
**guarantee** 27:15
**guess** 13:12 50:25 63:1 64:23 65:14 69:5 74:5 101:19 115:5
**guessing** 50:23 64:25 71:24 115:3,14 116:2,4,23
**guests** 13:9
**guide** 20:1
**gun** 40:14,15,22 88:23 89:1,3,4 95:1
**guns** 40:16,19,21,22
**guy** 29:15 37:8,9 45:3,5 47:1,2 58:24 83:21 86:3,4 87:16 91:11 96:25 100:6 129:14,15,25 133:18
**guy's** 87:19
**guys** 17:3,8,25 18:3,4,12 29:20 45:9 55:3 63:10 70:24 86:5 95:11 127:20
**guys'** 110:24

**H**

**habit** 27:7 37:1 80:21
**habits** 36:5 92:21
**hair** 69:23 70:14
**half** 29:13 32:13 52:4,6 66:25 99:13 108:19
**halfway** 51:12 58:13 115:8,20
**hand** 43:24 65:7 68:24,25 69:5,12,23 71:24
**handed** 63:9,14
**handful** 18:2
**handgun** 41:3
**handguns** 40:10,13
**handle** 18:5
**handled** 16:3
**handling** 40:24
**hanging** 51:18 115:10
**happen** 48:1 53:17
**happened** 9:13 11:20 18:23 29:8,10 30:25 31:13 43:12 48:18 50:24 53:19, 25 55:16 56:20 57:19,25 58:4 67:3 75:14,18 89:20 99:4 112:12,18 115:15,16, 17 117:16 127:11

**happening** 18:21
**hard** 23:25 84:10 95:6 117:8
**he'll** 121:12
**head** 14:18 30:7 75:24 90:1 118:12 133:23
**headed** 113:19 115:1
**heading** 50:17,18 74:16 113:21 114:4
**healed** 62:19,23
**healthy** 90:19
**hear** 6:7 110:13,15
**heart** 51:21
**heat** 48:10 82:6,11,14
**hectic** 104:7
**held** 4:6
**helicopter** 127:5
**helmet** 79:21,24
**helmets** 123:1,7,13
**helped** 29:20 74:24,25 133:19
**helper** 77:11,21 78:12
**helping** 36:15 64:8 77:12
**high** 9:18 10:12 63:15,17
**higher-ups** 86:2
**hinges** 83:12,23 84:3
**hire** 104:17
**hired** 12:5 19:20 105:3
**hit** 55:11,14 56:10,11,14, 17,25 89:25 114:14 115:13 117:14
**hitting** 56:6,7
**hold** 69:2,3 81:3
**holding** 51:17 63:24 115:11,12 123:22
**holes** 20:5
**home** 6:18 40:13,15 41:9 104:5,7
**homeboys** 102:5
**Homes** 8:23,25
**honest** 43:11 63:8 69:20 75:6 101:10 102:7 114:16
**honestly** 63:14
**hope** 123:25
**hoping** 68:19
**hospital** 67:16 68:9 79:20 90:4,5 126:20 127:6
**hospitals** 16:4
**hotel** 34:11,12 79:19 95:8
**hotels** 106:9,10
**hour** 35:16 54:13,14,16 55:20 120:7,19,22 121:14,

19,22
**hours** 14:22,24
**house** 6:14,16,24 99:12 100:6 104:10
**houses** 104:1
**Houston** 86:11,13,14,15
**huh-uh** 5:15
**hump** 55:12,13
**hundred** 60:11
**hunting** 89:9
**hurt** 101:12 127:1
**husband/wife** 9:7
**hydrated** 20:14
**hyperbaric** 67:1,14
**hyperbarics** 68:9

**I**

**Idaho** 2:9
**idea** 9:16 73:1 101:11
**identified** 13:23 90:10
**illegal** 39:12 41:6,12,24 42:9,10,17
**image** 97:19 128:18
**immediately** 114:21
**impression** 36:16,18 47:24 49:14,21 52:17
**income** 70:21 71:10 77:6, 11,19 78:11,20 101:5 102:25 105:17
**independent** 119:7,12
**individual** 45:18
**indoors** 108:17
**Industries** 2:5 4:6
**industry** 126:2
**influence** 124:24 125:4,8 126:16
**information** 16:5 28:18 29:14,17
**injured** 124:24
**injuries** 62:5
**injury** 117:18
**inside** 66:7
**inspect** 45:10
**inspected** 46:7
**Instagram** 3:14 92:1,6,10, 19 94:3 95:7 128:13 129:9, 11 132:6,19
**Installation** 11:9 21:4
**installer** 77:11,21 78:11
**instance** 79:7 80:6

**instinct** 118:20
**instinctively** 57:22,23,24
**instruct** 119:19
**instructed** 66:25 87:13 88:15 122:6
**instruction** 44:17 87:8
**instructions** 86:23
**insurance** 2:11 4:19 16:5 86:17
**intent** 130:9
**interrogatories** 103:17,20
**interrupt** 122:10,11
**Intervenor** 2:10
**investigated** 126:7
**involved** 107:9 132:20
**involves** 41:15
**involving** 41:18
**iphone** 37:22
**Ireyonna** 8:15
**Israel** 8:14
**issues** 9:6,7 36:1
**item** 37:18,20

**J**

**jacks** 107:24,25
**jail** 131:10
**Jake** 18:10,11 28:5,15,21 29:4 49:13 106:23 126:1
**Jake's** 29:16 106:24
**Jaubert** 7:15 103:13
**Jefferson** 130:25
**Jennings** 5:6 8:23,25 9:23,24 10:1,2,6,8 11:17 23:8 27:18 103:8 131:19
**Jim** 86:4
**job** 12:9,14 19:11 20:18,20, 25 21:16 23:19 24:4 25:23 26:2 29:18,19 34:9 35:4,5, 6 45:3,4 86:22,25 87:1,3 88:11 95:16 105:5 106:15, 18 125:7,17
**jobs** 10:17 21:11 24:17,20, 23 25:16 26:16 27:9 79:17 85:3,6,14,19 87:2,7 95:15
**John** 23:16
**Jr** 17:7
**jumped** 47:14
**June** 4:7 35:20,23 72:5,8 91:2,6 96:2,5 134:11

**K**

**Kansas** 12:24 15:3,4 19:15 24:18 106:6
**Karl** 87:20 104:16,17
**Kawasaki** 25:25
**Kawasakis** 23:17
**Kaylee** 8:16 93:2
**Kendall** 4:4,5,20 5:5 6:5 130:25
**keypad** 47:18 48:7
**keys** 43:22,24,25
**kick** 63:10
**kicked** 118:20
**kids** 6:25 8:18 9:6,11 12:21 13:11 32:25 89:7 94:3 100:12 102:10 107:7 108:15,16 132:17
**kids'** 69:23
**kind** 17:7,16 19:20 20:1 29:18 33:8 37:9 51:11 65:25 68:6,10,19 69:2,8 70:9 72:21 73:20 94:22 102:10 105:2 116:25 133:18,19
**knew** 28:3 45:25 46:1 59:18 118:19 124:7 127:22
**knowledge** 55:11 84:20 85:21,22 86:8
**Kubota** 26:1,6 111:15,17

**L**

**label** 80:12 81:23 82:5,13
**labels** 37:12,19
**lacerations** 62:7,18
**lady** 47:3 48:23 50:15,22 52:15 54:20 60:8 67:16 74:11 113:16,18 114:23
**Lafayette** 9:25 10:9,25 24:13 67:17
**Lake** 2:6,12 4:7 10:10 15:1, 11 16:9,18 17:19 23:19 24:4,6 25:5,6,9,13,14,16, 23 27:17,19 29:23 30:3 31:5,6,9,10 84:17 86:1,13 106:20 111:19,20
**Landed** 127:6
**Lane** 10:13
**latched** 122:18
**late** 31:16 32:24 33:2,3,4,6, 9,10,11,23,24
**latest** 64:5
**law** 2:2,8 38:4,7,9,16,17

lawn 37:16

laws 41:1,23 91:21

lawsuit 89:13

lawyer 42:17 90:7

laying 100:15 118:3

leading 27:24 28:1 44:18 78:24

leave 19:12 22:14 27:18 40:16

Leblanc 66:11,13 67:9

Leblanc's 66:12 67:6

left 27:21 28:2,3 43:3,5 47:8,11 51:10 54:9 56:1,2, 12 57:7,8,13,14 58:6,9 61:20,24 62:13 63:3,9,10, 21 64:16,17 67:25 68:24, 25 69:12,23 81:24,25 97:25 98:1 104:3 114:11, 15 123:15 128:19,25

left- 63:13

left-hand 73:5 75:10 76:9, 16

left-handed 63:7

leg 63:10,25

legal 39:24,25 40:4 41:22 88:23

legally 9:7

license 59:8

life 10:2 21:8 24:14 35:13 69:20 125:18

lift 56:14 69:11

lifted 90:4 126:19 127:3

lifting 117:3

ligaments 123:24

light 130:11

lightweight 69:4

limestone 50:6 53:22,25 54:3 74:2 75:21,23 116:21

limit 53:14

limits 68:24

lining 70:14

list 27:5,6,15 103:18

listed 101:2 103:2,7

Listen 81:3,4

listened 100:24

lists 37:2 77:10 131:15

live 7:2 8:18,22 131:19

lives 6:23

living 6:12 7:9,11,17,21 9:2,3,10,11 69:16 103:4,6, 9,19,21,23 126:3

40:1,3 41:5 42:1,18

LLC 11:15

load 13:20 36:13 80:22

location 84:17 85:25 88:12 108:7,10,20

locations 123:18

locked 133:8

lodging 106:9

long 6:12 7:17,25 12:2 13:23 14:9 20:5 21:5 30:16 42:14 50:17 51:25 54:20 71:22 72:1 86:21 108:11

looked 21:25 22:3 84:3 100:2 133:21

loose 117:7 118:16

lose 54:6

losing 54:4

loss 62:10 63:23 65:4

lot 11:5 26:23 50:6 54:24, 25 55:1,2 61:17 63:6 64:3, 9,24 69:24 70:9,18 82:22 88:6 98:3 102:5 126:4

Louisiana 5:6 7:12 8:25 10:8 23:8 28:6 29:23 38:4, 12 39:25 40:4 41:2,10,21 42:2,10,18 89:2,9 103:3,8, 14 113:10 126:1,3

Lourdes 67:16

lower 73:5

LQT 126:3

lunch 90:23

**M**

machine 114:14

Machinery 2:8

made 54:24 55:13 61:17 70:21 77:12,14,22 78:13, 21,23 79:1,10 83:24 109:7 113:4 114:24 116:25 121:9,10,11 133:21

mail 39:5 99:11

main 29:6

maintenance 46:7 83:21 127:15

maintenanced 127:17

make 6:6 20:13 24:2 38:21 39:8 42:10 52:16 55:17 60:2 68:9 71:2,9 78:19 87:25 92:5 95:14,17 119:19 133:10,17

makes 69:14 80:19 116:1

making 32:25 88:4 101:6 113:2,6 114:13,18

man 48:20 65:21 98:3

management 16:8

manual 11:6 27:11,16 37:7,24 38:3 58:16,19 76:10,12,14

March 66:17 99:1,8

Marcos 17:4

marijuana 33:20 40:6 124:13,25 125:4,9 130:10

mark 76:25 92:17 119:2 130:5

marked 72:10,12 80:2 100:16,17 130:3

marriage 9:6

marriages 8:4

married 7:25 8:2,10

Matt 17:9,11,14 60:23,24

matter 4:5

Maurice 126:3

meals 106:13,14

means 33:10 94:10

meat 68:11 115:11

medical 40:6 110:24 111:2,3

medication 124:2,5 126:23

medications 22:17 34:23 90:6 124:9

medicinal 40:5

medicine 127:4

medics 126:24

meetings 45:25

meets 53:21,24

memory 19:3 32:2 52:24 53:2 57:18,20 76:2,11 89:21,23 90:9 99:3

mention 83:16

mentioned 86:4 83:10 106:5

mentioning 83:17 84:1

message 30:6

metal 20:2 104:18

Miami 12:15 15:5 19:16 24:19 87:11

Michael 2:7

middle 65:17,20 74:11 80:13 113:15,16

midnight 33:11,13

Mike 4:16 119:4

Mike's 11:4 21:17

mile 29:12,13 52:4,6 99:13 108:18,19

miles 54:13,14,15 55:20 108:13,19 120:7,19,22

121:14,19,22

milkman 88:11

mind 35:11

Mine 102:19

minor 90:20

minute 23:1 36:5

minutes 10:8,9 127:2

mirror 128:18

misdemeanor 41:15,18

misrepresenting 98:15

missed 132:3

missing 64:7 65:6 67:24

mom 6:15,17,24 7:2 78:5, 16 103:11

mom's 7:5 94:16 104:4,6, 9,10

moment 40:7 90:3 101:7 124:3

momma 78:3

Monday 18:21,22 130:7

money 71:2,9 77:14 95:14, 18 101:6

monitor 19:10

months 12:4 66:22

Morgan 15:24 16:1,2,21 18:3

morning 4:2 33:8 34:6 43:2,3,9,10,11 44:22 45:11,15,21 46:3,19 47:20 52:25 58:15 59:2 82:4,7 83:4

motel 95:8

motion 66:9 68:4

motor 107:9

motorsport 50:2,3

Motorsports 108:9,21 111:7

mounds 113:7,10

move 13:4 14:14 122:7

moved 6:14 9:25 10:25 103:10 104:1,5,6

moving 96:24 130:21

mower 37:16

mud 107:16 116:22

Mudder 13:7 107:18

multi 110:4,5

multi-passenger 109:12

multiple 12:23 79:17

muscle 62:10 63:23 64:6,8 65:4,5 66:8,9

muscle/tissue 64:23

**music** 100:20,22,25 102:8,
9,10,11,13

**N**

**named** 17:25 86:3,4
**names** 8:12
**nasal** 62:22,24
**navigation** 42:5,23,25
**Nebeker** 2:5 4:7
**necessarily** 53:20 63:18
**needed** 12:13 16:5 89:12,
14 104:19
**nephew** 22:13
**Nerf** 95:1
**nerve** 62:11 63:25 65:4
**nerves** 62:11 63:25
**nets** 84:13,14 85:7,11,12,
15,20,22 88:4,7
**nicknames** 17:16
**night** 31:16 32:4,9,22
33:15,18,25 46:5
**no-name** 84:7
**nod** 5:15
**noises** 61:17
**noon** 91:4
**normal** 9:7 58:25 74:19,23
**Normandy** 107:24
**nose** 62:16
**notes** 30:25 89:10 102:21
**notice** 83:12,14,15
**noticed** 83:24
**number** 20:18 28:20 63:2
71:20,21 72:13,24 73:5
75:2 80:6 128:13
**numbers** 80:4,5

**O**

**Oasis** 102:19
**oath** 5:12,21
**objection** 112:24 119:9,
14,15 120:10,13,15 121:5,
9,10,11,16 122:20 123:3,
10 128:21
**obstacle** 12:16 13:4,7 19:9
20:3,12 43:20 48:21,22,24
60:2 74:2,10,13,24 76:4,7
85:25 108:4,11 112:9
113:14 123:6,8
**obstacles** 12:12 19:12
49:23,25 74:14 107:14,20,
22,23 112:4,6

**obvious** 97:5 132:7
**occasions** 85:11
**occurred** 48:25 49:2
89:22,24 90:2
**off-road** 23:1,7,13 24:19
25:17 59:7
**offered** 123:13
**office** 18:4 86:6 127:22
**officer** 131:4,8,10
**offshore** 55:1 126:2
**oil** 55:2
**Oklahoma** 29:25
**oldest** 8:7,9,13,14
**onboard** 49:19 126:5
133:19
**one-day** 14:4
**one-year** 7:20
**open** 41:11 69:23
**opened** 76:13
**opening** 113:24
**operate** 27:8 87:9,15
88:23 111:12
**operated** 111:22
**operating** 86:24 88:25
89:2,3 120:6 121:13 123:8
**operation** 27:5 111:24
**operations** 64:9
**opposite** 75:5
**option** 73:21
**ordering** 86:5
**Original** 134:16
**OSHA** 125:25 126:4
**outskirts** 75:25
**overhearing** 127:19
**overseeing** 15:24
**overseer** 19:23
**overturned** 110:10,16,18
**owned** 10:14 23:11
**owner's** 27:11,16 37:7,23
58:16,19 76:10,12,14

**P**

**p.m.** 91:2,6 134:10
**pages** 75:9
**paid** 14:19 34:12 71:9,11,
13 78:17 105:7 106:6,8,10,
11,22
**pain** 123:15 124:1,5,9,14
126:22
**panel** 81:25

**paper** 105:5
**paperwork** 105:3,20
**Papillion** 7:24 8:14
**Pardon** 110:14
**parents** 9:4
**Parish** 130:13,25
**parked** 44:1 83:20 100:5
110:16,18
**part** 10:23 44:9 64:2 87:24
115:19,20 116:2
**partial** 73:24
**partially** 82:5,14
**partner** 66:12 67:6
**parts** 64:6
**pass** 40:25 76:6 90:23
102:21
**passed** 42:1
**passenger** 93:7,14,18
94:10,11 96:10,15 97:13,
18,25 98:9,17,25 99:2,25
100:3 109:16 128:15
129:13
**passengers** 133:12
**patch** 54:1
**path** 49:25 50:1 59:18
73:25 74:4
**pay** 14:20 28:10 42:12
86:15 105:14 106:13,14,16
**paying** 42:15
**payments** 105:11
**Peluchette** 104:16,17
**pending** 131:16,18,22
**people** 13:10 14:12 17:18,
21,24 18:18 20:12 24:1
25:21 29:1,7 36:13,14,19
43:20 45:2 46:2,9,12,18,24
47:1,7,11,15 48:1,2,19
49:19,20,22 78:15 102:6
107:7,13 112:5 115:1
133:11,24
**Percocet** 124:11
**period** 7:20 12:25 30:24
31:1 109:6
**permanently** 7:3
**person** 60:6 91:25
**personal** 99:22
**pertains** 92:8
**Peter** 15:22 16:18 86:4
**phone** 37:4 41:22,25 42:2,
4,5,24 115:18 128:18
129:2,4
**photo** 75:6 110:22 118:25
**photograph** 73:12,17 75:3

**photographs** 3:12,13
22:3 52:19 72:12,16,17,18
73:2 113:20 114:2
**photos** 81:20
**physical** 66:20,22
**physician** 90:12,14,20
**pick** 52:2 59:12 73:15
115:1
**picked** 131:22
**pickup** 93:19
**picture** 33:14 75:11 76:9,
16,19 83:23 84:22
**picture-taking** 129:15
**pictures** 52:7 75:13 110:5
**pig** 107:16
**pinky** 65:2,3,20
**pinned** 116:18,19
**pinpoint** 52:8
**pipes** 20:2,6 29:21 104:18
107:21
**place** 9:10 52:7
**places** 12:23
**plaintiff** 2:2 4:14 89:20,21
**plaintiff's** 89:17
**plan** 68:12 75:17 101:8,9
**planned** 65:23
**planning** 66:5
**plastic** 66:4,24 94:24 95:3
**plates** 63:24
**play** 63:15 92:23
**played** 63:16
**pocket** 128:24 129:3
**point** 70:23 74:7,8
**pointer** 65:14,18
**Polaris** 2:5 4:6,15 23:2,17,
22 24:5,25 36:3 45:7,10,
15,16,20,22 47:14,16
72:25 76:18 111:22 120:6
121:13,21 127:25 128:3
132:8,11 133:24 134:3
**Polarises** 127:17
**poles** 20:5
**position** 16:7 19:9,19 44:1
65:22 119:6 125:23
**positioned** 46:4
**positions** 18:8
**positive** 81:2 93:24 98:23
105:15
**possession** 130:9,10
**possibility** 81:10
**post** 43:14

**posting** 129:9

**posts** 3:14 20:12 43:21

**pot** 31:1,2,3,5,10,20,25 32:4,6,8 35:3 39:12,13,17, 19,22 40:4

**Potts** 2:13 4:8

**pounds** 69:13

**power** 37:5,16

**practice** 27:2 31:24 35:11 36:24 37:6 47:17 49:17,18 52:21 78:19 84:24 85:1 88:21 91:21 120:2 129:7

**practices** 36:5 39:12 53:5, 6

**prepare** 21:22,25

**prepared** 67:4 78:2

**preparer** 77:24

**prescribed** 124:4,10,12

**prescription** 34:22

**presence** 130:11

**present** 41:3

**pressure** 51:22

**pretty** 10:13,20,22 12:15 15:24 16:4 19:11,19 20:10 23:9 24:16 33:3 34:25 39:2 40:14 43:12 45:24 46:15, 16 50:1 51:4 53:9 54:19 59:1 62:23 63:9 78:8 87:14 90:19 100:25 102:5,13 105:4

**previously** 104:11

**primary** 90:11,14

**prior** 20:8 22:25 23:6 24:4 26:16,20 27:9 31:17 53:11 84:8 85:3,6,14,18 87:7 90:17 109:18 111:21 123:6

**private** 63:19

**problems** 46:10 61:2,21, 22 62:20 68:22 104:8 127:23

**procedures** 63:3 68:15, 19,21

**process** 14:5,9,11 19:4 100:21

**produced** 101:5 103:1

**product** 27:3 37:3,13,16

**products** 25:1

**program** 107:3

**programs** 107:1,2

**promoted** 102:10 125:23

**pronounce** 92:12

**proper** 120:12,15 121:5,10

**properly** 61:14

**property** 76:1 113:22

**Protective** 126:8

**provide** 123:1

**provided** 87:18 123:7

**public** 36:14 49:20

**pulled** 117:8 118:24 123:20

**pulling** 114:6

**pumping** 51:15 116:23

**purpose** 43:20 69:1

**purposes** 40:5,22 89:12

**put** 18:1 19:19 39:4 47:24 49:7 52:17 61:8,10 64:2 66:8 80:3 88:15,17,18 102:2 133:23

**putting** 36:18 49:14 66:7

**Q**

**quarter** 29:12 52:6 126:4

**quarters** 29:11

**question** 5:24 6:3 23:25 27:23 47:12 81:4 89:19 92:21 97:15 98:5 110:15 118:8 119:6,11,20 121:12 122:7,8,16 124:22 131:13 132:7

**questions** 22:20 45:21 51:25 72:22 88:20 89:11, 14 91:10 92:6,24 96:8 98:13 124:16,21 128:7,10 131:24 132:24

**Quinney** 2:5 4:7

**R**

**race** 13:4,7,25 14:1,2,6 15:7,12,20,23 19:1,5,7,8 20:9,10,15,22 25:21,24 26:17 27:22,23 29:7 30:9 35:2 36:12 107:6,11 111:9, 11,15 112:8 113:25

**racers** 19:10

**races** 11:25 13:14,18,24 19:14 20:8 26:20 107:3,4

**racetrack** 50:3,4 75:23

**racing** 47:24 107:5,10

**radio** 20:13,16 114:24,25 117:22,25

**radioed** 117:23,25 118:1

**radioing** 51:20

**radios** 19:13

**raise** 84:2

**raised** 9:24

**raising** 112:22 113:12

**ramp** 108:2

**Ranger** 23:2,15,22 24:5,25 25:4,6,9,12 26:12 36:4,23 43:17 44:24 46:21 47:4 48:4,6,19 54:5 55:5,9,24 58:15,17,20 59:4 61:2,14, 22 73:6,7,8 75:12 76:18 79:22 80:11,13 81:1,5,12 83:2 85:4,6,25 86:24 111:22 121:21 134:3

**Rangers** 43:18,22,25 44:4, 6,17,20 45:20 53:11 84:9, 16 85:10,15,16

**rates** 14:21

**Ray** 2:5 4:6

**react** 55:17 57:10

**reaction** 56:24 57:13,21

**read** 26:23,24,25 27:3,5, 14,15 36:17 37:4,6,11,19, 23,24 38:1 47:19,21,23 76:12,14 80:17,20,23,24, 25 81:7,9 122:13,15

**reading** 37:2 80:21 82:10, 16 134:17

**ready** 13:21 14:17 25:23 43:10,14 51:15 68:8 70:2

**real** 50:19 95:2

**realized** 51:6,16 115:16 117:17,18 118:18

**reason** 9:2 22:19 29:16 44:19,20 49:16 59:17 96:16

**reasons** 54:24 125:22

**recall** 32:8 56:7,9,10 61:7 76:24 77:8,16,17,23 78:12, 14 81:10,17 83:5,17 84:1 112:13 113:5,9 114:8 116:12,13 118:17 119:25 120:5,9 130:14,15 133:5,6, 9 134:1

**receive** 16:12 105:16,21

**received** 86:10

**recent** 96:3

**recently** 70:6

**recess** 35:21 72:6 91:4

**recognize** 75:6 99:21

**recollection** 119:7,12

**recommend** 133:22

**recommended** 67:9 127:3 133:15

**reconstruct** 66:24 123:25

**Reconstruction** 11:4

**record** 3:16 4:3,12 16:16 35:19,22 57:5 64:19 65:11 72:4,7 91:1,6 102:14 119:18

**recorded** 93:17 101:1,21, 22,24,25 127:9

**recording** 98:4 101:17 102:14,15,17,18,19

**records** 71:4 77:18 79:9

**recruited** 104:14,21

**refer** 80:4

**referees** 112:5,7

**referred** 23:14 86:14

**reflecting** 129:5

**reflection** 129:5

**regard** 106:4 107:1,20 108:20

**regular** 31:1,3 35:9 129:7

**related** 130:6

**relationship** 28:24

**relatives** 126:12

**relax** 35:10

**relied** 55:2

**reload** 48:24

**rely** 78:25 79:4,8

**remember** 7:13,14 14:25 15:2,3,6,21,22 16:7 17:1,2, 3,8,9,13,24 18:4,16,20,24 19:1,6,18 20:3 21:16 27:13,21 30:2,4 31:15 32:21,23 33:4 34:5,7,12, 13,15 37:18 43:2,4,8 44:10,13 48:3,5,6,9,12,14, 15,17 49:9,24 50:7,9,13, 17,22 51:1,2,3 52:22 54:4, 9,10,11,19 55:11 58:3,5,7, 11 60:16 61:16 64:10 66:4 67:12 73:14,19 74:6,10,16 76:1,5 80:15,16 82:4,8,10, 11,12,15,16,20,21 83:2 86:18,19 87:12,14,19 89:11,13 100:8,13,14 103:25 104:18 105:13,22 108:8,10 112:17,20 113:2, 6 114:5,10,13,18,21 115:2, 6,7,8,10 117:24 127:8 130:8 131:3

**remote** 60:14

**removed** 64:3 85:19,22

**removing** 84:24 85:1

**RENCHER** 2:11

**rent** 24:19 28:13

**rental** 22:9,10,11 28:4,10, 11 44:11 97:8 99:16 106:19,22

**rented** 22:8 28:6 44:11 100:11

**repair** 63:25

**report** 19:13 43:13 112:8

**reported** 78:20

**reporter** 4:10 6:7 16:16 23:25 92:4 119:17

**representing** 4:16

**reprimanded** 125:12,18

**requested** 134:12

**requests** 89:18 121:7

**require** 39:1 41:1 43:22

**requirement** 38:12 88:8

**requires** 38:24

**residing** 103:14

**resisting** 131:4

**resolve** 131:15

**respect** 5:11 28:21 36:3,5, 8 41:2 63:3 86:24 101:9

**responses** 89:18

**rest** 55:3 65:15,16 75:19 128:7

**restraints** 38:18

**resulted** 132:12

**retracted** 119:6

**return** 77:2 95:19 103:2,7, 12

**returns** 71:5,9 77:3,4 78:20,25 79:14 95:20 103:1

**reverse** 93:21 97:17,19 98:1 128:7

**reversed** 97:21 98:8

**Rick** 2:4 4:15

**ridden** 84:9,13

**ride** 24:12 46:19 98:20

**riding** 38:13 39:9 79:22 84:8 130:16

**right-hand** 73:11,17 75:2

**right-handed** 63:7,8,11, 13

**ring** 65:19 76:20

**rise** 56:11

**road** 42:25 49:23 53:18,20 59:20 73:11,19,23 74:3,8, 9,12 75:7,18,19,20,21,24 76:1,6 97:1,3,5 99:13 113:19,21,22,23 114:2,4 116:20 129:16

**roads** 59:25

**Robby** 66:11,12

**Robert** 112:14

**rock** 55:14 56:14,17,25

**rocks** 55:12

**rods** 63:24 104:18

**role** 13:18,19 20:8

**roll** 32:15 50:23 51:3,9 56:21 115:21 116:2,3

**rolled** 114:3

**rollover** 114:22 115:23 132:20

**Ronnie** 17:7

**roof** 51:7 116:1

**room** 95:8

**roommated** 18:9

**Rope** 108:3

**Rose** 2:4 3:3,6 4:15 5:2 35:16 72:1 90:22 91:8 97:21 98:13,16 102:20 128:9,12 131:23 134:7,16

**Roughly** 14:24 33:19

**route** 59:11,13,15

**row** 98:11 99:20

**rule** 91:23

**rules** 5:10 36:6,9,11,24 88:21 91:12,21,24

**ruling** 119:19

**run** 107:6,16

**running** 130:1

**Ryan** 17:4 60:16,19,20

**RZR** 49:7

**S**

**safe** 40:14,15 42:14 54:23 125:14,15,20,24

**safely** 40:12 59:4 87:8,15

**safety** 36:6,9,24 40:22 55:2 61:10 87:23,24 88:21 91:12,21 92:21 125:25 133:19,20

**Salt** 2:6,12 4:7 15:1,11 16:9,18 17:19 23:19 24:4,6 25:5,6,9,12,14,16,23 27:17,19 29:23 30:3 31:5, 6,9,10 84:17 86:1,13 106:20 111:19,20

**San** 12:24 15:4 19:15 24:18

**sat** 47:5

**Saturday** 14:2,7 19:2 30:8

**scar** 62:18 64:3,24 68:21

**scarring** 67:3

**scars** 62:15

**scene** 60:17 112:12 126:19,23,24 128:4

**school** 9:18 10:12 63:15, 17,19

**Screen** 3:15

**screw** 20:5 69:14 123:21

**screws** 63:24

**season** 13:9

**seat** 38:4,5,7,10,19,23 39:1,4,6 49:8 52:12,18,20, 25 53:9,13 61:5,9,11 76:17,18,22 87:25 88:9,16, 18 93:14,18 94:9 96:12,15, 17,22 97:12,20 98:1,6,8,10 99:6,9,18,19 100:6,15 112:1 118:6,9,15,17,24 119:6,8,13 120:1,2,3 121:22 122:18 128:15,16 129:14 133:13,23 134:2,4

**seats** 26:13 38:13,21 39:8 98:21 100:9

**secure** 40:12

**self-healed** 63:1

**self-prepared** 78:1

**sending** 33:1

**sense** 116:1

**separate** 12:21 79:14

**separated** 9:8

**September** 94:5

**September/november** 30:21

**Sequoia** 98:22 100:10

**series** 72:12

**Services** 126:8

**set** 12:19,22 13:7,24,25 14:1 19:4,6,8 33:7 74:24 107:2,21 108:4,5 109:4

**Seth's** 11:3

**setting** 14:5 111:12 123:6, 8

**setup** 35:2

**setups** 109:16

**shape** 126:10

**shave** 70:14

**Shelly** 4:10

**shirt** 64:13 69:21 115:11 116:24 128:24

**shoes** 69:22

**shoot** 94:25

**shopping** 69:4

**short** 12:25 17:6

**shot** 3:15 127:1

**shotgun** 40:24

**shoulder** 94:10 97:24,25 98:1 128:17

**show** 52:19 64:13 72:11 95:19 98:6 99:17 128:15

**showed** 44:22 100:4 126:25 127:3 129:13

**showering** 69:17,25 70:3, 13

**showing** 83:19 97:11

**shown** 72:23 73:2,16 81:7 113:20 114:2 128:13

**shows** 76:17 77:5,19 78:10 79:5 80:11 82:24 98:15 129:4 130:7

**side** 48:7 51:7,10 54:9 56:1,15 57:9 64:14,15 65:7 70:16,17 75:10,12 84:13 85:7,11,12,15,20,22 88:4,7 97:2,18 114:15 118:19,20, 23,25 129:3,5

**side-by-side** 23:15 26:17, 22 53:14 88:10

**side-by-sides** 24:20 25:17 26:21 27:10 84:9,10 87:9

**sign** 104:25

**signature** 134:12

**signed** 102:12

**similar** 9:10 13:6 18:8 24:6 25:3 53:12 73:9 84:10 85:16 112:7

**simply** 122:6

**sir** 61:1,4 67:21 86:19 113:4 114:16,20 123:5,12 125:1,6,10,16,21 126:11, 14,18 127:12 128:3,8 130:14 131:7 134:8

**sit** 47:4 123:14

**site** 34:9 87:9 102:3

**sites** 106:16

**sits** 65:21

**sitting** 113:14

**situation** 9:10

**six-foot** 108:1

**six-seater** 26:14

**skim** 38:2

**skin** 68:22

**skinny** 120:4

**skipped** 33:25 112:9

**sleep** 100:14

**sleeping** 99:6

**slid** 116:21

**slide** 117:7

**slim** 53:9

**slow** 50:19 51:21 54:19

**small** 68:10 72:13

**smoke** 31:2,5,9,24 32:12, 19 35:3

**smoked** 31:20 32:4,6,8 33:20

**smoker** 31:1,3

**smoking** 31:18 39:12,13, 17,19,22 124:13 132:15

**smooth** 74:17

**socket** 62:9

**somebody's** 37:4

**son** 8:9 94:24

**song** 102:17

**songs** 101:1,21

**Sons** 11:15

**sort** 23:13 34:22 37:16 41:19 66:19 69:18,19 70:3 88:22 90:21 91:22 100:9, 18 125:23 126:17,22 127:15

**sound** 108:21 132:7

**Soundcloud** 3:15

**sounds** 45:22 63:2 90:25 108:23 114:16

**source** 71:10

**South** 2:5,11

**Spartan** 13:6 107:18

**speak** 6:5 112:11,14,19

**Specialty** 2:11 4:19

**specific** 52:24

**specifically** 36:22 48:15, 17

**speculation** 128:22

**speed** 53:14 54:11 120:6 121:13

**speeding** 54:7

**speedometer** 54:12

**Speedway** 108:9

**spell** 67:10

**spelling** 67:12

**spent** 10:2 95:18 129:18

**spine** 120:4

**split** 106:23

**spoke** 90:7 112:17

**sports** 63:15 108:24

**spot** 20:7

**squeaked** 61:17

**squeaky** 61:17

**stamp** 72:24

**standing** 97:11

**staring** 42:23 129:15

**start** 14:15 19:24 24:2 27:17 30:7 47:19 55:4 56:3 57:1 61:20 70:22 87:17,22 95:10

**started** 10:22 12:15,17 15:9 19:25 20:24 21:6,9,11

50:17,18 51:20 54:8 55:5, 6,10,24 56:12,22 57:3 58:8 61:24 70:6 71:8 87:11 95:17 100:20 104:9,10

**starting** 8:13 29:6 50:23 51:3 70:9,12 115:3

**starts** 53:20,22 56:13 57:13

**state** 2:5,8 4:11 5:3 13:8, 10,12 38:17 89:20 121:5

**statement** 112:20 113:2,4, 6 114:5,13,17 127:9

**statements** 114:9,19

**states** 29:22 98:2,9

**stay** 6:15,20 33:13 51:20, 22 54:23

**stayed** 55:18 88:17 104:4

**staying** 6:21 34:10,11 104:8,9,10 106:11

**stays** 65:21 104:2

**steady** 21:16

**steer** 61:14

**steering** 57:16 61:21 114:6,10 115:24 116:5,10 118:14

**stepson** 8:8

**sticker** 72:14

**sticking** 117:21

**stitching** 64:7

**stop** 67:21 88:12

**stopped** 21:9,21 74:9

**stops** 65:5

**straight** 55:4,7,8,19,23 57:12 58:8 127:6

**strapped** 120:5 122:24

**street** 2:3,5,8 5:6 6:12 7:15 99:12 103:8,18

**Strike** 89:16

**studied** 41:4,23 42:18 129:18

**studio** 101:12 102:14,17, 19

**study** 40:1

**studying** 129:19

**stuff** 44:13 62:12 70:9,12 117:21 130:22

**style** 25:3

**submitted** 134:17

**sudden** 55:9,24

**suffer** 62:5

**suggested** 125:19 126:8

**Suite** 2:6,9

**summertime** 10:21

**Sunday** 14:3,7 30:8

**supervised** 79:19

**supervising** 17:2 18:13 19:19 26:3 33:7

**supervisor** 15:17,19 18:1, 14,15 19:10,16,22 36:13 49:12,13,20 52:16 54:25 61:9 79:18 87:4

**supervisors** 16:25 18:8 29:3 46:1

**supervisory** 125:23

**supplies** 88:13,14

**supposed** 32:25 86:12

**supposedly** 62:25 130:22

**supposing** 58:4

**surgeon** 66:4,24

**surgeries** 64:4 66:14 69:9 70:8 90:6 96:4

**surgery** 64:5 66:3,13,15 67:3,5,9 68:1,3,4,5,8,11, 12,16 90:4 96:4,7 127:7

**surprised** 61:23

**surroundings** 87:23

**survival** 118:20

**SUV** 98:12

**swear** 120:24 121:2

**switch** 35:25

**switched** 15:9

**sworn** 4:12,22

---

**T**

**tailbone** 53:10 76:23

**take-down** 14:11

**taking** 59:11 124:1 132:12 133:12,14,25 134:13

**talk** 10:16 11:20 12:1 22:25 25:4 27:24 42:3 43:1 64:11 68:23 86:22

**talked** 19:15 28:16 29:21 30:23 35:3 39:11 44:16 91:10

**talking** 24:1 36:23 44:21 64:5 68:1 71:8 91:20 109:2 111:10

**tangled** 116:1

**Tavaris** 132:16,20

**tax** 71:4,5,9 77:2,3,4,18,24 78:15,20,25 79:8,14 95:19, 20 102:25 103:1,7,12 105:10,20

**taxes** 78:5 105:15

**Taylor** 18:10,11 28:5,15,22 106:25

**team** 15:8,9,10,12,18 16:23 63:17,18,20

**teams** 15:7

**telling** 112:18

**tells** 45:22

**tendons** 123:20

**term** 20:4

**terrain** 74:18

**test** 114:25

**testified** 4:23 91:11 104:11 111:21

**testifying** 5:22

**testimony** 109:3 111:6 114:1

**Texas** 2:3 29:25 86:11 106:5

**text** 30:5

**texting** 42:3

**theft** 41:19

**thefts** 41:20

**therapy** 66:20,22

**thickening** 68:10

**thin** 68:22

**thing** 14:4 20:11 33:23 35:9 37:25 38:1 43:12 47:25 50:2,20 58:11 60:1 70:3 77:18 82:24 83:24 88:22 91:22 107:8,13,16 108:16 115:9 124:11 129:6

**things** 5:14 9:5 16:5 20:16 24:13 26:4,23 42:8 68:25 69:5,7,18,19,24 70:17,18 77:9 80:22 90:21 108:3 119:17 133:20

**thinking** 108:8

**Thirteen** 8:1

**thought** 55:11,12 56:11 118:5,8

**three-day** 30:7

**three-row** 98:12 99:20

**Throw** 63:9

**ticket** 126:16

**tie** 69:22

**tilt** 55:13,17 56:12,13,17, 18,21,22,25 57:3,13 58:1 84:6 115:3

**tilted** 115:2

**tilting** 54:8 55:10,18 56:19 57:7,15 58:5 115:7

**tilts** 55:15 57:8

**time** 4:3 9:13 10:17,23 11:19,23 12:17,18,25

14:16,20 15:20 16:10,18,
21 17:17 20:15 21:3,20
23:1 24:1 26:25 30:5,24
31:1,4,12 32:21,23 33:19
34:5,8,23 35:6,20,23 36:9,
17 37:15,20 39:2,3 42:11
43:3,5 44:5,11 45:19 49:1,
4,6,13 55:21 56:16 59:12
61:19 72:5,8 75:17 79:11
81:6,12 83:3,25 84:21 86:7
87:2 90:7,15,22 91:2,6
93:23,25 94:17 98:22
101:12,13 102:8 103:15,23
105:6 108:17 109:6 116:18
119:13 120:7,19,22 121:14
122:19 124:4 125:2,11
127:5 129:18 130:8 132:13
133:3,4 134:10

**times** 12:23 20:19 24:12
39:6 45:20 59:15 64:3
83:22 98:3 127:18

**tip** 55:5,6,24 56:3 58:9
61:20,24

**tipped** 55:9 76:18

**tipping** 56:1

**tire** 72:25

**tissue** 62:10 64:3,24 68:21

**today** 5:12,24 22:17
123:14

**told** 95:9 119:24 120:21
126:25 127:20

**Tooele** 34:14,16

**tools** 80:22 88:13,14

**top** 54:14 58:6,14 64:1
115:19,24

**tore** 12:20

**torn** 123:24

**torso** 64:7 66:6,7

**total** 47:7 77:6,19

**touchy** 122:3,5

**Tough** 13:7 107:18

**toy** 94:24

**TRACY** 2:2

**trail** 53:23 60:1,2 74:14

**trailer** 44:13

**trailers** 13:21

**training** 59:6 60:1 87:6,18,
24 88:3 107:4 125:25
126:4

**transcript** 134:16

**transportation** 106:15

**travel** 109:9

**traveled** 106:5

**traveling** 75:4 112:22
113:8,11

**treat** 65:24

**treatment** 35:14 66:19
86:10,12

**treatments** 67:15,25

**trial** 5:22 128:7

**trip** 27:17 31:6 45:14 49:22
50:8 111:22

**trips** 35:1,7 89:9

**truck** 93:8,9,10,19 94:13
98:24

**turn** 52:9 55:5,15 56:17
57:1,3,7,8,14 64:14 69:25
70:1

**turned** 55:16 114:15 115:9

**turning** 54:8 57:11

**TVS** 109:8

**two-seat** 109:23

**two-seater** 26:6

**two-wheel** 133:3,5,7

**two-year-old** 38:23,25
95:4

**Tying** 69:22

**type** 24:1 27:16 41:20
96:25 104:25 119:17 124:9
127:9 129:14

**types** 107:21

**typical** 5:18 31:24 32:11
34:25

**typically** 24:25 32:12 37:4,
6,23 57:17

**U**

**uh-huh** 5:13,16 8:19 10:3
11:18 12:8 15:13 16:11
23:3 26:7,19 32:16 45:24
47:9 55:22 62:14 63:4
73:13 80:8 90:13 91:13
92:2,25 93:20 94:21 118:4

**unbuckled** 53:14

**unbuckling** 53:12

**uncle** 11:2

**unconscious** 51:5

**undecided** 68:2

**understand** 5:11,21,24
11:21 16:17 22:20 65:23
76:17 77:2 79:7 115:22
118:7 119:21 131:13

**understood** 6:3 30:15

**undo** 64:12 118:15

**undoing** 118:17

**unexpected** 62:1

**union** 121:5

**United** 98:2,9

**University** 127:6

**upper** 73:10,17 75:2 76:9

**user's** 27:10

**Utah** 2:6,12 4:7 30:1 86:1
106:18 108:21,24 111:7,9,
11,14,15,20,22 123:2,7
127:13

**utility** 109:9

**UTV** 110:10,16,22,25
111:2,17 117:3 118:3

**UTVS** 109:9,11,12,15,18,
23 110:20 111:3,6,8,12,22
123:2,8

**V**

**van** 98:21 100:9

**varied** 50:6 107:23 108:19

**varies** 14:12,13 50:1 79:3,
5 108:18 123:18

**vary** 25:1,2 108:12,16

**vehicle** 22:7 25:3,10,15
27:16 38:14 41:8 45:16,18,
19 59:16 82:8 83:18,19
88:23,25 89:2,4 90:1 93:5
94:12,16 96:18,20,23 97:6
98:2 99:20,21,22 114:3
115:18,19 116:8 118:16
129:9 130:17,21 132:8,11
133:10,25

**vehicles** 23:1,7,13 24:19
25:17,22 27:7 45:1 53:12
50:7 97:8 98:20 100:11
107:9 109:10 127:16,25
128:4

**vent** 82:6,11,14

**vents** 48:10

**verify** 92:16 106:1

**versus** 4:5

**video** 33:1 42:7,8,11,19
64:13 93:14,17 96:25 97:1
98:4,15 100:3,13 128:18
129:24 132:13

**videoing** 129:1,8

**videos** 92:20 98:10 99:24
100:3 128:14,15 129:10,
12,18,19,20,24 132:6,19

**view** 60:7

**visible** 47:22 82:17

**visit** 6:25 13:12 86:16

**volunteer** 59:21

**volunteers** 19:9,12 26:18
43:14 50:9,11,14 52:2,16
59:12 60:9 61:3,5,13,15
73:15 81:15 112:3,4,21
133:25

**W**

**W-2** 105:16 106:2

**Wadsworth** 4:10

**waistline** 41:10

**wait** 23:24 47:13 51:23
116:25

**waiting** 44:1 68:13

**waking** 34:5 58:6 100:14
115:8

**walk** 117:19

**walked** 117:19

**walkie-talkie** 50:16

**walkie-talkies** 81:14

**walkies** 48:23

**walls** 108:1,2

**Walmart** 10:23

**wanted** 76:4 130:5

**wanting** 57:18

**warning** 26:25 27:6 36:20
37:11,12,19 47:19 48:4
80:12,15,16,25 81:7,9,23
82:1,3,5,10,13,17

**warnings** 26:21,24 27:3,4
36:3,6,16 47:16,18,22
48:5,10 80:22

**watch** 129:16

**watched** 61:11 132:6

**water** 20:14 50:16

**waters** 48:22 81:14 114:24

**ways** 29:13 68:23

**weapon** 94:22 95:2

**wear** 38:5,9

**wearing** 61:5 79:21 118:5,
9 119:8,13

**website** 102:2

**week** 18:24 30:9,11,12
44:8,10 45:13 67:19 71:15,
16 74:24 124:6,8 127:14

**weeks** 90:5 124:8

**weight** 69:11

**weld** 29:20

**welding** 104:15

**west** 2:8 5:5 10:9 11:5
15:8,10,12,18 16:23

**Western** 79:19

**whatnot** 35:2

**wheel** 55:15,17 56:18 57:2,
10 115:24 116:5,10

**Wheeler** 2:8 4:17

**Whichever** 57:3

**wife** 7:22 9:11 47:2 48:20 79:11,17 104:2,7

**wife's** 7:23

**Wilder** 90:11

**window** 51:12 115:9

**windows** 111:16

**windshield** 51:12 58:12 115:13,17 116:16 117:11, 14 118:2,6,10,12,13

**Winn-dixie** 79:18

**winner** 107:6,7

**wire** 107:25

**wise** 71:20 106:8

**withholdings** 105:10,11

**witnessed** 127:19

**woke** 51:5,6 54:2 90:1 99:7 115:16 118:18

**wondering** 89:22 131:17

**word** 20:4 38:2

**wore** 87:25

**work** 10:18 13:1 14:23 18:20 19:8,23,25 20:1 26:5 31:19,25 33:5,14,16,20 34:6,7 35:12 39:18,21 43:3,10,11 44:2,8 46:5,11 54:25 55:1 58:24 64:6 65:7 70:24,25 71:1,25 77:25 79:11 83:21 85:2 87:9 95:7,12,13,14 101:8,18 104:12,24 111:7

**workday** 31:15 32:11 58:25

**worked** 10:23,24 11:2,3,4 12:17,25 17:16 18:13 21:7, 18 31:16 32:3,12,24 33:3, 4,5,9,11,18,23,24 46:5 62:3 70:20 79:17 110:20 114:25 125:2,8,11 126:1,2

**worker** 125:14,24

**workers** 28:6 36:14 71:11, 14 126:13

**working** 10:20,22 11:23 12:3,6 14:13 17:25 20:25 21:2,3,5 28:17 30:21,23 34:15 44:12 66:1 68:6 71:25 77:15,20 86:7 87:5 95:11 105:17 125:3,7 126:4 127:13,19

**works** 68:20

**wound** 73:20 127:2

**wreck** 117:3

**wrecked** 118:19

**wrist** 123:18

**write** 63:11,13

**written** 89:11,14 127:9

**wrong** 42:20

## Y

**yard** 83:20 84:21 86:8

**yards** 60:12 88:13

**year** 7:19 30:22 70:7 71:6 77:6 78:10,12,17,21 79:5,6 92:15

**years** 8:1 10:1 21:15,19 31:13 34:4 38:8 40:24 41:11 47:21 54:18 70:9 78:24 79:2,18

**yesterday** 22:16

**younger** 11:14 12:10 102:6

**youngest** 38:24

## Z

**zooming** 54:21



DEPOSITION
EXHIBIT

Anderson

PENGAD 800-631-6989

CLAIMS 000051





CLAIMS 000053



CLAIMS 000054





# Exhibit 3

ANDERSON

vs

POLARIS INDUSTRIES, INC

JESSIE WAYMENT

June 06, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3                          *  *  *

 4    KENDALL ANDERSON,               )
                                      ) Civil No.
 5              Plaintiff,            ) 2:17-cv-00205-DN
                                      )
 6         v.                         ) Deposition of:
                                      )
 7    POLARIS INDUSTRIES, INC.        ) JESSIE WAYMENT
      and BIGRENTZ, INC., a/k/a       )
 8    BIG RENZ, WHEELER CAT           )
      a/k/a WHEELER MACHINERY         )
 9    CO., BATTLEFROG a/k/a           )
      BattleFrog Obstacle Race        )
10    Series,                         )
                                      )
11              Defendants.           )
                                      )
12                                    )

13                          *  *  *

14

15                     June 6, 2018
                       10:00 a.m.
16

17

18            Law Offices of Ray, Quinney & Nebeker
               36 South State Street, Suite 1400
19                    Salt Lake City, Utah

20                          *  *  *

21

22

23                   Shelly Wadsworth
              - Certified Realtime Reporter -
24            Registered Professional Reporter

25
```

ANDERSON vs POLARIS INDUSTRIES, INC

June 06, 2018                                                          Jessie Wayment

**2**

1                 A P P E A R A N C E S
2  For the Plaintiff:          Andrew G. Counts
3                              THE TRACY LAW FIRM
                               4701 Bengal Street
                               Dallas, Texas 75235
4
   For the Defendant          Rick L. Rose
5  Polaris Industries:         RAY QUINNEY & NEBEKER
                               36 South State Street
6                              Suite 1400
                               Salt Lake City, Utah 84111
7
   For the Defendant          Michael G. Brady
8  BigRentz and               BRADY LAW CHARTERED
   Wheeler Machinery:          2537 West State Street
9                              Suite 200
                               Boise, Idaho 83702
10
   For the Intervenor         D. Gregory Anjewierden
11 Specialty Insurance Group:  RENCHER | ANJEWIERDEN
                               460 South 400 East
12                             Salt Lake City, Utah 84111
13 Also Present:              Cody Rhoades
14                              * * *
15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X
2  EXAMINATION                           PAGE
3
   By Mr. Counts                          4
4
   By Mr. Rose                           13
5
   By Mr. Counts                         19
6
   By Mr. Rose                           22
7
8
   EXHIBITS
9
10 No. 1      Wheeler Rental Agreement      6
11 No. 2      BigRentz Purchase Order       6
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                P R O C E E D I N G S
2                JESSIE WAYMENT,
3  called as a witness by and on behalf of the
4  plaintiff, being duly sworn, was examined and
5  testified as follows:
6                   EXAMINATION
7  BY MR. COUNTS:
8      Q.   Would you state your name for the record,
9  please.
10     A.   Jessie Wayment.
11     Q.   Mr. Wayment, you've had the opportunity to
12 sit through the depositions of your co-workers,
13 Mr. Webb and Mr. Jones, correct?
14     A.   Yes.
15     Q.   Have you ever given a deposition before?
16     A.   No.
17     Q.   When did you find out you were going to
18 give sworn testimony on behalf of Wheeler in this
19 case as one of its corporate representatives?
20     A.   May 31, 2018.
21     Q.   And it looks like from what I've been
22 handed you've been designated as the corporate
23 representative designated for topic 6, which is any
24 indemnity provisions which exist or may exist.  Is
25 that it?

**5**

1      A.   No.  And number 2.  Or number 4, sorry.
2  It's 4 and 6.
3      Q.   I don't have 4 listed for you.  So you're
4  4, you're 6, and you're 2, correct?
5      A.   Yes.
6      Q.   What, if anything, did you do to prepare
7  for today's deposition?
8      A.   Just looked up dates in my e-mails so I
9  could get caught up on the information.  Just a
10 little bit of e-mail review.
11     Q.   When is the last e-mail that you sent or
12 received having to do with this case?
13     A.   May 31st.
14     Q.   I apologize.  That was a bad question.
15 Aside from the e-mail letting you know that you were
16 going to give sworn testimony on behalf of Wheeler,
17 what was the other last e-mail you reviewed for this
18 case?
19     A.   2016.
20     Q.   A long time ago.  Okay.  How long did you
21 prepare for this deposition?
22     A.   Forty-five minutes.
23     Q.   What documents did you review to prepare
24 for today?
25     A.   E-mails.

6

1    Q.    It looks like you brought some documents
2  with you today; is that correct?
3    A.    Yes.
4    Q.    You have a copy of the notice, right?
5    A.    Yes.
6    Q.    What are the other things that you brought
7  with you?
8    A.    I brought the rental agreement between
9  Wheeler Machinery and BigRentz.
10   Q.    May I see that, please?
11   A.    Yes.
12       (Exhibit No. 1 was marked.)
13   Q.    Any other documents you brought, aside
14  from Exhibit 1 and your deposition notice?
15   A.    Just a purchase order agreement between
16  Wheeler Machinery and BigRentz.
17   Q.    Can I see that, please?
18   A.    Yes.
19       MR. COUNTS:  I'll mark that as Exhibit 2.
20       (Exhibit No. 2 was marked.)
21   Q.    Any other documents, sir?
22   A.    No.
23   Q.    Do you have a copy of Exhibit 1 over
24  there?
25   A.    Yes.

7

1    Q.    Did you bring a copy of those e-mails that
2  you looked at?
3    A.    No.
4    Q.    Let me ask you, since you've been
5  designated as the corporate representative for topic
6  2, what is the relationship between Wheeler and
7  BigRentz?
8    A.    So Wheeler Machinery is a supplier of
9  equipment to BigRentz, which then BigRentz takes
10  that equipment and re-rents it to an end user.
11   Q.    So Wheeler owns the equipment and they
12  rent it to BigRentz and then BigRentz rents it to
13  somebody else, correct?
14   A.    Yes.
15   Q.    So back when this accident occurred,
16  Wheeler was the owner of the UTV, correct?
17   A.    Yes.
18   Q.    And when did Wheeler transfer possession
19  of the UTV/ATV, however you want to describe it, to
20  BigRentz?
21   A.    May 6, 2016.
22   Q.    What is Wheeler's position with respect to
23  after they rent equipment to BigRentz?  What
24  responsibilities or obligations does Wheeler have
25  for that equipment?

8

1    A.    Can you repeat the question?
2    Q.    Maybe it's better if we actually read the
3  topic.  First, topic 2 says, "The relationship, if
4  any, between defendant Wheeler CAT a/k/a Wheeler
5  Machinery Co. and co-defendant BigRentz, Inc. a/k/a
6  Big Renz, including the terms of the relationship
7  and any respective rights and obligations of the
8  parties to one another."  I'm trying to understand,
9  when Wheeler rents equipment to BigRentz like the
10  Polaris ATV/UTV that was involved in this accident,
11  is Wheeler contracting away safety to BigRentz, or
12  what responsibilities or obligations does Wheeler
13  think it has with respect to safety of that UTV?
14   A.    So Wheeler Machinery is an equipment
15  supplier to BigRentz.  We are a business-to-business
16  entity to where we want companies that we do
17  business with to have the insurance.  We want them
18  to be established.  So that's our choice of who we
19  do business with.  Everything is in the rental
20  contract as far as what the person that we're
21  renting to is responsible for.  And it is on the
22  back of the rental contract.
23   Q.    Well, let's turn to the back of the rental
24  contract, which I believe is Exhibit 1.
25   A.    Yes.

9

1    Q.    Is there anything on there about safety?
2    A.    Yes.
3    Q.    Where's that at?
4    A.    I would have to take some time to find it
5  and outline it.
6       MR. COUNTS:  We'll go off the record.  You
7  can take as much time as you need.
8       (Off the record.)
9    A.    So in the contract in 1 and 2, it does
10  discuss in there some responsibilities of proper
11  maintenance, operation, you know, not limited to
12  speeding, lack of lubrication, maintenance,
13  necessary fluids.  Just some basic information.
14  That's all that I could find in the contract.
15   Q.    And some of those things someone may say
16  falls under the umbrella of safety.  But there's
17  nothing in the contract itself that says the word
18  "safety" or "safe" or anything of that nature,
19  correct?
20   A.    No.
21   Q.    Is what I said correct?
22   A.    Yes.
23   Q.    I apologize.  Sometimes I ask a question
24  for the reporter.
25       With respect to number 6 on Exhibit 1,

10

1  that is the only indemnity provision that Wheeler is
2  aware of vis-à-vis BigRentz, correct?
3      A.   Yes.
4      Q.   Are you aware of whether or not Wheeler
5  has notified BigRentz in this case that it intends
6  to seek indemnification?
7      A.   No.
8      Q.   Let's talk about topic 4, "The
9  relationship, if anything, between Wheeler and
10  BattleFrog."  Is there any relationship between
11  Wheeler and BattleFrog?
12      A.   No.
13      Q.   At no time there's never been a
14  relationship, correct?
15      A.   No.
16      Q.   Is what I said correct?  Let me put it
17  that way.  Is what I said correct, at no time
18  there's never been a relationship between Wheeler
19  and BattleFrog, correct?
20      A.   I do not know.
21      Q.   But you're the one that's been designated
22  to talk about that, right?
23      A.   Yes.
24      Q.   So you'd be the one to ask, right?
25      A.   Yes.

11

1      Q.   And you don't know.
2      A.   No.
3      Q.   What is your job title at Wheeler?
4      A.   Rental manager.
5      Q.   And how long have you had that job title?
6      A.   Three years.
7      Q.   When did you start?
8      A.   March of 2015.
9      Q.   And how old of a gentleman are you, sir?
10      A.   Thirty-two.
11      Q.   Before working for Wheeler, what did you
12  do?
13      A.   I was in college full time.  And then I've
14  worked at other equipment dealerships.
15      Q.   Such as who?
16      A.   It's called Pacific Tri-Star.
17      Q.   And what type of equipment do they rent?
18      A.   Caterpillar.  Off brands such as Chinese
19  equipment.
20      Q.   Do they rent any sort of UTV/ATV?
21      A.   No.
22      Q.   Prior to working with Wheeler, had you
23  ever worked for a company that rented UTVs or ATVs?
24      A.   No.
25      Q.   What is your degree in college in?

12

1      A.   Bachelor's of finance.
2      Q.   Prior to renting the ATVs/UTVs to BigRentz
3  that had to do with Mr. Anderson and BattleFrog, how
4  many times before had Wheeler rented equipment or
5  vehicles to BigRentz?
6      A.   One time.
7      Q.   And when would that have been?
8      A.   September of 2015.
9      Q.   Do you remember what they rented on that
10  day?
11      A.   Mini excavator, Caterpillar machine.
12      Q.   Since the day of this accident, has
13  Wheeler rented any equipment to BigRentz?
14      A.   I do not know.
15      Q.   You're not aware of any, correct?
16      A.   I'm not aware.
17      Q.   I got the impression, and I want you to
18  correct me if I'm wrong, that the majority of what
19  Wheeler rents is construction equipment, Caterpillar
20  equipment, that sort of thing; is that correct?
21      A.   Yes.
22      Q.   What part of its business is this rental
23  of ATVs/UTVs?
24      A.   I do not know.
25      Q.   Do you know how many Wheeler owns?

13

1      A.   Fifteen to 20.
2      Q.   Is that 15 to 20 roughly the same amount
3  that they've rented the last three years since
4  you've been there?
5      A.   Yes.
6      Q.   If they have 10 to 15 ATVs or UTVs, how
7  many different types of equipment do they
8  have?  Are we talking hundreds?  Thousands?
9      A.   Thousands.
10      Q.   So this UTV/ATV is a very, very, very
11  small percentage of what Wheeler does, correct?
12      A.   Yes.
13      MR. COUNTS:  That's all the questions I
14  have, sir.  Thank you.
15      EXAMINATION
16  BY MR. ROSE:
17      Q.   Did you have any involvement, then, in the
18  investigation of how the accident happened?
19      A.   No.
20      Q.   There's some e-mails that you're involved
21  in, if we get into the CLAIMS documents, that maybe
22  your counsel can put in front of you.  I think the
23  e-mail string with you starts with 21, CLAIMS 21.
24  And right at the bottom, it says, "From: Kirk.
25  Thursday, May 26."  If you flip over to the next

14

1   page, it says, "To: Jessie Wayment." That's you?
2      A.   Yes.
3      Q.   And the Kirk is Kirk Steadman.  You see
4   that from his signature there.
5      A.   Yes.
6      Q.   Have you had dealings with Kirk Steadman
7   over the years before this?
8      A.   No.
9      Q.   Do you know much about Steadman's
10  Recreation and its business?
11     A.   They are the local Polaris dealer.
12     Q.   And have you ever been out to their
13  facility?
14     A.   No.
15     Q.   Do you understand that Steadman's is one
16  of the largest recreational vehicle dealers in Utah?
17     A.   Yes.
18     Q.   And carries a number of manufacturers'
19  products, not just Polaris, right?
20     A.   Yes.
21     Q.   He sends you an e-mail, and it says,
22  "After looking over this machine, there's no damage
23  that would have happened before the accident.  The
24  front wheel was bent passed its limits and contacted
25  the A-arm, pulled the CV axle joint out, bent the

16

1      Q.   And if I understand correctly, the Ranger
2   hasn't actually been repaired yet; is that true?
3      A.   I do not know.
4      Q.   Are you at all involved in the question
5   about whether either BigRentz or BattleFrog is
6   required to pay for the repairs that are going to be
7   necessary?
8      A.   The involvement I would have was with
9   BigRentz being responsible to pay for the damages to
10  the machine.
11     Q.   And is that Wheeler's position that
12  BigRentz is responsible to pay for the damage to the
13  machine?
14     A.   Yes.
15     Q.   And why is that Wheeler's position?
16     A.   Because if we go back to the rental
17  contract, we were a supplier to the equipment to
18  BigRentz.  And then what they do with it to their
19  end user is BigRentz's responsibility.  But our
20  relationship between Wheeler Machinery and BigRentz
21  is since we rented the machine to them that they
22  were responsible because they're the ones that
23  signed the contract, the rental agreement.
24     Q.   Are you actually, then, now in the process
25  of pursuing collection of the repair costs for the

15

1   strut, and bent the wheel of the point of contact.
2   If you look at the picture, you can see how the
3   wheel was pulled back by the ground after it was on
4   its side sliding forward."  What was your
5   involvement in getting conclusions from Steadman's
6   Recreation about what caused the accident?
7      A.   So I was the rental manager that rented it
8   to BigRentz.  So my responsibility, my role, was to
9   flow the information, make sure the information is
10  getting to the right people.  That was our goal was
11  to send an e-mail out to Steadman's asking for a
12  response to the incident.
13     Q.   If you flip to the next page, which is
14  CLAIMS 23 at the bottom, there's an e-mail.  It
15  looks like it's to Brian, and then there's a very
16  detailed two paragraph description about how
17  essentially the damage you see on the Ranger was
18  caused by the accident, not that it caused the
19  accident itself.  Whose description is that in the
20  e-mail?
21     A.   I don't know who Brian is.
22     Q.   Do you know who wrote that conclusion
23  about what happened?  It's on the bottom two
24  paragraphs of CLAIMS 23.
25     A.   I do not.

17

1   Ranger from BigRentz?
2      A.   I do not know right now.  But at the time,
3   yes.
4      Q.   Who would be?  I'm just trying to figure
5   out what the status of that is.
6      A.   Cody would be able to answer that
7   question.
8      Q.   And I take it you don't know anything
9   about the purchase of these Rangers from Polaris?
10     A.   I do not, no.
11     Q.   Or whether they came with doors when they
12  were originally sold?
13     A.   I do not, no.
14     Q.   Have you heard any discussions about
15  whether these Rangers came with doors or whether
16  they had been removed before the day of the
17  accident?
18     A.   I do not know that.
19     Q.   If you look at CLAIMS 133 and 134, those
20  are two black and white pictures of a Ranger being
21  loaded on a truck.  My only question about that is,
22  is that a picture of the Ranger after the accident
23  or before the accident, if you know?
24     A.   Before.
25     Q.   Is it your practice, then, before a Ranger

18

1   is delivered to take pictures of it?
2      A.   Yes.
3      Q.   And so where would those pictures have
4   been taken?  Can you tell?  Is that in the Wheeler
5   yard?
6      A.   Yes.  Salt Lake Wheeler yard.
7      Q.   So 133 and 134 are pictures of the Ranger
8   in the Wheeler yard before it was delivered out to
9   BattleFrog.
10     A.   Yes.
11     Q.   And so we can see from these pictures that
12  it did not have doors, then, when it was delivered
13  to BattleFrog, correct?
14     A.   Yes.
15     MR. COUNTS:  Delivered to BigRentz or
16  delivered to BattleFrog?  You think this is the
17  Wheeler yard, correct?
18     Q.   Let me back up and make sure I understand
19  that.  Were these Rangers delivered, then, from the
20  Wheeler yard directly to the obstacle course
21  location?
22     A.   Yes.
23     Q.   Is it Wheeler's practice, then, to take a
24  photograph for some reason of the equipment that it
25  is renting before its actually delivered to wherever

19

1   it's going?
2      A.   Yes.
3      Q.   And that's what these two photographs are.
4      A.   Yes.
5      Q.   And did you take these photographs?
6      A.   No.
7      Q.   Who took the photographs?
8      A.   We have yardmen, so a yardman would have.
9   Somebody that works inside the yard there, they
10  would have taken them pictures.
11     Q.   At least it looks like these photographs,
12  then, answer the question that when this Ranger left
13  Wheeler's yard it did not have doors on it.
14     A.   Yes.
15     Q.   That's true?
16     A.   (Nodded affirmatively.)
17     MR. ROSE:  Thank you.
18     MR. COUNTS:  I have a few follow-up
19  questions.  Oh, do you have any questions, Greg?
20     MR. ANJEWIERDEN:  No.
21        FURTHER EXAMINATION
22  BY MR. COUNTS:
23     Q.   Is there an inventory made of what items
24  are included?  In this instance with the Polaris ATV
25  or the other ATVs that were delivered, is there an

20

1   inventory of what's being delivered to BigRentz or
2   to BattleFrog?
3      A.   I do not know that.
4      Q.   In other words, are you aware of whether
5   there was an owner's manual that was included in any
6   of the ATVs, including the subject Polaris ATV, when
7   it was delivered?
8      A.   Yes.
9      Q.   There were owner's manuals in there?
10     A.   Yes.
11     Q.   And how do you know that?
12     A.   We have a picture to prove that or a
13  picture has been taken of that machine.
14     Q.   Of the subject Polaris vehicle?
15     A.   Of the subject Polaris machine.
16     Q.   With the owner's manual?
17     A.   Yes.
18     Q.   That's the actual owner's manual that was
19  supplied from Polaris or whoever gave the vehicle.
20     A.   Yes.
21     Q.   It sounds like from your testimony that
22  the vehicles, the ATVs/UTVs, were never in
23  BigRentz's possession.  They were delivered from
24  Wheeler to BattleFrog; is that correct?
25     A.   That's correct.

21

1      Q.   There's also an e-mail or maybe more than
2   one e-mail from Mike Aguirre at BigRentz, and you
3   are included.  You're CC'd on this e-mail.  Do you
4   remember seeing any e-mails from Mike Aguirre?
5      A.   Yes.
6      Q.   In one of those e-mails, he says, "I'd
7   like to set up a three-way phone conversation."  Did
8   you ever have any phone conversations with anybody
9   from BigRentz after this accident related to the
10  accident or what may or may not have occurred?
11     A.   So, yes.  I took the phone call on May
12  16th of 2016 at 9:45 to be notified of the incident.
13     Q.   And who called you?
14     A.   I believe it was Zach with BigRentz.
15     Q.   What did Zach tell you?
16     A.   He said that there was an incident that
17  happened at Miller Motorsports with one of the UTVs.
18  And then I said, "Okay, I will do our process of
19  getting a Wheeler representative to go out to the
20  incident."
21     Q.   And then you would have contacted somebody
22  who would have had Mr. Jones go out there.
23     A.   Exactly.
24     Q.   Did he tell you anything else in that
25  phone conversation?

22

1    A.   No.
2    Q.   Do you remember anything else you told
3  him?
4    A.   No.
5    Q.   Aside from that phone conversation on May
6  16th, did you ever have any other phone
7  conversations with BigRentz after the accident?
8    A.   No.
9    Q.   Did you ever have any phone conversations
10  or e-mail conversations with anybody from BattleFrog
11  after the accident?
12    A.   No.
13        MR. COUNTS:  That's all I have.
14        MR. ROSE:  I'm sorry, I have just a few
15  more questions, if no one else does.
16            FURTHER EXAMINATION
17  BY MR. ROSE:
18    Q.   What sort of inspection would there have
19  been of the Ranger that was involved in the accident
20  by Wheeler before it was delivered out to the
21  BattleFrog obstacle course location?
22        MR. RHOADES:  I can answer those things.
23        MR. COUNTS:  He's been designated.  If he
24  can answer, that's fine.
25    Q.   I just wonder as the rental manager, are

23

1  you involved in what sort of inspections there are
2  of the equipment before it goes out?
3    A.   No.
4    Q.   So Cody would be the one that would better
5  be able to answer that one?
6    A.   Yes.
7    Q.   And then also questions about what
8  documentation would exist, if any, about the
9  inspection, Cody would be the one to answer that?
10    A.   Yes.
11        MR. ROSE:  Okay.  That's fine.  I'll ask
12  him that.
13        MR. COUNTS:  Nothing further.
14        MR. BRADY:  Thank you so much, Jessie.
15        (Signature requested.)
16    (Whereupon the taking of this deposition was
17  concluded at 10:25 a.m.)
18            * * *
19  Original transcript filed with Mr. Counts.
20    Reading copy submitted to Mr. Brady.
21
22
23
24
25

24

1            C E R T I F I C A T E
2  STATE OF UTAH        )
3  COUNTY OF _____  )
4       I HEREBY CERTIFY that I have read the foregoing
5  testimony consisting of 20 pages, numbered
6  from 4 through 23 inclusive, and the same is a true
7  and correct transcription of said testimony except as
8  I have indicated said changes on enclosed errata sheet.
9
10
11
12                  _____
                    JESSIE WAYMENT
13
14
15
16       Subscribed and sworn to at _____
17  this _____ day of _____ 2018.
18
19
20
21
22                  _____
                    Notary Public
23
24  My commission expires:
25                              * * *

25

1            C E R T I F I C A T E
2  STATE OF UTAH        )
3  COUNTY OF SALT LAKE  )
4       THIS IS TO CERTIFY that the deposition of JESSIE
5  WAYMENT was taken before me, Shelly Wadsworth, a
6  Registered Professional Reporter in and for the State of
7  Utah.
8       That the said witness was by me, before
9  examination, duly sworn to testify the truth, the whole
10  truth, and nothing but the truth in said cause.
11       That the testimony was reported by me in Stenotype,
12  and thereafter transcribed by computer under my
13  supervision, and that a full, true, and correct
14  transcription is set forth in the foregoing pages,
15  numbered 4 through 23 inclusive.
16       I further certify that I am not of kin or otherwise
17  associated with any of the parties to said cause of
18  action and that I am not interested in the event thereof.
19       WITNESS MY HAND this 15th day of June, 2018.
20
21                  Shelly Wadsworth
22
                    _____
                    Shelly Wadsworth, RPR, CRR
23
24
25

## Exhibits

**Wayment Exhibit 01** 6:12,14,23 8:24 9:25
**Wayment Exhibit 02** 6:19,20

## 1

**1** 6:12,14,23 8:24 9:9,25
**10** 13:6
**10:25** 23:17
**133** 17:19 18:7
**134** 17:19 18:7
**15** 13:2,6
**16th** 21:12 22:6

## 2

**2** 5:1,4 6:19,20 7:6 8:3 9:9
**20** 13:1,2
**2015** 11:8 12:8
**2016** 5:19 7:21 21:12
**2018** 4:20
**21** 13:23
**23** 15:14,24
**26** 13:25

## 3

**31** 4:20
**31st** 5:13

## 4

**4** 5:1,2,3,4 10:8

## 6

**6** 4:23 5:2,4 7:21 9:25

## 9

**9:45** 21:12

## A

**A-ARM** 14:25
**a.m.** 23:17
**a/k/a** 8:4,5
**accident** 7:15 8:10 12:12 13:18 14:23 15:6,18,19

17:17,22,23 21:9,10 22:7, 11,19
**actual** 20:18
**affirmatively** 19:16
**agreement** 6:8,15 16:23
**Aguirre** 21:2,4
**amount** 13:2
**Anderson** 12:3
**ANJEWIERDEN** 19:20
**apologize** 5:14 9:23
**ATV** 19:24 20:6
**ATV/UTV** 8:10
**ATVS** 11:23 13:6 19:25 20:6
**ATVS/UTVS** 12:2,23 20:22
**aware** 10:2,4 12:15,16 20:4
**axle** 14:25

## B

**Bachelor's** 12:1
**back** 7:15 8:22,23 15:3 16:16 18:18
**bad** 5:14
**basic** 9:13
**Battlefrog** 10:10,11,19 12:3 16:5 18:9,13,16 20:2, 24 22:10,21
**behalf** 4:3,18 5:16
**bent** 14:24,25 15:1
**Big** 8:6
**Bigrentz** 6:9,16 7:7,9,12, 20,23 8:5,9,11,15 10:2,5 12:2,5,13 15:8 16:5,9,12, 18,20 17:1 18:15 20:1 21:2,9,14 22:7
**Bigrentz's** 16:19 20:23
**bit** 5:10
**black** 17:20
**bottom** 13:24 15:14,23
**Brady** 23:14,20
**brands** 11:18
**Brian** 15:15,21
**bring** 7:1
**brought** 6:1,6,8,13
**business** 8:17,19 12:22 14:10
**business-to-business** 8:15

## C

**call** 21:11
**called** 4:3 11:16 21:13
**carries** 14:18
**case** 4:19 5:12,18 10:5
**CAT** 8:4
**Caterpillar** 11:18 12:11,19
**caught** 5:9
**caused** 15:6,18
**CC'D** 21:3
**Chinese** 11:18
**choice** 8:18
**CLAIMS** 13:21,23 15:14, 24 17:19
**co-defendant** 8:5
**co-workers** 4:12
**Cody** 17:6 23:4,9
**collection** 16:25
**college** 11:13,25
**companies** 8:16
**company** 11:23
**concluded** 23:17
**conclusion** 15:22
**conclusions** 15:5
**construction** 12:19
**contact** 15:1
**contacted** 14:24 21:21
**contract** 8:20,22,24 9:9, 14,17 16:17,23
**contracting** 8:11
**conversation** 21:7,25 22:5
**conversations** 21:8 22:7, 9,10
**copy** 6:4,23 7:1 23:20
**corporate** 4:19,22 7:5
**correct** 4:13 5:4 6:2 7:13, 16 9:19,21 10:2,14,16,17, 19 12:15,18,20 13:11 18:13,17 20:24,25
**correctly** 16:1
**costs** 16:25
**counsel** 13:22
**Counts** 4:7 6:19 9:6 13:13 18:15 19:18,22 22:13,23 23:13,19
**CV** 14:25

## D

**damage** 14:22 15:17 16:12
**damages** 16:9
**dates** 5:8
**day** 12:10,12 17:16
**dealer** 14:11
**dealers** 14:16
**dealerships** 11:14
**dealings** 14:6
**defendant** 8:4
**degree** 11:25
**delivered** 18:1,8,12,15,16, 19,25 19:25 20:1,7,23 22:20
**deposition** 4:15 5:7,21 6:14 23:16
**depositions** 4:12
**describe** 7:19
**description** 15:16,19
**designated** 4:22,23 7:5 10:21 22:23
**detailed** 15:16
**directly** 18:20
**discuss** 9:10
**discussions** 17:14
**documentation** 23:8
**documents** 5:23 6:1,13, 21 13:21
**doors** 17:11,15 18:12 19:13
**duly** 4:4

## E

**e-mail** 5:10,11,15,17 13:23 14:21 15:11,14,20 21:1,2,3 22:10
**e-mails** 5:8,25 7:1 13:20 21:4,6
**end** 7:10 16:19
**entity** 8:16
**equipment** 7:9,10,11,23, 25 8:9,14 11:14,17,19 12:4,13,19,20 13:7 16:17 18:24 23:2
**essentially** 15:17
**established** 8:18
**EXAMINATION** 4:6 13:15 19:21 22:16
**examined** 4:4

June 06, 2018

**excavator** 12:11
**exhibit** 6:12,14,19,20,23
   8:24 9:25
**exist** 4:24 23:8

**F**

**facility** 14:13
**falls** 9:16
**Fifteen** 13:1
**figure** 17:4
**filed** 23:19
**finance** 12:1
**find** 4:17 9:4,14
**fine** 22:24 23:11
**flip** 13:25 15:13
**flow** 15:9
**fluids** 9:13
**follow-up** 19:18
**Forty-five** 5:22
**forward** 15:4
**front** 13:22 14:24
**full** 11:13

**G**

**gave** 20:19
**gentleman** 11:9
**give** 4:18 5:16
**goal** 15:10
**Greg** 19:19
**ground** 15:3

**H**

**handed** 4:22
**happened** 13:18 14:23
   15:23 21:17
**heard** 17:14
**hundreds** 13:8

**I**

**impression** 12:17
**incident** 15:12 21:12,16,
   20
**included** 19:24 20:5 21:3
**including** 8:6 20:6
**indemnification** 10:6
**indemnity** 4:24 10:1

**information** 5:9 9:13 15:9
**inside** 19:9
**inspection** 22:18 23:9
**inspections** 23:1
**instance** 19:24
**insurance** 8:17
**intends** 10:5
**inventory** 19:23 20:1
**investigation** 13:18
**involved** 8:10 13:20 16:4
   22:19 23:1
**involvement** 13:17 15:5
   16:8
**items** 19:23

**J**

**Jessie** 4:2,10 14:1 23:14
**job** 11:3,5
**joint** 14:25
**Jones** 4:13 21:22

**K**

**Kirk** 13:24 14:3,6

**L**

**lack** 9:12
**Lake** 18:6
**largest** 14:16
**left** 19:12
**letting** 5:15
**limited** 9:11
**limits** 14:24
**listed** 5:3
**loaded** 17:21
**local** 14:11
**location** 18:21 22:21
**long** 5:20 11:5
**looked** 5:8 7:2
**lubrication** 9:12

**M**

**machine** 12:11 14:22
   16:10,13,21 20:13,15
**Machinery** 6:9,16 7:8 8:5,
   14 16:20
**made** 19:23
**maintenance** 9:11,12

**majority** 12:18
**make** 15:9 18:18
**manager** 11:4 15:7 22:25
**manual** 20:5,16,18
**manuals** 20:9
**manufacturers'** 14:18
**March** 11:8
**mark** 6:19
**marked** 6:12,20
**Mike** 21:2,4
**Miller** 21:17
**Mini** 21:17
**minutes** 5:22
**Motorsports** 21:17

**N**

**nature** 9:18
**nodded** 19:16
**notice** 6:4,14
**notified** 10:5 21:12
**number** 5:1 9:25 14:18

**O**

**obligations** 7:24 8:7,12
**obstacle** 18:20 22:21
**occurred** 7:15 21:10
**operation** 9:11
**opportunity** 4:11
**order** 6:15
**Original** 23:19
**originally** 17:12
**outline** 9:5
**owner** 7:16
**owner's** 20:5,9,16,18
**owns** 7:11 12:25

**P**

**Pacific** 11:16
**paragraph** 15:16
**paragraphs** 15:24
**part** 12:22
**parties** 8:8
**passed** 14:24
**pay** 16:6,9,12
**people** 15:10
**percentage** 13:11

**person** 8:20
**phone** 21:7,8,11,25 22:5,6,
   9
**photograph** 18:24
**photographs** 19:3,5,7,11
**picture** 15:2 17:22 20:12,
   13
**pictures** 17:20 18:1,3,7,11
   19:10
**plaintiff** 4:4
**point** 15:1
**Polaris** 8:10 14:11,19 17:9
   19:24 20:6,14,15,19
**position** 7:22 16:11,15
**possession** 7:18 20:23
**practice** 17:25 18:23
**prepare** 5:6,21,23
**Prior** 11:22 12:2
**process** 16:24 21:18
**products** 14:19
**proper** 9:10
**prove** 20:12
**provision** 10:1
**provisions** 4:24
**pulled** 14:25 15:3
**purchase** 6:15 17:9
**pursuing** 16:25
**put** 10:16 13:22

**Q**

**question** 5:14 8:1 9:23
   16:4 17:7,21 19:12
**questions** 13:13 19:19
   22:15 23:7

**R**

**Ranger** 15:17 16:1 17:1,
   20,22,25 18:7 19:12 22:19
**Rangers** 17:9,15 18:19
**re-rents** 7:10
**read** 8:2
**Reading** 23:20
**reason** 18:24
**received** 5:12
**record** 4:8 9:6,8
**Recreation** 14:10 15:6
**recreational** 14:16
**related** 21:9
**relationship** 7:6 8:3,6
   10:9,10,14,18 16:20

ANDERSON vs POLARIS INDUSTRIES, INC
Jessie Wayment

June 06, 2018

**remember** 12:9 21:4 22:2
**removed** 17:16
**rent** 7:12,23 11:17,20
**rental** 6:8 8:19,22,23 11:4 12:22 15:7 16:16,23 22:25
**rented** 11:23 12:4,9,13 13:3 15:7 16:21
**renting** 8:21 12:2 18:25
**rents** 7:12 8:9 12:19
**Renz** 8:6
**repair** 16:25
**repaired** 16:2
**repairs** 16:6
**repeat** 8:1
**reporter** 9:24
**representative** 4:23 7:5 21:19
**representatives** 4:19
**requested** 23:15
**required** 16:6
**respect** 7:22 8:13 9:25
**respective** 8:7
**response** 15:12
**responsibilities** 7:24 8:12 9:10
**responsibility** 15:8 16:19
**responsible** 8:21 16:9,12, 22
**review** 5:10,23
**reviewed** 5:17
**RHOADES** 22:22
**rights** 8:7
**role** 15:8
**ROSE** 13:16 19:17 22:14, 17 23:11
**roughly** 13:2

**S**

**safe** 9:18
**safety** 8:11,13 9:1,16,18
**Salt** 18:6
**seek** 10:6
**send** 15:11
**sends** 14:21
**September** 12:8
**set** 21:7
**side** 15:4
**signature** 14:4 23:15
**signed** 16:23

**sir** 6:21 11:9 13:14
**sit** 4:12
**sliding** 15:4
**small** 13:11
**sold** 17:12
**sort** 11:20 12:20 22:18 23:1
**sounds** 20:21
**speeding** 9:12
**start** 11:7
**starts** 13:23
**state** 4:8
**status** 17:5
**Steadman** 14:3,6
**Steadman's** 14:9,15 15:5, 11
**string** 13:23
**strut** 15:1
**subject** 20:6,14,15
**submitted** 23:20
**supplied** 20:19
**supplier** 7:8 8:15 16:17
**sworn** 4:4,18 5:16

**T**

**takes** 7:9
**taking** 23:16
**talk** 10:8,22
**talking** 13:8
**terms** 8:6
**testified** 4:5
**testimony** 4:18 5:16 20:21
**thing** 12:20
**things** 6:6 9:15 22:22
**Thirty-two** 11:10
**Thousands** 13:8,9
**three-way** 21:7
**Thursday** 13:25
**time** 5:20 9:4,7 10:13,17 11:13 12:6 17:2
**times** 12:4
**title** 11:3,5
**today** 5:24 6:2
**today's** 5:7
**told** 22:2
**topic** 4:23 7:5 8:3 10:8
**transcript** 23:19
**transfer** 7:18

**Tri-star** 11:16
**truck** 17:21
**true** 16:2 19:15
**turn** 8:23
**type** 11:17
**types** 13:7

**U**

**umbrella** 9:16
**understand** 8:8 14:15 16:1 18:18
**user** 7:10 16:19
**Utah** 14:16
**UTV** 7:16 8:13
**UTV/ATV** 7:19 11:20 13:10
**UTVS** 11:23 13:6 21:17

**V**

**vehicle** 14:16 20:14,19
**vehicles** 12:5 20:22
**vis-à-vis** 10:2

**W**

**Wayment** 4:2,10,11 14:1
**Webb** 4:13
**wheel** 14:24 15:1,3
**Wheeler** 4:18 5:16 6:9,16 7:6,8,11,16,18,24 8:4,9,11, 12,14 10:1,4,9,11,18 11:3, 11,22 12:4,13,19,25 13:11 16:20 18:4,6,8,17,20 20:24 21:19 22:20
**Wheeler's** 7:22 16:11,15 18:23 19:13
**white** 17:20
**word** 9:17
**words** 20:4
**worked** 11:14,23
**working** 11:11,22
**works** 19:9
**wrong** 12:18
**wrote** 15:22

**Y**

**yard** 18:5,6,8,17,20 19:9, 13
**yardman** 19:8
**yardmen** 19:8

**years** 11:6 13:3 14:7

**Z**

**Zach** 21:14,15

# Exhibit 4

ANDERSON

vs

POLARIS INDUSTRIES, INC

NEDA IMBIMBO

June 07, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189



1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3                              * * *

4    KENDALL ANDERSON,            )
                                  ) Civil No.
5              Plaintiff,         ) 2:17-cv-00205-DN
                                  )
6         v.                      ) Deposition of:
                                  )
7    POLARIS INDUSTRIES, INC.     ) NEDA IMBIMBO
     and BIGRENTZ, INC., a/k/a    )
8    BIG RENZ, WHEELER CAT        )
     a/k/a WHEELER MACHINERY      )
9    CO., BATTLEFROG a/k/a        )          **COPY**
     BattleFrog Obstacle Race     )
10   Series,                      )
                                  )
11             Defendants.        )
                                  )
12                                )

13                             * * *

14

15                        June 7, 2018
                          9:05 a.m.

16

17

18         Law Offices of Ray, Quinney & Nebeker
             36 South State Street, Suite 1400
19               Salt Lake City, Utah

20                             * * *

21

22

23                      Shelly Wadsworth
               - Certified Realtime Reporter -
24             Registered Professional Reporter

25

**Page 2**

```
 1              A P P E A R A N C E S
 2   For the Plaintiff:        Andrew G. Counts
                               THE TRACY LAW FIRM
 3                             4701 Bengal Street
                               Dallas, Texas 75235
 4
     For the Defendant         Rick L. Rose
 5   Polaris Industries:       RAY QUINNEY & NEBEKER
                               36 South State Street
 6                             Suite 1400
                               Salt Lake City, Utah 84111
 7
     For the Defendant         Michael G. Brady
 8   BigRentz and             BRADY LAW CHARTERED
     Wheeler Machinery:        2537 West State Street
 9                             Suite 200
                               Boise, Idaho 83702
10
     For the Intervenor        D. Gregory Anjewierden
11   Specialty Insurance Group: RENCHER | ANJEWIERDEN
                               460 South 400 East
12                             Salt Lake City, Utah 84111
13                             * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2   EXAMINATION                              PAGE
 3
     By Mr. Counts                             4
 4
     By Mr. Rose                              40
 5
 6
     EXHIBITS
 7
 8   No. 1      Contract                       7
 9   No. 2      Sales Orders                   7
10   No. 3      Supplier Visit                 8
11   No. 4      Purchase Order                 9
12   No. 5      E-mail Chain                  10
13   No. 6      E-mail Chain                  11
14   No. 7      Incident Report              11
15   No. 8      Sales Orders/Credit Memo     12
16   No. 9      Purchase Orders              12
17   No. 10     Rental Agreement             12
                BigRentz/Wheeler
18
     No. 11     Damage Invoice               12
19
     No. 12     Notes/Timeline               13
20
     No. 13     Deposition Topics            13
21
22
23
24
25
```

**Page 4**

```
 1              P R O C E E D I N G S
 2              NEDA IMBIMBO,
 3   called as a witness by and on behalf of the
 4   plaintiff, being duly sworn, was examined and
 5   testified as follows:
 6              EXAMINATION
 7   BY MR. COUNTS:
 8      Q.   Would you state your name for the record,
 9   please.
10      A.   Neda Imbimbo.
11      Q.   My name is Andrew Counts, and I'm one of
12   the attorneys for Mr. Anderson in this lawsuit.  Do
13   you understand that?
14      A.   Yes.
15      Q.   Do you understand that you are here
16   today -- well, first of all, what is the name of the
17   company that you work for?
18      A.   BigRentz.
19      Q.   Is that the official name of it?
20      A.   BigRentz, Inc.
21      Q.   If we just say BigRentz today, is that
22   fine?
23      A.   Yes.
24      Q.   And you understand you're here today to
25   give sworn testimony on behalf of BigRentz in this
```

**Page 5**

```
 1   lawsuit, correct?
 2      A.   Yes.
 3      Q.   And you've been designated as BigRentz's
 4   corporate representative for this case.
 5      A.   Correct.
 6      Q.   Essentially a corporation cannot speak for
 7   itself.  It has to speak through its officers or
 8   employees.  You're the voice of BigRentz.  Do you
 9   understand that?
10      A.   Yes.
11      Q.   When did you learn that you would be
12   giving testimony on behalf of BigRentz in this case?
13      A.   I want to say about three weeks ago when
14   we were notified of the deposition, maybe a month.
15      Q.   And you were given a list of topics that
16   you were supposed to come here today to talk about,
17   correct?
18      A.   Correct.
19      Q.   Since you learned that you were going to
20   be the corporate representative for BigRentz, how
21   much time have you spent preparing for today's
22   deposition?
23      A.   A couple days.
24      Q.   How many hours in that couple of days?
25      A.   I'd say eight hours.
```

ANDERSON vs POLARIS INDUSTRIES, INC

June 07, 2018                                                                      Neda Imbimbo

6

1    Q.   You've brought with you a number of
2  documents to the deposition today, correct?
3    A.   Correct.
4    Q.   I'm going to mark these as exhibits in a
5  second.  Outside of these documents you brought with
6  you, have you reviewed any other documents of any
7  nature to prepare for today's deposition?
8    A.   Yes.
9    Q.   What else did you review or look at?
10   A.   I went through e-mail communications.
11 They're referenced in one of the things I have my
12 notes in.  And they're all a part of the documents
13 I've given to Mr. Brady.
14   Q.   Understood.  Outside of those e-mails,
15 anything else you've looked at?
16   A.   Phone calls as well.
17   Q.   You looked at phone logs?
18   A.   I listened to phone calls.
19   Q.   I don't want to know anything that you've
20 discussed with your counsel.  Did you talk with
21 anybody else about the deposition today?
22   A.   No.
23   Q.   Did you review any photographs?
24   A.   Yes.
25   Q.   What photographs did you look at?

7

1    A.   The photographs that were sent regarding
2  the ATV accident.  Photographs of the ATV.
3    Q.   That were taken at the scene of the
4  accident?
5    A.   Taken of the ATV, I'm assuming, on the job
6  site.
7    Q.   Do you know who took those photographs?
8    A.   I believe it was Jon Jones.
9    Q.   And Jon Jones is an employee of Wheeler,
10 correct?
11   A.   Correct.
12   Q.   Any other photographs you looked at?
13   A.   No.
14       (Exhibit No. 1 was marked.)
15   Q.   Let's mark what you've brought with you
16 today.  I'm marking as Exhibit 1 what I assume is
17 the contract between BigRentz and BattleFrog; is
18 that correct?
19   A.   Correct.
20   Q.   Is that an original of the contract or a
21 copy?
22   A.   It's a copy.
23       (Exhibit No. 2 was marked.)
24   Q.   Exhibit 2 I'm marking is the sales order.
25 There's actually e-mails attached, so let me

8

1  separate those.  Exhibit 2 looks like a four-page
2  document.  Are these all the same document or are
3  they separate documents?
4    A.   They are separate documents.
5    Q.   How should I mark these then?  Which
6  belong to the sales order documents?
7    A.   These two are sales order, but it's sales
8  order from the very first time that BattleFrog
9  rented from BigRentz.  So it's not related to this
10 specific scenario.
11   Q.   And what is this document?
12   A.   This is a sales force log-in for a visit
13 to Wheeler CAT in 2015.
14       (Exhibit No. 3 was marked.)
15   Q.   I'll mark that as Exhibit 3.  What I've
16 marked as Exhibit 3, it says, "Supplier Visit."  Is
17 that correct?
18   A.   Correct.
19   Q.   The print is a little small.  It says,
20 "Subject: Supplier Visit.  Comments: Met with Cody
21 at the Wheeler CAT corporate office of Utah.  Went
22 great and gave us 20 percent book.  They were short
23 on time, but we got the message."  Who went to this
24 meeting?
25   A.   It was Van Truong, which was BigRentz

9

1  regional supply manager that manages the supplier
2  relationships.
3    Q.   Apparently he met with Mr. Cody Rhoades
4  from Wheeler, correct?
5    A.   Correct.  Back in 2015.
6    Q.   I'm looking on here, and I don't see
7  anything that's says -- oh, I do.  It says
8  5/12/2015.  In the corner, it says, "Last modified
9  on 9/13/2016.  What does that mean "last modified"?
10   A.   Someone went in and -- I don't know.  I
11 can't tell you specifically.
12   Q.   So we don't know whether that document has
13 been changed or not?
14   A.   It's not a document necessarily.  It's
15 like a sales force task log.  I was just trying to
16 find something that showed that we had talked to
17 Wheeler in 2015.
18   Q.   And I think you said that was the first
19 time BigRentz had ever rented from Wheeler, correct?
20   A.   This was just a visit to Wheeler.  The
21 first time we rented is actually on this one.  I
22 believe this is the first time.  I didn't check 2014
23 records because we were on a different system.
24       (Exhibit No. 4 was marked.)
25   Q.   Let me mark this purchase order as Exhibit

10

1  **4. And this is the first time that BigRentz rented**
2  **from Wheeler. I guess a mini compact excavator; is**
3  **that correct?**
4      A.  Correct.
5      **Q.  Was the second time BigRentz rented from**
6  **Wheeler the Polaris vehicle that we're talking about**
7  **here?**
8      A.  Correct.
9      **Q.  And then you've got an e-mail here dated**
10  **May 11, 2017. It actually says 1 of 10. These**
11  **extra pages, were they attachments to this e-mail?**
12      A.  It was the chain of e-mails. And the
13  photos were attached.
14          (Exhibit No. 5 was marked.)
15      **Q.  Let me mark this chain of e-mails. Is**
16  **this chain of e-mails the last e-mail communication**
17  **of any type that BigRentz has had with Wheeler?**
18      A.  No.
19      **Q.  What e-mails have been sent since between**
20  **BigRentz and Wheeler?**
21      A.  I can't tell you off the top of my head.
22      **Q.  How do you know there have been additional**
23  **e-mails?**
24      A.  I just assume that we've reached out in
25  other aspects. I also know that that e-mail chain

11

1  ended with trying to have a discussion with all
2  three parties. So I believe that there was probably
3  other e-mails after that. I only printed that one
4  because it had the majority of the relevant
5  information just from my review prior to this
6  meeting.
7      **Q.  Do you know if there was ever a three-way**
8  **phone call?**
9      A.  I'm not aware.
10          (Exhibit No. 6 was marked.)
11      **Q.  We actually have another e-mail here. So**
12  **this would be Exhibit 6. Exhibit 6 is just another**
13  **e-mail. I don't see that you're on this e-mail**
14  **chain, though, correct?**
15      A.  Correct. It was kind of a response in
16  this one. So I printed it separately.
17          (Exhibit No. 7 was marked.)
18      **Q.  Exhibit 7 is the incident report that**
19  **Wheeler conducted, correct?**
20      A.  Correct.
21      **Q.  Why don't you tell me what this group of**
22  **documents is, these separate stapled documents. The**
23  **first stapled set, what is this?**
24      A.  This first one is the sales orders related
25  to the specific order. It's two sales orders and

12

1  then a credit memo. And the credit memo is for the
2  cancellation of two of the units that are on the
3  sales order.
4          (Exhibit No. 8 was marked.)
5      **Q.  I've put that as Exhibit 8.**
6      A.  And then the next packet is purchase
7  orders. So it's a purchase order to Wheeler and
8  then it's also just copies of invoices of the other
9  suppliers that provided the UTVs to BattleFrog.
10  Because not all of the units that we provided to
11  BattleFrog were sourced through Wheeler.
12          MR. COUNTS:  I've marked that Exhibit 9.
13          (Exhibit No. 9 was marked.)
14      **Q.  Which units were not sourced through**
15  **Wheeler?**
16      A.  So there was nine units total. Two of
17  them were via Wheeler. And then the remainder were
18  between HERC and United Rentals.
19          (Exhibit No. 10 was marked.)
20      **Q.  Why don't you tell us what Exhibit 10 is.**
21      A.  It's the rental agreement between BigRentz
22  and Wheeler.
23          (Exhibit No. 11 was marked.)
24      **Q.  And Exhibit 11?**
25      A.  This was the damage invoice for the UTV

13

1  from Wheeler to BigRentz and then the invoice from
2  BigRentz to BattleFrog.
3          (Exhibit No. 12 was marked.)
4      **Q.  And what is Exhibit 12?**
5      A.  This was all of my notes of all of the
6  contact from Wheeler to BigRentz and BattleFrog to
7  BigRentz. Just a history timeline of events just as
8  I was getting my thoughts together.
9      **Q.  Is that a document that you created?**
10      A.  Correct.
11      **Q.  For purposes of today?**
12      A.  Yes. So not all items on here are related
13  to this incident specifically, but I was trying to
14  note all the series of events.
15          (Exhibit No. 13 was marked.)
16      **Q.  Exhibit 13 is just the deposition topics.**
17      A.  And my notes, yes.
18      **Q.  What is your current job title for**
19  **BigRentz?**
20      A.  Chief financial officer.
21      **Q.  Now, I apologize for asking this question,**
22  **but how old are you?**
23      A.  I am 30.
24      **Q.  And how long have you worked for BigRentz?**
25      A.  Since May 2014.

ANDERSON vs POLARIS INDUSTRIES, INC
Neda Imbimbo

14

1    Q.   I assume if you're the chief financial
2  officer you have a college degree?
3    A.   I do, yes.
4    Q.   What is your degree in?
5    A.   I have a bachelor's in economics and a
6  bachelor's in psychology.
7    Q.   When did you stop going to college or
8  university?
9    A.   I graduated in 2009.
10    Q.   From 2009 to 2014, what did you do?
11    A.   I worked.
12    Q.   I'm sorry.  That was a bad question.  For
13  whom did you work?
14    A.   I worked for a company called Polycom.  I
15  was an internal audit.  And then I also worked for a
16  company called Simpson Strong-Tie, also an internal
17  audit.  And then BigRentz.
18    Q.   How large of a corporation is BigRentz?
19    A.   In what aspect?
20    Q.   Well, how many employees does it have?
21    A.   At the moment, we have 65 employees.
22    Q.   Sixty-five?
23    A.   Correct.
24    Q.   And what are the gross sales or gross
25  revenue per year?

15

1    A.   Approximately 30 million.
2    Q.   And BigRentz is a California corporation,
3  correct?
4    A.   Delaware.
5    Q.   Delaware corporation.  Is its principal
6  office in California?
7    A.   Correct.
8    Q.   Are, essentially, all of the employees
9  located in California?
10    A.   There is one remote employee.  Yes, one
11  remote employee.  But other than that, yes.
12    Q.   Where is the remote employee located?
13    A.   In Georgia.
14    Q.   Now, how would you describe what BigRentz
15  does, its business?  What do they do?
16    A.   BigRentz is an online equipment rental
17  marketplace.  So we connect customers that are
18  looking for equipment to suppliers that own
19  equipment.  Really providing a heavy equipment
20  rental logistics solution to customers that are
21  looking for equipment.
22    Q.   Is the majority of what BigRentz rents
23  heavy construction type equipment?
24    A.   Correct.
25    Q.   What percentage of BigRentz's business is

16

1  renting smaller vehicles like UTVs or ATVs?
2    A.   Less than one percent.
3    Q.   Prior to having rented the ATV/UTVs to
4  BattleFrog in this case, how many other times had
5  BigRentz rented ATVs or UTVs?
6    A.   I'm not sure.
7    Q.   Is there any way to ballpark it?  Is this
8  one of the first times or had it been dozens of
9  times?
10    A.   It has been done before.  I can't tell you
11  the exact number.
12    Q.   Who at BigRentz may know the answer to
13  that question?
14    A.   I don't think anyone off the top of their
15  head.  I can look into it, and I would be able to
16  find the answer.
17    Q.   Fair enough.  I think you said before that
18  you had not talked to any employees of BigRentz to
19  prepare for today, correct?
20    A.   I mean, I guess I discussed the scenario.
21  All of the employees that were relevant to this
22  specific situation are no longer at BigRentz.
23    Q.   One of the people that I think whose name
24  appeared in several e-mails was Mike Aguirre.
25    A.   Correct.

17

1    Q.   Is he no longer employed?
2    A.   He's no longer employed.
3    Q.   When did he cease to be employed by
4  BigRentz?
5    A.   He was a claims manager, so he handled
6  incoming damage claims, reviewing them, reviewing
7  basically the pricing of them and then having the
8  discussion of billing from the relationship between
9  the supplier and us billing the customer.
10    Q.   And, I'm sorry, ma'am, my question was,
11  when did he cease to be an employee?
12    A.   I'm sorry.  I want to say March 2017.
13    Q.   Did he voluntarily leave or was he
14  terminated?
15    A.   He was terminated.
16    Q.   Why was he terminated?
17    A.   It was a layoff.
18    Q.   Does BigRentz happen to know his current
19  whereabouts?
20    A.   I'm not sure.
21    Q.   Do you have an idea of where he may be
22  located?
23    A.   Yes.  Last I understood, I believe he was
24  working for a crane equipment supplier.
25    Q.   Where?

**18**

1    A.   In Orange County.

2    Q.   Have you ever given a deposition before?

3    A.   No.

4    Q.   You've had an opportunity to meet with

5  your counsel to understand the deposition process,

6  correct?

7    A.   Correct.

8    Q.   Did BigRentz itself conduct any sort of

9  investigation into the accident that Kendall

10  Anderson was involved in back in May of 2016?

11    A.   There was no investigation directly

12  related to the accident. The only investigation was

13  performed by Mike Aguirre, which was related more so

14  towards the damage of the equipment and who was

15  responsible paying for it and, ultimately, trying to

16  have BattleFrog pay for the damage.

17    Q.   Did BigRentz rely upon the investigation

18  that Wheeler did, more specifically Mr. Jones for

19  Wheeler, in determining what may or may not have

20  happened that day?

21    A.   Yes.

22    Q.   BigRentz never hired any other individual

23  or entity to try to figure out what may or may not

24  have happened; is that fair?

25    A.   Yes.

**19**

1    Q.   It's my understanding that at least at

2  some point Wheeler was attempting to collect from

3  BigRentz money which Wheeler believed BigRentz owed

4  to it; is that fair?

5    A.   Specific to this?

6    Q.   Yes, specific to this.

7    A.   Correct.

8    Q.   What is the status of that?

9    A.   So Wheeler CAT has kind of a credit card

10  balance kind of thing set up. And they had

11  originally automatically just deducted it from our

12  account. And so we asked them to reverse it due to

13  the fact that there was this open situation about

14  it. And, you know, we wanted to make sure

15  everything was cleared before. And I believe at

16  that point it's just been open. So no one has paid

17  for it. BattleFrog has not paid BigRentz. BigRentz

18  has not paid Wheeler.

19    Q.   Counsel may have a copy of this. It's

20  Bates 17. This is an e-mail from Mike Aguirre dated

21  Wednesday, August 3, 2016. You are CC'd on this

22  e-mail, correct?

23    A.   Correct.

24    Q.   And if you look at the second paragraph,

25  Mike says, "I've advised our accounting team to hold

**20**

1  off on paying any of your damage invoices associated

2  with this rental pending the outcome of this

3  litigation. Since the outcome of these legal

4  proceedings could determine faulty equipment, which

5  was also suggested by your personnel to be the case,

6  we should not be held liable for the repair cost of

7  said damage." Do you see that?

8    A.   Correct.

9    Q.   Was there ever any response to this e-mail

10  from Wheeler?

11    A.   I believe so.

12    Q.   What did the response say?

13    A.   I don't know off the top of my head.

14    Q.   In the e-mails that you reviewed to

15  prepare for today, did you review this e-mail?

16    A.   I think I came across it, but I can't

17  remember it specifically.

18    Q.   Did you come across a response which may

19  exist?

20    A.   I don't remember. I don't remember the

21  response.

22    Q.   You don't remember any of the substance of

23  what the response may or may not have been?

24         MR. BRADY:  She indicated she doesn't

25  remember a response.

**21**

1         MR. COUNTS:  I apologize.

2    Q.   You don't remember Wheeler ever responding

3  to this e-mail, correct?

4    A.   Yeah. I just don't know. I don't know

5  specifically.

6    Q.   In reviewing all of the e-mails, you never

7  came across a response e-mail, correct?

8    A.   I could have. I just don't remember

9  specifically right now. If I saw one right now, I

10  wouldn't be surprised necessarily. I just don't

11  remember that specific e-mail.

12    Q.   And let me, again, read a part of that

13  e-mail. "Since the outcome of these legal

14  proceedings could determine faulty equipment, which

15  was also suggested by your personnel to be the

16  case." Is that still BigRentz's position that there

17  was faulty equipment which was suggested by Wheeler?

18    A.   No.

19    Q.   Is there a document which says that, that

20  that's no longer their position?

21    A.   I'm not sure.

22    Q.   You didn't come across one in the review

23  of documents to prepare for today's deposition, did

24  you?

25    A.   Sorry, what?

22

1    Q.   Any document that would suggest that's no
2 longer BigRentz's position.
3    A.   There is information between Mike Aguirre
4 and Jon Jones where Mike is stating, from his
5 review, he does not believe that this could have
6 been the fault of the equipment.  And then there was
7 the Steadman's report that also was provided to us
8 that confirmed that that was not the case.  Other
9 than that, I don't believe I've seen a specific
10 document that says that sentence specifically.
11    Q.   Are any of those documents dated after
12 August 3, 2016?
13    A.   I can't remember off the top of my head.
14    Q.   The documents that you just referred to
15 about Mike saying this or that, are those documents
16 that you have in front of you that are part of that
17 e-mail chain?
18    A.   It's part of this e-mail chain.
19    Q.   What's the date of that e-mail chain?
20    A.   I believe it's June 3rd.
21    Q.   So on June 3rd Mike says one thing.  And
22 on August 3rd, two months later, he says it could
23 have been faulty equipment, right?
24    A.   He says that Wheeler stated it could have
25 been faulty equipment.

23

1    Q.   What is BigRentz's document retention
2 policy?
3    A.   Currently we save all documents for seven
4 years.
5    Q.   So, obviously, anything having to do with
6 this case was saved, correct?
7    A.   Yes.
8    Q.   You're not aware of any document that may
9 or may not have been destroyed, correct?
10    A.   Before this current policy, we were only
11 keeping key employee e-mails.  So there could have
12 been, like, a person that was taking a BattleFrog
13 order that had communication that I might not have.
14 But related to the accident, I have all of the
15 documentation.
16    Q.   When did the document retention policy
17 change?
18    A.   I'd say within the last six months.
19    Q.   Before that, what was the document
20 retention policy?
21    A.   Everything was kept seven years, but it
22 was more so geared towards key employees.
23    Q.   Was it written down anywhere as to which
24 employees' e-mails were kept and which ones weren't?
25    A.   No.

24

1    Q.   Have you ever been to the site of the
2 accident?
3    A.   No.
4    Q.   Have you ever personally seen the Polaris
5 ATV that was involved in the accident?
6    A.   No.
7    Q.   Has anybody from BigRentz ever been to the
8 scene of the accident?
9    A.   No.
10    Q.   Has anybody from BigRentz ever personally
11 seen the ATV that was involved?
12    A.   No.
13    Q.   Has anybody from BigRentz at any point in
14 time ever done any sort of inspection of the subject
15 vehicle?
16    A.   No.
17    Q.   Any sort of maintenance or repair?
18    A.   No.
19    Q.   Does BigRentz have a safety philosophy?
20    A.   Yes.
21    Q.   What is that?
22    A.   Safety is one of our core values.  We want
23 to make sure that equipment is safe and our
24 customers that are using the equipment are using it
25 safely and there's no accidents.  OSHA requires that

25

1 all operators have safety training.  And we, if
2 requested, provide online training or onsite
3 training through our manufacturers or equipment
4 suppliers.
5    Q.   Do all of the customers that rent from
6 BigRentz know that?
7    A.   That it's available?  Yes.  It's per our
8 contract per section 5.03.
9    Q.   What does section 5.03 say, if you would?
10    A.   Do you want me to read the whole thing?
11    Q.   If I could have the exhibit that's colored
12 that's more legible than my copy, and then we'll
13 kind of read along together.
14    A.   "Customer agrees that BigRentz has no
15 control over the manner in which the property is
16 operated during the Actual Rental Period or any
17 third party allowed under this contract.  Customer
18 also acknowledges and agrees that the property may
19 be dangerous if used improperly or by untrained
20 parties.  Customer warrants and represents that (i)
21 prior to each use, customer has or will inspect the
22 property to confirm that it is in good condition
23 without defects, including readable decals and
24 operating and safety instructions and is suitable
25 for customer's intended use; (ii) only those

26

1 individuals will use the property who are not under
2 the influence of drugs or alcohol or otherwise
3 impaired and are properly trained and qualified to
4 use the property; (iii) the property will be used in
5 a careful, proper and legal manner, in compliance
6 with all operational and safety instructions
7 provided on, in or with the property in all federal,
8 state, and local laws, rules and regulations,
9 including, but not limited to, OSHA, ANSI and the
10 Internal Revenue Code, as revised; (iv) customer
11 would not allow the use of the property in a
12 negligent, illegal, unauthorized or abusive manner,
13 or in any publication (print, in audiovisual or
14 electronic) nor allow use of the property by any
15 unauthorized individual; (v) customer will pay for
16 any fees for licenses, registrations, permits and
17 other certificates that may be required for the
18 lawful operation of the property; (vi) the property
19 will be kept in a secure location; (vii) customer or
20 its employees and agents will not alter or cover of
21 any decals or insignia on the property or remove any
22 operational or safety instructions; and (viii)
23 removal of the property from the United States is
24 prohibited. Customer acknowledges that customer is
25 solely responsible to obtain training that customer

27

1 desires or deems necessary prior to the use of the
2 property and customer disclaims any obligation or
3 responsibility of BigRentz to customer or any
4 operator of the property in that regard even though
5 BigRentz does provide some training information on
6 its website at http://www.BigRentz/safety. That
7 information is provided only as a courtesy and by
8 doing so, BigRentz does not represent in any manner
9 that the training provided there is complete,
10 adequate or sufficient for customer's purposes or
11 that it absolves in any way customer's sole
12 obligation for adequate training. If the property
13 does not operate properly, is not suitable for
14 customer's intended use, does not have operating and
15 safety instructions, or customer has questions
16 regarding use of the property, customer should not
17 use the property and shall contact BigRentz
18 immediately."
19    Q.   Thank you.  I appreciate that.  Do you
20 want to take a second to catch your breath?
21    A.   I'm fine.
22    Q.   Yesterday when I asked Wheeler's corporate
23 representative what their safety philosophy was,
24 they actually had a little booklet.  Does BigRentz
25 have any booklet or document that outlines what

28

1 their safety philosophy or safety goals are?
2    A.   No.
3    Q.   Yesterday Wheeler said, "The safety of
4 Wheeler Associates and customers is always the first
5 consideration in all aspects of our business.  The
6 ongoing condition of zero accidents and injuries is
7 our normal level of safety.  Any accident or injury
8 is considered an unacceptable abnormality that must
9 be corrected immediately.  The Company and every
10 Associate has a moral obligation to do everything
11 possible to ensure each person returns home safely
12 every day."  Is there anything that Wheeler says
13 about its safety philosophy that BigRentz disagrees
14 with with respect to its safety philosophy?
15    A.   No.
16    Q.   In other words, BigRentz agrees that it
17 and its associates have a moral obligation to ensure
18 that each person returns home safely every day,
19 correct?
20    A.   So due to the nature of how we operate, we
21 are not onsite.  So by how our contract is set up,
22 the obligation is on the renter to make sure that
23 they are properly trained and are able to operate
24 the equipment.
25    Q.   And correct me if I'm wrong.  What I think

29

1 I'm hearing you saying is that BigRentz contracts
2 out their safety of the vehicles that they rent?
3    A.   It's on the renter to make sure that
4 they're operating it safely.
5    Q.   Does BigRentz believe that it has any sort
6 of obligation or duty to ensure that the equipment
7 that it is renting to customers is safe in any way?
8    A.   Yes.  In terms of notifying the customer,
9 in which we have stated in the contract in that
10 section, that this could be potentially dangerous
11 equipment and it is on the customer to make sure
12 that they are properly trained to operate the
13 equipment.
14    Q.   And I appreciate that response, ma'am.
15 But my question is a little bit more specific.  Does
16 BigRentz believe that it, that BigRentz, has any
17 duty or obligation to ensure that the equipment that
18 it rents to customers is safe?
19    A.   Yes.
20    Q.   With respect to the Polaris ATV that
21 Kendall Anderson was riding in on the day of the
22 accident, did BigRentz do one single thing to try
23 and ensure that that Polaris ATV was safe?
24    A.   Per our contract, it's the obligation of
25 BattleFrog to have reviewed and inspected the

30

1  equipment to ensure that it was safe for them to
2  use.
3      Q.   And I appreciate that.  Again, I don't
4  think that was the answer to my specific question.
5  With respect to the ATV that Kendall Anderson was
6  operating on the day of the accident, did BigRentz
7  itself do one single thing to ensure that that ATV
8  was safe?
9      A.   We did not directly do any sort of
10 inspection on the equipment to ensure anything of
11 any sort.
12     Q.   No inspection, nothing of any sort, right?
13     A.   No inspection of the equipment.  Because,
14 again, by the nature of our business, we do not ever
15 see the equipment.  So, therefore, the obligation
16 is, by the contract, on the customer to inspect the
17 equipment and ensure that it's good for use.
18     Q.   So BigRentz chose to rent from Wheeler,
19 correct?
20     A.   (Nodded affirmatively.)
21     Q.   Is that yes?
22          MR. BRADY:  You have to answer audibly
23 "yes."
24     A.   Yes.
25     Q.   And we're not fussing at you.  It's just

31

1  that the court reporter can't take down a nod of the
2  head.
3          The contract that BigRentz has with
4  Wheeler, does BigRentz have a responsibility to
5  Wheeler to ensure that the equipment is safe?
6      A.   I do not specifically recall a clause off
7  of the contract that would specifically state that.
8      Q.   Do you recall anything on the contract
9  that would imply that?
10          MR. BRADY:  Well, Counsel, do you want to
11 show her the contract?  That way we're not guessing
12 as to what you're questioning her on.
13          MR. COUNTS:  Let me ask it this way maybe.
14 I will show her a copy in a second.
15     Q.   Did you review the contract with Wheeler
16 to prepare for today?
17     A.   Not with Wheeler, no.
18          MR. BRADY:  It's CLAIMS 9.
19          MR. COUNTS:  Thank you.
20     Q.   Would you look at paragraph 3.
21     A.   Maintenance?
22     Q.   "Maintenance, Full Value:"  It says, "The
23 lessee," and that's BigRentz, correct?
24     A.   Uh-huh.
25     Q.   Is that a "yes"?

32

1      A.   Yes.
2      Q.   "Agrees to take good care of the
3  equipment," correct?
4      A.   Correct.
5      Q.   "To keep the same free and clear of all
6  liens, claims, and encumbrances of any kind
7  whatsoever, and to keep the same in good order and
8  repair at its own expense and cost," correct?
9      A.   Correct.
10     Q.   So BigRentz agreed or told Wheeler, "We
11 will do this," correct?
12     A.   Correct.
13     Q.   But BigRentz did not do it, did they?
14     A.   BigRentz, in return, then, has in section
15 5.02 the same, if not more, detailed site
16 inspection, maintenance, requirement of BattleFrog.
17     Q.   Understood.  But with respect to
18 BigRentz's contract with Wheeler, BigRentz did not
19 follow through with that section of the contract,
20 did they?
21     A.   I wouldn't say that we necessarily -- this
22 is in the aspect of repair at its own expense.  I
23 mean, there wasn't anything that was to be done that
24 we haven't done.  So I wouldn't say that we
25 necessarily have not directly done that.  But also,

33

1  in return, BattleFrog is the one that is going to be
2  doing anything of that sort in BigRentz's, I guess,
3  capacity.
4      Q.   I understand.  Did BigRentz do anything to
5  ensure that BattleFrog was living up to what
6  BattleFrog told BigRentz it would do?
7      A.   It was a contractual obligation of
8  BattleFrog.
9      Q.   And I understand that.  That was not my
10 question.  Did BigRentz do anything to ensure that
11 BattleFrog was living up to what it was supposed to
12 do for BigRentz?
13     A.   What would be an example of something
14 BigRentz could do?
15     Q.   I don't know.  Did they do anything?  Did
16 you contact them, send an e-mail, send a letter,
17 send a fax, call them on the phone?
18     A.   Yeah.  We had them sign a contract that
19 that is something that they would do.
20     Q.   I want to see if I understand what you're
21 saying.  BigRentz agrees with another company, "We
22 will take good care of this equipment."  You
23 contractually tell them you're going to do that,
24 right?
25     A.   (Nodded affirmatively.)

34

1   Q.   Correct?
2   A.   Correct.
3   Q.   And then BigRentz turns around and says,
4   "In order for us to fulfill our contractual
5   obligations, we're going to have another company do
6   that for us," correct?
7   A.   Correct.
8   Q.   But BigRentz didn't do anything to make
9   sure that this other company did what they were
10  supposed to do, right?
11  A.   Sure.
12  Q.   Does BigRentz have any employee whose
13  designated role is safety or anything having to do
14  with safety?
15  A.   No.
16  Q.   Have they ever?
17  A.   Mike Aguirre had a part in it.  He was
18  doing some of the trainings.
19  Q.   But you said he was a claims adjuster,
20  right?
21  A.   He was a claims manager, correct.  But he
22  did do some trainings as well.
23  Q.   What training did he do that you're aware
24  of?
25  A.   He did equipment training, which included

35

1   safety as well.
2   Q.   What did that entail?
3   A.   In terms of use of equipment, OSHA
4   requirements, just everything from A to Z on our
5   core equipment that we rent.
6   Q.   And I assume, and correct me if I'm wrong,
7   that BigRentz still has Mike's employee file,
8   correct?
9   A.   Correct.
10  Q.   That would have all of that information in
11  it about what safety stuff he did or did not do,
12  right?
13  A.   Correct.
14  MR. COUNTS:  Thank you.  Ma'am, we've been
15  going about 45 minutes.  We're going to take a quick
16  break.
17  (Recess.)
18  Q.   Ma'am, we're back on the record after a
19  short break.  This Exhibit 12, do you have a copy of
20  it?
21  A.   Let me pull it up.
22  Q.   These, again, are notes that you made,
23  correct?
24  A.   Correct.
25  Q.   For each of these notes is there a

36

1   document or an e-mail which is where you got the
2   information?
3   A.   Yes.  Something.
4   Q.   For instance, 3/29/16, "Subject:
5   BattleFrog Relationship.  Shaun Mohler, BigRentz,
6   reached out to Brian Morgan, BattleFrog, to
7   understand more about his rental needs and set him
8   up with a national account.  In the conversation,
9   Brian states that he rents equipment every week and
10  normally represents from Sunbelt."  Is that an
11  e-mail?  Is that a fax?  Is that a letter?  What is
12  that?
13  A.   It was either a phone call or a sales
14  force activity log.  I can't remember specifically
15  which one it was, but it was either one of the two.
16  Q.   So there's actually a document which shows
17  this phone call and the subject of the phone call,
18  what was discussed in the phone call?
19  A.   Yes.  Either that or the phone call, one
20  or the other.  I just don't remember off the top of
21  my head which one it was.
22  Q.   If it was a phone call, you weren't on
23  that phone call, right?
24  A.   Oh, no.  It was a recorded phone call.
25  Q.   So there's audio recordings of phone calls

37

1   that you listened to?
2   A.   Correct.
3   Q.   The 65 employees that BigRentz has,
4   obviously you're the CFO.  There's probably a CEO.
5   There's managers and such.  Are the vast majority of
6   the employees for BigRentz people who just take,
7   like, online orders?
8   A.   Yes.  They're customer service
9   representatives that coordinate the rentals with the
10  customers and with the suppliers.
11  Q.   Anybody that worked for BigRentz at the
12  time of these rentals back in 2016 that had any
13  industry experience in either construction or ATV
14  rentals or anything of that nature?
15  A.   There are several different people in
16  different roles that have industry or construction
17  experience.
18  Q.   There are, okay.
19  A.   Correct.
20  Q.   Do you know the names of any of those
21  individuals?
22  A.   I can't think of every person's resumé off
23  the top of my head.  I know Mike Aguirre had
24  experience in the field.  I can't think of anybody
25  else relevant off the top of my head.  But there's

ANDERSON vs POLARIS INDUSTRIES, INC
June 07, 2018                                                        Neda Imbimbo

---

**38**

1  definitely rental coordinators that are from the
2  industry and other people that are from the
3  industry.
4      Q.   It sounds like from what you said earlier,
5  and correct me if I'm wrong, that BigRentz simply
6  takes an order from whomever it may be, and then
7  BigRentz goes out to somebody else, for instance
8  Wheeler CAT, and gets the equipment and then that's
9  all BigRentz does.  Is that fair enough?
10     A.   Correct.
11     Q.   BigRentz is, basically, just a middleman.
12     A.   Correct.
13     Q.   BigRentz never does anything to see if the
14  customers that are renting from BigRentz know how to
15  use the equipment, correct?
16     A.   When we onboard customers, we do ask if
17  they have operated equipment before, have they
18  certified.  And also going back to our contract, all
19  customers are required on them to be properly
20  trained.  Different types of equipment require
21  different types of certifications, and that's on the
22  customer to ensure that their operators have that
23  proper training and certification.
24     Q.   Outside of the contract that BigRentz has
25  its customers sign, does BigRentz do anything else

---

**39**

1  to try to find out if these people know what they're
2  doing or if they have experience or if they're safe?
3  Do you do anything?
4      A.   As I mentioned, we ask the customer when
5  we first onboard them if they've operated equipment
6  before and if they have experience.
7      Q.   And are those conversations documented
8  anywhere?
9      A.   We have phone calls.
10     Q.   Is every phone call recorded?
11     A.   Yes.
12     Q.   So any phone call that BigRentz ever had
13  with BattleFrog or anybody from BattleFrog was
14  recorded, correct?
15     A.   Yes.
16     Q.   And you still have copies of all of those
17  recordings, correct?
18     A.   Correct.
19     Q.   Is there a typical markup that BigRentz
20  has when it rents from another company and then they
21  rent to the customer?
22     A.   It ranges anything from 10 percent to
23  about 35 percent.
24     Q.   In this particular case, what was the
25  markup?

---

**40**

1      A.   I can't tell you off the top of my head.
2  But the purchase order and sales order are both in
3  these packets, so we could calculate it if we need
4  to.
5          MR. COUNTS:  Fair enough.  Ma'am, I think
6  at this time I'm going to pass the witness.
7                   EXAMINATION
8  BY MR. ROSE:
9      Q.   I'm Rick Rose, and I represent Polaris in
10  this case.  It sounds like Mike Aguirre never did
11  visit the scene; is that right?
12     A.   Correct.
13     Q.   And he didn't ever inspect the Ranger?
14     A.   Correct.
15     Q.   And he nor BigRentz hired anyone to
16  investigate what happened with respect to the
17  accident.
18     A.   Not outside of Wheeler.
19     Q.   So it's, essentially, relied entirely on
20  Wheeler and Wheeler's hiring of Steadman's
21  Recreation to investigate what happened in the
22  accident.
23     A.   Correct.
24          MR. ROSE:  That's all I have.  Thanks.
25          MR. ANJEWIERDEN:  I don't have anything.

---

**41**

1          MR. BRADY:  I have nothing.
2          MR. COUNTS:  You're done, ma'am.  Thank
3  you very much.
4          (Signature requested.)
5          (Whereupon the taking of this deposition was
6  concluded at 10:00 a.m.)
7                   * * *
8          Original transcript filed with Mr. Counts.
9          Reading copy submitted to Mr. Brady.

---

42

```
 1              C E R T I F I C A T E
 2    STATE OF UTAH        )
 3    COUNTY OF _____ )
 4         I HEREBY CERTIFY that I have read the foregoing
 5    testimony consisting of 38 pages, numbered
 6    from 4 through 41 inclusive, and the same is a true
 7    and correct transcription of said testimony except as
 8    I have indicated said changes on enclosed errata sheet.
 9
10
11
12                  _____
                          NEDA IMBIMBO
13
14
15
16         Subscribed and sworn to at _____
17    this _____ day of _____ 2018.
18
19
20
21
22                  _____
                          Notary Public
23
24    My commission expires:
25                         * * *
```

43

```
 1              C E R T I F I C A T E
 2    STATE OF UTAH        )
 3    COUNTY OF SALT LAKE  )
 4         THIS IS TO CERTIFY that the deposition of NEDA
 5    IMBIMBO was taken before me, Shelly Wadsworth, a
 6    Registered Professional Reporter in and for the State of
 7    Utah.
 8         That the said witness was by me, before
 9    examination, duly sworn to testify the truth, the whole
10    truth, and nothing but the truth in said cause.
11         That the testimony was reported by me in Stenotype,
12    and thereafter transcribed by computer under my
13    supervision, and that a full, true, and correct
14    transcription is set forth in the foregoing pages,
15    numbered 4 through 41 inclusive.
16         I further certify that I am not of kin or otherwise
17    associated with any of the parties to said cause of
18    action and that I am not interested in the event thereof.
19         WITNESS MY HAND this 15th day of June, 2018.
20
21                  Shelly Wadsworth
22                  _____
                    Shelly Wadsworth, RPR, CRR
23
24
25
```

## Exhibits

**Imbimbo Exhibit 01**
 7:14,16
**Imbimbo Exhibit 02**
 7:23,24 8:1
**Imbimbo Exhibit 03**
 8:14,15,16
**Imbimbo Exhibit 04**
 9:24,25 10:1
**Imbimbo Exhibit 05**
 10:14
**Imbimbo Exhibit 06**
 11:10,12
**Imbimbo Exhibit 07**
 11:17,18
**Imbimbo Exhibit 08**
 12:4,5
**Imbimbo Exhibit 09**
 12:12,13
**Imbimbo Exhibit 10**
 12:19,20
**Imbimbo Exhibit 11**
 12:23,24
**Imbimbo Exhibit 12**
 13:3,4 35:19
**Imbimbo Exhibit 13**
 13:15,16

## (

**(i)** 25:20
**(v)** 26:15

## 1

**1** 7:14,16 10:10
**10** 10:10 12:19,20
**11** 10:10 12:23,24
**12** 13:3,4 35:19
**13** 13:15,16
**17** 19:20

## 2

**2** 7:23,24 8:1
**20** 8:22
**2009** 14:9,10
**2014** 9:22 13:25 14:10
**2015** 8:13 9:5,17
**2016** 18:10 19:21 22:12 37:12
**2017** 10:10 17:12

## 3

**3** 8:14,15,16 19:21 22:12 31:20
**3/29/16** 36:4
**30** 13:23 15:1
**3rd** 22:20,21,22

## 4

**4** 9:24 10:1
**45** 35:15

## 5

**5** 10:14
**5.02** 32:15
**5.03** 25:8,9
**5/12/2015** 9:8

## 6

**6** 11:10,12
**65** 14:21 37:3

## 7

**7** 11:17,18

## 8

**8** 12:4,5

## 9

**9** 12:12,13 31:18
**9/13/2016** 9:9

## A

**abnormality** 28:8
**absolves** 27:11
**abusive** 26:12
**accident** 7:2,4 18:9,12 23:14 24:2,5,8 28:7 29:22 30:6
**accidents** 24:25 28:6
**account** 19:12 36:8
**accounting** 19:25
**acknowledges** 25:18 26:24
**activity** 36:14
**Actual** 25:16
**additional** 10:22
**adequate** 27:10,12
**adjuster** 34:19
**advised** 19:25
**affirmatively** 30:20 33:25
**agents** 26:20
**agreed** 32:10
**agreement** 12:21
**agrees** 25:14,18 28:16 32:2 33:21
**Aguirre** 16:24 18:13 19:20 22:3 34:17 37:23
**alcohol** 26:2
**allowed** 25:17
**alter** 26:20
**Anderson** 4:12 18:10 29:21 30:5
**Andrew** 4:11
**ANSI** 26:9
**apologize** 13:21 21:1
**Apparently** 9:3
**appeared** 16:24
**Approximately** 15:1
**aspect** 14:19 32:22
**aspects** 10:25 28:5
**Associate** 28:10
**associates** 28:4,17
**assume** 7:16 10:24 14:1 35:6
**assuming** 7:5
**attached** 7:25 10:13
**attachments** 10:11
**attempting** 19:2
**attorneys** 4:12
**ATV** 7:2,5 24:5,11 29:20,23 30:5,7 37:13
**ATV/UTVS** 16:3
**ATVS** 16:1,5
**audibly** 30:22
**audio** 36:25
**audiovisual** 26:13
**audit** 14:15,17
**August** 19:21 22:12,22
**automatically** 19:11
**aware** 11:9 23:8 34:23

## B

**bachelor's** 14:5,6
**back** 9:5 18:10 35:18 37:12 38:18
**bad** 14:12
**balance** 19:10
**ballpark** 16:7
**basically** 17:7 38:11
**Bates** 19:20
**Battlefrog** 7:17 8:8 12:9, 11 13:2,6 16:4 18:16 19:17 23:12 29:25 32:16 33:1,5, 6,8,11 36:5,6
**behalf** 4:3,25 5:12
**believed** 19:3
**belong** 8:6
**Bigrentz** 4:18,20,21,25 5:8,12,20 7:17 8:9,25 9:19 10:1,5,17,20 12:21 13:1,2, 6,7,19,24 14:17,18 15:2, 14,16,22 16:5,12,18,22 17:4,18 18:8,17,22 19:3,17 24:7,10,13,19 25:6,14 27:3,5,8,17,24 28:13,16 29:1,5,16,22 30:6,18 31:3, 4,23 32:10,13,14,18 33:4, 6,10,12,14,21 34:3,8,12 35:7 36:5 37:3,6,11 38:5,7, 9,11,13,14,24,25
**Bigrentz's** 5:3 15:25 21:16 22:2 23:1 32:18 33:2
**billing** 17:8,9
**bit** 29:15
**book** 8:22
**booklet** 27:24,25
**Brady** 6:13 20:24 30:22 31:10,18
**break** 35:16,19
**breath** 27:20
**Brian** 36:6,9
**brought** 6:1,5 7:15
**business** 15:15,25 28:5 30:14

## C

**California** 15:2,6,9
**call** 11:8 33:17 36:13,17, 18,19,22,23,24
**called** 4:3 14:14,16
**calls** 6:16,18 36:25
**cancellation** 12:2

**capacity** 33:3
**card** 19:9
**care** 32:2 33:22
**careful** 26:5
**case** 5:4,12 16:4 20:5 21:16 22:8 23:6
**CAT** 8:13,21 19:9 38:8
**catch** 27:20
**CC'D** 19:21
**cease** 17:3,11
**CEO** 37:4
**certificates** 26:17
**certification** 38:23
**certifications** 38:21
**certified** 38:18
**CFO** 37:4
**chain** 10:12,15,16,25 11:14 22:17,18,19
**change** 23:17
**changed** 9:13
**check** 9:22
**chief** 13:20 14:1
**chose** 30:18
**claims** 17:5,6 31:18 32:6 34:19,21
**clause** 31:6
**clear** 32:5
**cleared** 19:15
**Code** 26:10
**Cody** 8:20 9:3
**collect** 19:2
**college** 14:2,7
**colored** 25:11
**Comments** 8:20
**communication** 10:16 23:13
**communications** 6:10
**compact** 10:2
**company** 4:17 14:14,16 28:9 33:21 34:5,9
**complete** 27:9
**compliance** 26:5
**condition** 25:22 28:6
**conduct** 18:8
**conducted** 11:19
**confirm** 25:22
**confirmed** 22:8
**connect** 15:17
**consideration** 28:5

**considered** 28:8
**construction** 15:23 37:13, 16
**contact** 13:6 27:17 33:16
**contract** 7:17,20 25:8,17 28:21 29:9,24 30:16 31:3, 7,8,11,15 32:18,19 33:18 38:18,24
**contracts** 29:1
**contractual** 33:7 34:4
**contractually** 33:23
**control** 25:15
**conversation** 36:8
**coordinate** 37:9
**coordinators** 38:1
**copies** 12:8
**copy** 7:21,22 19:19 25:12 31:14 35:19
**core** 24:22 35:5
**corner** 9:8
**corporate** 5:4,20 8:21 27:22
**corporation** 5:6 14:18 15:2,5
**correct** 5:1,5,17,18 6:2,3 7:10,11,18,19 8:17,18 9:4, 5,19 10:3,4,8 11:14,15,19, 20 13:10 14:23 15:3,7,24 16:19,25 18:6,7 19:7,22,23 20:8 21:3,7 23:6,9 28:19, 25 30:19 31:23 32:3,4,8,9, 11,12 34:1,2,6,7,21 35:6,8, 9,13,23,24 37:2,19 38:5, 10,12,15
**corrected** 28:9
**cost** 20:6 32:8
**counsel** 6:20 18:5 19:19 31:10
**Counts** 4:7,11 12:12 21:1 31:13,19 35:14
**County** 18:1
**couple** 5:23,24
**court** 31:1
**courtesy** 27:7
**cover** 26:20
**crane** 17:24
**created** 13:9
**credit** 12:1 19:9
**current** 13:18 17:18 23:10
**customer** 17:9 25:14,17, 20,21 26:10,15,19,24,25 27:2,3,15,16 29:8,11 30:16 37:8 38:22
**customer's** 25:25 27:10, 11,14

**customers** 15:17,20 24:24 25:5 28:4 29:7,18 37:10 38:14,16,19,25

**D**

**damage** 12:25 17:6 18:14, 16 20:1,7
**dangerous** 25:19 29:10
**date** 22:19
**dated** 10:9 19:20 22:11
**day** 18:20 28:12,18 29:21 30:6
**days** 5:23,24
**decals** 25:23 26:21
**deducted** 19:11
**deems** 27:1
**defects** 25:23
**degree** 14:2,4
**Delaware** 15:4,5
**deposition** 5:14,22 6:2,7, 21 13:16 18:2,5 21:23
**describe** 15:14
**designated** 5:3 34:13
**desires** 27:1
**destroyed** 23:9
**detailed** 32:15
**determine** 20:4 21:14
**determining** 18:19
**directly** 18:11 30:9 32:25
**disagrees** 28:13
**disclaims** 27:2
**discussed** 6:20 16:20 36:18
**discussion** 11:1 17:8
**document** 8:2,11 9:12,14 13:9 21:19 22:1,10 23:1,8, 16,19 27:25 36:1,16
**documentation** 23:15
**documents** 6:2,5,6,12 8:3,4,6 11:22 21:23 22:11, 14,15 23:3
**dozens** 16:8
**drugs** 26:2
**due** 19:12 28:20
**duly** 4:4
**duty** 29:6,17

**E**

**e-mail** 6:10 10:9,11,16,25 11:11,13 19:20,22 20:9,15 21:3,7,11,13 22:17,18,19

33:16 36:1,11
**e-mails** 6:14 7:25 10:12, 15,16,19,23 11:3 16:24 20:14 21:6 23:11,24
**earlier** 38:4
**economics** 14:5
**electronic** 26:14
**employed** 17:1,2,3
**employee** 7:9 15:10,11,12 17:11 23:11 34:12 35:7
**employees** 5:8 14:20,21 15:8 16:18,21 23:22 26:20 37:3,6
**employees'** 23:24
**encumbrances** 32:6
**ended** 11:1
**ensure** 28:11,17 29:6,17, 23 30:1,7,10,17 31:5 33:5, 10 38:22
**entail** 35:2
**entity** 18:23
**equipment** 15:16,18,19, 21,23 17:24 18:14 20:4 21:14,17 22:6,23,24 24:23, 24 25:3 28:24 29:6,11,13, 17 30:1,10,13,15,17 31:5 32:3 33:22 34:25 35:3,5 36:9 38:8,15,17,20
**essentially** 5:6 15:8
**events** 13:7,14
**exact** 16:11
**EXAMINATION** 4:6
**examined** 4:4
**excavator** 10:2
**exhibit** 7:14,16,23,24 8:1, 14,15,16 9:24,25 10:14 11:10,12,17,18 12:4,5,12, 13,19,20,23,24 13:3,4,15, 16 25:11 35:19
**exhibits** 6:4
**exist** 20:19
**expense** 32:8,22
**experience** 37:13,17,24
**extra** 10:11

**F**

**fact** 19:13
**fair** 16:17 18:24 19:4 38:9
**fault** 22:6
**faulty** 20:4 21:14,17 22:23, 25
**fax** 33:17 36:11

federal 26:7
fees 26:16
field 37:24
figure 18:23
file 35:7
financial 13:20 14:1
find 9:16 16:16
fine 4:22 27:21
follow 32:19
force 8:12 9:15 36:14
four-page 8:1
free 32:5
front 22:16
fulfill 34:4
Full 31:22
fussing 30:25

**G**

gave 8:22
geared 23:22
Georgia 15:13
give 4:25
giving 5:12
goals 28:1
good 25:22 30:17 32:2,7
  33:22
graduated 14:9
great 8:22
gross 14:24
group 11:21
guess 10:2 16:20 33:2
guessing 31:11

**H**

handled 17:5
happen 17:18
happened 18:20,24
head 10:21 16:15 20:13
  22:13 31:2 36:21 37:23,25
hearing 29:1
heavy 15:19,23
held 20:6
HERC 12:18
hired 18:22
history 13:7
hold 19:25
home 28:11,18

hours 5:24,25
http://www.bigrentz/
safety. 27:6

**I**

idea 17:21
ii 25:25
iii 26:4
illegal 26:12
Imbimbo 4:2,10
immediately 27:18 28:9
impaired 26:3
imply 31:9
improperly 25:19
incident 11:18 13:13
included 34:25
including 25:23 26:9
incoming 17:6
individual 18:22 26:15
individuals 26:1 37:21
industry 37:13,16 38:2,3
influence 26:2
information 11:5 22:3
  27:5,7 35:10 36:2
injuries 28:6
injury 28:7
insignia 26:21
inspect 25:21 30:16
inspected 29:25
inspection 24:14 30:10,
  12,13 32:16
instance 36:4 38:7
instructions 25:24 26:6,
  22 27:15
intended 25:25 27:14
internal 14:15,16 26:10
investigation 18:9,11,12,
  17
invoice 12:25 13:1
invoices 12:8 20:1
involved 18:10 24:5,11
items 13:12
iv 26:10

**J**

job 7:5 13:18
Jon 7:8,9 22:4
Jones 7:8,9 18:18 22:4

June 22:20,21

**K**

keeping 23:11
Kendall 18:9 29:21 30:5
key 23:11,22
kind 11:15 19:9,10 25:13
  32:6

**L**

large 14:18
lawful 26:18
laws 26:8
lawsuit 4:12 5:1
layoff 17:17
learn 5:11
learned 5:19
leave 17:13
legal 20:3 21:13 26:5
legible 25:12
lessee 31:23
letter 33:16 36:11
level 28:7
liable 20:6
licenses 26:16
liens 32:6
limited 26:9
list 5:15
listened 6:18 37:1
litigation 20:3
living 33:5,11
local 26:8
located 15:9,12 17:22
location 26:19
log 9:15 36:14
log-in 8:12
logistics 15:20
logs 6:17
long 13:24
longer 16:22 17:1,2 21:20
  22:2
looked 6:15,17 7:12

**M**

made 35:22
maintenance 24:17
  31:21,22 32:16

majority 11:4 15:22 37:5
make 19:14 24:23 28:22
  29:3,11 34:8
manager 9:1 17:5 34:21
managers 37:5
manages 9:1
manner 25:15 26:5,12
  27:8
manufacturers 25:3
March 17:12
mark 6:4 7:15 8:5,15 9:25
  10:15
marked 7:14,23 8:14,16
  9:24 10:14 11:10,17 12:4,
  12,13,19,23 13:3,15
marketplace 15:17
marking 7:16,24
meet 18:4
meeting 8:24 11:6
memo 12:1
message 8:23
met 8:20 9:3
middleman 38:11
Mike 16:24 18:13 19:20,25
  22:3,4,15,21 34:17 37:23
Mike's 35:7
million 15:1
mini 10:2
minutes 35:15
modified 9:8,9
Mohler 36:5
moment 14:21
money 19:3
month 5:14
months 22:22 23:18
moral 28:10,17
Morgan 36:6

**N**

names 37:20
national 36:8
nature 6:7 28:20 30:14
  37:14
necessarily 9:14 21:10
  32:21,25
Neda 4:2,10
negligent 26:12
nod 31:1
nodded 30:20 33:25
normal 28:7

note 13:14

notes 6:12 13:5,17 35:22, 25

notified 5:14

notifying 29:8

number 6:1 16:11

**O**

obligation 27:2,12 28:10, 17,22 29:6,17,24 30:15 33:7

obligations 34:5

obtain 26:25

office 8:21 15:6

officer 13:20 14:2

officers 5:7

official 4:19

onboard 38:16

ongoing 28:6

online 15:16 25:2 37:7

onsite 25:2 28:21

open 19:13,16

operate 27:13 28:20,23 29:12

operated 25:16 38:17

operating 25:24 27:14 29:4 30:6

operation 26:18

operational 26:6,22

operator 27:4

operators 25:1 38:22

opportunity 18:4

Orange 18:1

order 7:24 8:6,7,8 9:25 11:25 12:3,7 23:13 32:7 34:4 38:6

orders 11:24,25 12:7 37:7

original 7:20

originally 19:11

OSHA 24:25 26:9 35:3

outcome 20:2,3 21:13

outlines 27:25

owed 19:3

**P**

packet 12:6

pages 10:11

paid 19:16,17,18

paragraph 19:24 31:20

part 6:12 21:12 22:16,18 34:17

parties 11:2 25:20

party 25:17

pay 18:16 26:15

paying 18:15 20:1

pending 20:2

people 16:23 37:6,15 38:2

percent 8:22 16:2

percentage 15:25

performed 18:13

Period 25:16

permits 26:16

person 23:12 28:11,18

person's 37:22

personally 24:4,10

personnel 20:5 21:15

philosophy 24:19 27:23 28:1,13,14

phone 6:16,17,18 11:8 33:17 36:13,17,18,19,22, 23,24,25

photographs 6:23,25 7:1, 2,7,12

photos 10:13

plaintiff 4:4

point 19:2,16 24:13

Polaris 10:6 24:4 29:20,23

policy 23:2,10,16,20

Polycom 14:14

position 21:16,20 22:2

potentially 29:10

prepare 6:7 16:19 20:15 21:23 31:16

preparing 5:21

pricing 17:7

principal 15:5

print 8:19 26:13

printed 13:16

prior 11:5 16:3 25:21 27:1

proceedings 20:4 21:14

process 18:5

prohibited 26:24

proper 26:5 38:23

properly 26:3 27:13 28:23 29:12 38:19

property 25:15,18,22 26:1, 4,7,11,14,18,21,23 27:2,4, 12,16,17

provide 25:2 27:5

provided 12:9,10 22:7 26:7 27:7,9

providing 15:19

psychology 14:6

publication 26:13

pull 35:21

purchase 9:25 12:6,7

purposes 13:11 27:10

put 12:5

**Q**

qualified 26:3

question 13:21 14:12 16:13 17:10 29:15 30:4 33:10

questioning 31:12

questions 27:15

quick 35:15

**R**

reached 10:24 36:6

read 21:12 25:10,13

readable 25:23

recall 31:6,8

Recess 35:17

record 4:8 35:18

recorded 36:24

recordings 36:25

records 9:23

referenced 6:11

referred 22:14

regard 27:4

regional 9:1

registrations 26:16

regulations 26:8

related 8:9 11:24 13:12 18:12,13 23:14

relationship 17:8 36:5

relationships 9:2

relevant 11:4 16:21 37:25

rely 18:17

remainder 12:17

remember 20:17,20,22,25 21:2,8,11 22:13 36:14,20

remote 15:10,11,12

removal 26:23

remove 26:21

rent 25:5 29:2 30:18 35:5

rental 12:21 15:16,20 20:2 25:16 36:7 38:1

rentals 12:18 37:9,12,14

rented 8:9 9:19,21 10:1,5 16:3,5

renter 28:22 29:3

renting 16:1 29:7 38:14

rents 15:22 29:18 36:9

repair 20:6 24:17 32:8,22

report 11:18 22:7

reporter 31:1

represent 27:8

representative 5:4,20 27:23

representatives 37:9

represents 25:20 36:10

requested 25:2

require 38:20

required 26:17 38:19

requirement 32:16

requirements 35:4

requires 24:25

respect 28:14 29:20 30:5 32:17

responding 21:2

response 11:15 20:9,12, 18,21,23,25 21:7 29:14

responsibility 27:3 31:4

responsible 18:15 26:25

resumé 37:22

retention 23:1,16,20

return 32:14 33:1

returns 28:11,18

revenue 14:25 26:10

reverse 19:12

review 6:9,23 11:5 20:15 21:22 22:5 31:15

reviewed 6:6 20:14 29:25

reviewing 17:6 21:6

revised 26:10

Rhoades 9:3

riding 29:21

role 34:13

roles 37:16

rules 26:8

**S**

safe 24:23 29:7,18,23 30:1, 8 31:5

**safely** 24:25 28:11,18 29:4

**safety** 24:19,22 25:1,24 26:6,22 27:15,23 28:1,3,7, 13,14 29:2 34:13,14 35:1, 11

**sales** 7:24 8:6,7,12 9:15 11:24,25 12:3 14:24 36:13

**save** 23:3

**saved** 23:6

**scenario** 8:10 16:20

**scene** 7:3 24:8

**section** 25:8,9 29:10 32:14,19

**secure** 26:19

**send** 33:16,17

**sentence** 22:10

**separate** 8:1,3,4 11:22

**separately** 11:16

**series** 13:14

**service** 37:8

**set** 11:23 19:10 28:21 36:7

**Shaun** 36:5

**short** 8:22 35:19

**show** 31:11,14

**showed** 9:16

**shows** 36:16

**sign** 33:18 38:25

**simply** 38:5

**Simpson** 14:16

**single** 29:22 30:7

**site** 7:6 24:1 32:15

**situation** 16:22 19:13

**Sixty-five** 14:22

**small** 8:19

**smaller** 16:1

**sole** 27:11

**solely** 26:25

**solution** 15:20

**sort** 18:8 24:14,17 29:5 30:9,11,12 33:2

**sounds** 38:4

**sourced** 12:11,14

**speak** 5:6,7

**specific** 8:10 11:25 16:22 19:5,6 21:11 22:9 29:15 30:4

**specifically** 9:11 13:13 18:18 20:17 21:5,9 22:10 31:6,7 36:14

**spent** 5:21

**stapled** 11:22,23

**state** 4:8 26:8 31:7

**stated** 22:24 29:9

**states** 26:3 36:9

**stating** 22:4

**status** 19:8

**Steadman's** 22:7

**stop** 14:7

**Strong-tie** 14:16

**stuff** 35:11

**subject** 8:20 24:14 36:4,17

**substance** 20:22

**sufficient** 27:10

**suggest** 22:1

**suggested** 20:5 21:15,17

**suitable** 25:24 27:13

**Sunbelt** 36:10

**supplier** 8:16,20 9:1 17:9, 24

**suppliers** 12:9 15:18 25:4 37:10

**supply** 9:1

**supposed** 5:16 33:11 34:10

**surprised** 21:10

**sworn** 4:4,25

**system** 9:23

**T**

**takes** 38:6

**taking** 23:12

**talk** 5:16 6:20

**talked** 9:16 16:18

**talking** 10:6

**task** 9:15

**team** 19:25

**terminated** 17:14,15,16

**terms** 29:8 35:3

**testified** 4:5

**testimony** 4:25 5:12

**thing** 19:10 22:21 25:10 29:22 30:7

**things** 6:11

**thoughts** 13:8

**three-way** 11:7

**time** 5:21 8:8,23 9:19,21,22 10:1,5 24:14 37:12

**timeline** 13:7

**times** 16:4,8,9

**title** 13:18

**today** 4:16,21,24 5:16 6:2, 21 7:16 13:11 16:19 20:15 31:16

**today's** 5:21 6:7 21:23

**told** 32:10 33:6

**top** 10:21 16:14 20:13 22:13 36:20 37:23,25

**topics** 5:15 13:16

**total** 12:16

**trained** 26:3 28:23 29:12 38:20

**training** 25:1,2,3 26:25 27:5,9,12 34:23,25 38:23

**trainings** 34:18,22

**Truong** 8:25

**turns** 34:3

**type** 10:17 15:23

**types** 38:20,21

**U**

**Uh-huh** 31:24

**ultimately** 18:15

**unacceptable** 28:8

**unauthorized** 26:12,15

**understand** 4:13,15,24 5:9 18:5 33:4,9,20 36:7

**understanding** 19:1

**understood** 6:14 17:23 32:17

**United** 12:18 26:23

**units** 12:2,10,14,16

**university** 14:8

**untrained** 25:19

**Utah** 8:21

**UTV** 12:25

**UTVS** 12:9 16:1,5

**V**

**values** 24:22

**Van** 8:25

**vast** 37:5

**vehicle** 10:6 24:15

**vehicles** 16:1 29:2

**vi** 26:18

**vii** 26:19

**viii** 26:22

**visit** 8:12,16,20 9:20

**voice** 5:8

**voluntarily** 17:13

**W**

**wanted** 19:14

**warrants** 25:20

**website** 27:6

**Wednesday** 19:21

**week** 36:9

**weeks** 5:13

**whatsoever** 32:7

**Wheeler** 7:9 8:13,21 9:4, 17,19,20 10:2,6,17,20 11:19 12:7,11,15,17,22 13:1,6 18:18,19 19:2,3,9, 18 20:10 21:2,17 22:24 28:3,4,12 30:18 31:4,5,15, 17 32:10,18 38:8

**Wheeler's** 27:22

**whereabouts** 17:19

**whomever** 38:6

**words** 28:16

**work** 4:17 14:13

**worked** 13:24 14:11,14,15 37:11

**working** 17:24

**written** 23:23

**wrong** 28:25 35:6 38:5

**Y**

**year** 14:25

**years** 23:4,21

**Yesterday** 27:22 28:3

# Exhibit 5

ANDERSON

vs

POLARIS INDUSTRIES, INC

STEVEN WEBB

June 06, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
1                IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3                            * * *

4    KENDALL ANDERSON,           )
                                 ) Civil No.
5              Plaintiff,        ) 2:17-cv-00205-DN
                                 )
6         v.                     ) Deposition of:
                                 )
7    POLARIS INDUSTRIES, INC.    ) STEVEN WEBB
     and BIGRENTZ, INC., a/k/a   )
8    BIG RENZ, WHEELER CAT       )
     a/k/a WHEELER MACHINERY     )
9    CO., BATTLEFROG a/k/a       )
     BattleFrog Obstacle Race    )
10   Series,                     )
                                 )
11             Defendants.       )
                                 )
12                               )

13                           * * *

14

15                      June 6, 2018
                        9:05 a.m.

16

17

18        Law Offices of Ray, Quinney & Nebeker
          36 South State Street, Suite 1400
19              Salt Lake City, Utah

20                           * * *

21

22

23               Shelly Wadsworth
          - Certified Realtime Reporter -
24        Registered Professional Reporter

25
```



**Page 2**

A P P E A R A N C E S

For the Plaintiff:        Andrew G. Counts
                          THE TRACY LAW FIRM
                          4701 Bengal Street
                          Dallas, Texas 75235

For the Defendant         Rick L. Rose
Polaris Industries:       RAY QUINNEY & NEBEKER
                          36 South State Street
                          Suite 1400
                          Salt Lake City, Utah 84111

For the Defendant         Michael G. Brady
BigRentz and              BRADY LAW CHARTERED
Wheeler Machinery:        2537 West State Street
                          Suite 200
                          Boise, Idaho 83702

For the Intervenor        D. Gregory Anjewierden
Specialty Insurance Group: RENCHER | ANJEWIERDEN
                          460 South 400 East
                          Salt Lake City, Utah 84111

Also Present:             Cody Rhoades
                          Jonathan Jones
                          Jessie Wayment
                            * * *

I N D E X

EXAMINATION                                          PAGE

By Mr. Counts                                          3

EXHIBITS

No. 1          "The Wheeler Way" Pamphlet             6

**Page 3**

P R O C E E D I N G S

STEVEN WEBB,

called as a witness by and on behalf of the
plaintiff, being duly sworn, was examined and
testified as follows:

EXAMINATION

BY MR. COUNTS:

Q.   Would you state your name for the record,
please, sir.

A.   Steven Webb.

Q.   Mr. Webb, my name is Andrew Counts.  And
I'm one of the attorneys for the plaintiff, Kendall
Anderson, in this lawsuit that I believe has been
brought against the company that you work for.  Do
you understand that?

A.   Yes.

Q.   And it looks like you brought a copy of
the notice of deposition to the deposition today; is
that correct?

A.   Yes.

Q.   Well, first of all, what is the official
name of the company that you work for?

A.   Wheeler Machinery Co.

Q.   For the purposes of this deposition, is it
okay if I just refer to that as Wheeler?  Is that

**Page 4**

how you guys refer to the company, as Wheeler?

A.   Sure.  That's fine.

Q.   And you've been designated as a corporate
representative on behalf of Wheeler for only two
topics in this case.  Do you understand that?

A.   Yes.

Q.   It looks like from what your attorneys
handed me, number 19, you've been designated as a
corporate representative for the mission statement
of Wheeler, as well as topic 20, the safety
philosophy of Wheeler; is that correct?

A.   Yes.

Q.   What is your current job title at Wheeler?

A.   Accountant.

Q.   And how long have you held that position?

A.   I've been in the accounting department for
almost 21 years.  It will be 21 years in July.

Q.   And how long have you worked for Wheeler?

A.   The same time.  The same amount of time.

Q.   What is your educational background?  Are
you an accountant?

A.   I am an exact accountant.  Bachelor's
degree at BYU.

Q.   In accounting, I assume.

A.   In accounting, yes.

**Page 5**

Q.   Certified CPA?

A.   Not a CPA.

Q.   What do your day-to-day job duties entail
working for Wheeler?

A.   I have a variety of duties.  One of them
is to interface with our insurance broker on claims
and communicate that information, company
information, to them.  Help with the insurance
renewals.  Communicate information about claims and
insurance from our company like Travelers and our
broker to other management personnel at Wheeler.

Q.   When did you first learn that you were
going to give sworn testimony in this case?

A.   That decision was made last week.

Q.   Do you remember what day last week?

A.   When did we meet, Cody?  Was that
Thursday?

MR. RHOADES:  Yes.

A.   It was Thursday that we met.  We decided
then that I would cover these two topics.

Q.   How long have you spent preparing for this
deposition?

A.   Not all that long.

Q.   What does that mean?

A.   Basically what I'm going to tell you comes

6

1   from our handbook, The Wheeler Way.  We have our
2   safety statement in there and our mission statement.
3           MR. COUNTS:  Can I see that, please.
4   Thank you.  I'm going to mark this as Exhibit 1.
5           (Exhibit No. 1 was marked.)
6       Q.   The document that you've handed me is a
7   little pamphlet entitled The Wheeler Way.  Did you
8   have any input in creating this document at all?
9       A.   No.
10      Q.   I don't see anything specifically in here
11  that says mission statement.  Is there a specific
12  mission statement?
13      A.   Yeah.  Can I borrow it back?
14      Q.   Sure.
15      A.   It's our Guiding Principles.  Our safety
16  statement is part of it.  So it's on this page.  Our
17  Guiding Principles here.  It covers Service,
18  Integrity, Stewardship, and Safety.  It's all our
19  mission statement.
20      Q.   As far as the safety philosophy, would you
21  read what it says regarding safety on that page.
22      A.   Sure.  "The safety of Wheeler Associates
23  and customers is always the first consideration in
24  all aspects of our business.  The ongoing condition
25  of zero accidents and injuries is our normal level

7

1   of safety.  Any accident or injury is considered an
2   unacceptable abnormality that must be corrected
3   immediately.  The Company and every Associate has a
4   moral obligation to do everything possible to ensure
5   each person returns home safely every day."
6       Q.   Fair enough.  Aside from looking at The
7   Wheeler Way pamphlet --
8       A.   I'm going to grab my water.
9       Q.   Go ahead.
10      A.   Sorry.
11      Q.   Aside from looking at that pamphlet, what
12  other documents, if any, did you review to prepare
13  for today?
14      A.   I haven't brought any other documents.
15      Q.   That wasn't my question.  My question was,
16  what other documents, if any, did you review to
17  prepare for today?
18      A.   None.
19      Q.   Is there anything in your job duties in
20  the last 21 years that has to do with safety at
21  Wheeler?
22      A.   Not as far as administration of safety,
23  that type of thing, no.  No, I haven't been in the
24  safety department.
25      Q.   How long has that safety philosophy been

8

1   in place at Wheeler?
2       A.   I would say more than 10 years.
3       Q.   Has that brochure or a similar type of
4   brochure been in existence for about 10 years?
5       A.   Yes.  At least that long, yes.
6       Q.   In addition to being the corporate
7   representative in this case, in discovery we were
8   provided with I think one or two e-mails where I
9   think your name was mentioned.  Do you remember
10  sending e-mails having to do with anything regarding
11  the accident that Mr. Anderson was involved in?
12      A.   Me sending e-mails?
13      Q.   To anybody regarding the accident that
14  Mr. Anderson was involved in.
15      A.   Yeah.  I was handling some of the e-mails,
16  yeah.
17      Q.   Let me look and see.  On July 29, 2016,
18  you sent an e-mail to Mike who I believe works for
19  BigRentz.  Do you remember doing that?
20      A.   I don't remember that specifically, but
21  it's possible.
22      Q.   You said, "Mike, I work in the treasury
23  department at Wheeler Machinery and part of my job
24  duties include interfacing with our insurance broker
25  and attorney on these matters."  Does that ring a

9

1   bell?
2       A.   Yeah.
3       Q.   Is the treasury department the same as the
4   accounting department?
5       A.   At one time we had a separate treasury
6   department that I was a part of, and I reported to
7   the corporate treasurer.  Wheeler had some layoffs,
8   a little bit of downsizing, and they did away with
9   the treasury department and put me back into
10  accounting.  I was in accounting before that.  I
11  went into treasury for approximately three years.
12  And then after downsizing did away with the treasury
13  department.
14      Q.   You also say in this e-mail, "I've
15  gathered some information from our Wheeler personnel
16  about the accident, and we will be investigating
17  this matter for other relevant facts."  Do you
18  remember writing that?
19          MR. BRADY:  Counsel, do you want to have
20  him look at it?
21          MR. COUNTS:  Here you go.
22      A.   Not specifically.
23      Q.   I'll show it to you.
24      A.   Yep.
25      Q.   Do you remember writing that now?  Does

ANDERSON vs POLARIS INDUSTRIES, INC

June 06, 2018                                                    Steven Webb

10

1  that refresh your memory?
2      A.  It looks familiar.
3      Q.  What information do you remember Wheeler
4  personnel gathering about the accident?
5      A.  Boy, going back.  We had photographs.  We
6  had the accident report or incident report that our
7  other people involved in this, that will be giving
8  their depositions, said they gathered.  Information
9  from Cody Rhoades who was our rental manager at the
10  time.  Just general information about whatever
11  information we had available.
12     Q.  On August 3, 2016, let me show you this.
13  Mike, is it Aguirre.  How do you pronounce his last
14  name?
15     A.  It looks like (Ug-wire).
16     Q.  Mike from BigRentz wrote an e-mail to you
17  and copied Mr. Rhoades and Mr. Wayment.  And who is
18  Neda Etemad.  Do you know who that is?
19     A.  I don't.
20     Q.  Mr. Aguirre, he's writing an e-mail to
21  you.  He's copying the other individuals at Wheeler.
22  And if you look at the second paragraph, the second
23  sentence, he says, "Since the outcome of these legal
24  proceedings could determine faulty equipment which
25  was also suggested by your personnel to be the case,

11

1  we should not be held liable for the repair cost of
2  said damage."  Do you see that?
3      A.  Yes.
4      Q.  Did you ever respond to Mr. Aguirre or
5  contradict anything having to do with the faulty
6  equipment which was also suggested by your
7  personnel?  Did you ever send any reply e-mail to
8  that?
9      A.  Not that I remember.
10     Q.  Did you ever call up and say, hey, this is
11  not correct, it wasn't faulty equipment and we never
12  suggested that?
13     A.  I don't remember.  I don't remember doing
14  that.  It's been a while.
15     Q.  Did you discuss this e-mail and what
16  Mr. Aguirre said with anybody at Wheeler?
17     A.  I believe I passed that on to some of our
18  other people.  I shared that with our CFO, Jeff
19  Ipsen.  I kept him in the loop on these
20  communications.  I shared possibly this one and
21  other e-mails with Cody Rhoades, our rental manager.
22  And with my boss at the time.
23     Q.  When you shared this e-mail with anybody
24  else, did they say anything in response to what
25  Mr. Aguirre said regarding faulty equipment

12

1  suggested by Wheeler?
2      A.  Again, I don't remember.  That was so long
3  ago, two years ago.  It was almost two years ago.  I
4  don't remember.
5      Q.  After sharing this e-mail with the CFO and
6  other Wheeler employees, did any of them tell you,
7  no, it was not faulty equipment and we never said
8  that?
9      A.  Again, I don't remember.  I'd have to go
10  back and look through e-mails and see what
11  communications took place.
12     Q.  What's the name of the CFO again?  I'm
13  sorry.
14     A.  Jeff Ipsen.
15     Q.  What did Mr. Ipsen say to you about
16  anything having to do with the accident or any
17  investigation that was done?
18     A.  Well, he instructed me to continue
19  interfacing with our insurance broker, find out what
20  we could, pass that on to our representatives at
21  Travelers and the Travelers' attorney.
22     Q.  Have you ever had any contact with anybody
23  from Polaris regarding either the Polaris vehicle
24  that was involved in the accident or the accident to
25  Mr. Anderson?

13

1      A.  Yeah.  One time I tried to get ahold of a
2  sales rep, I believe it was, and I don't remember
3  his name, at Polaris to get information to try to
4  get detailed information about the vehicles that we
5  purchased because a question had come up about doors
6  on the machines.  That seemed to be an issue.  So I
7  tried to see if we could get a detailed equipment
8  list or specification list for the machines to see
9  if doors were part of them.  And he refused to
10  provide the information.  Once he found out it was
11  part of a litigation, then he did not want to
12  cooperate or provide that.  He said that would be
13  provided through the attorneys.  So I didn't get
14  anywhere with that.  I didn't get any information.
15     Q.  Were you ever able to find out anything
16  having to do with the doors or the nets on that
17  Polaris vehicle?
18     A.  Not myself personally, no.
19     Q.  Do you have any personal knowledge outside
20  of the mission statement or the safety philosophy of
21  Wheeler or the e-mails that we've talked about
22  having to do with either the Polaris vehicle that
23  was involved in the accident or Mr. Anderson
24  himself?
25     A.  No.

**14**

1  Q.  Since you're in the accounting department,
2  what is the status of, I guess, the bills that
3  Wheeler submitted to BigRentz to pay?  Has BigRentz
4  paid any of those, to your knowledge?
5  A.  As far as I know, they have not paid the
6  repair bill for the machine.  We got an estimate
7  from Steadman's on what it would cost.  They sent us
8  an estimate and we passed that on, created an
9  invoice to bill for that.  Other than that, I don't
10 have any other information beyond that.
11 Q.  Is that August 3rd e-mail from Mr. Aguirre
12 to you that we were previously discussing, Bates 17,
13 is that the last e-mail communication, letter, or
14 fax, anything that you had with anybody from
15 BigRentz?
16 A.  Again, that was a while ago.  I don't
17 specifically remember having any more communications
18 with him.
19 Q.  How about anybody from BigRentz?
20 A.  Anybody else from BigRentz?  No, not that
21 I recall.
22 Q.  But after you received this e-mail, you do
23 remember forwarding this e-mail to other employees
24 of Wheeler, correct?
25 A.  Yes.  I believe I would have done that,

**15**

1  yeah, would have shared that with others.
2  Q.  When you learned that you would have your
3  deposition taken today, did you go back through your
4  e-mail account and try to find any e-mails or faxes
5  or letters having to do with this case or anything
6  that had to do with the case?
7  A.  No.  No, I didn't go back and review
8  everything.  I was only going to give a deposition
9  about the safety philosophy and the mission
10 statement.  So, no, I didn't prepare detail to
11 answer other questions.
12     MR. COUNTS:  Fair enough.  That's all the
13 questions I have for you, sir.
14     MR. ROSE:  I don't have any.
15     MR. ANJEWIERDEN:  I don't have any.
16     MR. BRADY:  I don't have any questions.
17 Thank you.  You may be excused.
18     (Signature requested.)
19 (Whereupon the taking of this deposition was
20 concluded at 9:20 a.m.)
21     * * *
22 Original transcript filed with Mr. Counts.
23     Reading copy submitted to Mr. Brady.
24
25

**16**

1         C E R T I F I C A T E
2  STATE OF UTAH        )
3  COUNTY OF _____  )
4     I HEREBY CERTIFY that I have read the foregoing
5  testimony consisting of 13 pages, numbered
6  from 3 through 15 inclusive, and the same is a true
7  and correct transcription of said testimony except as
8  I have indicated said changes on enclosed errata sheet.
9
10
11
12                    _____
                       STEVEN WEBB
13
14
15
16     Subscribed and sworn to at _____
17 this _____ day of _____ 2018.
18
19
20
21
22
                       _____
23                     Notary Public
24
25 My commission expires:
                           * * *

**17**

1         C E R T I F I C A T E
2  STATE OF UTAH        )
3  COUNTY OF SALT LAKE  )
4     THIS IS TO CERTIFY that the deposition of STEVEN
5  WEBB was taken before me, Shelly Wadsworth, a Registered
6  Professional Reporter in and for the State of Utah.
7     That the said witness was by me, before
8  examination, duly sworn to testify the truth, the whole
9  truth, and nothing but the truth in said cause.
10    That the testimony was reported by me in Stenotype,
11 and thereafter transcribed by computer under my
12 supervision, and that a full, true, and correct
13 transcription is set forth in the foregoing pages,
14 numbered 3 through 15 inclusive.
15    I further certify that I am not of kin or otherwise
16 associated with any of the parties to said cause of
17 action and that I am not interested in the event thereof.
18    WITNESS MY HAND this 15th day of June, 2018.
19
20
21            *Shelly Wadsworth*
               Shelly Wadsworth, RPR, CRR
22
23
24
25

## Exhibits

**Webb Exhibit 01** 6:4,5

### 1

**1** 6:4,5
**10** 8:2,4
**17** 14:12
**19** 4:8

### 2

**20** 4:10
**2016** 8:17 10:12
**21** 4:17 7:20
**29** 8:17

### 3

**3** 10:12
**3rd** 14:11

### 9

**9:20** 15:20

### A

**a.m.** 15:20
**abnormality** 7:2
**accident** 7:1 8:11,13 9:16 10:4,6 12:16,24 13:23
**accidents** 6:25
**account** 15:4
**accountant** 4:14,21,22
**accounting** 4:16,24,25 9:4,10 14:1
**addition** 8:6
**administration** 7:22
**Aguirre** 10:13,20 11:4,16, 25 14:11
**ahead** 7:9
**ahold** 13:1
**amount** 4:19
**Anderson** 3:13 8:11,14 12:25 13:23
**Andrew** 3:11
**ANJEWIERDEN** 15:15
**approximately** 9:11
**aspects** 6:24

**Associate** 7:3
**Associates** 6:22
**assume** 4:24
**attorney** 8:25 12:21
**attorneys** 3:12 4:7 13:13
**August** 10:12 14:11

### B

**Bachelor's** 4:22
**back** 6:13 9:9 10:5 12:10 15:3,7
**background** 4:20
**Basically** 5:25
**Bates** 14:12
**behalf** 3:3 4:4
**bell** 9:1
**Bigrentz** 8:19 10:16 14:3, 15,19,20
**bill** 14:6,9
**bills** 14:2
**bit** 9:8
**borrow** 6:13
**boss** 11:22
**Boy** 10:5
**Brady** 9:19 15:16,23
**brochure** 8:3,4
**broker** 5:6,11 8:24 12:19
**brought** 3:14,17 7:14
**business** 6:24
**BYU** 4:23

### C

**call** 11:10
**called** 3:3
**case** 4:5 5:13 8:7 10:25 15:5,6
**Certified** 5:1
**CFO** 11:18 12:5,12
**claims** 5:6,9
**Cody** 5:16 10:9 11:21
**communicate** 5:7,9
**communication** 14:13
**communications** 11:20 12:11 14:17
**company** 3:14,22 4:1 5:7, 10 7:3
**concluded** 15:20
**condition** 6:24

**consideration** 6:23
**considered** 7:1
**contact** 12:22
**continue** 12:18
**contradict** 11:5
**cooperate** 13:12
**copied** 10:17
**copy** 3:17 15:23
**copying** 10:21
**corporate** 4:3,9 8:6 9:7
**correct** 3:19 4:11 11:11 14:24
**corrected** 7:2
**cost** 11:1 14:7
**Counsel** 9:19
**Counts** 3:7,11 6:3 9:21 15:12,22
**cover** 5:20
**covers** 6:17
**CPA** 5:1,2
**created** 14:8
**creating** 6:8
**current** 4:13
**customers** 6:23

### D

**damage** 11:2
**day** 5:15 7:5
**day-to-day** 5:3
**decided** 5:19
**decision** 5:14
**degree** 4:23
**department** 4:16 7:24 8:23 9:3,4,6,9,13 14:1
**deposition** 3:18,24 5:22 15:3,8,19
**depositions** 10:8
**designated** 4:3,8
**detail** 15:10
**detailed** 13:4,7
**determine** 10:24
**discovery** 8:7
**discuss** 11:15
**discussing** 14:12
**document** 6:6,8
**documents** 7:12,14,16
**doors** 13:5,9,16
**downsizing** 9:8,12

**duly** 3:4
**duties** 5:3,5 7:19 8:24

### E

**e-mail** 8:18 9:14 10:16,20 11:7,15,23 12:5 14:11,13, 22,23 15:4
**e-mails** 8:8,10,12,15 11:21 12:10 13:21 15:4
**educational** 4:20
**employees** 12:6 14:23
**ensure** 7:4
**entail** 5:3
**entitled** 6:7
**equipment** 10:24 11:6,11, 25 12:7 13:7
**estimate** 14:6,8
**Etemad** 10:18
**exact** 4:22
**EXAMINATION** 3:6
**examined** 3:4
**excused** 15:17
**exhibit** 6:4,5
**existence** 8:4

### F

**facts** 9:17
**Fair** 7:6 15:12
**familiar** 10:2
**faulty** 10:24 11:5,11,25 12:7
**fax** 14:14
**faxes** 15:4
**filed** 15:22
**find** 12:19 13:15 15:4
**fine** 4:2
**forwarding** 14:23
**found** 13:10

### G

**gathered** 9:15 10:8
**gathering** 10:4
**general** 10:10
**give** 5:13 15:8
**giving** 10:7
**grab** 7:8
**guess** 14:2
**Guiding** 6:15,17

guys  4:1

**H**

handbook  6:1
handed  4:8 6:6
handling  8:15
held  4:15 11:1
hey  11:10
home  7:5

**I**

immediately  7:3
incident  10:6
include  8:24
individuals  10:21
information  5:7,8,9 9:15
  10:3,8,10,11 13:3,4,10,14
  14:10
injuries  6:25
injury  7:1
input  6:8
instructed  12:18
insurance  5:6,8,10 8:24
  12:19
Integrity  6:18
interface  5:6
interfacing  8:24 12:19
investigating  9:16
investigation  12:17
Involce  14:9
involved  8:11,14 10:7
  12:24 13:23
Ipsen  11:19 12:14,15
issue  13:6

**J**

Jeff  11:18 12:14
job  4:13 5:3 7:19 8:23
July  4:17 8:17

**K**

Kendall  3:12
knowledge  13:19 14:4

**L**

lawsuit  3:13

layoffs  9:7
learn  5:12
learned  15:2
legal  10:23
letter  14:13
letters  15:5
level  6:25
liable  11:1
list  13:8
litigation  13:11
long  4:15,18 5:21,23 7:25
  8:5 12:2
loop  11:19

**M**

machine  14:6
Machinery  3:23 8:23
machines  13:6,8
made  5:14
management  5:11
manager  10:9 11:21
mark  6:4
marked  6:5
matter  9:17
matters  8:25
meet  5:16
memory  10:1
mentioned  8:9
met  5:19
Mike  8:18,22 10:13,16
mission  4:9 6:2,11,12,19
  13:20 15:9
moral  7:4

**N**

Neda  10:18
nets  13:16
normal  6:25
notice  3:18
number  4:8

**O**

obligation  7:4
official  3:21
ongoing  6:24
Original  15:22
outcome  10:23

**P**

paid  14:4,5
pamphlet  6:7 7:7,11
paragraph  10:22
part  6:16 8:23 9:6 13:9,11
pass  12:20
passed  11:17 14:8
pay  14:3
people  10:7 11:18
person  7:5
personal  13:19.
personally  13:18
personnel  5:11 9:15 10:4,
  25 11:7
philosophy  4:11 6:20
  7:25 13:20 15:9
photographs  10:5
place  8:1 12:11
plaintiff  3:4,12
Polaris  12:23 13:3,17,22
position  4:15
possibly  11:20
prepare  7:12,17 15:10
preparing  5:21
previously  14:12
Principles  6:15,17
proceedings  10:24
pronounce  10:13
provide  13:10,12
provided  8:8 13:13
purchased  13:5
purposes  3:24
put  9:9

**Q**

question  7:15 13:5
questions  15:11,13,16

**R**

read  6:21
Reading  15:23
recall  14:21
received  14:22
record  3:8
refer  3:25 4:1
refresh  10:1

refused  13:9
relevant  9:17
remember  5:15 8:9,19,20
  9:18,25 10:3 11:9,13 12:2,
  4,9 13:2 14:17,23
renewals  5:9
rental  10:9 11:21
rep  13:2
repair  11:1 14:6
reply  11:7
report  10:6
reported  9:6
representative  4:4,9 8:7
representatives  12:20
requested  15:18
respond  11:4
response  11:24
returns  7:5
review  7:12,16 15:7
Rhoades  5:18 10:9,17
  11:21
ring  8:25
ROSE  15:14

**S**

safely  7:5
safety  4:10 6:2,15,18,20,
  21,22 7:1,20,22,24,25
  13:20 15:9
sales  13:2
send  11:7
sending  8:10,12
sentence  10:23
separate  9:5
Service  6:17
shared  11:18,20,23 15:1
sharing  12:5
show  9:23 10:12
signature  15:18
similar  8:3
sir  3:9 15:13
specific  6:11
specifically  6:10 8:20
  9:22 14:17
specification  13:8
spent  5:21
state  3:8
statement  4:9 6:2,11,12,
  16,19 13:20 15:10

**status** 14:2
**Steadman's** 14:7
**Steven** 3:2,10
**Stewardship** 6:18
**submitted** 14:3 15:23
**suggested** 10:25 11:6,12 12:1
**sworn** 3:4 5:13

**T**

**taking** 15:19
**talked** 13:21
**testified** 3:5
**testimony** 5:13
**thing** 7:23
**Thursday** 5:17,19
**time** 4:19 9:5 10:10 11:22 13:1
**title** 4:13
**today** 3:18 7:13,17 15:3
**topic** 4:10
**topics** 4:5 5:20
**transcript** 15:22
**Travelers** 5:10 12:21
**Travelers'** 12:21
**treasurer** 9:7
**treasury** 8:22 9:3,5,9,11, 12
**type** 7:23 8:3

**U**

**Ug-wire** 10:15
**unacceptable** 7:2
**understand** 3:15 4:5

**V**

**variety** 5:5
**vehicle** 12:23 13:17,22
**vehicles** 13:4

**W**

**water** 7:8
**Wayment** 10:17
**Webb** 3:2,10,11
**week** 5:14,15
**Wheeler** 3:23,25 4:1,4,10, 11,13,18 5:4,11 6:1,7,22 7:7,21 8:1,23 9:7,15 10:3,

21 11:16 12:1,6 13:21 14:3,24
**work** 3:14,22 8:22
**worked** 4:18
**working** 5:4
**works** 8:18
**writing** 9:18,25 10:20
**wrote** 10:16

**Y**

**years** 4:17 7:20 8:2,4 9:11 12:3



The Wheeler Way





Dear Associate,

Wheeler Machinery Co. is a company built on ideals—
ideals such as honesty, service, safety and fairness.
These are timeless principles. They were here before us,
and they will be a part of Wheeler long after we're gone.

We felt it would be helpful to collect these ideals into one
source that would be available to all Wheeler Associates.
We're calling this collection "The Wheeler Way". Hopefully,
you will find it useful and refer to it often.

Best Regards,

Rob Campbell                    Paul Campbell



## TABLE OF CONTENTS

Guiding Principles................................................6

Focus 2020........................................8-9

Leadership "Be" Competencies.....................10-11

Wheeler Associate Bill of Rights......................12

The Wheeler Customer Experience....................13

11 Commandments of Customer Service............ 14-15

5

## GUIDING PRINCIPLES

### SAFETY:
The safety of Wheeler Associates and customers is **always** the first consideration in all aspects of our business. The **ongoing** condition of zero accidents and injuries is our normal level of safety. Any accident or injury is considered an unacceptable abnormality that must be corrected immediately. The Company and every Associate has a moral obligation to do everything possible to ensure each person returns home safely every day.

### SERVICE:
Personally serve and help customers and Associates. Make their lives better.

### INTEGRITY:
Never compromise honesty. A good deal is a good deal only when it benefits both the customer and the company. Communicate openly and honestly and encourage others to do so. Work hard.

### STEWARDSHIP:
Be open to ideas, be difficult to provoke. Be considerate of Associates and their families, customers, suppliers and the community. Our goal is to provide a superior product and exceptional service to our customers, to provide a stable and satisfying livelihood for our Associates, to leave the company in as good or better shape than we found it.



**GUIDING PRINCIPLES**

## FOCUS 2020

### WHERE WE ARE GOING:

Wheeler Machinery Co. will be the top equipment distributor and services supplier in the western United States as measured by safety, market dominance and financial stability.

*The foundations of Focus 2020 are the Wheeler Guiding Principles of Safety, Service, Integrity and Stewardship.*

### HOW WE WILL GET THERE:

Wheeler Machinery Co. will be the safest Caterpillar Dealer in North America. We will dominate the markets we serve and we will be among the most financially stable Caterpillar Dealers in the western United States.

### WHAT WE NEED TO DO EACH DAY:

Our customers have a better experience working with us than with any of our competitors. Customers simply prefer to do business with us because we consistently exceed their expectations.

Prime product and product support coverage, programs and equipment technology make us our customers' most profitable option.

We are a completely safe, highly skilled, united and energized workforce.

**FOCUS 2020**

We are known for producing great leaders.

Powerful use of internal and external data drives great decision making.

We continual'y improve people, quality, velocity and cost through effective use of Caterpillar Production System (CPS).

We are a valued neighbor in the communities in which we live and work.

### HOW WE WILL KNOW WHEN WE GET THERE:

1. Working without accidents and injuries is our normal level of safety.
*Metric: Each year's LTIFR, RIFR and TIFR is better that the preceding best year, until the results are consistently 0.00.*

2. We dominate the markets we serve.
*Metric: Each year's market dominance metrics are better than the preceding best year, until the results are consistently at or above these levels:*

| | | | |
|---|---|---|---|
| *Retail PINS – CMI:* | $\geq 67$ | *Service DCAL:* | $\geq 50$ |
| *Retail PINS – BCP:* | $\geq 40$ | *Power Systems Total Revenue:* | $\geq \$70MM$ |
| *Rental Market Share* | | *Technology Systems Total Revenue:* | $\geq \$25MM$ |
| *POPS – Mining:* | $\geq 80$ | *Crushing Systems Total Revenue:* | $\geq \$40MM$ |
| *POPS – Non-mining:* | $\geq 60$ | | |

3. We are financially stable.
*Metric: Company Return on Assets $\geq 10\%$ each year.*

9

## LEADERSHIP "BE" COMPETENCIES

*Wheeler Machinery Leaders have a sincere and genuine desire to demonstrate the following attributes in all aspects of their work:*

### EMPATHY AND LISTENING
Engage and listen on a personal level. Be aware of and sensitive to the needs and circumstances of others. Take necessary measures to seek understanding first.

### HUMILITY & ACCEPTS RESPONSIBILITY
Be patient in your interactions; be inclusive and supportive of others. Seek out feedback and correction. Recognize the contributions and value of others. Be responsible for the success and failure of your own work, admitting mistakes and giving credit where it is due.

### RESPECTFUL
Show appreciation for each person's time, efforts, abilities and achievements. Treat others as you would be treated. Communicate in a polite and professional manner.

### INTEGRITY AND ETHICS
Demonstrate uncompromising honesty, fairness, goodness, honor and stand up for what is right. Demonstrate ethical behavior by following company and social standards in your work and decisions. Utilize personal integrity if an ethical standard has not been identified.



**LEADERSHIP "BE" COMPETENCIES**

### STEWARDSHIP & THINK COMPANY-WIDE

Leave the company better than you found it. Embrace changes, work efficiently and control costs. Care for the safety, health, development and success of each person. Understand and consider company-wide needs and impact when making decisions. Be willing to sacrifice for the good of the whole.

### SERVICE ORIENTED

Help and support others' needs. Work cooperatively, doing whatever task needs to be done to achieve success. Be motivated by the success of others over your own and give of your time, energy and talents.

11

## WHEELER ASSOCIATE BILL OF RIGHTS

***Every Wheeler Associate can expect:***

- The company will do all it can to provide a safe and positive work environment.
- To be treated with respect.
- To be treated fairly.
- To never be the object of any form of harassment or discrimination.
- To be compensated fairly for the work performed.
- To receive honest, timely and accurate information about the company's performance.
- To receive honest, timely and accurate feedback about his or her performance.
- To clearly understand what his or her supervisor expects.
- To receive regular coaching from supervisors about how to improve job performance.
- To receive a formal performance appraisal at least annually.
- To have exceptional job performance rewarded and recognized.
- To have poor job performance corrected quickly.
- To be given the tools, training and incentive to meet or exceed what is expected.



### THE WHEELER CUSTOMER EXPERIENCE

#### *What it means to us:*

- We do things right the first time.
- We respond to our customers' needs quickly, aggressively and positively.

#### *What it should mean to our customers:*

- I'm comfortable depending on Wheeler for all of my construction equipment and engine-related needs.

13

## 11 COMMANDMENTS OF CUSTOMER SERVICE



1. We honor our customers as welcome guests and serve them in the manner they desire.

2. We respect the time and priorities of our customers.

3. We personally serve and help our customers and strive to make their lives better.

14

## 11 COMMANDMENTS OF CUSTOMER SERVICE

4. Solving customer problems is the reason our company exists. We are not an equipment sales company. We are a service company that solves customer problems.

5. We never compromise honesty.

6. A good deal is a good deal only when it benefits both the customer and the company.

7. For every dollar a customer spends with us, we expect him or her to receive a dollar and ten cents in value.

8. We want our customers to prefer to do business with us.

9. When a customer completes a transaction with us, we want him or her to think, *"Wow! What a great experience! I wish all my suppliers were that good."*

10. By choosing to buy a Cat machine from Wheeler Machinery, our customers are entrusting to us their ability to make a living. That is a sacred trust we must honor.

11. We want our customers to retire rich, due in large part to purchasing Cat machines and being supported by Wheeler Machinery.

15

# Exhibit 6

ANDERSON

vs

POLARIS INDUSTRIES, INC

CODY RHOADES

June 06, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3                              *  *  *

 4    KENDALL ANDERSON,             )
                                    )  Civil No.
 5                  Plaintiff,      )  2:17-cv-00205-DN
                                    )
 6         v.                       )  Deposition of:
                                    )
 7    POLARIS INDUSTRIES, INC.      )  CODY RHOADES
      and BIGRENTZ, INC., a/k/a     )
 8    BIG RENZ, WHEELER CAT         )
      a/k/a WHEELER MACHINERY       )
 9    CO., BATTLEFROG a/k/a         )
      BattleFrog Obstacle Race      )
10    Series,                       )
                                    )
11                  Defendants.     )
                                    )
12                                  )

13                              *  *  *

14

15                          June 6, 2018
                            10:35 a.m.
16

17

18             Law Offices of Ray, Quinney & Nebeker
                36 South State Street, Suite 1400
19                    Salt Lake City, Utah

20                              *  *  *

21

22

23                       Shelly Wadsworth
                  - Certified Realtime Reporter -
24                Registered Professional Reporter

25
```

ANDERSON vs POLARIS INDUSTRIES, INC
June 06, 2018                                                          Cody Rhoades

2

```
 1            A P P E A R A N C E S
 2  For the Plaintiff:        Andrew G. Counts
                              THE TRACY LAW FIRM
 3                            4701 Bengal Street
                              Dallas, Texas 75235
 4
    For the Defendant         Rick L. Rose
 5  Polaris Industries:       RAY QUINNEY & NEBEKER
                              36 South State Street
 6                            Suite 1400
                              Salt Lake City, Utah 84111
 7
    For the Defendant         Michael G. Brady
 8  BigRentz and              BRADY LAW CHARTERED
    Wheeler Machinery:        2537 West State Street
 9                            Suite 200
                              Boise, Idaho 83702
10
    For the Intervenor        D. Gregory Anjewierden
11  Specialty Insurance Group: RENCHER | ANJEWIERDEN
                              460 South 400 East
12                            Salt Lake City, Utah 84111
13              * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              I N D E X
 2  EXAMINATION                                 PAGE
 3
    By Mr. Counts                                 4
 4
    By Mr. Rose                                  46
 5
    By Mr. Anjewierden                           58
 6
 7
    EXHIBITS
 8
 9  No. 1    Exhibit "A" - Topics               10
10  No. 2    Colored Photograph                 10
11  No. 3    Original Invoice                   12
12  No. 4    Steadman's Recreation Repair Order 12
13  No. 5    Triple-S Polaris Repair Order      12
14  No. 6    Polaris Owner's Manual             15
15  No. 7    Return to Ready Policies           15
             and Definitions
16
    No. 8    Colored Photograph                 25
17
18
19
20
21
22
23
24
25
```

4

```
 1            P R O C E E D I N G S
 2            CODY RHOADES,
 3  called as a witness by and on behalf of the
 4  plaintiff, being duly sworn, was examined and
 5  testified as follows:
 6            EXAMINATION
 7  BY MR. COUNTS:
 8      Q.   Would you state your name for the record,
 9  please.
10      A.   Cody Rhoades.
11      Q.   Mr. Rhoades, you sat through three of your
12  fellow corporate representative depositions today,
13  correct?
14      A.   Yes.
15      Q.   You understand the process, correct?
16      A.   Yes.
17      Q.   You understand that you're speaking on
18  behalf of Wheeler, its knowledge and its positions
19  in this case, correct?
20      A.   Correct.
21      Q.   Have you ever testified in a deposition
22  before?
23      A.   I have not.
24      Q.   What is your current age, sir?
25      A.   Forty-two.
```

5

```
 1      Q.   And how long have you worked for Wheeler?
 2      A.   Just over 20 years.
 3      Q.   After you graduated from high school, did
 4  you go to college?
 5      A.   I went to college while I was working at
 6  Wheeler just in the last -- I probably graduated
 7  four or five years ago.
 8      Q.   And my question may have been a poor one.
 9  I assume that you graduated from high school when
10  you were 18?
11      A.   Yes.
12      Q.   And then it looks like four years later
13  when you were 22 you started working for Wheeler.
14      A.   Yes.
15      Q.   In that four-year period of time, what
16  were you doing?
17      A.   I worked for Sandy City, which is a local
18  suburb of Salt Lake, for a year and a half.  And
19  prior to that I worked for Pacific West Company.  I
20  was a laborer.  I was operating skid steers, loading
21  trucks.  It's a pit operation type of thing.
22      Q.   You said you just obtained a degree.  What
23  is your degree in?
24      A.   My degree is business management,
25  bachelor's.
```

6

1    Q.    What is your current title at Wheeler?
2    A.    Current title as of Monday is paving
3    product sales representative.
4    Q.    What does that mean?
5    A.    So I'm the paving salesman for Wheeler
6    Machinery for the state of Utah.
7    Q.    And that's construction equipment,
8    correct?
9    A.    Correct.  Pavers, rollers, crack sealers
10   with highway stuff.
11   Q.    Prior to earning that job title, what were
12   you doing for Wheeler?
13   A.    Rental operations manager for the prior 14
14   years.
15   Q.    And so were you ahead of Mr. Wayment?
16   A.    Jessie worked for me, yes.  He was under
17   me, yes.
18   Q.    For 14 years prior to that you were the
19   head rental person.
20   A.    Yep.
21   Q.    And then the first six years at Wheeler
22   what did you do?
23   A.    Started out as a yardman, which is
24   basically a steam cleaner.  Checking machines in and
25   out, that type of thing.  And then I went in as a

7

1    transport driver.  And then we opened our Ogden
2    store.  I was up there for about a year and a half.
3    And then I come down and I was on the rental counter
4    for four years or so.  And then moved up to the
5    operations manager for the whole department.
6    Q.    Now, your other three co-corporate
7    representatives, they each had one or two or three
8    topics.  It looks like you had the bulk of
9    everything we're going to talk about today, fair?
10   A.    Yes.
11   Q.    When did you first learn that you were
12   going to be what I will say the main corporate
13   representative for Wheeler in this case?
14   A.    This last week, Thursday.
15   Q.    And how long have you spent preparing for
16   this deposition?
17   A.    I've been involved with it pretty much the
18   whole time as far as seeing e-mails back and forth.
19   I've been pretty much copied on every part of it
20   from the day it happened.  As far as preparation,
21   just yesterday.
22   Q.    How long did you spend yesterday
23   preparing?
24   A.    Thirty minutes.
25   Q.    Did you review any documents to prepare?

8

1    A.    Just the ones yesterday with . . .
2    Q.    With your attorney, with your counsel.
3    A.    Yes.
4    Q.    What documents were those that you looked
5    at?
6    A.    Looked at some pictures, the ones I have
7    today.  In case it come up, I got the Polaris
8    invoice when we originally bought them.  I have the
9    contracts, which we've already talked about.  I
10   think one of the questions talks about our policies
11   or that.  I brought that.
12         And then I've got the repair invoices.  So
13   any time our machines came back, these Rangers, we
14   would send them to a Polaris dealer.  That
15   particular machine had been out prior three times.
16   And so every time it came back, I have the records
17   of when we sent them to the Polaris dealerships.
18   One is Triple-S Polaris in Cedar City, and the
19   second one is Steadman's out in Tooele.  So I've got
20   the dates of all of that in case you need it.
21   Q.    We have several documents that you brought
22   with you today.  Aside from what you brought with
23   you today, did you look at any other documents to
24   prepare for today?
25   A.    Jessie had sent out an e-mail on Friday

9

1    because he kind of put everything together for me.
2    And I just looked at it just to make sure I could
3    remember because it had been two years.
4    Q.    What did that e-mail have with it?
5    A.    It had the contract.  It had pictures.  I
6    don't think it had Jones's -- what did Jon have?
7    Q.    The investigation report?
8    A.    It didn't have that.  It was an e-mail
9    that had three attachments.  It had the pictures,
10   the contracts, and I think that's it.
11   Q.    I want to make sure I understand.
12   A.    I think that's it.
13   Q.    I want to make sure I understand your
14   answer.  You've brought with you documents you
15   reviewed.
16   A.    Yeah.
17   Q.    Outside of the investigation report, which
18   may have been something you looked at, did you look
19   at anything else to prepare for today that you
20   haven't brought with you?
21   A.    No.
22   Q.    Well, let's mark what you've brought with
23   you.  Can we mark your deposition notice as Exhibit
24   1?
25   A.    Sure.

10

1       (Exhibit No. 1 was marked.)
2    Q.   These are all the topics that everybody
3    today has been talking about. What else did you
4    bring? The photographs. This is a new one, so to
5    speak. We'll mark that as 2.
6       (Exhibit No. 2 was marked.)
7    Q.   It's my understanding that Exhibit 2 is a
8    photograph of the subject Polaris Ranger 570, the
9    one that was involved in the accident, when it was
10   brand new. And it was delivered to Wheeler; is that
11   correct?
12   A.   Yeah. So every time these machines leave
13   or come back, we get pictures. The original job
14   that we bought all these for was a windmill project
15   down in Cedar City, just outside of Cedar City.
16   This was the picture of when it left Salt Lake to go
17   to Cedar City.
18   Q.   What day or date would that have been?
19   A.   Approximately March the 1st, 2nd,
20   somewhere in there.
21   Q.   Of what year?
22   A.   Of '15.
23   Q.   Now, you said that this vehicle had been
24   taken out three times prior or rented three times
25   prior, correct?

11

1    A.   Correct.
2    Q.   Do we have photographs of any of those
3    other times?
4    A.   I didn't bring them, but we have them.
5    Q.   You do have them.
6    A.   Yes.
7    Q.   So it sounds like you're telling me there
8    are a number of pictures of this subject Polaris
9    vehicle that Wheeler has that we may not have; is
10   that correct?
11   A.   Yes.
12   Q.   Well, let's start off. Wheeler purchased
13   the vehicle from somebody, correct?
14   A.   Yes.
15   Q.   Who did it purchase the vehicle from?
16   A.   From Polaris, the corporate Polaris.
17   Q.   And when was that?
18   A.   This is dated 2/12/15.
19   Q.   And I assume when it was purchased it had
20   zero miles on it.
21   A.   Correct. Brand new.
22   Q.   And it was purchased for $13,781.49?
23   A.   Correct.
24   Q.   And, obviously, there's other vehicles
25   that were purchased, and that's why it says $165,000

12

1    for the total price, correct?
2    A.   Yes.
3       MR. COUNTS: We'll mark this as Exhibit 3,
4    this original invoice.
5       (Exhibit No. 3 was marked.)
6    Q.   Does Wheeler still own this subject
7    vehicle today?
8    A.   Yes.
9    Q.   So ever since you took possession back in
10   February 2015, Wheeler has owned it.
11   A.   Yes.
12   Q.   What else did you bring today?
13   A.   I've got copies of the contracts.
14   Q.   Which we talked about in the last
15   deposition, correct?
16   A.   Yes. And then I've got the repair orders.
17      MR. COUNTS: We'll mark this repair order
18   as Exhibit 4 and this other repair order as Exhibit
19   5.
20      (Exhibit No. 4 was marked.)
21      (Exhibit No. 5 was marked.)
22      MR. BRADY: Just for the record, would you
23   identify 4 and 5.
24      MR. COUNTS: Yes. Exhibit 4 says, "Repair
25   Order Due: $5,350.49. Date promised: 12/22/2015."

13

1    It says at the top "Steadman's Recreation, Inc."
2    It's a two-page document. Is that correct, sir?
3       THE WITNESS: Yes.
4       MR. ROSE: That one is before the
5    accident?
6       MR. COUNTS: Yes.
7       MR. BRADY: All of these are before the
8    accident.
9       MR. ROSE: I see. Thank you.
10      THE WITNESS: This particular one, it's
11   not all complete. See, 2 of 4? So this particular
12   piece right here is the one that was for the $2,141
13   for the subject machine.
14   Q.   What are the other two pages that are not
15   here?
16   A.   We sent four of them out to be repaired.
17   Q.   Other vehicles.
18   A.   Yes. More of this, but for the particular
19   machine.
20   Q.   And what I've marked as Exhibit No. 5 to
21   your deposition says, "Repair Order. Today's Date:
22   12/7/2015." It's got "Triple-S Polaris Cedar City"
23   at the top. It's a two-page document. I don't have
24   a number or anything else that would identify it.
25   It does say at this time on 12/7/2015 that there

14

1    were 1,668 miles on it. Is that correct?
2    A.    249 hours, 1,668 on the miles.
3    Q.    If that date is correct, December of 2015,
4    in the 10 months since it was purchased it had put
5    1,668 miles on it; is that correct?
6    A.    Correct. And Exhibit 5 was the first time
7    it got repaired. And Exhibit 4 was the one where it
8    got repaired prior to going to BigRentz.
9    Q.    Fair enough. Now, you also brought with
10   you the owner's manual for the subject Polaris
11   vehicle, correct?
12   A.    Correct.
13   Q.    It's over a hundred pages, I believe.
14   It's somewhere in the neighborhood of a hundred
15   pages. Does that sound right?
16   A.    Yes.
17         MR. ROSE:   That's not a copy of the actual
18   manual, right?
19         MR. COUNTS:   Well, it says, "2015 Polaris
20   Ranger ETX Range 570 Owner's Manual for Maintenance
21   and Safety."
22         MR. ROSE:   I understand. But it's not the
23   one that was in the vehicle.
24         MR. COUNTS:   I'll ask.
25   Q.    Was it the one that was in the vehicle?

15

1    A.    No. It's still in it.
2          MR. BRADY:   This is one produced by you in
3    this case.
4          MR. COUNTS:   We'll mark this Exhibit 6,
5    the Polaris Owner's Manual.
6          (Exhibit No. 6 was marked.)
7    Q.    What else did you bring?
8    A.    This is a Return to Ready Policies and
9    Definitions. It's, basically, every step in the
10   process what their responsibilities are. And then
11   on the back we just want to make sure everybody
12   knows what a quality reliable machine is, so we put
13   that definition in there as well. We want to rent
14   machines. We just want them to know if you're
15   paying for this yourself, would you be happy, type
16   of thing.
17         MR. COUNTS:   Let me mark this as Exhibit
18   7.
19         MR. ROSE:   What are we calling that?
20         MR. COUNTS:   It says, "Return to Ready
21   Policies and Definitions." It's a two-page
22   document.
23         (Exhibit No. 7 was marked.)
24   Q.    Would you describe what Exhibit 7 is.
25   A.    It's a Return to Ready Policies and

16

1    Definitions. It just has the counterman's
2    responsibilities, the yardman's responsibilities,
3    the inspector's responsibilities, the shop's
4    responsibilities, the definition of a reliable and
5    quality rental machine, and then our policy for
6    servicing equipment.
7    Q.    Any other documents?
8    A.    That's it.
9    Q.    Now, earlier you heard Mr. Webb in his
10   short deposition when he talked about what the
11   safety philosophy of Wheeler was. And he produced
12   The Wheeler Way brochure. Have you seen that
13   before?
14   A.    Yes.
15   Q.    You understand what it says, correct?
16   A.    I do.
17   Q.    You understand that Wheeler said it has a
18   moral obligation to ensure each person returns home
19   safely every day, correct?
20   A.    Correct.
21   Q.    And any accident or injury is considered
22   an unacceptable abnormality that must be corrected
23   immediately, correct?
24   A.    It absolutely is. Wheeler takes safety
25   extremely serious. We were either the top or always

17

1    the top one or two CAT dealers in the whole nation
2    for safety.
3    Q.    Now, the owner's manual that came with the
4    subject Polaris ATV, have you ever read that before?
5    A.    No.
6    Q.    Has anybody from Wheeler ever read it   .
7    before?
8    A.    I have no idea.
9    Q.    Well, you understand in the owner's manual
10   that there are a number of warnings and things that
11   Polaris is telling people about safety with respect
12   to that subject Polaris vehicle, right?
13   A.    Yes.
14   Q.    And Wheeler would agree that riding an ATV
15   like the subject Polaris vehicle can be a dangerous
16   activity, correct?
17   A.    Sure.
18   Q.    And that it's important for the actual
19   user of the vehicle to understand that, correct?
20   A.    Me growing up, probably not so much. I
21   mean, it's pretty common to me.
22   Q.    I'm talking about Wheeler's understanding.
23   A.    I'm here representing myself.
24   Q.    You're representing Wheeler, though.
25   You're the voice of Wheeler. You understand that?

18

1    A.   I would assume -- well, I'm not going to
2    assume. Yes.
3    Q.   Now, Wheeler supplied the owner's manual
4    with the vehicle, correct?
5    A.   100 percent, yes.
6    Q.   What did Wheeler say -- well, let me back
7    up. We heard earlier in the last deposition that
8    Wheeler delivered the vehicle directly to
9    BattleFrog, correct?
10   A.   Yes.
11   Q.   And that BigRentz never actually had
12   physical possession of the vehicle, correct?
13   A.   Right.
14   Q.   Do you know if BigRentz ever did any
15   maintenance at all while it was at the BattleFrog
16   place?
17   A.   Not to my knowledge.
18   Q.   Did Wheeler do any maintenance while it
19   was at the BattleFrog place?
20   A.   No, we did not.
21   Q.   But Wheeler was renting to BigRentz and
22   BigRentz was renting to BattleFrog, but Wheeler
23   shipped it directly to BattleFrog, right?
24   A.   Correct.
25   Q.   Who was the person or persons who received

19

1    it from BattleFrog?
2    A.   I don't know.
3    Q.   Were you present when that occurred?
4    A.   No.
5    Q.   Who was present when that occurred?
6    A.   I have no idea.
7    Q.   Since I think you were the head of the
8    rental department at the time, you instructed
9    somebody to deliver it to BattleFrog.
10   A.   So what happened is BigRentz called
11   Jessie. Jessie set it up. They probably paid us
12   our transport to deliver it.
13   Q.   Who is Jessie?
14   A.   Jessie is the guy you deposed right before
15   me. He took the original call from BigRentz. We
16   don't know who BattleFrog is. BigRentz specializes
17   in renting equipment to stuff exactly like that
18   where people go from town to town to town. That's
19   kind of their specialty. So they called Jessie and
20   asked if we had any ATVs. He came up with two. We
21   sent two of them out there. I'm assuming it was our
22   truck. I'd have to look. Yes, we hauled them out
23   there. Sometimes we use contract haulers. I do not
24   know who from BattleFrog actually received them in.
25   Q.   Is there any documentation that says XYZ

20

1    received these vehicles?
2    A.   No. That is not one of our policies.
3    Q.   There's no policies or procedures for when
4    Wheeler delivers a vehicle to a customer or a
5    customer who is renting from one of your customers
6    as to what is --
7    A.   That they have to sign for it once it hits
8    the job site, no.
9    Q.   When Wheeler delivers, in this instance, a
10   UTV, does Wheeler say anything about be safe, read
11   the owner's manual, or do this or that or the other?
12   A.   If requested.
13   Q.   If not requested, they don't.
14   A.   Correct. We rent to contractors. They
15   know how to run this stuff.
16   Q.   But you understood, in this case, that you
17   were not giving the Polaris vehicle to a contractor,
18   right? You were giving it to the ultimate consumer,
19   right?
20   A.   Right.
21   Q.   You were bypassing the contractor.
22   A.   We didn't rent it to BattleFrog. We
23   rented it to BigRentz. In any opinion, it was their
24   responsibility to share that information had the
25   customer asked for it.

21

1    Q.   That BigRentz should have informed
2    BattleFrog of whatever safety, correct?
3    A.   Yeah.
4    Q.   Even though BattleFrog received it
5    directly from Wheeler, correct?
6    A.   They're in California. I mean, they're
7    not going to send a truck to go pick it up.
8    Q.   Who's in California?
9    A.   BigRentz.
10   Q.   I'm just saying, was there any employee
11   that came from California to take possession and
12   then transfer possession to BattleFrog?
13   A.   No. They never do.
14   Q.   But I thought I heard earlier from one of
15   the testimonies that you'd only rented to BigRentz
16   one time before this actual Polaris vehicle was
17   delivered. Is that correct?
18   A.   I'm not sure. It sounds correct. I'd
19   heard of it.
20   Q.   If you would, let's turn to the Polaris
21   owner's manual, which is Exhibit 6. So prior to
22   Wheeler delivering the Polaris ATV directly to
23   BattleFrog, the owner's manual had been in Wheeler's
24   possession for, what, 15 months or so, correct?
25   A.   Correct.

ANDERSON vs POLARIS INDUSTRIES, INC
June 06, 2018                                                          Cody Rhoades

22

1    Q.    But you're not aware of whether anybody
2  from Wheeler ever actually looked in that owner's
3  manual, correct?
4    A.    I have no idea.
5    Q.    Let's turn to page 7. I'm sorry, page 5.
6  It's Bates labeled page 7 on my copy, but it's page
7  5. It says Introduction at the top, right?
8    A.    Correct.
9    Q.    And you see the warning symbol, right?
10   A.    Yes.
11   Q.    It says, "Failure to follow the warnings
12  contained in this manual can result in severe injury
13  or death," correct?
14   A.    Correct.
15   Q.    And Wheeler would have known that at the
16  time it rented it to BattleFrog, right?
17   A.    Correct.
18   Q.    If you go down to I think it's the fourth
19  bullet point from the bottom, it says, "Never permit
20  a guest to operate this vehicle unless the guest has
21  read this manual and all product labels," correct?
22   A.    Correct.
23   Q.    Again, Wheeler never told BattleFrog to
24  read the manual, correct?
25   A.    No.

23

1    Q.    And Wheeler never told BigRentz to make
2  sure BattleFrog read the manual, correct?
3    A.    Correct.
4    Q.    The bullet point down from that, it says,
5  "Always use the cab nets (or doors) while riding in
6  this vehicle." You see that, right?
7    A.    I do.
8    Q.    Then down from that, it says, "Always wear
9  a helmet, eye protection, gloves, long-sleeve shirt,
10  long pants and over-the-ankle boots," correct?
11   A.    Correct.
12   Q.    None of the warnings like this were ever
13  communicated to BattleFrog or BigRentz, correct?
14       MR. BRADY: Counsel, I guess the witness
15  can testify as to what his knowledge is in this
16  regard, but the manual was in the vehicle. And I
17  guess whether it was communicated by BigRentz or
18  Wheeler, where are you going with this?
19       MR. COUNTS: If we can go off the record.
20       (Off the record.)
21   Q.    You've been identified to be the voice of
22  Wheeler with respect to several topics, one of which
23  is any and all steps or procedures that Wheeler
24  should take, takes, or has in place to ensure
25  safety, correct? That's number 12, right?

24

1    A.    Yes.
2    Q.    16, Wheeler's knowledge and/or belief as
3  to what its moral or ethical obligations were, if
4  any, to warn people regarding dangers, correct?
5    A.    Yes.
6    Q.    18, what its moral or ethical obligations
7  were to provide a safe vehicle, including, but not
8  limited to, properly inspecting and maintaining
9  Polaris vehicles, warning those using the Polaris
10  vehicles of hazards, and providing needing safety
11  equipment, training, and/or assistance to assure
12  safety, correct?
13   A.    Correct.
14   Q.    Page 8 of the manual says, "The driver and
15  all passengers must wear helmet, eye protection,
16  gloves, long-sleeve shirt, long pants,
17  over-the-ankle boots and seat belt at all times,"
18  correct?
19   A.    Correct.
20   Q.    Let's look at page 10. "Warning labels
21  have been placed on the vehicle for your
22  protection." You see that, correct?
23   A.    Correct.
24   Q.    "If any label becomes illegible or comes
25  off, contact your Polaris dealer to purchase a

25

1  replacement. Replacement safety labels are provided
2  by Polaris at no charge." Is that correct?
3    A.    Correct.
4    Q.    You see that Polaris is telling you that's
5  a safety label, right?
6    A.    Correct.
7    Q.    And we've already heard before that
8  Wheeler believes it has an obligation to ensure
9  safety, right?
10   A.    Correct.
11       (Exhibit No. 8 was marked.)
12   Q.    I'll show you what's Exhibit 8. You see
13  that picture?
14   A.    Yes.
15   Q.    And you see that's a photograph of the
16  subject Polaris vehicle, right?
17   A.    I think.
18   Q.    I'll represent to you that is a picture
19  that was yesterday produced during the deposition as
20  being a picture of part of the Polaris vehicle,
21  okay?
22   A.    Okay.
23   Q.    Now, it looks to me like there's a vent
24  that's making that warning somewhat illegible.
25  Would you agree with me?

26

1    A.   It appears that way, yes.
2    Q.   Who put that vent there?
3    A.   I have no idea.
4    Q.   Was that vent there when Wheeler delivered
5    it?
6    A.   I'm sure it came that way from the
7    manufacturer.  We wouldn't have put a vent in, I
8    don't think.  We ordered them with heaters.  I don't
9    know if that's part of the heater or what.
10   Q.   I want to make sure I understand what
11   you're saying.  It's Wheeler's position that that
12   vent came with the vehicle when Wheeler purchased it
13   from Polaris; is that correct?
14   A.   To my knowledge, yes.
15   Q.   So Wheeler is not the one who made that
16   warning somewhat illegible, correct?
17   A.   Correct.
18   Q.   Let's turn to page 16 of the owner's
19   manual.  You see there under the heading Operating
20   Without Instruction, there's a sentence that says,
21   "All operators must read and understand the Owner's
22   Manual and all warning and instruction labels before
23   operating the vehicle."  Correct?
24   A.   Correct.
25   Q.   The next page, Operator Safety.  "Cab

27

1    Nets.  Riding in this vehicle without using the cab
2    nets (or doors, if equipped) increases the risk of
3    serious injury or death in the event of an accident
4    or rollover.  Always use the cab nets (or doors)
5    while riding in this vehicle."  Do you see that?
6    A.   I do.
7    Q.   Now, when the vehicle came from Polaris,
8    it had cab nets or doors, correct?
9    A.   It had doors.
10   Q.   When it was delivered --
11   A.   We never did get nets.  We ordered them
12   with doors.
13   Q.   Fair enough.  When the vehicle was
14   delivered to BattleFrog, it had no doors, correct?
15   A.   Correct.
16   Q.   Who took the doors off?
17   A.   I believe it was the prior rental.
18   Q.   Who was the prior rental?
19   A.   That particular one, I believe it was
20   Questar Gas.
21   Q.   Who is Questar Gas?
22   A.   They're the local gas company.
23   Q.   What were they renting the ATV for?
24   A.   I'm not sure.
25   Q.   When did they rent it?

28

1    A.   4/25/16 to 4/28/16, three days.  And I'm
2    not sure exactly.  Most of the time when these
3    things come back they come without the doors.  I
4    mean, they literally slide off.  It's extremely
5    simple.  They're a canvas door.  I mean, you can
6    roll the windows down.  They're plastic.  A lot of
7    times they came back without the doors on them.
8    Many times we had to replace doors.
9    Q.   Is there any documentation, anything
10   written, any photographs that show that when Wheeler
11   got this vehicle back from the entity it had rented
12   to that the doors had been removed?
13   A.   Correct.  We have all that.
14   Q.   You do have all that?
15   A.   Yes.  From prior rentals?
16   Q.   Yes.
17   A.   We do.
18   Q.   Have you seen that?
19   A.   I'm sure I can find them.  We take
20   pictures of everything.
21   Q.   In preparing for this deposition, did you
22   look at that?
23   A.   I looked at the pictures when it left
24   without the doors.
25   Q.   In preparing for this deposition, did you

29

1    try to determine who had removed the doors?
2    A.   I didn't.
3    Q.   Why is it you believe that the prior
4    rental is who had removed them?
5    A.   It had to have been.  I can prove it.
6    Q.   How would you go about proving it?
7    A.   I would go look at pictures.
8    Q.   That Wheeler has.
9    A.   Absolutely.  I can tell exactly who
10   brought it back.  I'm not a hundred percent sure
11   because I didn't research it.
12   Q.   But Wheeler understands that this is a
13   serious safety hazard to ride in the vehicle without
14   doors, right?
15   A.   No.
16   Q.   Well, Polaris is telling people it's a
17   serious safety hazard to ride without doors.  Is
18   Wheeler's position that Polaris is wrong about that?
19   A.   No.  They're canvas doors.
20   Q.   Understood.  It's what Polaris says in the
21   manual.
22   A.   I understand that.
23   Q.   Does Wheeler agree with that statement?
24   A.   The machine left without the doors.  Move
25   on.

30

1    Q.   In any event, does Wheeler agree with what
2  Polaris says in the owner's manual about doors are
3  necessary for safety?
4    A.   I have no idea.
5    Q.   Well, you're the voice of Wheeler. I want
6  to know what Wheeler thinks.
7    A.   You want to know what I think?
8      MR. BRADY: He's telling you what Wheeler
9  thinks. He has no idea.
10   A.   I don't know. You can move them and shake
11  them like this.
12   Q.   Before Wheeler delivers a vehicle, in this
13  case to BattleFrog, does Wheeler conduct an
14  inspection of the vehicle?
15   A.   So on these particular units we had the
16  Polaris dealers conduct the inspections.
17   Q.   So the answer to my question is yes.
18   A.   Yes.
19   Q.   And is there documentation of what is done
20  during these inspections?
21   A.   Yes. Well, it's on the bills exactly what
22  they did. As soon as we'd get them back, we'd load
23  them up and take them to a Polaris dealership. They
24  would go through them completely and tell us
25  everything that was wrong with them, you can see.

31

1    Q.   But you just told me that this Polaris,
2  the subject Polaris vehicle, had been rented about
3  two weeks before BattleFrog got it, right, or a week
4  before?
5    A.   It was a three-day rental right before or
6  six or eight days before that. The long rental came
7  back on 12/14/15.
8    Q.   When was the last inspection of this
9  vehicle that was done before BattleFrog received it?
10   A.   It would have been this one. I paid the
11  bill on 5/4, and they took it on 5/6. So this one I
12  paid it. We'd have to go back and look at exact
13  dates. I'm pretty sure it was sometime after
14  December 15th of '15.
15     MR. BRADY: You're looking at Exhibit 4?
16     THE WITNESS: Exhibit 4, yes.
17   Q.   Correct me if I'm wrong. The last time
18  this vehicle was inspected before BattleFrog took
19  possession was back in December of 2015?
20   A.   Somewhere around there.
21   Q.   But you see on that same page, it says,
22  "Failure to inspect and verify that the vehicle is
23  in a safe operating condition before operating
24  increases the risk of an accident. Always perform
25  the pre-ride inspection before each use of your

32

1  Ranger to make sure it's in safe operating
2  condition." Right?
3    A.   Correct.
4    Q.   But that wasn't done before BattleFrog got
5  it, right?
6    A.   We sent it out on one three-day rental
7  from the last time a Polaris dealership laid their
8  eyes on it. The inspection, it would have been a
9  yardman physically looking at it, making sure it
10  stopped and steered, maybe checking the fluids, that
11  type of thing.
12   Q.   So who was the yardman who inspected this
13  vehicle before BattleFrog took possession?
14   A.   I'd have to look and see who received it.
15   Q.   Is there some documentation that would
16  show that somebody inspected it before BattleFrog
17  received it?
18   A.   A visual. Yes, a visual. I do have that,
19  yes. I don't have it with me, but I can get it for
20  you.
21   Q.   Have you seen that in preparing for the
22  deposition?
23   A.   No.
24   Q.   When was the last time you saw that?
25   A.   Probably two years ago when this first

33

1  happened. I don't know. It would be the prior
2  receiving. So our yardmen do a shipper when
3  anything leaves, and they do a receiving when
4  anything comes back is what I'm referring to. And
5  they have to put their initials on it and it time
6  stamps it.
7    Q.   Let's get the timeline straight, if we
8  can. The three-day rental that somebody had before
9  BattleFrog received it, what were those dates again?
10   A.   4/25/16 to 4/28/16.
11   Q.   When did BattleFrog receive it?
12   A.   5/6/16.
13   Q.   So BattleFrog got it eight days after it
14  was returned to Wheeler, correct?
15   A.   Correct.
16   Q.   Now, is there any documentation that
17  you've seen of any inspection having been done from
18  4/28 to 5/6?
19   A.   Honestly, I don't think I've seen it, but
20  I can get it.
21   Q.   If it exists, you can get it.
22   A.   Correct. What it will look like is a
23  receiving. It will be the shipper when it left on
24  4/25 and it will be a receiving on 4/28. It will
25  have a guy's initials. It will say here's how many

34

1  gallons of fuel, here's how many hours it had.
2  We'll have pictures. It will say, hey, I noticed
3  this or I noticed this or I topped off this or
4  anything like that.
5      Q.   Are you aware of how many miles the
6  Polaris had on it at the time of the accident?
7      A.   I can guess. But, no, I'm not a hundred
8  percent sure. I can get it, though.
9          MR. BRADY:  We have pictures of it.
10         MR. ROSE:  52 is the one with the
11  photograph on it. It's hard to read, though.
12     Q.   It looks like it says in this photograph
13  2296. Does that look right?
14     A.   That looks right.
15     Q.   In the 15 months that Wheeler owned it
16  before the accident, almost 2,300 miles had been put
17  on it, correct?
18     A.   Correct.
19     Q.   Now, did Wheeler itself ever conduct any
20  maintenance or repairs on the subject Polaris
21  vehicle?
22     A.   No.
23     Q.   Every maintenance or repair was conducted
24  by an authorized Polaris dealership?
25     A.   Correct.

35

1      Q.   What are the names of each dealership that
2  conducted maintenance or repairs?
3      A.   Triple-S Polaris out of Cedar City, Utah
4  and Steadman's Recreation out of Tooele, Utah.
5      Q.   Those are the only two?
6      A.   Those are the only two.
7      Q.   Does Wheeler have the records of each
8  maintenance or repairs that either of those two
9  Polaris dealers did at any point in time?
10     A.   We just have the invoices, Exhibits 4 and
11  5, of what they've done.
12     Q.   I want to make sure I'm clear on this.
13  Exhibits 4 and 5 are the only maintenance or repair
14  records of any type that Wheeler has that pertains
15  to this specific vehicle.
16     A.   Correct.
17     Q.   And no other maintenance or repairs was
18  done by anybody.
19     A.   No.
20     Q.   Is that correct?
21     A.   That's correct. Other than just washing
22  and that type of stuff. But it's not documented.
23     Q.   Are you familiar that Polaris has a
24  service manual for that 570 and it has specific
25  times, hours or miles where maintenance needs to be

36

1  done?
2      A.   Correct. So our policy is when they're
3  out on rent, the customer services their own
4  machines. The first rental on this thing was six
5  months. That customer is required to take care of
6  that.
7      Q.   Does Wheeler maintain records of
8  maintenance that these customers are doing?
9      A.   Yes. Typically, yes.
10     Q.   With respect to this specific vehicle, do
11  you have those records?
12     A.   On this specific vehicle, no.
13     Q.   You don't have any other records other
14  than 4 and 5.
15     A.   Because you have to open up the job for it
16  to track it. Where the Polaris dealerships are
17  doing that, it does not hit our system to track. We
18  can go back to that Polaris dealership because they
19  maintain all of that information. I could go back
20  to Steadman's right now and say, "Tell me the
21  history of this VIN number, tell me what you did to
22  it, tell me what the hours were, tell me all of
23  that." They can give me that information.
24     Q.   In the last two years, has Wheeler ever
25  done that?

37

1      A.   In the last two years, no.
2      Q.   And when you say the customer is
3  responsible for the maintenance, that would be a
4  company like BigRentz, correct?
5      A.   Correct.
6      Q.   Not necessarily the end user or in this
7  case BattleFrog, right?
8      A.   Correct. It would be, in my opinion,
9  BattleFrog.
10     Q.   Well, BattleFrog didn't rent from you.
11  BigRentz rented from you, right?
12     A.   Correct.
13     Q.   So it would have been BigRentz's
14  responsibility.
15     A.   I'm sure they have the same policy. How
16  are they going to maintain it?
17     Q.   But vis-a-vis Wheeler, Wheeler's position
18  is BigRentz was responsible. BigRentz's position
19  may be the customer is responsible. But with
20  respect to Wheeler, Wheeler's position is that
21  BigRentz is responsible.
22     A.   This particular rental was 10 days. It
23  was supposed to be two weeks or something. It's not
24  going to get serviced in a 10-day rental. There's
25  that conversation. Had it been a six-month rental,

38

1  we would say, hey, when this thing is due for
2  service, here's a Polaris dealer, here's where you
3  take it, here's a phone number.
4      Q.   I understand that.  But yesterday
5  Mr. Anderson, the plaintiff in this case, testified
6  that he had seen somebody doing some sort of
7  maintenance or repair work on the Polaris vehicle
8  before he rode it.  Did you know that?
9      A.   No.
10     Q.   Now, I'm not saying that maybe he could be
11 mistaken, but that's what he testified to yesterday.
12 You don't know anything about that?
13     A.   It got there on 5/6 and the accident
14 happened on five . . .
15     Q.   12 or something, 5/14.
16         MR. BRADY:  5/14.
17     A.   I know it wasn't a Wheeler employee.  I
18 would have that record if it was.
19     Q.   And you haven't received anything from
20 BigRentz where they said they did anything; is that
21 right?
22     A.   Correct.
23     Q.   So I want to make sure we're on the same
24 page.
25     A.   Yep.

39

1      Q.   I thought I had seen a document somewhere
2  where it had said that Wheeler had sold it to
3  BigRentz.  Have are you ever seen that?
4      A.   Huh-uh.
5      Q.   I was confused about that because I
6  thought you guys had rented it.  I will look and see
7  if my memory is accurate.
8          This is what I'm talking about.  See this
9  says "Wheeler CAT" on it?  It says, "Sold to:
10 BigRentz."  That just means rent it?
11     A.   Yeah.  That's on every one of them.
12     Q.   I wanted to clear that up.
13     A.   Yep.
14     Q.   Where did BattleFrog take possession of
15 the vehicles at?
16     A.   At Miller Motorsports Park.
17     Q.   Where the actual racetrack or course was
18 going to be held, right?
19     A.   Correct.
20     Q.   Did Wheeler know what BattleFrog was going
21 to be doing out there?
22     A.   I don't think so.
23     Q.   Do you remember the name of the driver
24 that delivered it?
25     A.   I don't.  I could find out.

40

1      Q.   There are records that are kept that say
2  that, right?
3      A.   Yeah.
4      Q.   So BigRentz is a California company,
5  right?
6      A.   Correct.
7      Q.   And BattleFrog is a Florida company,
8  right?
9      A.   I don't know.
10     Q.   You don't know.
11     A.   I don't know.
12     Q.   I'll represent to that they're a Florida
13 company or they were a Florida company.  Wheeler is
14 a Utah company?
15     A.   Correct.
16     Q.   Wheeler knows more about the terrain of
17 Utah than a Florida company or California company;
18 is that fair?
19     A.   Fair.
20     Q.   Where this accident happened where the
21 Polaris vehicle was delivered to, how would you
22 describe the terrain out there?
23     A.   Flat.  Racetrack pavement, asphalt.  I've
24 been there.  It's flat.
25     Q.   Have you been to the scene of the

41

1  accident?
2      A.   I've been to the track.  I didn't see
3  exactly where it was at on the property.
4      Q.   In a lot of the pictures that we see that
5  a Wheeler investigator took, Mr. Jones, I believe,
6  you can see in these pictures where the accident
7  apparently happened that looks like a pretty
8  desolate area; is that fair?
9      A.   It's pretty dry out there, yes.
10     Q.   And Wheeler employees had been in areas
11 like this before, right?
12     A.   I'm sure.
13     Q.   And Wheeler would have known about any, I
14 guess, possible gopher holes or something, correct?
15 Right?  Is that fair?
16     A.   Fair.
17     Q.   You wouldn't expect a Florida company to
18 know about gopher holes, would you?
19     A.   Why not?
20     Q.   Are there gophers in Florida that make
21 holes?
22     A.   I have no idea.
23     Q.   Fair enough.  Have you had any
24 conversations -- I'm not talking about e-mails, but
25 I'm talking about in-person conversations or phone

42

1    conversations -- with any BigRentz employees about
2    what happened?
3        A.   I don't honestly remember.  I want to
4    say -- I don't think I talked to anybody from them.
5    I think Jessie was our contact.  And I think Steve
6    did, too.  I don't think I ever did.
7        Q.   You don't remember talking to anybody from
8    BigRentz?
9        A.   Nope.
10       Q.   You were a part of some e-mail chain?
11       A.   I think I got copied on most everything.
12       Q.   Did you take the time to read these
13   e-mails?
14       A.   Yeah.  I was concerned, yeah.
15       Q.   Who was the point man who was talking to
16   Mr. Aguirre or somebody else at BigRentz?  Who was
17   the main man?
18       A.   I don't know who Mr. Aguirre is.  I'm
19   assuming whoever would set it up would have talked
20   to Jessie.  And then once the accident happened, it
21   probably would have went to Steve.  But I was not on
22   the communication with BigRentz.  It was one of them
23   two.  Jessie prior to the accident.  Steve after the
24   accident.
25       Q.   What did we say earlier, there was

43

1    something like 10 to 15 ATVs or UTVs that Wheeler
2    has and that they rent to people; is that correct?
3        A.   Twelve.  On our original order we had 12.
4    I want to say we had a total of around 16 in our
5    fleet is what we had.
6        Q.   You had then and you have around that same
7    amount now.  Because you still rent to people.
8        A.   We have not that many.  We still have a
9    few, though.  I switched jobs.  I've been in
10   training since January, so I've been out of the loop
11   since then.
12       Q.   Has Wheeler made any changes to any of its
13   policies or procedures when it rents to people or
14   when it transfers vehicles or anything that's
15   occurred since this accident?
16       A.   No.
17       Q.   What is Wheeler's document retention
18   policy?
19       A.   It's, I want to say, 10 years.  It's
20   either seven or 10 years electronically.
21       Q.   And Wheeler would agree that it has an
22   obligation to furnish UTVs that are well-maintained,
23   correct?
24       A.   Absolutely.
25       Q.   And that Wheeler has to follow the

44

1    manufacturer's recommended requirements, correct?
2        A.   Correct.
3        Q.   And that Wheeler either has to personally
4    inspect it or have somebody else inspect it to make
5    sure it's a safe vehicle before they rent it,
6    correct?
7        A.   Yes.
8        Q.   Have you ever seen the actual Polaris
9    vehicle that was involved in this accident in
10   person?
11       A.   No, not since the accident.  I mean, I
12   probably seen it when they first got here just
13   because it was new to us and I wanted to go check
14   them out.  So I probably seen this particular one
15   when it was brand new, but I wouldn't have seen it
16   since.
17       Q.   And you've never been out to the site of
18   the accident after the accident to try to figure out
19   what happened or to observe anything.
20       A.   I have not.
21           MR. COUNTS:  Let's take a quick break, if
22   we could.
23           (Recess.)
24       Q.   Earlier you were talking about how Wheeler
25   had received some sort of award or was recognized as

45

1    being one of the safest dealerships.  What was that
2    again?  What were you saying?
3        A.   They get an award.  We're usually number
4    one or two for being the safest CAT dealer.
5        Q.   Who awards that, CAT itself?
6        A.   Caterpillar, yes.
7        Q.   And so Wheeler would agree that it has a
8    lot more expertise with respect to safety than the
9    ultimate consumers do, correct?
10       A.   Yeah.  We take it very serious.  We talk
11   about it before every meeting.
12       Q.   Before Mr. Anderson rode on this subject
13   Polaris ATV, what, if anything, did Wheeler do to
14   ensure that he'd be riding a safe vehicle?
15       A.   Our part of it would be get it to
16   somebody, to our Polaris dealers, and have them
17   check through it and make sure everything is good
18   every time they come back.
19       Q.   Anything else?
20       A.   No.
21       Q.   And then, again, as far as you know,
22   Wheeler never communicated any dangers to the
23   ultimate user, correct, like Mr. Anderson?
24       A.   Correct.
25           MR. COUNTS:  That's all the questions I

46

1  have, sir. I appreciate your time. I pass the
2  witness.
3           EXAMINATION
4  BY MR. ROSE:
5     Q.  I represent Polaris. I'm Rick Rose. I
6  want to just make sure I have the timeline correct
7  on this. I haven't had a chance to review some of
8  these documents. So the first thing in the timeline
9  is Wheeler bought this particular Ranger from
10  Polaris and it was delivered approximately when?
11    A.  2/12/15 was the invoice date.
12    Q.  And then do you know when it was actually
13  delivered?
14    A.  To the first customer?
15    Q.  No, to Wheeler.
16    A.  To Wheeler when it came to us?
17    Q.  Right.
18    A.  I can find that. I don't have it. It
19  would probably have been somewhere around the same
20  time frame. Typically, we get the invoices right
21  around the same date.
22    Q.  So February or March of '15 it would have
23  been delivered to Wheeler by Polaris.
24    A.  Correct.
25    Q.  And when it came, it was in the condition

47

1  that's shown on Exhibit 2.
2     A.  Correct.
3     Q.  And that would include four canvas doors
4  for each of the doors of the Ranger, right?
5     A.  Yes.
6     Q.  And when was it first rented, then, to
7  someone?
8     A.  3/3/15.
9     Q.  And how long was it rented?
10    A.  Through 9/22/15 for that particular
11  rental. That was on the wind farms down in Cedar
12  City. Milford, Utah.
13    Q.  And who was the customer?
14    A.  Swinerton Builders.
15    Q.  I want to make sure I understand the
16  process. When it would have been delivered to
17  Swinerton Builders, what sort of inspection was done
18  of it by Wheeler before it was delivered to
19  Swinerton?
20    A.  It was brand new. Probably fueled it,
21  checked the fluids. It's a pre-delivery type of
22  thing. Just make sure the fluids are up.
23    Q.  And then in the six months it was at
24  Swinerton Builders, would Wheeler have had any
25  involvement in it at all during that time period?

48

1     A.  If they would have had breakdowns or
2  anything like that, they would call us. And then we
3  would have taken it to Triple-S Polaris in this
4  particular case.
5     Q.  Were there photographs, then, of it taken
6  immediately before it was sent to Swinerton?
7     A.  Correct. Which is what this is.
8     Q.  That's what Exhibit 2 is. And then when
9  it comes back to Wheeler on September 22, 2015,
10  would there have been an inspection of it done then?
11    A.  There would have been pictures and a
12  receiving document. And then we would have taken it
13  right to Triple-S, which we did.
14    Q.  I have Triple-S.
15    A.  That's the Triple-S one, yes.
16    Q.  So that's Exhibit 5. Does Wheeler still
17  have the pictures that were taken, then, when it was
18  delivered back from Swinerton?
19    A.  Yes.
20    Q.  And the receiving document, does it still
21  have that?
22    A.  Yes.
23    Q.  Just describe for me, because I don't
24  think we've seen it yet, what does the receiving
25  document have on it?

49

1     A.  So a yardman, which is the guy who is
2  physically with the machine, he'll fuel it. He'll
3  do his checks of the fluids and all of that type of
4  thing. Then he'll go sit down at a computer. He'll
5  put his initials. It already time stamps that time.
6  And then he'll just put in the hours or miles, how
7  many gallons of fuel he put in there, and then he'll
8  note any damage that he's seen. Then he prints it
9  off. It goes to the rental counter guy, which is
10  what Jessie's job is. And so now he gets the
11  contracts, gets the receiver, and takes it off. Or
12  when it ships, he puts it on.
13    Q.  Were pictures of it taken when it
14  was returned, then, from Swinerton?
15    A.  The yardman, when it leaves, they take a
16  picture. It's on their iPhone. It's an app. It
17  goes directly in so the whole company can see it.
18  And then when it comes back, they take the same
19  pictures.
20    Q.  And you still have that picture, then,
21  when it came back from Swinerton?
22    A.  Yes.
23    Q.  And then if you look at the Triple-S
24  exhibit there, with respect to this particular
25  Ranger, what was noted as far as any issues or

50

1  anything that needed to be repaired?
2      A.   Customer asked for full estimate of
3  damages and repairs on the unit.  They put some fuel
4  in it, drained and cleaned the fuel system, pulled
5  the pump, cleaned pump and tank, cleaned all lines
6  and injector.  It looks like we replaced two shocks,
7  a hood, a decal on the hood.  There's four of those.
8  So they damaged, I'm assuming, all of the little
9  decals.  A seat, a boot kit.  So they changed the
10  oil in it, a filter.  I'm not sure what the washer
11  is.  And then the windshield.
12      Q.   So when Swinerton returned it, did it have
13  the doors on it still?
14      A.   I'm not a hundred percent sure.
15      Q.   But there would be a picture that would
16  show that.
17      A.   A lot of them would take them off.  They
18  just would.  Customers do that.
19      Q.   And then if they take them off, when they
20  return them are they just stuck in the back or what
21  do they do with the doors?
22      A.   We'll try to get them.  If not, we'll
23  replace them and bill for them.
24      Q.   In any event, there would be some
25  documents that would let us know if the doors were

51

1  on it when it returned from Swinerton, right?
2      A.   Yes.
3      Q.   And then when was it next rented?
4      A.   9/23/15.
5      Q.   And how long was it?
6      A.   Well, this is kind of confusing.  Through
7  12/14/15.
8      Q.   And who was it rented to then?
9      A.   The company is AECOM.
10      Q.   So you go through the same process.  There
11  would be a picture taken before it was delivered to
12  AECOM, a picture taken when it returned, and the
13  documentation you've described.
14      A.   Correct.
15      Q.   Do you know whether in these inspections
16  that one of the things that Wheeler would have been
17  looking for is to see if it did have the doors on
18  it?
19      A.   Correct.
20      Q.   And if it didn't have the doors, then
21  you'd either go to the customer and say, "Hey, we
22  need the doors back," or perhaps even buy new ones?
23      A.   Yeah.  We did it all the time.  We bought
24  a lot of them.
25      Q.   And do you know with respect to this

52

1  particular unit, did you have to buy new doors
2  because customers didn't return it?
3      A.   I'm not a hundred percent sure, but I can
4  definitely find out.
5      Q.   Would there be documents on that?
6      A.   It would be one of these two.  I don't
7  think on this particular one.
8      Q.   Do you want the other one, too?
9      A.   Yeah.  I don't know if it has doors on it
10  or not.
11      Q.   It was then rented from 9/23 to 12/14 from
12  AECOM, and then it was taken to Steadman's, correct?
13      A.   Yes.
14      Q.   And what did Steadman's find on this
15  particular unit?
16      A.   It's got filter, oil, gear case lube,
17  filter, a belt drive, spark plug, battery, gasket,
18  another gasket, another gasket, cylinder head,
19  cylinder, piston, a valve, two valves, a seat,
20  crankshaft, bearing ball, spacer, gasket, impeller,
21  the clutch, seal, tires.  I'm not sure what the
22  other stuff is.  $2,100 worth of stuff.
23      Q.   Does it appear from looking at Exhibits 4
24  and 5, then, that when Swinerton and AECOM returned
25  it it was returned with doors on it?

53

1      A.   Possibly.  I would think so where we
2  didn't charge them for it.  I could go back and find
3  out for sure.
4      Q.   And then when was it rented next?
5      A.   The next was 4/25/16 to 4/28/16 to Questar
6  Gas.
7      Q.   And that process would have been the same
8  thing, take pictures when it was sent out, take
9  pictures when it was back, and have the
10  documentation that you've talked about.
11      A.   Yes.
12      Q.   I was trying to figure out from your
13  earlier answers whether you know or you're just
14  wondering whether Questar failed to return it with
15  the doors.
16      A.   I can find out.  I don't know.
17      Q.   So you don't know one way or another.
18      A.   No.  I should have figured that out.
19      Q.   You would expect the person in the yard
20  that was doing the inspection after the unit was
21  returned to look to see if it had doors on it,
22  right?
23      A.   Correct.
24      Q.   And then to make some sort of notation if
25  the doors were missing so they could be replaced.

ANDERSON vs POLARIS INDUSTRIES, INC
June 06, 2018                                                   Cody Rhoades

54

1    A.   Correct.
2    Q.   And then was the next time it was rented
3  the one to . . .
4    A.   BigRentz.
5    Q.   BigRentz.
6    A.   And that was on 5/6/16.
7    Q.   And we know from the photograph that we've
8  talked about earlier that when it was rented to
9  BigRentz it did not have doors on it.
10    A.   Correct.
11    Q.   That's what leads you to believe that
12  Questar didn't return the doors.
13    A.   I don't know for sure.  I find it hard to
14  believe it was them on a three-day rental, but I'd
15  have to look.  I can find out who definitely didn't
16  return them.
17    Q.   The only possibilities here, I guess, are
18  that Questar removed the doors and didn't return
19  them, or that once Questar returned it Wheeler
20  removed the doors for some reason.
21    A.   Yeah.  We would never remove them.  No
22  reason to.
23    Q.   Did Wheeler think that it was okay to rent
24  the Ranger at issue to BigRentz who was going to
25  provide it to BattleFrog without the doors on it?

55

1    A.   I would think so, yes.  I mean, they're
2  flimsy doors.  They're not a safety -- I mean,
3  they're flimsy as heck.  You could take them off
4  that simple.
5    Q.   So that doesn't concern you, then, that it
6  was rented without doors?
7    A.   It doesn't, no.
8    Q.   Have you ever had any discussions about
9  whether it was appropriate to rent these units to
10  customers without the doors on them?
11    A.   Never had that discussion.
12    Q.   And it doesn't sound like it was the
13  requirement of anyone at Wheeler when a machine like
14  this comes in to read the owner's manual, to do
15  anything with the owner's manual.
16    A.   No.
17    Q.   So is your best estimate here that
18  probably no one from Wheeler did read the owner's
19  manual?
20    A.   I doubt it.  Every CAT machine has an
21  owner's manual.  I mean, nobody ever -- I mean, we
22  expect our customers to do that, right?  Whoever is
23  actually operating them.
24    Q.   You expect the person that's actually
25  using it to read the owner's manual.

56

1    A.   Absolutely.
2    Q.   I can't remember if you said this.  Have
3  you read the owner's manual since this litigation to
4  see what it says?
5    A.   No.
6    Q.   If my count is correct, I think that
7  owner's manual actually says 10 times that the
8  Ranger is not supposed to be used without the doors
9  or the nets.  That's not something that Wheeler was
10  aware of before the accident?
11    A.   No.  We were never provided nets, just so
12  you know.
13        MR. ANJEWIERDEN:  What was that?
14        THE WITNESS:  We were never provided nets.
15    Q.   And Wheeler ordered it with doors.
16    A.   Correct.
17    Q.   So it elected to buy one that had doors
18  instead of nets.
19    A.   Correct.
20    Q.   Were you involved in the purchase of it?
21    A.   I was.
22    Q.   Do you know why it was that you selected
23  one --
24    A.   We just went off of what -- his name is
25  Jamie Juliano.  He's the Polaris rep.  We told him

57

1  what we were doing.  This particular job we thought
2  was going to be a year, and he just said, "Let's do
3  doors and the heater."  And we elected a heater.
4  That was the only two options.
5    Q.   It sounds like that was because on the
6  particular job you expected it to be a year and
7  there were going to be times it would be cold.
8    A.   It would go through the winter.
9    Q.   So you would need the heater and the
10  doors.
11    A.   Yeah.
12    Q.   What document would it be that would show
13  who delivered it to the race course?
14    A.   The shipping document would tell who
15  delivered.  My guess, we have outside haulers, ones
16  that have just a pickup truck with the trailer
17  versus a big transport.  Where it was just two of
18  them, we wouldn't send a big transport on that
19  because we can get it done with a pickup.  It would
20  be one of our outside haulers, would be my
21  assumption.  I can find out.
22    Q.   I have actually seen this Ranger after the
23  accident obviously out at Steadman's.  It doesn't
24  have doors on it.  Do you know where the doors are?
25    A.   I don't know for sure.



58

1    Q.   Have you done anything since the accident
2  to try to figure out where the doors are?
3    A.   No.
4    Q.   Are you aware of out in the Wheeler yard
5  or facility anywhere that there are some doors that
6  are laying around or stored somewhere?
7    A.   I don't.  I'm not that close to it,
8  so . . .
9    Q.   And it sounds like you were not involved
10  in the investigation about how the accident happened
11  at all.
12    A.   No.
13        MR. ROSE:  Let me look at my notes, but I
14  think I'm done.  Let me take one minute.  Somebody
15  else can go ahead, if they have any.
16        MR. ANJEWIERDEN:  I actually have some for
17  you.
18        EXAMINATION
19  BY MR. ANJEWIERDEN:
20    Q.   You said that sometimes when the vehicles
21  would come back without the doors you'll ask the
22  customers for them, but then when they don't have
23  them you'll bill them for them, right?
24    A.   We'll call Polaris and have them just send
25  us some, order them.

59

1    Q.   That's what I was getting at.  So you get
2  the replacement doors from Polaris?
3    A.   Correct.  From the Polaris dealerships.
4  Not from Polaris.  From the dealerships.
5    Q.   How much do those cost?
6    A.   I've seen the invoices.  I want to say
7  between 3- and 500 bucks.
8    Q.   For a full set of doors?
9    A.   For probably two.  I honestly don't know.
10    Q.   Do you just keep doors at Wheeler in the
11  event that they come back without doors, or do you
12  order them every time separately?
13    A.   Typically, what happens is when the
14  machine comes back we'll take it right to the
15  Polaris dealership.  They'll go through everything.
16  If it's out of doors, we'll add it at that point.
17    Q.   Do you take it to the Polaris dealership
18  every time it comes back?
19    A.   On the three-day one I'm sure we didn't.
20  But anything substantial at all, we definitely
21  would.
22    Q.   Even though it came back without doors,
23  you still didn't take it to the Polaris dealership.
24    A.   And I don't know exactly how these ones
25  got missed.  I honestly don't.  But the timelines

60

1  with those invoices and the dates, we took them back
2  on both substantial rentals.  The one was just a
3  three-day rental.
4    Q.   How easy is it to put on the doors?
5  What's the process for doing that?
6    A.   It's got two little things.  There's one
7  on top, one on bottom.  It simply goes like that.
8  That's it.  I mean, it's literally seconds.
9        MR. BRADY:  That meant nothing on the
10  record.  It's like a pin hinge?
11    A.   You can explain it better.  Very simple.
12  There's just two little studs on the actual machine,
13  and the door has a round thing that goes over the
14  stud.  It's literally that easy.
15    Q.   So I guess if it's that easy, it's not
16  something you have to take it to the Polaris
17  dealership to replace the doors.
18    A.   They just do all of the maintenance on
19  them, so that's why we do that.
20    Q.   But somebody at Wheeler could do that, if
21  they wanted to.
22    A.   Absolutely.
23        MR. ANJEWIERDEN:  I don't have any other
24  questions.
25        MR. ROSE:  I'm done.

61

1        MR. COUNTS:  Thank you, sir.
2        MR. BRADY:  Thank you.
3        (Signature requested.)
4        (Whereupon the taking of this deposition was
5  concluded at 11:50 a.m.)
6             * * *
7        Original transcript filed with Mr. Counts.
8        Reading copy submitted to Mr. Brady.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        C E R T I F I C A T E

62

```
 1   STATE OF UTAH        )
 2   COUNTY OF _____  )
 3        I HEREBY CERTIFY that I have read the foregoing
 4   testimony consisting of 58 pages, numbered
 5   from 4 through 61 inclusive, and the same is a true
 6   and correct transcription of said testimony except as
 7   I have indicated said changes on enclosed errata sheet.
 8
 9
10
11                       _____
                         CODY RHOADES
12
13
14
15        Subscribed and sworn to at _____
16   this _____ day of _____ 2018.
17
18
19
20
21                       _____
                         Notary Public
22
23   My commission expires:
24                   * * *
25            C E R T I F I C A T E
```

63

```
 1   STATE OF UTAH          )
 2   COUNTY OF SALT LAKE    )
 3        THIS IS TO CERTIFY that the deposition of CODY
 4   RHOADES was taken before me, Shelly Wadsworth, a
 5   Registered Professional Reporter in and for the State of
 6   Utah.
 7        That the said witness was by me, before
 8   examination, duly sworn to testify the truth, the whole
 9   truth, and nothing but the truth in said cause.
10        That the testimony was reported by me in Stenotype,
11   and thereafter transcribed by computer under my
12   supervision, and that a full, true, and correct
13   transcription is set forth in the foregoing pages,
14   numbered 4 through 61 inclusive.
15        I further certify that I am not of kin or otherwise
16   associated with any of the parties to said cause of
17   action and that I am not interested in the event thereof.
18        WITNESS MY HAND this 15th day of June, 2018.
19
20        Shelly Wadsworth
21        _____
             Shelly Wadsworth, RPR, CRR
22
23
24
25
```

## Exhibits

**Rhoades Exhibit 01**
9:23,24 10:1
**Rhoades Exhibit 02**
10:6,7 47:1 48:8
**Rhoades Exhibit 03**
12:3,5
**Rhoades Exhibit 04**
12:18,20,24 14:7 31:15,16
**Rhoades Exhibit 05**
12:18,19,21 13:20 14:6
48:16
**Rhoades Exhibit 06**
15:4,6 21:21
**Rhoades Exhibit 07**
15:17,18,23,24
**Rhoades Exhibit 08**
25:11,12

## $

**$13,781.49** 11:22
**$165,000** 11:25
**$2,100** 52:22
**$2,141** 13:12
**$5,350.49** 12:25

## 1

**1** 9:24 10:1
**1,668** 14:1,2,5
**10** 14:4 24:20 37:22 43:1,
19,20 56:7
**10-day** 37:24
**100** 18:5
**11:50** 61:5
**12** 23:25 38:15 43:3
**12/14** 52:11
**12/14/15** 31:7 51:7
**12/22/2015** 12:25
**12/7/2015** 13:22,25
**14** 6:13,18
**15** 10:22 21:24 31:14 34:15
43:1 46:22
**15th** 31:14
**16** 24:2 26:18 43:4
**18** 5:10 24:6
**1st** 10:19

## 2

**2** 10:5,6,7 13:11 47:1 48:8
**2,300** 34:16
**2/12/15** 11:18 46:11
**20** 5:2
**2015** 12:10 14:3,19 31:19
48:9
**22** 5:13 48:9
**2296** 34:13
**249** 14:2
**2nd** 10:19

## 3

**3** 12:3,5
**3-** 59:7
**3/3/15** 47:8

## 4

**4** 12:18,20,23,24 13:11 14:7
31:15,16 35:10,13 36:14
52:23
**4/25** 33:24
**4/25/16** 28:1 33:10 53:5
**4/28** 33:18,24
**4/28/16** 28:1 33:10 53:5

## 5

**5** 12:19,21,23 13:20 14:6
22:5,7 35:11,13 36:14
48:16 52:24
**5/14** 38:15,16
**5/4** 31:11
**5/6** 31:11 33:18 38:13
**5/6/16** 33:12 54:6
**500** 59:7
**52** 34:10
**570** 10:8 14:20 35:24

## 6

**6** 15:4,6 21:21

## 7

**7** 15:18,23,24 22:5,6

## 8

**8** 24:14 25:11,12

## 9

**9/22/15** 47:10
**9/23** 52:11
**9/23/15** 51:4

## A

**a.m.** 61:5
**abnormality** 16:22
**absolutely** 16:24 29:9
43:24 56:1 60:22
**accident** 10:9 13:5,8 16:21
27:3 31:24 34:6,16 38:13
40:20 41:1,6 42:20,23,24
43:15 44:9,11,18 56:10
57:23 58:1,10
**accurate** 39:7
**activity** 17:16
**actual** 14:17 17:18 21:16
39:17 44:8 60:12
**add** 59:16
**AECOM** 51:9,12 52:12,24
**age** 4:24
**agree** 17:14 25:25 29:23
30:1 43:21 45:7
**Aguirre** 42:16,18
**ahead** 6:15 58:15
**amount** 43:7
**and/or** 24:2,11
**Anderson** 38:5 45:12,23
**ANJEWIERDEN** 56:13
58:16,19 60:23
**answers** 53:13
**app** 49:16
**apparently** 41:7
**appears** 26:1
**approximately** 10:19
46:10
**area** 41:8
**areas** 41:10
**asphalt** 40:23
**assistance** 24:11
**assume** 5:9 11:19 18:1,2
**assuming** 19:21 42:19
50:8
**assumption** 57:21

**assure** 24:11
**attachments** 9:9
**attorney** 8:2
**ATV** 17:4,14 21:22 27:23
45:13
**ATVS** 19:20 43:1
**authorized** 34:24
**award** 44:25 45:3
**awards** 45:5
**aware** 22:1 34:5 56:10
58:4

## B

**bachelor's** 5:25
**back** 7:18 8:13,16 10:13
12:9 15:11 18:6 28:3,7,11
29:10 30:22 31:7,12,19
33:4 36:18,19 45:18 48:9,
18 49:18,21 50:20 51:22
53:2,9 58:21 59:11,14,18,
22 60:1
**ball** 52:20
**basically** 6:24 15:9
**Bates** 22:6
**battery** 52:17
**Battlefrog** 18:9,15,19,22,
23 19:1,9,16,24 20:22
21:2,4,12,23 22:16,23
23:2,13 27:14 30:13 31:3,
9,18 32:4,13,16 33:9,11,13
37:7,9,10 39:14,20 40:7
54:25
**bearing** 52:20
**behalf** 4:3,18
**belief** 24:2
**believes** 25:8
**belt** 24:17 52:17
**big** 57:17,18
**Bigrentz** 14:8 18:11,14,21,
22 19:10,15,16 20:23 21:1,
9,15 23:1,13,17 37:4,11,
18,21 38:20 39:3,10 40:4
42:1,8,16,22 54:4,5,9,24
**Bigrentz's** 37:13,18
**bill** 31:11 50:23 58:23
**bills** 30:21
**boot** 50:9
**boots** 23:10 24:17
**bottom** 22:19 60:7
**bought** 8:8 10:14 46:9
51:23
**Brady** 12:22 13:7 15:2
23:14 30:8 31:15 34:9
38:16 60:9 61:2,8

**brand** 10:10 11:21 44:15 47:20
**break** 44:21
**breakdowns** 48:1
**bring** 10:4 11:4 12:12 15:7
**brochure** 16:12
**brought** 8:11,21,22 9:14, 20,22 14:9 29:10
**bucks** 59:7
**Builders** 47:14,17,24
**bulk** 7:8
**bullet** 22:19 23:4
**business** 5:24
**buy** 51:22 52:1 56:17
**bypassing** 20:21

**C**

**cab** 23:5 26:25 27:1,4,8
**California** 21:6,8,11 40:4, 17
**call** 19:15 48:2 58:24
**called** 4:3 19:10,19
**calling** 15:19
**canvas** 28:5 29:19 47:3
**care** 36:5
**case** 4:19 7:13 8:7,20 15:3 20:16 30:13 37:7 38:5 48:4 52:16
**CAT** 17:1 39:9 45:4,5 55:20
**Caterpillar** 45:6
**Cedar** 8:18 10:15,17 13:22 35:3 47:11
**chain** 42:10
**chance** 46:7
**changed** 50:9
**charge** 25:2 53:2
**check** 44:13 45:17
**checked** 47:21
**checking** 6:24 32:10
**checks** 49:3
**City** 5:17 8:18 10:15,17 13:22 35:3 47:12
**cleaned** 50:4,5
**cleaner** 6:24
**clear** 35:12 39:12
**close** 58:7
**clutch** 52:21
**co-corporate** 7:6
**Cody** 4:2,10

**cold** 57:7
**college** 5:4,5
**common** 17:21
**communicated** 23:13,17 45:22
**communication** 42:22
**company** 5:19 27:22 37:4 40:4,7,13,14,17 41:17 49:17 51:9
**complete** 13:11
**completely** 30:24
**computer** 49:4
**concern** 55:5
**concerned** 42:14
**concluded** 61:5
**condition** 31:23 32:2 46:25
**conduct** 30:13,16 34:19
**conducted** 34:23 35:2
**confused** 39:5
**confusing** 51:6
**considered** 16:21
**construction** 6:7
**consumer** 20:18
**consumers** 45:9
**contact** 24:25 42:5
**contained** 22:12
**contract** 9:5 19:23
**contractor** 20:17,21
**contractors** 20:14
**contracts** 8:9 9:10 12:13 49:11
**conversation** 37:25
**conversations** 41:24,25 42:1
**copied** 7:19 42:11
**copies** 12:13
**copy** 14:17 22:6 61:8
**corporate** 4:12 7:12 11:16
**correct** 4:13,15,19,20 6:8, 9 10:11,25 11:1,10,13,21, 23 12:1,15 13:2 14:1,3,5,6, 11,12 16:15,19,20,23 17:16,19 18:4,9,12,24 20:14 21:2,5,17,18,24,25 22:3,8,13,14,17,21,22,24 23:2,3,10,11,13,25 24:4, 12,13,18,19,22,23 25:2,3, 6,10 26:13,16,17,23,24 27:8,14,15 28:13 31:17 32:3 33:14,15,22 34:17,18, 25 35:16,20,21 36:2 37:4, 5,8,12 38:22 39:19 40:6,15 41:14 43:2,23 44:1,2,6,9,

45:9,23,24 46:6,24 47:2 48:7 51:14,19 52:12 53:23 54:1,10 56:6,16,19 59:3
**corrected** 16:22
**cost** 59:5
**counsel** 8:2 23:14
**count** 56:6
**counter** 7:3 49:9
**counterman's** 16:1
**Counts** 4:7 12:3,17,24 13:6 14:19,24 15:4,17,20 23:19 44:21 45:25 61:1.7
**crack** 6:9
**crankshaft** 52:20
**current** 4:24 6:1,2
**customer** 20:4,5,25 36:3,5 37:2,19 46:14 47:13 50:2 51:21
**customers** 20:5 36:8 50:18 52:2 55:10,22 58:22
**cylinder** 52:18,19

**D**

**damage** 49:8
**damaged** 50:8
**damages** 50:3
**dangerous** 17:15
**dangers** 24:4 45:22
**date** 10:18 12:25 13:21 14:3 46:11,21
**datod** 11:18
**dates** 8:20 31:13 33:9 60:1
**day** 7:20 10:18 16:19
**days** 28:1 31:6 33:13 37:22
**dealer** 8:14 24:25 38:2 45:4
**dealers** 17:1 30:16 35:9 45:16
**dealership** 30:23 32:7 34:24 35:1 36:18 59:15,17, 23 60:17
**dealerships** 8:17 36:16 45:1 59:3,4
**death** 22:13 27:3
**decal** 50:7
**decals** 50:9
**December** 14:3 31:14,19
**definition** 15:13 16:4
**Definitions** 15:9,21 16:1
**degree** 5:22,23,24
**deliver** 19:9,12

**delivered** 10:10 18:8 21:17 26:4 27:10,14 39:24 40:21 46:10,13,23 47:16, 18 48:18 51:11 57:13,15
**delivering** 21:22
**delivers** 20:4,9 30:12
**department** 7:5 19:8
**deposed** 19:14
**deposition** 4:21 7:16 9:23 12:15 13:21 16:10 18:7 25:19 28:21,25 32:22 61:4
**depositions** 4:12
**describe** 15:24 40:22 48:23
**desolate** 41:8
**determine** 29:1
**directly** 18:8,23 21:5,22 49:17
**discussion** 55:11
**discussions** 55:8
**document** 13:2,23 15:22 39:1 43:17 48:12,20,25 57:12,14
**documentation** 19:25 28:9 30:19 32:15 33:16 51:13 53:10
**documented** 35:22
**documents** 7:25 8:4,21, 23 9:14 16:7 46:8 50:25 52:5
**door** 28:5 60:13
**doors** 23:5 27:2,4,8,9,12, 14,16 28:3,7,8,12,24 29:1, 14,17,19,24 30:2 47:3,4 50:13,21,25 51:17,20,22 52:1,9,25 53:15,21,25 54:9,12,18,20,25 55:2,6,10 56:8,15,17 57:3,10,24 58:2,5,21 59:2,8,10,11,16, 22 60:4,17
**doubt** 55:20
**drained** 50:4
**drive** 52:17
**driver** 7:1 24:14 39:23
**dry** 41:9
**due** 12:25 38:1
**duly** 4:4

**E**

**e-mail** 8:25 9:4,8 42:10
**e-mails** 7:18 41:24 42:13
**earlier** 16:9 18:7 21:14 42:25 44:24 53:13 54:8

earning 6:11

easy 60:4,14,15

elected 56:17 57:3

electronically 43:20

employee 21:10 38:17

employees 41:10 42:1

end 37:6

ensure 16:18 23:24 25:8 45:14

entity 28:11

equipment 6:7 16:6 19:17 24:11

equipped 27:2

estimate 50:2 55:17

ethical 24:3,6

ETX 14:20

event 27:3 30:1 50:24 59:11

exact 31:12

EXAMINATION 4:6 46:3 58:18

examined 4:4

exhibit 9:23 10:1,6,7 12:3, 5,18,20,21,24 13:20 14:6,7 15:4,6,17,23,24 21:21 25:11,12 31:15,16 47:1 48:8,16 49:24

Exhibits 35:10,13 52:23

exists 33:21

expect 41:17 53:19 55:22, 24

expected 57:6

expertise 45:8

explain 60:11

extremely 16:25 28:4

eye 23:9 24:15

eyes 32:8

**F**

facility 58:5

failed 53:14

Failure 22:11 31:22

fair 7:9 14:9 27:13 40:18,19 41:8,15,16,23

familiar 35:23

farms 47:11

February 12:10 46:22

fellow 4:12

figure 44:18 53:12 58:2

figured 53:18

filed 61:7

filter 50:10 52:16,17

find 28:19 39:25 46:18 52:4,14 53:2,16 54:13,15 57:21

flat 40:23,24

fleet 43:5

flimsy 55:2,3

Florida 40:7,12,13,17 41:17,20

fluids 32:10 47:21,22 49:3

follow 22:11 43:25

Forty-two 4:25

four-year 5:15

fourth 22:18

frame 46:20

Friday 8:25

fuel 34:1 49:2,7 50:3,4

fueled 47:20

full 50:2 59:8

furnish 43:22

**G**

gallons 34:1 49:7

gas 27:20,21,22 53:6

gasket 52:17,18,20

gear 52:16

give 36:23

giving 20:17,18

gloves 23:9 24:16

good 45:17

gopher 41:14,18

gophers 41:20

graduated 5:3,6,9

growing 17:20

guess 23:14,17 34:7 41:14 54:17 57:15 60:15

guest 22:20

guy 19:14 49:1,9

guy's 33:25

guys 39:6

**H**

half 5:18 7:2

happened 7:20 19:10 33:1 38:14 40:20 41:7 42:2,20 44:19 58:10

happy 15:15

hard 34:11 54:13

hauled 19:22

haulers 19:23 57:15,20

hazard 29:13,17

hazards 24:10

he'll 49:2,4,6,7

head 6:19 19:7 52:18

heading 26:19

heard 16:9 18:7 21:14,19 25:7

heater 26:9 57:3,9

heaters 26:8

heck 55:3

held 39:18

helmet 23:9 24:15

hey 34:2 38:1 51:21

high 5:3,9

highway 6:10

hinge 60:10

history 36:21

hit 36:17

hits 20:7

holes 41:14,18,21

home 16:18

honestly 33:19 42:3 59:9, 25

hood 50:7

hours 14:2 34:1 35:25 36:22 49:6

Huh-uh 39:4

hundred 14,13,14 29:10 34:7 50:14 52:3

**I**

idea 17:8 19:6 22:4 26:3 30:4,9 41:22

identified 23:21

identify 12:23 13:24

illegible 24:24 25:24 26:16

immediately 16:23 48:6

impeller 52:20

important 17:18

in-person 41:25

include 47:3

including 24:7

increases 27:2 31:24

information 20:24 36:19, 23

informed 21:1

initials 33:5,25 49:5

injector 50:6

injury 16:21 22:12 27:3

inspect 31:22 44:4

inspected 31:18 32:12,16

inspecting 24:8

inspection 30:14 31:8,25 32:8 33:17 47:17 48:10 53:20

inspections 30:16,20 51:15

inspector's 16:3

instance 20:9

instructed 19:8

instruction 26:20,22

Introduction 22:7

investigation 9:7,17 58:10

investigator 41:5

invoice 8:8 12:4 46:11

invoices 8:12 35:10 46:20 59:6 60:1

involved 7:17 10:9 44:9 56:20 58:9

involvement 47:25

iphone 49:16

issue 54:24

issues 49:25

**J**

Jamie 56:25

January 43:10

Jessie 6:16 8:25 19:11,13, 14,19 42:5,20,23

Jessie's 49:10

job 6:11 10:13 20:8 36:15 49:10 57:1,6

jobs 43:9

Jon 9:6

Jones 41:5

Jones's 9:6

Juliano 56:25

**K**

kind 9:1 19:19 51:6

kit 50:9

knowledge 4:18 18:17 23:15 24:2 26:14

**L**

**label** 24:24 25:5
**labeled** 22:6
**labels** 22:21 24:20 25:1
  26:22
**laborer** 5:20
**laid** 32:7
**Lake** 5:18 10:16
**laying** 58:6
**leads** 54:11
**learn** 7:11
**leave** 10:12
**leaves** 33:3 49:15
**left** 10:16 28:23 29:24
  33:23
**limited** 24:8
**lines** 50:5
**literally** 28:4 60:8,14
**litigation** 56:3
**load** 30:22
**loading** 5:20
**local** 5:17 27:22
**long** 5:1 7:15,22 23:10
  24:16 31:6 47:9 51:5
**long-sleeve** 23:9 24:16
**looked** 8:4,6 9:2,18 22:2
  28:23
**loop** 43:10
**lot** 28:6 41:4 45:8 50:17
  51:24
**lube** 52:16

**M**

**machine** 8:15 13:13,19
  15:12 16:5 29:24 49:2
  55:13,20 59:14 60:12
**Machinery** 6:6
**machines** 6:24 8:13 10:12
  15:14 36:4
**made** 26:15 43:12
**main** 7:12 42:17
**maintain** 36:7,19 37:16
**maintaining** 24:8
**maintenance** 14:20
  18:15,18 34:20,23 35:2,8,
  13,17,25 36:8 37:3 38:7
  60:18
**make** 9:2,11,13 15:11 23:1
  26:10 32:1 35:12 38:23
  41:20 44:4 45:17 46:6

47:15,22 53:24
**making** 25:24 32:9
**man** 42:15,17
**management** 5:24
**manager** 6:13 7:5
**manual** 14:10,18,20 15:5
  17:3,9 18:3 20:11 21:21,23
  22:3,12,21,24 23:2,16
  24:14 26:19,22 29:21 30:2
  35:24 55:14,15,19,21,25
  56:3,7
**manufacturer** 26:7
**manufacturer's** 44:1
**March** 10:19 46:22
**mark** 9:22,23 10:5 12:3,17
  15:4,17
**marked** 10:1,6 12:5,20,21
  13:20 15:6,23 25:11
**means** 39:10
**meant** 60:9
**meeting** 45:11
**memory** 39:7
**miles** 11:20 14:1,2,5 34:5,
  16 35:25 49:6
**Milford** 47:12
**Miller** 39:16
**minute** 58:14
**minutes** 7:24
**missed** 59:25
**missing** 53:25
**mistaken** 38:11
**Monday** 6:2
**months** 14:4 21:24 34:15
  36:5 47:23
**moral** 16:18 24:3,6
**Motorsports** 39:16
**move** 29:24 30:10
**moved** 7:4

**N**

**names** 35:1
**nation** 17:1
**necessarily** 37:6
**needed** 50:1
**needing** 24:10
**neighborhood** 14:14
**nets** 23:5 27:1,2,4,8,11
  56:9,11,14,18
**notation** 53:24
**note** 49:8

**noted** 49:25
**notes** 58:13
**notice** 9:23
**noticed** 34:2,3
**number** 11:8 13:24 17:10
  23:25 36:21 38:3 46:3

**O**

**obligation** 16:18 25:8
  43:22
**obligations** 24:3,6
**observe** 44:19
**obtained** 5:22
**occurred** 19:3,5 43:15
**Ogden** 7:1
**oil** 50:10 52:16
**open** 36:15
**opened** 7:1
**operate** 22:20
**operating** 5:20 26:19,23
  31:23 32:1 55:23
**operation** 5:21
**operations** 6:13 7:5
**Operator** 26:25
**operators** 26:21
**opinion** 20:23 37:8
**options** 57:4
**order** 12:17,18,25 13:21
  43:3 58:25 59:12
**ordered** 26:8 27:11 56:15
**orders** 12:16
**original** 10:13 12:4 19:15
  43:3 61:7
**originally** 8:8
**over-the-ankle** 23:10
  24:17
**owned** 12:10 34:15
**owner's** 14:10,20 15:5
  17:3,9 18:3 20:11 21:21,23
  22:2 26:18,21 30:2 55:14,
  15,18,21,25 56:3,7

**P**

**Pacific** 5:19
**pages** 13:14 14:13,15
**paid** 19:11 31:10,12
**pants** 23:10 24:16
**Park** 39:16
**part** 7:19 25:20 26:9 42:10
  45:15

**pass** 46:1
**passengers** 24:15
**pavement** 40:23
**Pavers** 6:9
**paving** 6:2,5
**paying** 15:15
**people** 17:11 19:18 24:4
  29:16 43:2,7,13
**percent** 18:5 29:10 34:8
  50:14 52:3
**perform** 31:24
**period** 5:15 47:25
**permit** 22:19
**person** 6:19 16:18 18:25
  44:10 53:19 55:24
**personally** 44:3
**persons** 18:25
**pertains** 35:14
**philosophy** 16:11
**phone** 38:3 41:25
**photograph** 10:8 25:15
  34:11,12 54:7
**photographs** 10:4 11:2
  28:10 48:5
**physical** 18:12
**physically** 32:9 49:2
**pick** 21:7
**pickup** 57:16,19
**picture** 10:16 25:13,18,20
  49:16,20 50:15 51:11,12
**pictures** 8:6 9:5,9 10:13
  11:8 28:20,23 29:7 34:2,9
  41:4,6 48:11,17 49:13,19
  53:8,9
**piece** 13:12
**pin** 60:10
**piston** 52:19
**pit** 5:21
**place** 18:16,19 23:24
**plaintiff** 4:4 38:5
**plastic** 28:6
**plug** 52:17
**point** 22:19 23:4 35:9
  42:15 59:16
**Polaris** 8:7,14,17,18 10:8
  11:8,16 13:22 14:10,19
  15:5 17:4,11,12,15 20:17
  21:16,20,22 24:9,25 25:2,
  4,16,20 26:13 27:7 29:16,
  18,20 30:2,16,23 31:1,2
  32:7 34:6,20,24 35:3,9,23
  36:16,18 38:2,7 40:21 44:8
  45:13,16 46:5,10,23 48:3
  56:25 58:24 59:2,3,4,15,

17,23 60:16
**policies** 8:10 15:8,21,25
  20:2,3 43:13
**policy** 16:5 36:2 37:15
  43:18
**poor** 5:8
**position** 26:11 29:18
  37:17,18,20
**positions** 4:18
**possession** 12:9 18:12
  21:11,12,24 31:19 32:13
  39:14
**possibilities** 54:17
**Possibly** 53:1
**pre-delivery** 47:21
**pre-ride** 31:25
**preparation** 7:20
**prepare** 7:25 8:24 9:19
**preparing** 7:15,23 28:21,
  25 32:21
**present** 19:3,5
**pretty** 7:17,19 17:21 31:13
  41:7,9
**price** 12:1
**prints** 49:8
**prior** 5:19 6:11,13,18 8:15
  10:24,25 14:8 21:23 27:17,
  18 28:15 29:3 33:1 42:23
**procedures** 20:3 23:23
  43:13
**process** 4:15 15:10 47:16
  51:10 53:7 60:5
**produced** 15:2 16:11
  25:19
**product** 6:3 22:21
**project** 10:14
**promised** 12:25
**properly** 24:8
**property** 41:3
**protection** 23:9 24:15,22
**prove** 29:5
**provide** 24:7 54:25
**provided** 25:1 56:11,14
**providing** 24:10
**proving** 29:6
**pulled** 50:4
**pump** 50:5
**purchase** 11:15 24:25
  56:20
**purchased** 11:12,19,22,25
  14:4 26:12
**put** 9:1 14:4 15:12 26:2,7
  33:5 34:16 49:5,6,7 50:3

60:4
**puts** 49:12

### Q

**quality** 15:12 16:5
**Questar** 27:20,21 53:5,14
  54:12,18,19
**question** 5:8 30:17
**questions** 8:10 45:25
  60:24
**quick** 44:21

### R

**race** 57:13
**racetrack** 39:17 40:23
**Range** 14:20
**Ranger** 10:8 14:20 32:1
  46:9 47:4 49:25 54:24 56:8
  57:22
**Rangers** 8:13
**read** 17:4,6 20:10 22:21,24
  23:2 26:21 34:11 42:12
  55:14,18,25 56:3
**Reading** 61:8
**Ready** 15:8,20,25
**reason** 54:20,22
**receive** 33:11
**received** 18:25 19:24 20:1
  21:4 31:9 32:14,17 33:9
  38:19 44:25
**receiver** 49:11
**receiving** 33:2,3,23,24
  48:12,20,24
**Recess** 44:23
**recognized** 44:25
**recommended** 44:1
**record** 4:8 12:22 23:19,20
  38:18 60:10
**records** 8:16 35:7,14 36:7,
  11,13 40:1
**Recreation** 13:1 35:4
**referring** 33:4
**regard** 33:16
**reliable** 15:12 16:4
**remember** 9:3 39:23 42:3,
  7 56:2
**remove** 54:21
**removed** 28:12 29:1,4
  54:18,20
**rent** 15:13 20:14,22 27:25
  36:3 37:10 39:10 43:2,7
  44:5 54:23 55:9

**rental** 6:13,19 7:3 16:5
  19:8 27:17,18 29:4 31:5,6
  32:6 33:8 36:4 37:22,24,25
  47:11 49:9 54:14 60:3
**rentals** 28:15 60:2
**rented** 10:24 20:23 21:15
  22:16 28:11 31:2 37:11
  39:6 47:6,9 51:3,8 52:11
  53:4 54:2,8 55:6
**renting** 18:21,22 19:17
  20:5 27:23
**rents** 43:13
**rep** 56:25
**repair** 8:12 12:16,17,18,24
  13:21 34:23 35:13 38:7
**repaired** 13:16 14:7,8 50:1
**repairs** 34:20 35:2,8,17
  50:3
**replace** 28:8 50:23 60:17
**replaced** 50:6 53:25
**replacement** 25:1 59:2
**report** 9:7,17
**represent** 25:18 40:12
  46:5
**representative** 4:12 6:3
  7:13
**representatives** 7:7
**representing** 17:23,24
**requested** 20:12,13 61:3
**required** 36:5
**requirement** 55:13
**requirements** 44:1
**research** 29:11
**respect** 17:11 23:22 36:10
  37:20 45:8 49:24 51:25
**responsibilities** 15:10
  16:2,3,4
**responsibility** 20:24
  37:14
**responsible** 37:3,18,19,
  21
**result** 22:12
**retention** 43:17
**return** 15:8,20,25 50:20
  52:2 53:14 54:12,16,18
**returned** 33:14 49:14
  50:12 51:1,12 52:24,25
  53:21 54:19
**returns** 16:18
**review** 7:25 46:7
**reviewed** 9:15
**Rhoades** 4:2,10,11
**Rick** 46:5

**ride** 29:13,17
**riding** 17:14 23:5 27:1,5
  45:14
**risk** 27:2 31:24
**rode** 38:8 45:12
**roll** 28:6
**rollers** 6:9
**rollover** 27:4
**Rose** 13:4,9 14:17,22
  15:19 34:10 46:4,5 58:13
  60:25
**round** 60:13
**run** 20:15

### S

**safe** 20:10 24:7 31:23 32:1
  44:5 45:14
**safely** 16:19
**safest** 45:1,4
**safety** 14:21 16:11,24
  17:2,11 21:2 23:25 24:10,
  12 25:1,5,9 26:25 29:13,17
  30:3 45:8 55:2
**sales** 6:3
**salesman** 6:5
**Salt** 5:18 10:16
**Sandy** 5:17
**sat** 4:11
**scene** 40:25
**school** 5:3,9
**seal** 52:21
**sealers** 6:9
**seat** 24:17 50:9 52:19
**seconds** 60:8
**selected** 56:22
**send** 8:14 21:7 57:18
  58:24
**sentence** 26:20
**separately** 59:12
**September** 48:9
**service** 35:24 38:2
**serviced** 37:24
**services** 36:3
**servicing** 16:6
**set** 19:11 42:19 59:8
**severe** 22:12
**shake** 30:10
**share** 20:24
**shipped** 18:23
**shipper** 33:2,23

**shipping** 57:14
**ships** 49:12
**shirt** 23:9 24:16
**shocks** 50:6
**shop's** 16:3
**short** 16:10
**show** 25:12 28:10 32:16 50:16 57:12
**shown** 47:1
**sign** 20:7
**signature** 61:3
**simple** 28:5 55:4 60:11
**simply** 60:7
**sir** 4:24 13:2 46:1 61:1
**sit** 49:4
**site** 20:8 44:17
**six-month** 37:25
**skid** 5:20
**slide** 28:4
**sold** 39:2,9
**sort** 38:6 44:25 47:17 53:24
**sound** 14:15 55:12
**sounds** 11:7 21:18 57:5 58:9
**spacer** 52:20
**spark** 52:17
**speak** 10:5
**speaking** 4:17
**specializes** 19:16
**specialty** 19:19
**specific** 35:15,24 36:10,12
**spend** 7:22
**spent** 7:15
**stamps** 33:6 49:5
**start** 11:12
**started** 5:13 6:23
**state** 4:8 6:6
**statement** 29:23
**Steadman's** 8:19 13:1 35:4 36:20 52:12,14 57:23
**steam** 6:24
**steered** 32:10
**steers** 5:20
**step** 15:9
**steps** 23:23
**Steve** 42:5,21,23
**stopped** 32:10
**store** 7:2

**stored** 58:6
**straight** 33:7
**stuck** 50:20
**stud** 60:14
**studs** 60:12
**stuff** 6:10 19:17 20:15 35:22 52:22
**subject** 10:8 11:8 12:6 13:13 14:10 17:4,12,15 25:16 31:2 34:20 45:12
**submitted** 61:8
**substantial** 59:20 60:2
**suburb** 5:18
**supplied** 18:3
**supposed** 37:23 56:8
**Swinerton** 47:14,17,19,24 48:6,18 49:14,21 50:12 51:1 52:24
**switched** 43:9
**sworn** 4:4
**symbol** 22:9
**system** 36:17 50:4

**T**

**takes** 16:24 23:24 49:11
**taking** 61:4
**talk** 7:9 45:10
**talked** 8:9 12:14 16:10 42:4,19 53:10 54:8
**talking** 10:3 17:22 39:8 41:24,25 42:7,15 44:24
**talks** 8:10
**tank** 50:5
**telling** 11:7 17:11 25:4 29:16 30:8
**terrain** 40:16,22
**testified** 4:5,21 38:5,11
**testify** 23:15
**testimonies** 21:15
**thing** 5:21 6:25 15:16 32:11 36:4 38:1 46:8 47:22 49:4 53:8 60:13
**things** 17:10 28:3 51:16 60:6
**thinks** 30:6,9
**Thirty** 7:24
**thought** 21:14 39:1,6 57:1
**three-day** 31:5 32:6 33:8 54:14 59:19 60:3
**Thursday** 7:14
**time** 5:15 7:18 8:13,16 10:12 13:25 14:6 19:8

21:16 22:16 28:2 31:17 32:7,24 33:5 34:6 35:9 42:12 45:18 46:1,20 47:25 49:5 51:23 54:2 59:12,18
**timeline** 33:7 46:6,8
**timelines** 59:25
**times** 8:15 10:24 11:3 24:17 28:7,8 35:25 56:7 57:7
**tires** 52:21
**title** 6:1,2,11
**today** 4:12 7:9 8:7,22,23, 24 9:19 10:3 12:7,12
**Today's** 13:21
**told** 22:23 23:1 31:1 56:25
**Tooele** 8:19 35:4
**top** 13:1,23 16:25 17:1 22:7 60:7
**topics** 7:8 10:2 23:22
**topped** 34:3
**total** 12:1 43:4
**town** 19:18
**track** 36:16,17 41:2
**trailer** 57:16
**training** 24:11 43:10
**transcript** 61:7
**transfer** 21:12
**transfers** 43:14
**transport** 7:1 19:12 57:17, 18
**Triple-s** 8:18 13:22 35:3 48:3,13,14,15 49:23
**truck** 19:22 21:7 57:16
**trucks** 5:21
**turn** 21:20 22:5 26:18
**Twelve** 43:3
**two-page** 13:2,23 15:21
**type** 5:21 6:25 15:15 32:11 35:14,22 47:21 49:3
**Typically** 36:9 46:20 59:13

**U**

**ultimate** 20:18 45:9,23
**unacceptable** 16:22
**understand** 4:15,17 9:11, 13 14:22 16:15,17 17:9,19, 25 26:10,21 29:22 38:4 47:15
**understanding** 10:7 17:22
**understands** 29:12

**understood** 20:16 29:20
**unit** 50:3 52:1,15 53:20
**units** 30:15 55:9
**user** 17:19 37:6 45:23
**Utah** 6:6 35:3,4 40:14,17 47:12
**UTV** 20:10
**UTVS** 43:1,22

**V**

**valve** 52:19
**valves** 52:19
**vehicle** 10:23 11:9,13,15 12:7 14:11,23,25 17:12,15, 19 18:4,8,12 20:4,17 21:16 22:20 23:6,16 24:7,21 25:16,20 26:12,23 27:1,5, 7,13 28:11 29:13 30:12,14 31:2,9,18,22 32:13 34:21 35:15 36:10,12 38:7 40:21 44:5,9 45:14
**vehicles** 11:24 13:17 20:1 24:9,10 39:15 43:14 58:20
**vent** 25:23 26:2,4,7,12
**verify** 31:22
**versus** 57:17
**VIN** 36:21
**vis-a-vis** 37:17
**visual** 32:18
**voice** 17:25 23:21 30:5

**W**

**wanted** 39:12 44:13 60:21
**warn** 24:4
**warning** 22:9 24:9,20 25:24 26:16,22
**warnings** 17:10 22:11 23:12
**washer** 50:10
**washing** 35:21
**Wayment** 6:15
**wear** 23:8 24:15
**Webb** 16:9
**week** 7:14 31:3
**weeks** 31:3 37:23
**well-maintained** 43:22
**West** 5:19
**Wheeler** 4:18 5:1,6,13 6:1, 5,12,21 7:13 10:10 11:9,12 12:6,10 16:11,12,17,24 17:6,14,24,25 18:3,6,8,18, 21,22 20:4,9,10 21:5,22

22:2,15,23 23:1,18,22,23
25:8 26:4,12,15 28:10
29:8,12,23 30:1,5,6,8,12,
13 33:14 34:15,19 35:7,14
36:7,24 37:17,20 38:17
39:2,9,20 40:13,16 41:5,
10,13 43:1,12,21,25 44:3,
24 45:7,13,22 46:9,15,16,
23 47:18,24 48:9,16 51:16
54:19,23 55:13,18 56:9,15
58:4 59:10 60:20

**Wheeler's**  17:22 21:23
24:2 26:11 29:18 37:17,20
43:17

**wind**  47:11

**windmill**  10:14

**windows**  28:6

**windshield**  50:11

**winter**  57:8

**wondering**  53:14

**work**  38:7

**worked**  5:1,17,19 6:16

**working**  5:5,13

**worth**  52:22

**written**  28:10

**wrong**  29:18 30:25 31:17


                  X

**XYZ**  19:25


                  Y

**yard**  53:19 58:4

**yardman**  6:23 32:9,12
49:1,15

**yardman's**  16:2

**yardmen**  33:2

**year**  5:18 7:2 10:21 57:2,6

**years**  5:2,7,12 6:14,18,21
7:4 9:3 32:25 36:24 37:1
43:19,20

**yesterday**  7:21,22 8:1
25:19 38:4,11







DEPOSITION
EXHIBIT

6

Rhoades

PENGAD 800-631-6989

**2015**

**POLARIS**

*RANGER*® **ETX**
*RANGER*® **570**
*RANGER*® **570 EPS**
*RANGER CREW*® **570**
*RANGER CREW*® **570 EPS**

**Owner's Manual**
**for Maintenance and Safety**

---

### ⚠ WARNING

Read, understand, and follow all of the instructions
and safety precautions in this manual and on all product labels.

Failure to follow the safety precautions could result in serious injury or death.

---

### ⚠ WARNING

The engine exhaust from this product contains chemicals known to the State
of California to cause cancer, birth defects or other reproductive harm.

---



***For videos and more information
about a safe riding experience with
your Polaris vehicle, scan this QR
code with your smartphone.***

# WELCOME

Thank you for purchasing a POLARIS vehicle, and welcome to our world-wide family of POLARIS enthusiasts. Be sure to visit us online at www.polaris.com for the latest news, new product introductions, upcoming events, career opportunities and more.

Here at POLARIS we proudly produce an exciting line of utility and recreational products.

- Snowmobiles
- All-terrain vehicles (ATVs)
- Low emission vehicles (LEVs)
- *RANGER*® utility vehicles
- RZR® sport vehicles
- VICTORY® motorcycles
- GEM® electric vehicles

We believe POLARIS sets a standard of excellence for all utility and recreational vehicles manufactured in the world today. Many years of experience have gone into the engineering, design, and development of your POLARIS vehicle, making it the finest machine we've ever produced.

For safe and enjoyable operation of your vehicle, be sure to follow the instructions and recommendations in this owner's manual. Your manual contains instructions for minor maintenance, but information about major repairs is outlined in the POLARIS Service Manual and should be performed only by a factory certified Master Service Dealer® (MSD) technician.

Your POLARIS dealer knows your vehicle best and is interested in your total satisfaction. Be sure to return to your dealership for all of your service needs during, and after, the warranty period.



POLARIS®, *RANGER*® and *RANGER* CREW® are trademarks of POLARIS Industries Inc.

Copyright 2014 POLARIS Industries Inc. All information contained within this publication is based on the latest product information at the time of publication. Due to constant improvements in the design and quality of production components, some minor discrepancies may result between the actual vehicle and the information presented in this publication. Depictions and/or procedures in this publication are intended for reference use only. No liability can be accepted for omissions or inaccuracies. Any reprinting or reuse of the depictions and/or procedures contained within, whether whole or in part, is expressly prohibited.

The original instructions for this vehicle are in English. Other languages are provided as translations of the original instructions.

Printed in U.S.A.

2015 *RANGER* ETX, *RANGER* 570/570 EPS, *RANGER* CREW 570/570 EPS Owner's Manual
P/N 9925356

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Features and Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Winch Guide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Emission Control Systems . . . . . . . . . . . . . . . . . . . . . . . 58

Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

POLARIS Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Troubleshooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Maintenance Log . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

# INTRODUCTION

The *RANGER* is an off-road vehicle. Familiarize yourself with all laws and regulations concerning the operation of this vehicle in your area.

The following signal words and symbols appear throughout this manual and on your vehicle. Your safety is involved when these words and symbols are used. Become familiar with their meanings before reading the manual.



The safety alert symbol indicates a potential personal injury hazard.

## DANGER

A DANGER indicates a hazardous situation that, if not avoided, will result in death or serious injury.

## WARNING

A WARNING indicates a hazardous situation that, if not avoided, could result in death or serious injury.

## CAUTION

A CAUTION indicates a hazardous situation that, if not avoided, could result in minor or moderate injury.

## NOTICE

A NOTICE indicates a situation that could result in property damage.



The Prohibition Safety Sign indicates an action NOT to take in order to avoid a hazard.



The Mandatory Action Sign indicates an action that NEEDS to be taken to avoid a hazard.

4

# INTRODUCTION

**⚠ WARNING**

Failure to follow the warnings contained in this manual can result in severe injury or death.

Your POLARIS *RANGER* is not a toy and can be hazardous to operate. This vehicle handles differently than other vehicles, such as cars, trucks or other off-road vehicles. A collision or rollover can occur quickly, even during routine maneuvers like turning, or driving on hills or over obstacles, if you fail to take proper precautions.

- Read this owner's manual and review the safety DVD that came with your vehicle. A free extra copy of the DVD can be obtained by contacting your local POLARIS dealer. Understand all safety warnings, precautions and operating procedures before operating the vehicle. Keep this manual with the vehicle.
- Review the safety DVD and take the free online Recreational Off Highway Vehicle Association (ROHVA) training course at www.rohva.org.
- This vehicle is an ADULT VEHICLE ONLY. You MUST be at least age 16 and have a valid driver's license to operate this vehicle.
- No person under the age of 12 may ride as a passenger in this vehicle. All riders must be able to sit with backs against the seat, both feet flat on the floor and both hands on the steering wheel (if driving) or on a passenger hand hold.
- Never permit a guest to operate this vehicle unless the guest has read this manual and all product labels.
- Always use the cab nets (or doors) while riding in this vehicle. Always keep hands, feet and all other body parts inside the vehicle at all times.
- Always wear a helmet, eye protection, gloves, long-sleeve shirt, long pants and over-the-ankle boots.
- Never use this vehicle with drugs or alcohol, as these conditions impair judgment and reduce operator reaction time.

# INTRODUCTION
## Vehicle Identification Numbers

Record your vehicle's identification numbers and key number in the spaces provided. Remove the spare key and store it in a safe place. An ignition key can be duplicated only by ordering a POLARIS key blank (using your key number) and mating it with one of your existing keys. The ignition switch must be replaced if all keys are lost.

VIN (stamped into main frame)







Key Number

Vehicle Model Number: _____

Frame VIN: _____

Engine Serial Number: _____

Key Number: _____

6

# INTRODUCTION

## European Vibration and Noise

The driver-perceived noise and hand/arm and whole body vibration levels of this machinery is measured per prEN 15997.

The operating conditions of the machinery during testing:

The vehicles were in like-new condition. The environment was controlled as indicated by the test procedure(s).

The uncertainty of vibration exposure measurement is dependent on many factors, including:

- Instrument and calibration uncertainty
- Variations in the machine such as wear of components
- Variation of machine operators such as experience or physique
- Ability of the worker to reproduce typical work during measurements
- Environmental factors such as ambient noise or temperature

# SAFETY
## Safe Riding Gear

The driver and all passengers must wear helmet, eye protection, gloves, long-sleeve shirt, long pants, over-the-ankle boots and seat belt at all times. Protective gear reduces the chance of injury.



### Helmet

Wearing a helmet can prevent a severe head injury. Whenever riding this POLARIS vehicle, always wear a helmet that meets or exceeds established safety standards.

Approved helmets in the USA and Canada bear a U.S. Department of Transportation (DOT) label.

Approved helmets in Europe, Asia and Oceania bear the ECE 22.05 label. The ECE mark consists of a circle surrounding the letter E, followed by the distinguishing number of the country which has granted approval. The approval number and serial number will also be displayed on the label.



8

**SAFETY**

## Safe Riding Gear
### Eye Protection

Do not depend on eyeglasses or sunglasses for eye protection. Whenever riding this POLARIS vehicle, always wear shatterproof goggles or use a shatterproof helmet face shield. POLARIS recommends wearing approved Personal Protective Equipment (PPE) bearing markings such as VESC 8, V-8, Z87.1, or CE. Make sure protective eye wear is kept clean.

### Gloves

Wear gloves for comfort and for protection from sun, cold weather and other elements.

### Boots

Wear sturdy over-the-ankle boots for support and protection. Never ride a POLARIS vehicle with bare feet or sandals.

### Clothing

Wear long sleeves and long pants to protect arms and legs.

### Rider Comfort

Under certain operating conditions, heat generated by the engine and exhaust system can elevate temperatures in the driver and passenger cab area. The condition occurs most frequently when a vehicle is being operated in high ambient temperatures at low speeds and/or high load conditions for an extended period of time. The use of certain windshield, roof and/or cab systems may contribute to this condition by restricting airflow. Any discomfort due to heat buildup in this area can be minimized by wearing proper riding apparel and by varying speeds to increase airflow.

# SAFETY
## Safety Labels and Locations

Warning labels have been placed on the vehicle for your protection. Read and follow the instructions of the labels on the vehicle carefully. If any of the labels depicted in this manual differ from the labels on your vehicle, always read and follow the instructions of the labels *on the vehicle*.

If any label becomes illegible or comes off, contact your POLARIS dealer to purchase a replacement. Replacement *safety* labels are provided by POLARIS at no charge. The part number is printed on the label.



Seat Belt/Drive Responsibly Warning

Shift Caution

Proper Use Warning

## Max Payload Warning
**WARNING**



Max Payload Warning

| RANGER Mid Size | Never Exceed | If Total Payload Exceeds |
|---|---|---|
| ETX | 35 mph (56 kph) | 700 lbs. (317 kg) |
| 570/570 EPS | 35 mph (56 kph) | 850 lbs. (385 kg) |
| CREW 570/570 EPS | 35 mph (56 kph) | 1000 lbs. (453 kg) |

7181296

## Shift Caution
**CAUTION**

To avoid transmission damage, shift only when vehicle is stationary and at idle.

APPLY BRAKE TO START. When this vehicle is not in operation, or unattended, place shift in the park position.

7181060

10

# SAFETY

# Safety Labels and Locations
## Seat Belt/Drive Responsibly Warning
**WARNING**

Improper vehicle use can result in SEVERE INJURY or DEATH

**Be Prepared**

- Fasten seat belts.
- Wear an approved helmet and protective gear.
- ALWAYS use vehicle cab nets and/or doors.
- Each rider must be able to sit with back against seat, feet flat on the floor, and hands on steering wheel or hand holds. Stay completely inside the vehicle.

**Drive Responsibly**

Avoid loss of control and rollovers:

- Avoid abrupt maneuvers, sideways sliding, skidding or fishtailing, and never do donuts.
- Slow down before entering a turn.
- Avoid hard acceleration when turning, even from a stop.
- Plan for hills, rough terrain, ruts and other changes in traction and terrain. Avoid paved surfaces.
- Avoid sidehilling (riding across slopes).

**Be Sure Riders Pay Attention and Plan Ahead**

If you think or feel the vehicle may tip or roll, reduce your risk to injury:

- Keep a firm grip on the steering wheel or hand holds and brace yourself.
- Do not put any part of your body outside of the vehicle for any reason.

LOCATE AND READ OWNER'S MANUAL. FOLLOW ALL INSTRUCTIONS AND WARNINGS. ALWAYS REVIEW SAFETY VIDEO AND TAKE ROHVA TRAINING (rohva.org).



Rollovers have caused severe injuries and death, even on flat, open areas.

7181110

# Proper Use Warning
**Require Proper Use of Your Vehicle**

Do your part to prevent injuries:

- Do not allow careless or reckless driving.
- Make sure operators are 16 or older with a valid driver's license.
- Do not let people drive or ride after using alcohol or drugs.
- Do not allow operation on public roads (unless designated for off-highway vehicle access) - collisions with cars and trucks can occur.
- *ETX / 570 / 570 EPS:* Do not exceed seating capacity: 2 occupants.
- *CREW 570 / 570 EPS:* Do not exceed seating capacity: 4 occupants.



Proper Use Warning

# SAFETY
## Safety Labels and Locations
### Passenger/Tire Pressure Warning

**WARNING**

- Passengers can be thrown off. This can cause serious injury or death.
- Never carry passengers in cargo box.

**WARNING**

IMPROPER TIRE PRESSURE OR OVERLOADING CAN CAUSE LOSS OF CONTROL RESULTING IN SERIOUS INJURY OR DEATH.

- Reduce speed and allow greater distance for braking when carrying cargo.
- Overloading or carrying tall, off-center, or unsecured loads will increase your risk of losing control. Loads should be centered and carried as low as possible in box.
- For stability on rough or hilly terrain, reduce speed and cargo.
- Be careful if load extends over the side of the box.

| *RANGER* MIDSIZE | *RANGER* MIDSIZE | *RANGER* MIDSIZE CREW | LSV-EV |
|---|---|---|---|
| **MAXIMUM CARGO BOX LOAD** | 500 lbs. (226 kg) | 500 lbs. (226 kg) | 500 lbs. (226 kg) |
| **TIRE PRESSURE IN PSI (KPa)** | FRONT 10 (69) REAR 10 (69) | FRONT 10 (69) REAR 14 (96) | FRONT 20 (138) REAR 20 (138) |
| **MAXIMUM WEIGHT CAPACITY** INCLUDES WEIGHT OF OPERATOR, PASSENGER, CARGO AND ACCESSORIES | 1000 lbs. (454 kg) | 1250 lbs. (547 kg) | 1000 lbs. (454 kg) |
| **Read Operation & Maintenance Manual for more detailed loading information.** | | | |

7181056

## Clutch Cover Warning

**WARNING**

- Moving parts hazard under belt-clutch guard. To prevent serious injury, do not operate vehicle with guard removed.
- Do not modify engine or clutch. Doing so can cause part failure, possible imbalance, and excessive engine RPM which can result in serious injury or death.

7175488



Clutch Cover Warning

12

# SAFETY

## Operator Safety

**⚠ WARNING**

Serious injury or death can result if you do not follow these instructions and procedures, which are outlined in further detail within your owner's manual.

- Read this entire manual and all labels carefully. Follow the operating procedures described.
- Never allow anyone under the age of 16 to operate this vehicle and never allow anyone without a valid driver's license to operate this vehicle.
- Do not carry a passenger until you have at least two hours of driving experience with this vehicle.
- No person under the age of 12 may ride as a passenger in this vehicle. All riders must be able to sit with backs against the seat, both feet flat on the floor and both hands on the steering wheel (if driving) or on a passenger hand hold.
- The driver and all passengers must wear helmet, eye protection, gloves, long-sleeve shirt, long pants, over-the-ankle boots and seat belt at all times.
- Always use the cab nets (or doors) while riding in this vehicle.
- Always keep hands and feet inside the vehicle at all times.
- Always keep both hands on the steering wheel and both feet on the floorboards of the vehicle during operation.
- Never permit a guest to operate this vehicle unless the guest has read this manual and all product labels.
- To reduce rollover risk, be especially careful when encountering obstacles and slopes and when braking on hills or during turns.
- This vehicle is for off road use only. Never operate on public roads (unless marked for off-road use). Always avoid paved surfaces.
- Never consume alcohol or drugs before or while operating this vehicle.
- Never operate at excessive speeds. Always travel at a speed proper for the terrain, visibility and operating conditions, and your experience.
- Never attempt jumps or other stunts.
- Always inspect the vehicle before each use to make sure it's in safe operating condition. Always follow the inspection procedures described in this manual.

# SAFETY
## Operator Safety

- Always travel slowly and use extra caution when operating on unfamiliar terrain. Be alert to changing terrain.
- Never operate on excessively rough, slippery or loose terrain.
- Always follow proper procedures for turning. Practice turning at slow speeds before attempting to turn at faster speeds. Never turn at excessive speeds.
- Always have this vehicle checked by an authorized POLARIS dealer if it has been involved in an accident.
- Never operate this vehicle on hills too steep for the vehicle or for your abilities. Practice on smaller hills before attempting larger hills.
- Always follow proper procedures for climbing hills as described in this manual. See page 40. Check the terrain carefully before attempting to climb a hill. Never climb hills with excessively slippery or loose surfaces. Never apply throttle suddenly. Never make sudden gear changes. Never go over the top of a hill at high speed.
- Always follow the proper procedures outlined in this manual for traveling downhill and for braking on hills. See page 40. Check the terrain carefully before descending a hill. Never travel downhill at high speed. Avoid going downhill at an angle, which would cause the vehicle to lean sharply to one side. Travel straight down the hill where possible.
- Always check for obstacles before operating in a new area. Never attempt to operate over large obstacles such as large rocks or fallen trees. Always follow the proper procedures outlined in this manual when operating over obstacles. See page 39.
- Always be careful of skidding or sliding. On slippery surfaces such as ice, travel slowly and exercise caution to reduce the chance of skidding or sliding out of control.
- Never operate your vehicle in fast-flowing water or in water deeper than that specified in this manual. See page 42. Wet brakes may have reduced stopping ability. Test your brakes after leaving water. If necessary, apply them lightly several times to let friction dry out the pads.
- Always be sure there are no obstacles or people behind your vehicle when operating in reverse. When it's safe to proceed in reverse, move slowly. Avoid turning at sharp angles in reverse.

# SAFETY

## Operator Safety

- Always use the proper size and type of tires specified in this manual. Always maintain proper tire pressure as specified on safety labels.
- Never modify this vehicle through improper installation or use of non-POLARIS approved accessories.
- Never exceed the stated load capacity for this vehicle. Cargo should be properly distributed and securely attached. Reduce speed and follow the instructions in this manual for hauling cargo or pulling a trailer. Allow a greater distance for braking.
- Always place the transmission in PARK before getting out of the vehicle.
- Always stop the engine before refueling. Remove flammable material containers from the box before filling them with fuel. Make sure the refueling area is well ventilated and free of any source of flame or sparks. Gasoline is extremely flammable. See page 18 for fuel safety warnings.
- Always remove the ignition key when the vehicle is not in use to prevent unauthorized use by someone under the age of 16 or without a driver's license and proper training, or accidental starting.

**FOR MORE INFORMATION ABOUT SAFETY, call POLARIS at 1-800-342-3764.**

## Equipment Modifications

Do not install any non-POLARIS approved accessory or modify the vehicle for the purpose of increasing speed or power. Any modifications or installation of non-POLARIS approved accessories could create a substantial safety hazard and increase the risk of bodily injury.

The warranty on your POLARIS vehicle will be terminated if any non-POLARIS approved equipment and/or modifications have been added to the vehicle that increase speed or power.

The addition of certain accessories, including (but not limited to) mowers, blades, tires, sprayers, or large racks, may change the handling characteristics of the vehicle. Use only POLARIS-approved accessories, and familiarize yourself with their function and effect on the vehicle.

# SAFETY
## Operator Safety

**⚠ WARNING**

Failure to operate the *RANGER* properly can result in a collision, loss of control, accident or rollover, which may result in serious injury or death. Heed all safety warnings outlined in this section of the owner's manual. See the OPERATION section of the owner's manual for proper operating procedures.

## Age Restrictions

This vehicle is an ADULT VEHICLE ONLY. NEVER operate this vehicle if you are under age 16 and NEVER operate without a valid driver's license.



Never operate with a passenger under the age of 12. All riders must be able to sit with backs against the seat, both feet flat on the floor and both hands on the steering wheel (if driving) or on a passenger hand hold.

## Operating Without Instruction

Operating this vehicle without proper instruction increases the risk of an accident. The operator must understand how to operate the vehicle properly in different situations and on different types of terrain.



All operators must read and understand the Owner's Manual and all warning and instruction labels before operating the vehicle.

All operators should review the safety DVD provided with this vehicle and take a ROHVA training course (www.rohva.org).

## Using Alcohol or Drugs

Operating the vehicle after consuming alcohol or drugs could adversely affect operator judgment, reaction time, balance and perception.



Never drink alcohol or use drugs or medications before or while operating this vehicle.

## Seat Belts

Riding in this vehicle without wearing the seat belt increases the risk of serious injury in the event of rollover, loss of control, other accident or sudden stop. Seat belts may reduce the severity of injury in these circumstances.

All riders *must* wear seat belts at all times.

## Protective Apparel

Riding in this vehicle without wearing an approved helmet and protective eyewear increases the risk of a serious injuries in the event of an accident.

Operator and all passengers *must* always wear an approved helmet that fits properly and eye protection (goggles or face shield).

# SAFETY

## Operator Safety
### Cab Nets

Riding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover. Always use the cab nets (or doors) while riding in this vehicle.

*Always keep hands and feet inside the vehicle at all times.*

## Failure to Inspect Before Operating

Failure to inspect and verify that the vehicle is in safe operating condition before operating increases the risk of an accident. Always perform the pre-ride inspection before each use of your *RANGER* to make sure it's in safe operating condition. See page 36.

Always follow all inspection and maintenance procedures and schedules described in this owner's manual. See page 59.

## Operating With a Load on the Vehicle

The weight of both cargo and passengers impacts vehicle operation. For your safety and the safety of others, carefully consider how your vehicle is loaded and how to safely operate the vehicle. Follow the instructions in this manual for loading, tire pressure, gear selection and speed.

• ***Do not exceed vehicle weight capacities.*** The vehicle's maximum weight capacity is listed in the specifications section of this manual and on a label on the vehicle. When more passenger weight is added, cargo weight may need to be reduced accordingly.

• The recommended tire pressures are listed in the specifications section of this manual and on a label on the vehicle.

***Always follow these guidelines:***

| Under ANY of these conditions: | Do ALL of these steps: |
|---|---|
| Passenger and/or cargo exceeds half the maximum weight capacity | 1. Slow down. |
| Operating in rough terrain | 2. Verify tire pressure. |
| Operating over obstacles | 3. Use extra caution when operating. |
| Climbing an incline | |
| Towing | |

# Exhibit 7





CLAIMS 000144

# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Kendall Anderson,<br><br>    *Plaintiff,*<br><br>vs.<br><br>BigRentz, Inc. a/k/a Big Renz, and<br>Wheeler CAT a/k/a Wheeler Machinery Co.,<br><br>    *Defendants.* | **AFFIDAVIT OF MARIUSZ ZIEJEWSKI, Ph.D, Inż**<br><br>Case No. 2:17-cv-00205-DN-EJF<br><br>Judge: David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |

| | |
|---|---|
| STATE OF NORTH DAKOTA | § |
| | § |
| COUNTY OF CASS | § |

Before me the undersigned Notary Public, personally appeared Mariusz Ziejewski, Ph.D., Inż, an individual known to me, who upon his oath deposed and stated the following:

1. "My name is Mariusz Ziejewski. I am over the age of eighteen and am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I reside in Fargo, North Dakota.

**General Background and Experience**

3.   I have a Ph.D. in mechanical engineering, and I am a tenured Professor with the Department of Mechanical Engineering at North Dakota State University. I have taught in the areas of Biomechanics of Impact, Advanced Biomechanics, and Vehicle Dynamics. Additionally, I am the Director of the Impact Biomechanics Laboratory and the Automotive Systems Laboratory at North Dakota State University as well as a Clinical Adjunct Associate Professor with the Department of Neuroscience at the School of Medicine of the University of North Dakota.

4.   A true and correct copy of my curriculum vitae is attached to this Affidavit as **Attachment "1"**, and is incorporated by reference. A copy of my work (report) in this matter to date is attached to this Affidavit as **Attachment "2"**.

5.   Over the past 35 years, I have been involved in research and education in the field of biomechanics and vehicle dynamics.

6.   For the last 25 years, my research focus has been on human body biomechanics.

7.   My academic degrees are in the fundamental concepts of science and engineering governing dynamic behavior of viscoelastic materials like living soft tissue.

8.   I completed additional academic courses in human anatomy, physiology and medical neurosciences, which is not part of my formal degrees.

9.   I was selected to participate in specialized training through the research for the United States Air Force (USAF) and Army involving the analysis of over 900 tests with humans – male/female.

10.   I have participated in a variety of research programs addressing the biomechanics of the human body:

> *US Air Force/Army (Department of Defense):  1996 – Present*
>
> - Eight (8) research contracts in the area of human body biomechanics
>
> *NHTSA (National Highway Traffic Safety Administration):  1992-1997*
>
> - Developed elliptical brain model submitted to NHTSA
> - Member of Collaboration Group on Human Brain Modeling
>
> *ER (Emergency Room) 2001 – 2005*
> Study in conjunction with MeritCare Trauma Center and FM Ambulance
>
> - Over 300 cases analyzed
> - Identification of biomechanical risk factors for ER setting

11.   Furthermore, I hold the following specialized certifications:

- *Crash Data Analysis*, Sponsored by GM, Vetronix and Texas Eng. Ext., 2001.
- *Injury Scaling (AIS)*, April 2005, Sponsored by the AAAM.
- *Injury Scaling (AIS),* Advanced course, June 2008, Sponsored by the AAAM.
- *Fully Accredited* Accident Reconstructionist (ACTAR #1939)

12.   I have authored four (4) book chapters and over one hundred (100) technical referenced publications.

## Methodology Utilized in this Case

13.   The methodology that I used in this case is widely recognized in the scientific community as the proper approach for assessing biomechanical issues in incidents involving motorized vehicles. The background for the general methodology is presented below.

3 of 8

14.   In the SAE publication #940568 *"Injury Reconstruction: The Biomechanical Analysis of Accidental Injury" by* A. M. Nahum et al, the procedure for injury reconstruction is laid out. The figure below is taken directly from the paper.



Figure 1 - Flow Diagram for Injury Reconstruction, SAE #940568

15.   Additionally, in the Table below, also taken directly from the paper, descriptions of the necessary data and the data sources for injury reconstruction are listed.

TABLE 1. DATA NECESSARY FOR INJURY RECONSTRUCTION

| DATA | SOURCES |
|---|---|
| Comprehensive description of all injuries of all vehicle occupants (injury type, location, severity) | Accident vehicle(s)<br>Medical records (including physician, nursing, and EMT caregivers) and x-rays<br>Interviews with vehicle occupant(s) and other witnesses |
| Location and description of areas contacted within and exterior to vehicle (matched to specific injuries for each occupant); forensic data confirming occupant contact and location | Accident vehicle(s)<br>Accident scene (ground/pavement and other environmental objects, e.g., trees, fences, other vehicles)<br>Interviews |
| Human tolerance data | Experimental data on human tolerance |
| Restraint system: use and functional characteristics | Accident vehicle(s)<br>Interviews |
| Vehicle kinematics and kinetics; prinicipal direction of force (PDOF) and velocity change (delta-V) for all significant vehicle motions | Accident vehicle(s)<br>Accident scene<br>Numerical calculations<br>Interviews |

Figure 2 - Data Necessary for Injury Reconstruction, SAE #940568

Nahum, A.M., et al, *"Injury Reconstruction: The Biomechanical Analysis of Accidental Injury,"* SAE #940568.

16. Below is a list of the work I performed specific to this case:

- Studied the provided materials;
- Determined vehicle parameters for the Polaris UTV;
- Searched and measured an exemplar Polaris UTV;
- Performed surrogate fit analysis in exemplar UTV;
- Assessed the impact phase of vehicle dynamics;
- Conducted testing;
- Determined Mr. Anderson's segments' geometric and mass properties, and the joints' locations and range of motion characteristics using the Generator of Body Data (GEBOD) AL/WPAFB computer program;
- Performed Mr. Anderson's body dynamics analysis for selected phases of event.

17. The area of biomechanics is a component of bioengineering. The biomechanical analysis is based on the principles of physics; engineering, including viscoelastic properties of tissue; and life sciences. Impact biomechanics is the study of damage/failure of human body regions, organs, and tissue or cells as a result of the sud-

den application of forces. The concept of damage/failure can be structural, or physiological, and in a clinical setting, is referred to as "injury" or "trauma".

18.   One of the common objectives for a biomechanical analysis is to determine whether the injury mechanism for damage/failure was present and whether or not the forces were sufficient to cause the damage. Biomechanical engineers are not physicians and they do not perform clinical diagnoses; rather, they generally accept the diagnoses as presented in the medical records.

19.   The procedure for biomechanical analysis (Figure 3) involves an understanding of the driving force that can be quantified in terms of generally accepted engineering parameters like change in the velocity, time duration of impact, and/or vehicle acceleration (VEHICLE DYNAMICS ANALYSIS). The quantification of impact severity for the occupant perspective is the remaining portion of the biomechanical evaluation (HUMAN BODY DYNAMICS ANALYSIS). The meaning of the results from the biomechanical analysis is illustrated, by comparison, against the human tolerances (HUMAN TOLERANCE ANALYSIS).



Figure 3 – Complete Procedure for Biomechanical Analysis

20.  The mechanism for the injury that I described to is well known in the scientific community. As an example, the mechanism of injury is described in the peer reviewed publication by Couturier et al (2007).

21.  The last step in the procedure (HUMAN TOLERENCE ANALYSIS) followed the NHTSA approach which utilized the Abbreviated Injury Scale (AIS).

22.  Based on the above methodology, conclusions can be formulated. In the case for Mr. Anderson, the overall conclusions were reached based on the totality of the evidence.

## Opinions/Conclusions

23.  My testimony in this case is not from the design perspective, but from a performance perspective as it relates to biomechanical assessment.

24.  Over the course of my career, I have seen hundreds upon hundreds of crash tests conducted by various automobile manufacturers, and I have seen hundreds upon hundreds of crash tests conducted by others, such as the Insurance Institute for Highway Safety (IIHS). I am very familiar with the performance of restraint systems, and the performance of doors in accidents.

25.  This case is simple. As I indicated in my report, during the accident sequence, Mr. Anderson's arm was allowed to be partially ejected. This caused his arm injuries.

26.   Had the Polaris UTV had the doors that were supplied from Polaris when the vehicle was new, Mr. Anderson's arm would not have been partially ejected during the accident sequence, and he would not have had his arm injuries.

"FURTHER AFFIANT SAYETH NAUGHT."

_____
Mariusz Ziejewski, Ph.D., Inż

SWORN TO AND SUBSCRIBED to before me, the undersigned authority, by the said Mariusz Ziejewski on the _13th_ day of February, 2019.

_____
Notary Public, State of North Dakota

BENNETT LYSTAD
Notary Public
State of North Dakota
My Commission Expires July 4, 2023

# ATTACHMENT "1"

# Mariusz Ziejewski, Ph.D. Inż.

Telephone: (701)231-7098 Work                      Telefax: (701)293-1454
Telephone: (701)232-9223 Home            Email: Mariusz.Ziejewski@ndsu.edu

**Professor, Tenured, Department of Mechanical Engineering**
- **Director of Impact Biomechanics Laboratory, College of Engineering**
- **Director of Automotive Systems Laboratory, Department of Mechanical Engineering**

*North Dakota State University, Fargo, North Dakota 58108*

**Clinical Adjunct Associate Professor, Department of Clinical Neuroscience, School of Medicine**

*University of North Dakota, Grand Forks, North Dakota 58201*

## BIOGRAPHICAL SUMMARY

- *Invited Chairman, "Physics of Blast as it Relates to Brain Injury" scientific peer review for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP) (Intramural Proposals).*
- *Invited Chairman, "Physics of Blast as it Relates to Brain Injury" scientific peer review for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP) (Extramural Proposals).*
- *Invited Reviewer, Scientific Peer Review Panel for Concept  Proposals related to brain injuries caused by blasts for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).*
- *Invited Reviewer, Scientific Peer Review Panel for  Intramural Clinical Diagnosis Proposals related to brain injuries caused by blasts for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).*
- *Invited Reviewer, Scientific Peer Review Panel for Moderate-Severe Traumatic Brain Injury, Intramural War Supplement Program, 2008 DoD*
- *Founding Chairman, North American Brain Injury Society's (NABIS) Blast Injury Institute, 2007-present.*
- *Elected to serve on the International Brain Injury Association's (IBIA) Board of Governors(Stockholm, Sweden) 2003-present*
- *Board member of the North American Brain Injury Society (NABIS) 2004-present.*
- *Chairman of the North American Brain Injury Society (NABIS) 2012 – present.*
- *Vice-Chair of the North American Brain Injury Society (NABIS) 2011-2012.*
- *Director for Biomechanics Section of the North American Brain Injury Society (NABIS).*
- *Chair, "Brain Injury: New Science, Best Practice, and Future Innovations," North American Brain Injury Society conference Poster Presentations, Amelia Island, FL.  September 22-24, 2005.*
- *Development of soccer headgear national standards for American Society for Testing and Materials (ASTM), F08.53 Task Group on Soccer Headgear Subcommittee.  (F 2439-06)*
- *Faculty member lecturing on biomechanical aspects of pathology in the nervous system secondary to trauma as a part of Neuroanatomy and Neurophysiology Course (NEUPSY 805) at the Fielding Institute with APA accredited Ph.D. Program in Clinical Psychology for the semester of 9/97-1/98.*
- *Former Member of the National Highway Traffic Safety Administration (NHTSA) Collaboration Group on Human Brain Modeling. 1992-1997.*
- *Member of the United States Engineering Education Delegation to the Republic of South Africa with assigned area of emphasis in bioengineering education. 1996.*
- *Selected to conduct research for the Armstrong Aerospace Medical Research Laboratory, Human System Division, Wright-Patterson Air Force Base, Dayton, Ohio during their 1996 and 1997 Summer Research Program.  Projects included laboratory studies of human body responses to impact, head/neck biodynamic modeling, development of Biodynamics Injury Criteria for the human spine. (~900 tests analyzed, male/female)*
- *President (2000 – 2002) and Chairman of the Activities Committee (1996 – 2000) involved in human body dynamic validation research studies for the Articulated Total Body (ATB) User's Group organized by the Armstrong Aerospace Medical Research Laboratory, Human System Division, Wright-Patterson Air Force Base, Dayton, Ohio.*
- *Collaborator to the Society of Automotive Engineers (SAE) Human Mechanical Response and Injury Criteria Task Group.*
- *Taught a variety of subjects over 40 years in the mechanical engineering field including biomechanics, vehicle dynamics, kinematics (human body dynamics) and computer modeling and simulation*
- *For over 25 years research focus on human body biomechanics*
- *Authored three (3) book chapters and over one hundred (100) technical refereed articles.*
- *Invited Key Presentations:*
  - *"Biomechanical Perspective on Low Energy Impacts Causing Serious Long Term Consequences," and "State-of-the-Art Biomechanical Issues In Relation to Mild Traumatic Brain Injury," 5th World Congress on Brain Injury, International Brain Injury Association, Stockholm, Sweden, May 2003.*
  - *"Biomechanical Issues Related to Reduction of Trauma to the Brain from Unanticipated Low Impacts in Soccer," Chairman's Roundtable Discussion on Head Injury and Youth Sports, United States Consumer Products Safety Commission, Washington, D.C., May, 2000.*
  - *"Panel Discussion: Blast Injuries and Traumatic Brain Injury," North American Brain Injury Society, Brain Injury Conference of the Americas, Miami, FL., September 2006.*
- *Compliance Testing FMVSS 223 Rear Impact Guards & 224 Rear Impact Protection, B.L. Industries 2004-2005.*
- *Editorial board, Brain Injury Professional*
- *Emergency Room (ER) Biomechanical Brain Injury Evaluation Research, FM Ambulance Service, MeritCare Trauma Center, Sponsored in part by MeritCare Foundation, Fargo, ND, 2001-2005.*
- *Certified in Crash Data Analysis, Sponsored by GM, Vetronix and Texas Eng. Ext., Santa Barbara, CA, 2001.*
- *Certified in AIS Scaling, Certified completion (with examination) of Injury Scaling: Uses and Techniques Course (AIS Scale), April 2005. Sponsored by the AAAM.*
- *Certified in AIS Scaling, Certified completion (with examination) of Injury Scaling (AIS) Update Course, June 2008, Sponsored by the AAAM. Advanced course with suggested prerequisites including at least 2 years of active engagement in AIS coding.*
- *Fully Accredited Accident Reconstructionist, Accreditation Commission for Traffic Accident Reconstruction (ACTAR) #1939*

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                    2

## EDUCATION

### ENGINEERING

| | |
|---|---|
| Aug. 1985 | · *Ph.D. in Engineering*, *North Dakota State University, Fargo, ND* |
| | *Major area: Mechanical Engineering* |
| June 1978 | · *Postgraduate education*, *Superior Automotive Officer School, Poland* |
| July 1977 | · *Masters of Science in Agricultural Engineering (Equivalent of Bioengineering)* |
| | *Academy of Technology and Agriculture, Poland* |
| June 1975 | · Secondary Major, *Bachelor of Science in Agriculture (Equivalent of Biological Sciences)* |
| | *Academy of Technology and Agriculture, Poland* |
| June 1975 | · Primary Major, *Bachelor of Science in Mechanical Engineering (Diplomat Engineer)* |
| | *Academy of Technology and Agriculture, Poland* |

### ANATOMY AND PHYSIOLOGY

| | |
|---|---|
| May 1993 | · *Human Anatomy and Physiology,* |
| | *North Dakota State University, Fargo, North Dakota* |
| Dec. 1974 | · *Physiology* |
| | *Academy of Technology and Agriculture, Poland* |
| Dec. 1974 | · *Biochemistry* |
| | *Academy of Technology and Agriculture, Poland.* |
| June 1973 | ·*Anatomy* |
| | *Academy of Technology and Agriculture, Poland.* |

### MEDICAL RELATED

| | |
|---|---|
| June 2008 | · *Certified in AIS Scaling, Certified completion (with examination) of Injury Scaling (AIS) Update Course. Advanced course with suggested prerequisites including at least 2 years of active engagement in AIS coding.* |
| April 2005 | · *Certified in AIS Scaling, Certified completion (with examination) of Injury Scaling: Uses and Techniques Course (AIS Scale)* |
| May 1995 | · *Medical Neurosciences, School of Medicine,* |
| | *University of North Dakota, Grand Forks, North Dakota* |

## CONTINUING EDUCATION

### BIOMECHANICS

2018
- "TBI: Severity of Impact and Head Gear Protection," *North American Brain Injury Society (NABIS) 14th Annual Conference on Brain Injury*, Houston, TX

2017
- 12th World Congress on Brain Injury – International Brain Injury Association (IBIA), New Orleans, LA
- "The Contribution of an Engineering Analysis in a TBI Case," *12th World Congress on Brain Injury (IBIA),* New Orleans, LA
- "Approaches to the Evaluation and Treatment of Concussion: A Panel Disscusion," *12th World Congress on Brain Injury (IBIA),* New Orleans, LA; Panelist Group: John J. Leddy, MD FACSM FACP University of Buffalo; COL Sidney R. Hinds II (DoD Brain Health Research Program Coordinator, DoD Blast Injury Research Program Coordinating Office and US Army Medical Research and Material Command); Michael McCrea, PhD, ABPP (Director of Brain Injury Research, Departments of Neurosurgery, Neurology & Psychiatry and Medical College of WI)

2016
- 11th World Congress on Brain Injury – International Brain Injury Association (IBIA), The Netherlands
- "New Developments in Recognizing and Proving Moderate Traumatic Brain Injuries," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury,* Tampa, FL
- "The Complexity of Mild TBI: Case Presentations and Panel Discussion," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury,* Tampa, FL
- "Severe Traumatic Brain Injury TBI: Case Presentations and Panel Discussion," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury,* Tampa, FL

2015

- "A Comparative Study on the Protection Efficiency of Combat Helmets against Ballistic Impacts and Blast Waves," *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX
- "The Influence of Directionality of Correlating Kinematical Severity to Tissue Level Injury of the Human Head," *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX
- "Effect of Skull Deformation under Blunt Impact on the Level of Brain Injury, *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX

2014
- 10th World Congress on Brain Injury - International Brain Injury Association (IBIA), San Francisco, CA
- Alaska Brain Injury Conference – Anchorage, AK
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 on Headgear and Helmets Subcommittee F08.51 on Medical and Biomechanics, New Orleans, LA

2013
- 11th Annual Conference on Brain Injury – North American Brain Injury Society's (NABIS) Conference, New Orleans, LA
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 on Headgear and Helmets Subcommittee F08.51 on Medical and Biomechanics, Jacksonville, FL

2012
- 10th Annual Conference on Brain Injury –North American Brain Injury Society's (NABIS) Conference, Miami, FL
- 9th World Congress on Brain Injury, International Brain Injury Association, Edinburgh, Scotland
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Headgear Subcommittee F08.51 Medical Aspects and Biomechanics, Phoenix, AZ

2011
- 12th Annual Neuroscience of Brain Injury – Brain Injury Association of California, Napa, California
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Headgear Subcommittee F08.51 Medical Aspects and Biomechanics, Anaheim, CA
- 9th Annual Conference on Brain Injury - North American Brain Injury Society's (NABIS) Conference, New Orleans, LA
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Headgear Subcommittee F08.51 Medical Aspects and Biomechanics, Tampa, FL

2010
- National Association of State Head Injury Administrators (NASHIA) and North American Brain Injury Society's (NABIS) Brain Injury Partnerships: NASHIA & NABIS Conference, Minneapolis, MN.
- North American Brain Injury Society (NABIS) and Alaska Brain Injury Network's (ABIN) Alaska Brain Injury Conference, Anchorage, AK.
- 8th World Congress on Brain Injury, International Brain Injury Association, Washington, DC
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Headgear Subcommittee and Subcommittee F08.51 Medical Aspects and Biomechanics, St. Louis, MO.
- International Brain Mapping and Intraoperative Surgical Planning Society 2010 World Congress, Bethesda, MD.

2009
- North American Brain Injury Society's (NABIS) Brain Injury Conference of the Americas, Austin, TX
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Headgear Subcommittee and Subcommittee F08.51 Medical Aspects and Biomechanics, Atlanta, GA.

2008
- North American Brain Injury Society's (NABIS) Brain Injury Conference of the Americas, New Orleans, LA
- Veteran's Health Administration's Visual Consequences of Traumatic Brain Injury Conference, Billerica, MA
- Blast Injury Symposium, Wayne State University, Detroit, MI
- 7th World Congress on Brain Injury, International Brain Injury Association, Lisbon, Portugal
- 11th Annual Conference, The New York Academy of Traumatic Brain Injury, New York, NY
- Traumatic Brain Injury Consortium/Think Tank Session, College Station, TX

2007
- North American Brain Injury Society's Blast Injury Institute Mid-Winter Conference, Washington, DC
- North American Brain Injury Society, Brain Injury Conference of the Americas, San Antonio, TX
- Emergency World Summit, An American Auto Safety Tragedy: Roof Crush, Washington, DC
- 10th Annual Conference, The New York Academy of Traumatic Brain Injury, New York, NY

2006
- Biomedical Engineering Society, 2006 Annual Fall Meeting, Chicago, IL
- Brain Injury Association of Illinois, Annual Conference, Chicago, IL
- North American Brain Injury Society, Brain Injury Conference of the Americas, Miami, FL
- 8th International Neurotrauma Symposium, Traumatic Brain Injury, Spinal Cord Injury – The Silent Epidemic of the 21st Century, Rotterdam, The Netherlands

- Society of Automotive Engineers Seminar, Occupant and Vehicle Responses in Rollovers, Troy, Michigan*

2005
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Task Group on Soccer Headgear, Dallas, TX
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Task Group on Soccer Headgear, Reno, NV
- Spring 2005 Brain Injury Conference: "Biomechanics and Physiological Impact of Traumatic Brain Injury" and American Academy for the Certification of Brain Injury Specialists (AACBIS). Memphis, TN
- Certified Completion of *Injury Scaling: Uses and Techniques* Course (AIS Scale).  Sponsored by the Association for the Advancement of Automotive Medicine (AAAM).  Approved by the American Health Information Management Association and satisfies the requirements of the Clinical Data Management core educational content area.  Meets the Board of Certification for Emergency Nursing's (BCEN) Category of Clinical and has the approval of the Emergency Nurse's Association (ENA)

2004
- ATB Model Users' Group Conference, Salt Lake City, UT
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Task Group on Soccer Headgear, Salt Lake City, UT
- Fifth Annual – Managing Challenging Situations in Brain Injury Care Conference, Bethesda Rehabilitation Hospital, Healtheast, Minneapolis, MN
- Brain Injury Association of Indiana, "Contemporary Issues In Brain Injury Litigation", Indianapolis, IN
- Fifth Annual Brain Injury Association of America, Napa Valley, CA
- 16th Annual Medical & Legal Issues in Brain Injury; North American Brain Injury Society, Brain Injury Association of America, and International Brain Injury Association; Amelia Island, Florida
- The Biomechanics of Brain Injury, Mt. Sinai Medical Center, Brain Injury Association of NY, New York, NY
- 5th World Congress of Brain Injury, International Brain Injury Association, Stockholm, Sweden
- American Society of Testing and Materials (ASTM) Conference, Subcommittee F08.53 Task Group on Soccer Headgear, Kansas City, KS
- Congress of the European Federation of Neurological Societies, International Brain Injury Association Vienna, Austria.
- Fourth Annual Brain Injury Association of America, Napa Valley, CA
- ATB Model Users' Group Conference sponsored by the US Air Force Research Laboratory, Patuxent Naval Air Station, Patuxent River, MD

2001
- The Brain Injury Association's, 20th Annual Symposium, Atlanta, GA

2000
- The Biomechanics of Brain Injury, Mt. Sinai Medical Center, Brain Injury Association of NY, New York, NY
- Sports Related Concussions Workshop, ASTM Subcommittee F08.51 on Medical Aspects and Biomechanics, Orlando, FL
- Biomechanics Research: Experimental and Computational, Proceedings of the Twenty-Seventh International Workshop, National Highway Traffic Safety Administration, Atlanta, GA 44th Stapp Car Crash Conference, Atlanta, GA*
- ATB Model Users' Group Conference, Wichita State University, Wichita, KS*
- American Society for Testing and Materials Conference, Montreal, Quebec, Canada

1999
- Brain Injury Conference, Bancroft NeuroHealth, Philadelphia, PA

1998
- NATO/RTO Specialist Meeting, Dayton, OH
- 5th International LS-DYNA Users Conference, Detroit, MI*
- ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Dayton, OH

1997
- Aerospace Medical Association Annual Scientific Meeting in Chicago, IL (May)
- ATB Model Users' Group Conference, US Air Force Armstrong Laboratory, Charlottesville, VA (Apr.)*

1996
- Society of Automotive Engineers, 40th Stapp Car Crash Conference, Albuquerque, N.M. (Nov.)*
- NATO/AGARD Specialists' Meeting on Impact Head Injury (Nov.)*
- ATB Model Users' Group Conference, US Air Force Armstrong Laboratory, Phoenix, AZ (Feb.)*

1995
- Twenty-Third International Workshop on Human Subjects for Biomechanical Research, US Department of Transportation, National Highway Traffic Safety Administration, San Diego, CA (Nov.)

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                    5

- Society of Automotive Engineers, 39th Stapp Car Crash Conference, San Diego, CA (Nov.)
- Accidental Injury: Biomechanics & Prevention, sponsored by University of California, San Diego School of Medicine, San Diego, CA (Nov.)
- ATB Model Seminar, Wright-Patterson Air Force Base, Dayton, OH (June)*
- LS-DYNA3D Seminar LSTC, Livermore, CA (March)

1994
- "*The Biomechanics of Impact and its Relationship to Crash Performance Standards,*" sponsored by Association for the Advancement of Automotive Medicine (AAAM) in cooperation with International Research Council on the Biomechanics of Impact (IRCOBI), Philadelphia, PA (Oct.)
- International Symposium on Head Injury Research, "*Head Injury '94,*" sponsored by the U.S. Department of Transportation's National Highway Traffic Safety Administration, Oct. 12-14, 1994, Washington, D.C.

1993
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1991
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1988
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) Seminar on Injuries, Anatomy, Biomechanics and Federal Regulation *

1986
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1984
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1982
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

* Also listed under Vehicle Structure-Vehicle Dynamics


## VEHICLE STRUCTURE - VEHICLE DYNAMICS

2014
- CSI – CDR Technician 1 and 2 Training, Conroe, TX

2013
- CDR Training, Conroe, TX
- "Acceleration and Vericom Familiarization", Vericom Conference, Washington (June)
- ARC-CSI Crash Conference, Las Vegas, NV (May)

2012
- ARC-CSI Crash Conference (ACTAR #1939), Las Vegas, NV

2007
- PC Crash Fundamentals Workshop, Las Vegas, NV

2006
- Society of Automotive Engineers Seminar, Occupant and Vehicle Responses in Rollovers, Troy, Michigan*

2001
- Crash Data Retrieval (CDR) Training and Certification, Sponsored by General Motors, Vetronix and Texas Engineering Extension Service (TEEX), (Airbag sensing and diagnostic module, vehicle speed, change in velocity, seatbelt usage, etc.) Santa Barbara, CA

2000
- ATB Model Users' Group Conference, Wichita State University, Wichita, KS*
- 44th Stapp Car Crash Conference, Atlanta, GA*

1998
- 5th International LS-DYNA Users Conference, Detroit, MI*

1997
- ATB Model Users' Group Conference, US Air Force Armstrong Laboratory, Charlottesville, VA (Apr.)*

1996
- Society of Automotive Engineers, 40th Stapp Car Crash Conference, Albuquerque, NM (Nov.)*
- NATO/AGARD Specialists' Meeting on Impact Head Injury (Nov.)*
- ATB Model Users' Group Conference, US Air Force Armstrong Laboratory, Phoenix, AZ (Feb.)*

1995
- ATB Model Seminar, Wright-Patterson Air Force Base, Dayton, OH (June)*

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                6

- LS-DYNA3D Seminar LSTC, Livermore, CA (March)*

1993
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1992
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1991
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1990
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1989
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) Seminar on Accident Reconstruction, Using CRASH3 Computer Program

1988
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) Seminar on Injuries, Anatomy, Biomechanics and Federal Regulation *
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1987
- Society of Automotive Engineers, International Off-Highway Congress & Exposition, Milwaukee, WI (Sept.)

1986
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1984
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.) *

1983
- Society of Automotive Engineers, International Off-Highway Congress & Expo., Milwaukee, WI (Sept.)

1982
- Society of Automotive Engineers, International Congress & Exposition, Detroit, MI (Feb.)

* Also listed under Biomechanics

# WORK EXPERIENCE

| | |
|---|---|
| 3/23 to present | *Board Member for PINK Concussions Professional Advisory Board (PINK Pro AB)* |
| 9/13 to 2018 | *Chair, of the North American Brain Injury Society (NABIS)* |
| 2006 to present | *Abstract Submission Chair, of the North American Brain Injury Society (NABIS)* |
| 9/11 to 9/12 | *Vice-Chair, of the North American Brain Injury Society (NABIS)* |
| 5/04 | *Researcher, Compliance Testing FMVSS 223 Rear Impact Guards & 224 Rear Impact Protection for B.L. Industries* |
| 2/04 to present | *Board member for North American Brain Injury Society* |
| 7/03 to 2017 | Reelected *Board of Governors Member for International Brain Injury Association* |
| 4/03 to present | *Board of Advisors Member for Neurotrauma Registry. www.neurotraumaregistry.com* |
| 11/02 to present | *Member, American Society of Testing and Materials (ASTM) F08 Sports Equipment and Facilities Committee, F08.51 Medical Aspects and Biomechanics Subcommittee & F08.53 Task Group on Soccer Headgear Subcommittee* |
| 6/01 to present | *Collaborator, Emergency Room (ER) Biomechanical Brain Injury Evaluation Research, Meritcare Trauma Center, Fargo, ND* |
| 7/98 to present | *Clinical Adjunct Associate Professor, Department of Clinical Neuroscience at the University of North Dakota School of Medicine, Grand Forks, ND.* |
| 12/97 to present | *Director of Impact Biomechanics Laboratory, College of Engineering at North Dakota State University, Fargo, ND.* |
| 10/92 to present | *Director of Automotive Systems Laboratory Dept. of Mechanical Eng. & Applied Mechanics, North Dakota State University, Fargo, ND.* |
| 9/97 to 9/98 | *Faculty Member invited to lecture on biomechanical aspects of pathology in the nervous system secondary to trauma as a part of Neuroanatomy and Neurophysiology Course (NEUPSY 805) at the Fielding Institute with APA accredited Ph.D. Program in Clinical Psychology.* |

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                                      7

| | |
|---|---|
| 5/97 to 8/97 | *Researcher, United States Air Force Office of Scientific Research, Summer Research Program, Occupant Biodynamics Modeling, Armstrong Laboratory, Wright-Patterson Air Force Base, Dayton, OH.*<br>*Project involvement: laboratory studies of human body response to impact, head/neck biodynamics Injury Criteria for the human. (~900 tests analyzed, male/female)* |
| 5/96 to 9/96 | *Researcher, United States Air Force Office of Scientific Research. Summer Research Program. Occupant Biodynamics Modeling, Armstrong Laboratory, Wright-Patterson Air Force Base, Dayton, OH.*<br>*Project involvement: laboratory studies of human body response to impact, head/neck biodynamic modeling, development of biodynamics Injury Criteria for the human.* |
| 5/92 | *Tenured Associate Professor, Dept. of Mechanical Engineering & Applied Mechanics. North Dakota State Univ., Fargo, ND.* |
| 9/86 to 4/92 | *Assistant Professor, Dept. of Mechanical Engineering & Applied Mechanics, North Dakota State Univ., Fargo, ND.* |
| 9/85 to 9/86 | *Lecturer, Dept. of Mechanical Engineering & Applied Mechanics North Dakota State University, Fargo, ND.* |
| 11/80 to 8/85 | *Research Assistant, Dept. of Agricultural Engineering North Dakota State University, Fargo, ND.* |
| 4/80 to 11/80 | *Exchange Scientist, Agricultural Engineering Department, North Dakota State University of Agriculture and Applied Sciences, Fargo, ND* |
| 11/77 to 4/80 | *Assistant Professor, Mechanical Engineering Department Academy of Technology and Agriculture, Bydgoszcz, Poland.* |
| 11/77 to 4/80 | *Instructor, National Institute of Advanced Technical Education (Center of Technology Progress and Staff Perfection).* |

## Special Appointments

| | |
|---|---|
| 2018 | *Board Member for PINK Concussions Professional Advisory Board (PINK Pro AB)* |
| 2017 | *International Planning Committee Member for 12th World Congress on Brain Injury (IBIA)* |
| 2016 | *Medical Advisory Board Member for Rapid SOS (Harvard/MIT/Stanford emergency technology start-up)* |
| 2015 | *Invited Presenter, State-of-the-Science Meeting on "Does Repeated Blast-Related Trauma Contribute to the Development of Chronic Traumatic Encephalopathy (CTE)?", McLean, VA*<br>*Planning Committee Member for 4th Federal Interagency Conference on Traumatic Brain Injury (TBI)* |
| 2014 | *Invited Reviewer, "Digitization and Analysis of Non-Contact Inertial Loadings Related to Neurological injury within the Biodynamics Data Resource", Department of Defense (DoD) from Valeta Chancey PhD at U.S. Army Aeromedical Research Lab, Neurotrauma* |
| 2013 | *Invited Speaker, "Trauma Biomechanics Perspective on Brain Cellular Level Damage," 22nd Annual NORA Multi-Disciplinary Conference, San Diego, CA* |
| 2013 | *Invited Presenter, "Blast Injury Institute: New Developments in Understanding the Mechanism of Blast Related TBI (Clinical)," North American Brain Injury Society (NABIS)* |
| 2013 | *Invited Presenter, "Biomedical Perspective on Brain Injury due to Blast," 22nd Annual NORA Multi-Disciplinary Conference* |
| 2013 | *Chair and Invited Reviewer, 40 scientific peer reviews for the Department of Defense (DoD), Defense Health Program (DHP), Defense Medical Research and Development Program (DMRDP) and Military Operational Medicine Joint Program Committee 5 (MOMJPC-5); Injury Prevention, Physiological and Environmental Health Award (IPPEHA)* |
| 2013 | *Primary Reviewer, 3 scientific peer reviews for the Department of Defense (DoD), Defense Health Program (DHP), Defense Medical Research and Development Program (DMRDP) and Military Operational Medicine Joint Program Committee 5 (MOMJPC-5); Injury Prevention, Physiological and Environmental Health Award (IPPEHA)2013  Invited Primary Reviewer for 11 Full Publications submitted for American Society for Testing and Materials (ASTM) Concussion Symposium* |
| 2013 | *Invited Reviewer, "Development and Validation of two Subject-Specific Finite Element Models of Human Head against three Cadaveric Experiments," scientific peer review for International Journal for Numerical Methods in Biomedical Engineering* |

| | |
|---|---|
| 2013 | *Invited Reviewer, "Simulation, Fabrication and Impact Testing of a Novel Football Helmet Padding System that Decreases Rotational Acceleration," scientific peer review for Sport Engineering (SPEN)* |
| 2013 | *Co-Chair,* Concussions Seminar 2013, *American Society for Testing and Materials (ASTM) International, Jacksonville, GA, November 10-15, 2013* |
| 2013 | *Chair,* BII Blast Panel, *North American Brain Injury Society (NABIS) 11th Annual Conference on Brain Injury, New Orleans, LA, September 18-21, 2013* |
| 2012 | *Chair,* BII Blast Panel, *North American Brain Injury Society (NABIS) 10th Annual Conference on Brain Injury, Miami, FL, September, 12-15, 2012* |
| 2012 | *Chair, for the North American Brain Injury Society (NABIS) 10th Annual Conference on Brain Injury Abstract Sessions, Miami, FL, September, 12-15, 2012* |
| 2011 to 2012 | *Vice-Chair of the North American Brain Injury Society (NABIS), 10th Annual Conference on Brain Injury." Miami, FL, Sept. 12-15, 2012.* |
| 2012 | *Chairman, Scientific Peer Review Panel, Proposals, "Integrated Eye Tracking and Neural Monitoring for Enhanced Assessment of Mild TBI", United States Medical Research and Materiel Command (USARMC), DoD Psychological Health, Polytrauma, and Operational Health (PHPOH) Program. (2012)* |
| 2012 | *Moderator for North American Brain Injury Society (NABIS) Blast Panel, 10th Annual Conference on Brain Injury." Miami, FL, Sept. 12-15, 2012* |
| 2012 | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society Conference, "10th Annual Conference on Brain Injury." Miami, FL, Sept. 12-15, 2012* |
| 2012 | *Planning Committee Member for North American Brain Injury Society (NABIS)* |
| 2012 | *Chair, Peer Review Panel, Integrated Eye Tracking and Neural Monitoring for Enhanced Assessment of Mild TBI, Psychological Health, Polytrauma, and Operational Health (PHPOH), U.S. Army Medical Research and Materiel Command (USAMRMC)* |
| 2012 | *Invited Reviewer, "Evaluation of Cervical Spine Mechanical Properties and Injury at High Loading Rate for WIAMan," scientific peer review for the Department of Defense (DoD), Warrior Injury Assessment Manikin (WIAMan) Program, United States Medical Research and Materiel Command (USAMRMC).* |
| 2012 | *Invited Reviewer, "Human Injury Tolerance toward Development and Validation of a Warrior Manikin," scientific peer review for the Department of Defense (DoD), Warrior Injury Assessment Manikin (WIAMan) Program, United States Medical Research and Materiel Command (USAMRMC).* |
| 2012 | *Invited Reviewer, "Impact Biomechanics of Under-Belly Blast Loading Experienced by Mounted Soldiers," scientific peer review for the Department of Defense (DoD), Warrior Injury Assessment Manikin (WIAMan) Program, United States Medical Research and Materiel Command (USAMRMC).* |
| 2012 | *Invited Reviewer, "Instrumentation for Support of WIAMan Program: New Sensor Types and Data Recorder Capabilities must be used to Support Quantifying Human Injury Thresholds in Blast Environments," scientific peer review for the Department of Defense (DoD), Warrior Injury Assessment Manikin (WIAMan) Program, United States Medical Research and Materiel Command (USAMRMC).* |
| 2012 | *Invited Reviewer, "The Development of a Virtual 3D Surgical Atlas for Craniofacial Battlefield Injured: A New Paradigm in Preparing Surgeons to Treat Facial Trauma," scientific peer review for the Department of Defense (DoD), United States Army Medical Research and Materiel Command (USAMRMC).* |
| 2011 | *Chair,* BII Blast Panel, *North American Brain Injury Society (NABIS) 9th Annual Conference on Brain Injury, New Orleans, LA, September, 14-17, 2011* |
| 2011 | *Chair, for the North American Brain Injury Society (NABIS) 9th Annual Conference on Brain Injury Abstract Sessions, New Orleans, LA, September, 14-17, 2011* |
| 2011 to present | *Vice-Chair of the North American Brain Injury Society (NABIS), "9th Annual Conference on Brain Injury." New Orleans, LA, Sept. 15-17, 2011.* |
| 2011 | *Moderator for North American Brain Injury Society (NABIS) Blast Panel, "9th Annual Conference on Brain Injury." New Orleans, LA, Sept. 15-17, 2011* |
| 2011 | *Planning Committee Member for North American Brain Injury Society (NABIS)* |
| 2011 | *Chairman of the Surfaces & Injury Prevention Section at the 5th Asia-Pacific Congress in Sports Technology, Melbourne, Australia* |
| 2010 to present | *Editor-in-Chief for NABIS Conferences and Proceedings* |

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                                      9

| | |
|---|---|
| *2011* | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society Conference, "9th Annual Conference on Brain Injury." New Orleans, LA, Sept. 15-17, 2011* |
| *2010 to 2014* | *Re-elected to Board of Governors, International Brain Injury Association for the term 2010-2014* |
| *2010* | *Moderator for National Association of State Head Injury Administrators (NASHIA) and North American Brain Injury Society's Brain Injury Partnerships: NASHIA & NABIS Conference, Minneapolis, MN.* |
| *2010* | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society Conference, "8th Annual Conference on Brain Injury." Minneapolis, MN, Oct. 6-9, 2010* |
| *2010* | *Reviewer, Proposal for the United States Army Medical Research and Materiel Command (USAMRMC) Military Medical Research and Development Grant Program* |
| *2009* | *Reviewer, Intramural Proposals for the Department of Defense (DoD) Defense Medical Research and Development Program, Intramural Applied Research and Advanced Technology Development Award* |
| *2009* | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society Conference, "7th Annual Conference on Brain Injury." Austin, TX, Oct.14-17, 2009.* |
| *2009* | *Moderator, MTBI/Blast Panel, North American Brain Injury Society conference, "7th Annual Conference on Brain Injury." Austin, TX, Oct.14-17, 2009.* |
| *2009 to present* | *Planning Committee Member for North American Brain Injury Society conferences occurring in 2010* |
| *2009 to present* | *Board Member for North American Brain Injury Society* |
| *2008 to present* | *Invited Advisory Group Member , Traumatic Brain Injury – ROC (Resource Optimization Center)* |
| *2008* | *Reviewer, Proposals for the Military Operational Medical Research Program, US Army Materiel Research Command (USAMRMC).* |
| *2008* | *Reviewer, Intramural Proposals for the Department of Defense (DoD) Intramural War Supplement Program.* |
| *2008* | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society conference, "6th Annual Conference on Brain Injury." New Orleans, LA. Oct. 2-4, 2008.* |
| *2008* | *Invited Speaker, Invited by a former US Air Force Surgeon General to make a presentation on the Physics of Blast Injury to a special conference/think tank session on allocation of Department of Defense (DoD) funding for TBI/blast injuries.* |
| *2007* | *Chairman, "Physics of Blast as it Relates to Brain Injury" peer review for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).* |
| *2007* | *Chairman, Extramural Proposals related to brain injuries caused by blasts for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).* |
| *2007* | *Reviewer, Concept Proposals related to brain injuries caused by blasts for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).* |
| *2007* | *Reviewer, Intramural Proposals on clinical diagnosis related to brain injuries caused by blasts for the Department of Defense (DoD) Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program as a part of the Congressionally Directed Medical Research Programs (CDMRP).* |
| *2007 to present* | *Chairman, North American Brain Injury Society's (NABIS) Blast Injury Institute.* |
| *2007* | *Chairman, Sports Medicine Section for the 3rd Asia-Pacific Congress on Sports Technology, Singapore, September 23-26, 2007* |
| *2007* | *Chairman, Paper/Poster Chairman for the North American Brain Injury Society conference, "5th Annual Conference on Brain Injury." San Antonio, TX. September 27-29, 2007.* |
| *2007* | *Planning Committee, North American Brain Injury Society Conference, to be held in New Orleans, LA in 2008.* |
| *2007* | *Planning Committee, Blast Injury Institute, North American Brain Injury Society, Midwinter Conference, Washington, DC, November 2007.* |
| *2006* | *Planning Committee, North American Brain Injury Society conference "Brain Injury Conference of the Americas", Miami, FL. September 14-16, 2006.* |
| *2006* | *Paper/Poster Chair, North American Brain Injury Society conference, "Brain Injury Conference of the Americas", Miami, FL. September 14-16, 2006.* |
| *2005* | *Presentation Chair, North American Brain Injury Society conference "Brain Injury: New Science, Best Practice, and Future Innovations," Amelia Island, FL. September 22-24, 2005.* |
| *2004 to present* | *Director for Biomechanics section of North American Brain Injury Society* |

| | |
|---|---|
| 2004 to present | Board Member for North American Brain Injury Society |
| 2003 to 2009 | Board of Governors for International Brain Injury Association |
| 2003 to present | Board of Advisors for Neurotrauma Registry, www.neurotraumaregistry.com |
| 2002 to present | Development of soccer headgear national standards for American Society for Testing and Materials (ASTM), Member of F08 Sports Equipment and Facilities Committee, F08.51 Medical Aspects and Biomechanics Subcommittee & F08.53 Task Group on Soccer Headgear Subcommittee |
| 2002 to present | American Society for Testing and Materials (ASTM), Member of F08.51 Medical Aspects and Biomechanics Subcommittee |
| 2001 to present | Emergency Room (ER) Biomechanical Brain Injury Evaluation, F M Ambulance, Meritcare Trauma Center, Fargo, ND |
| 1997 to 1998 | Collaborator to the Society of Automotive Engineers (SAE) Human Mechanical Response and Injury Criteria Task Group. |
| 1996 | Member of United States Engineering Education Delegation to the Republic of South Africa (Assigned area of emphasis - bioengineering education) |
| Started 1994 | Member of the National Highway Traffic Safety Administration (NHTSA) Collaboration Group on Human Brain Modeling. |
| 2000 to 2002 | President of the Articulated Total Body (ATB) User's Group organized by the Armstrong Aerospace Medical Research Laboratory, Human System Division, Wright-Patterson Air Force Base, Dayton, Ohio. |
| 1996 to 2000 | Chairman of Activities Committee including validation studies and data base development for the Articulated Total Body (ATB) User's Group organized by the Armstrong Aerospace Medical Research Laboratory, Human System Division, Wright-Patterson Air Force Base, Dayton, Ohio. |
| 1995 to 1996 | Member of the Technical Program Committee for the Articulated Total Body (ATB) User's Group organized by the Harry G. Armstrong Aerospace Medical Research Laboratory, Human System Division. |
| 1995 to 1996 | Chair of the Technical Proceedings Committee for the Articulated Total Body (ATB) User's Group organized by the Harry G. Armstrong Aerospace Medical Research Laboratory, Human System Division. |

**Teaching Activity**

Biomechanics
Vehicle Dynamics
Kinematics (Human Body Dynamics)
Ph.D. and MS Theses
Senior Design Projects
Mechanical Systems Laboratory

**Research Activity**

Human Brain Modeling
- National Highway Traffic Safety Administration
- Department of Defense

Laboratory studies of human body responses to impact and head/neck biodynamic modeling
- Armstrong Aerospace Medical Research Laboratory, Human System Division, Wright-Patterson Air Force Base

Vehicle Dynamics Analysis
Statistical Methods

**University Special Appointments**

Chair, College of Engineering Promotion and Tenure Evaluation Committee
Chair, Mechanical Engineering Departmental Chair's 3rd Year Review Committee
Chair, Mechanical Engineering Promotion and Tenure Evaluation Committee
Chair, College of Engineering Promotion and Tenure Evaluation Committee
Member, College of Engineering Executive Committee
Member, University Faculty Senate
Member, University Senate Faculty Development Committee

**Editor**

Editorial Advisory Board Member for Brain Injury Professional, the official publication of NABIS
National Planning Committee Member for 10th World Congress on Brain Injury
Editor-in-Chief for NABIS Conferences and Proceedings
Brain Injury Professional
Open Mechanics Journal
International Journal of Mechanics and Solids

Mariusz Ziejewski, Ph.D., Inż. – Vita | 11

| | |
|---|---|
| **Membership** | *North American Brain Injury Society (NABIS), Board Member* |

- *Chairman, 2012-2017*
- *Abstract Submission Chair, 2006-2016*
- *Vice-Chairman, 2011*
- *Board member since 2004*
- *Editor-in-Chief for Conferences and Proceedings*
- *Founding Chair of Blast Injury Institute*
- *Director of the Biomechanics Section*
- *Conference Planning Committee member*
- *Moderator for National Association of State Head Injury Administrators (NASHIA) and North American Brain Injury Society's Brain Injury Partnerships: NASHIA & NABIS Conference, Minneapolis, MN, Oct. 6-9, 2010*
- *Moderator for North American Brain Injury Society (NABIS) Blast Panel, "9th Annual Conference on Brain Injury." New Orleans, LA, Sept. 15-17, 2011*

*American Society of Testing Materials (ASTM)*

- *Co-Chair of Symposium on the Mechanism of Concussion in Sports*
- *Member of Subcommittee F08.53 on Headgear and Helmets*
- *Member of Committee F08.51 on Medical Aspects and Biomechanics*

*International Brain Injury Association (IBIA)*

- *International Planning Committee*
- *Scientific Planning Committee*
- *Reelected to Board of Governors 2014*
- *Chair Panel Discussion 2014*
- *Elected to the Board of Governors since 2003-present*

*Member, Society of Automotive Engineers (SAE)*
*American Society of Mechanical Engineers (ASME), Bioengineering Division*
*Association for the Advancement of Automotive Medicine (AAAM)*
*American Society of Biomechanics*

# PUBLICATIONS

## BOOK CHAPTERS

Ziejewski, M., G. Karami, H. Sarvghad-Moghaddam and A. Rezaei
"CFD Modeling of the Underwash Effect of Military Helmets as Possible Mechanism for Blast Induced TBI," in *Computer Methods in Biomechanics and Biomedical Engineering*, Taylor & Francis Group

Ziejewski, M. and Ashare, A. – 2014
"The Mechanism of Concussion in Sports Selected Technical Papers-STP 1552" in *Mechanism of Concussion*, Atlanta, GA (Editors)

Ziejewski, M., and Karami, G.– 2012
"Biomechanical Perspective on Blast Injury," in: *Concussive Brain Trauma: Neurobehavioral Impairment and Maladaptation* by Dr. Rolland Parker, Taylor & Francis Group, Boca Raton, FL.

Ziejewski, M. – 1997
"Biomechanics of Head Injury," in: *Head Trauma Cases: Law and Medicine* by Dr. A.C. Roberts, Second Edition, John Wiley & Sons, Inc.

Ziejewski, M. – 1992
"Engineering Aspects of Head-Neck Injury," in: *Head and Neck Injury Handbook* by Lawrence J. Smith, Colorado Springs, CO: Shepard's McGraw-Hill, Inc.

## PAPERS

Eslaminejad, A., H. Sarvghad-Moghaddam, G. Karami, M. Ziejewski – 2017
"Brain Tissue Constitutive Material Models and the Finite Element Analysis of Blast-Induced TBI," *Scientia Irancia International Journal of Science and Technology*

Sarvghad-Moghaddam, H., A. Rezaei, G. Karami, M. Ziejewski – 2017

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                                                    12

"Correlative Analysis of Head Kinematics and Brain's Tissue Response:  A Computational Approach Towards Understanding the Mechanisms of Blast TBI," *Shockwaves*

Sarvghad-Moghaddam, H., W. Kwok, G. Karami, M. Ziejewski – 2017
"Effect of Fitting on the Protection Capacity of Ice Hockey Helmets:  Analyses of Headform Kinematics and Brain Tissue Responses in the Study of Mild TBI," *12th World Congress on Brain Injury, New Orleans, LA (Poster Presentation)*

Eslaminejad, A., M. Hosseini Farid, G. Karami, M. Ziejewski – 2017
"Contribution of Wave Propagation and Head Acceleration to the Development of Brain Tissue Responses under Blast," *12th World Congress on Brain Injury, New Orleans, LA* (Poster Presentation)

Sarvghad-Moghaddam, H., A. Eslaminejad, M. Hosseini Fardid, G. Karami, M. Ziejewski – 2017
"Cerebrospinal Fluid (CSF) adn Vibration of Skull in Acoustical Analysis of Human Head to Monitor Brain ICP," *12th World Congress on Brain Injury, New Orleans, LA* (Poster Presentation)

Eslaminejad, A., H. Sarvghad-Moghaddam, M. Hossieni Farid, G. Karami, M. Ziejewski – 2017
"A Study on the Effects of Strain Rates on Characteristics of Brain Tissue," *ASME International Mechanical Engineering Congress and Exposition*

Eslaminejad, A., H. Sarvghad-Moghaddam, G. Karami, M. Ziejewski – 2017
"Effect of the Constitutive Model of Brain Tissue on the Dynamic Response of Head to Blast Shockwaves," *Computational and Mathematical Biomedical Engineering, Pittsburgh, PA*

Sarvghad-Moghaddam, H., A. Eslaminejad, G. Karami, M. Ziejewski – 2017
"Understanding Blast-Induced Brain Injury Mechanisms:  A Finite Element Analysis," *5th International Conference on Computational and Mathematical Biomedical Engineering, Pittsburgh, PA*

Sarvghad-Moghaddam, H., G. Karami, M. Ziejewski – 2017
"Understanding the Pathology of Blast Brain Injury and the Role of Helmet Protect," *Proceedings of the International Research Council on the Biomechanics of Injury Conference, Antwerp, Belgium*

Eslaminejad, A., H. Sarvghad-Moghaddam, G. Karami, M. Ziejewski – 2017
"Understanding the Mechanics of Blast Pressure Waves Inside a Shock-Tube:  Effects of Geometry Optimization on the Blast Profile," *ASME Fluids Engineering Summer Conference, Waikoloa, HI*

Sarvghad-Moghaddam, H., A. Eslaminejad, G. Karami, M. Ziejewski – 2017
"Computational Fluid Dynamics Analysis of Blast Wave Interaction with Head and Helmet," *ASME Fluids Engineering Summer Conference, Waikoloa, HI*

Moghaddam, H., A. Rezaei, G. Karami, M. Ziejewski – 2017
"Impact-Induced Traumatic Brain Injury:  Effect of Human Head Model on Tissue," *Journal of Biomechanical Engineering*

Eslaminejad, A., H. Sarvghad-Moghaddam, A. Rezaei, G. Karami, M. Ziejewski – 2016
"Comparison of Brain Tissue Material Finite Element Models Based on Threshold for TBI," *ASME International Mechanical Engineering Congress and Exposition, Phoenix, AZ*

Eslaminejad, A., M. Hosseini Farid, G. Karami, M. Ziejewski – 2016
"A Compariosn of Various Constitutive Brain Tissue Finite Element Modeling," *2016 Military Health System Research Symposium, Kissimmee, FL*

Rezaei, A., H. Sarvghad-Moghaddam, A. Eslaminejad, G. Karami, M. Ziejewski – 2016
"Skull Deformation has No Impact on the Variation of Brain Intracranial Pressure," *Proceeding of the 2016 International Mechanical Engineering Congress and Exposition (IMECE), Phoenix, AZ*

Eslaminejad, A., H. Sarvghad-Moghaddam, A. Rezaei, G. Karami, M. Ziejewski – 2016
"Effect of Brain Tissue Constitutive Model on the Biomechanical Response of the Brain to Blast Loads," *Proceeding of the 2016 International Mechanical Engineering Congress and Exposition (IMECE), Phoenix, AZ*

Sarvghad-Moghaddam, H., A. Eslaminejad, A. Rezaei, G. Karami, M. Ziejewski – 2016
"Mechanical Response of the Brain under Blast:  The Effect of Blast Direction and the Head Protection," *Proceeding of the 2016 International Mechanical Engineering Congress and Exposition (IMECE), Phoenix, AZ*

Sarvghad-Moghaddam, H., A. Rezaei, G. Karami, M. Ziejewski – 2016
"CFD modeling of the underwash effect of military helmets as a possible mechanism for blast-induced traumatic brain injury," *Computer Methods in Biomechanics and Biomedical Engineering*

Rezaei, A., H. Sarvghad-Moghaddam, G. Karami, M. Ziejewski – 2016
"Evaluation of Brain Tissue Reponses because of the Underwash Overpressure of Helmet and Faceshield under Blast Loading," *International Journal for Numerical Methods of Biomedical Engineering*

Rezaei, A., H. Sarvghad-Moghaddam, G. Karami, M. Ziejewski – 2015
"Pressure and Shear Stress Propagations in the Brain:  Comparison of Two Independent Head Models," *Medical & Biological Engineering and Computing*

Salimi Jazi, Mehdi, A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2015
"Computational Biomechanics of Human Brain with and without the Inclusion of the Body under Blast," *Computer Methods in Biomechanics and Biomedical Engineering*

Scheer, D., G. Karami, M. Ziejewski – 2015
  "An Evaluation of the Riddell IQ HITS System in Prediction of an Athlete's Head Association," 7th *Asia-Pacific Congress on Sports Technology, Barcelona, Spain*
Scheer, D., G. Karami, M. Ziejewski – 2015
  "Effects of Helmet Surface Geometry on Head Acceleration in High Velocity Watersports," *7th Asia-Pacific Congress on Sports Technology, Barcelona, Spain*
Sarvghad-Moghaddam, H., A. Rezaei, F. Azarmi, G. Karami, M. Ziejewski – 2015
  "Mechanical Response of the Brain under Blast:  The Effect of Blast Direction and the Head Protection," *(ASME) IMECE Conference, Houston, Texas*
Sarvghad-Moghaddam, H., M. Salimi Jazi, A. Rezaei, G. Karami, M. Ziejewski – 2015
  "Stress Relaxation Experiments Provide Lowest and Highest Possible Stresses Experienced by Brain Tissue," *Journal of Biomechanical Engineering*
Sarvghad-Moghaddam, H., G. Karami, M. Ziejewski - 2014
  "Examination of the Blast-Induced Underwash Effect on a Helmeted Head on the Response of the Brain," *17th U.S. National Congress on Theoretical and Applied Mechanics (Michigan State University), East Lansing, MI*
Sarvghad-Moghaddam, H., A. Rezaei, M. Salimi Jazi, G. Karami, M. Ziejewski – 2014
  "A Study on the Influence of Directionality on Blast-Induced Brain Injury," *11th World Congress on Computational Mechanics (WCCMXI) East Lansing, MI*
Rezaei, A., M. Salimi Jazi, S. Javid, G. Karami, M. Ziejewski – 2014
  "Confined Blasts, and the Impact of Shock Wave Reflections on a Human Head and the Related Traumatic Brain Injury," *International Journal of Experimental and Computational Biomechanics*
Rezaei, A., G. Karami, M. Ziejewski – 2014
  "Examination of Brain Injury Thresholds in Terms of the Severity of Head Motion and the Brain Stresses," *International Brain Injury Association*,
Sarvghad-Moghaddam, H.,  M. Salimi Jazi, A. Rezaei, G. Karami, M. Ziejewski – 2014
  "Examination of the Protective Roles of Helmet/Faceshield and Directionality for Human Head Under Blast Waves," *Journal of Computer Methods in Biomechanics and Biomedical Engineering* (Online)
Sarvghad-Moghaddam, H., G. Karami, M. Ziejewski – 2014
  "The Effect of Directionality of Blunt Impacts on Mechanical Response of Brain," Paper# imece2014-39338, *American Society of Mechanical Engineers (ASME) IMECE Conference, Montreal, Canada*
Sarvghad-Moghaddam, H., G. Karami, M. Ziejewski – 2013
  "Examination of the Blast-Induced Underwash Effect on a Helmeted Head and the Response of the Brain," *17th U.S. National Congress on Theoretical and Applied Mechanics, Barcelona, Spain*
Sarvghad-Moghaddam, H., G. Karami, M. Ziejewski - 2013
  "Numerical Study of the Underwash Phenomenon of the Helmeted-Human-Head under Blast Waves," *10th World Congress on Brain Injury, San Francisco, CA*
Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2013
  "Study the Effect of Padding Materials on the Level of the Load in the Brain," NEMB2013, *ASME Conference*
Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2013
  "The Analysis of a Helmeted Human Head under Ballistic Impact Loads," *Journal of ASTM Mechanism of Concussion in Sports*
Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2013
  "Biomechanical Parameters in Blast Brain Injury with and without Helmet," *Int. J. of Experimental and Computational Biomechanics*
Rezaei, A., M. Salimi Jazi, G. Karami, M. Ziejewski – 2013
  "A Computational Study on Brain Tissue under Blast:  Primary and Tertiary Blast Injury," *Int. J. for Numerical Methods in Biomedical Engineering*
Rezaei, A., M. Salimi Jazi, S. Javid, G. Karami, M. Ziejewski – 2013
  "Confined Blasts, and the Impact of Shock Wave reflections on a Human Head and the Related Traumatic Brain Injury", *Int. J. Experimental and Computational Biomechanics*
Rezaei, A., M. Salimi Jazi, G. Karami, M. Ziejewski – 2013
  "The Effects of Retesting on the Mechanical Properties of Brain Tissues," Paper # IMECE2013-65149, *American Society of Mechanical Engineers (ASME) IMECE Conference, San Diego, CA*
Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2013
  "Effects of Attached Body on Biomechanical Response of the Helmeted Human Head under Blast," Paper # IMECE2013-65140, *American Society of Mechanical Engineers (ASME) IMECE Conference, San Diego, CA*
Rezaei, A., M. Salimi Jazi, G. Karami, M. Ziejewski – 2013

"Determination of Short-Term and Long-Term Moduli of Brain Tissue Viscoelastic Properties under Large Deformation," *International Research Council on Biomechanics of Injury (IRCOBI)*

Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2013
   "A Computational Study on Biomechanics of Brain of a Helmeted Human Head Model Exposed to Blast Waves from Different Orientations", *11th International Symposium Computer Methods in Biomechanics and Biomedical Engineering*

Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2012
   "Helmet-Head Interactions under the Blast", *The Journal of Head Trauma Rehabilitation (Peer Review Abstract)* 27(5): e40-e41

Rezaei, A., G. Karami, M. Ziejewski – 2012
   "Determination of the Constitutive Viscoelastic Formula for Brainstem" *The Journal of Head Trauma Rehabilitation (Peer Review Abstract)* 27(5): e40

Salimi J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2012
   "A Computational Study on Influence of Helmet Padding Materials on Human Brain under Ballistic Impacts," *Computer Methods in Biomechanics and Biomedical Engineering*

Salimi J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2012
   "The Analysis of Helmeted Human Head under Ballistic Impact Loads," *American Society for Testing and Materials (ASTM) Symposium on the Mechanism of Concussion in Sports, Atlanta, GA*

Dirisala, V., G. Karami, M. Ziejewski – 2012
   "Effects of Neck Damping Properties on Brain Response Underimpact Loading," *International Journal for Numerical Methods in Biomedical Engineering*

Rezaei, A., M. Salimi Jazi, S. Javid, G. Karami, M. Ziejewski – 2012
   "Confined Blasts, and the Impact of Shock Wave Reflections on a Human Head and the Related Traumatic Brain Injury," *Computer Methods in Biomechanics and Biomedical Engineering*

Rezaei, A., Karami, G., Ziejewski, M. – 2011
   "Simulation of Mechanical Properties of the Brain Matter under Creep-Recovery Tests," *North American Brain Injury Society (NABIS) Ninth Annual Conference on Brain Injury, New Orleans, LA*

Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2011
   "Helmet-Head Interactions under Ballistic Impacts – A Study on the Effects of Padding," *North American Brain Injury Society (NABIS) Ninth Annual Conference on Brain Injury, New Orleans, LA*

Robinson, M., T. Stousland, M. Baquai, G. Karami, M. Ziejewski – 2011
   "Reducing effect of softball-to-head impact by incorporating slip-surface in helmet," *Asia Pacific Congress on Sports Technology (APCST) – Melbourne, Australia*

Paka, P., G. Karami, M. Ziejewski – 2011
   "Examination of brain injury under impact with the ground of various stiffness," *Asia Pacific Congress on Sports Technology (APCST) – Melbourne, Australia*

Ziejewski, M., E. M. Yliniemi – 2011
   "Human Head Response Assessment Using Manikin Head Acceleration Pulse in Vertical Impact," *International Conference in Sport Medicine and Sport Science – Paris, France*

Paka, P., G. Karami, M. Ziejewski – 2011
   "Response Interaction of the Brain with the Grounds of Different Materials at Different Impact Velocities," *19th Annual Conference on Mechanical Engineering, May 10-12, Birjand, Iran*

Paka P., G. Karami, M. Ziejewski – 2010
   "A Study on the Interaction of Brain Impact with the Grounds of Different Materials Types," Paper IMECE2010-40001 *Proceedings of IMECE 2010, 2010 ASME International Mechanical Engineering Congress and Expo*, November 12-15, 2010, Vancouver, British Columbia, Canada.

Dirisala, V., G. Karami, M. Ziejewski – 2010
   "The Effects of Neck Stiffness Properties on Brain Response under Impact Loads," Paper IMECE2010-39758 *Proceedings of IMECE 2010, 2010 ASME International Mechanical Engineering Congress and Expo*, November 12-15, 2010, Vancouver, British Columbia, Canada.

Paka P., G. Karami, M. Ziejewski – 2010
   "Response Interaction of the Brain with the Grounds of Different Materials," *North American Brain Injury Society (NABIS) Eighth Annual Conference on Brain Injury, Minneapolis, MN*

Sotudeh Chafi, M., V. Dirisala, G. Karami, M. Ziejewski – 2010
   "A FE Parametric Study of the Dynamic Response of the Human Brain with Different CSF Constitutive Properties," *Bio-Medical Materials and Engineering*

Abolfathi, N., G. Karami, M. Ziejewski – 2010
   "Effect of Brain Tissue Undulation on Mechanical Properties," *Brain Injury*, March 2010; 24(3), 52-53.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2010

"Biomechanical Assessment of Brain Dynamic Responses Due to Blast Pressure Waves," *Annals of Biomedical Engineering*, 38(2): 490-504.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2009
"A Finite Element Method Parametric Study of the Dynamic Response of the Human Brain with Different Cerebrospinal Fluid Constitutive Properties," Proc. IMechE Vol. 223 Part H: *J. Engineering in Medicine.*

Batzer, S., B. Enz, G. Herndon, C. Thorbole, R. Hooker, T. Parnell, M. Ziejewski – 2009
"Heavy Truck Roll Cage Effectiveness," Paper IMECE2009-12423 *Proceedings of IMECE 2009, 2009 ASME International Mechanical Engineering Congress and Expo,* November 13-19, 2009, Lake Buena Vista, FL.

Batzer, S., D. Beltran, G. Herndon, C. Thorbole, M. Ziejewski – 2009
"Motor Coach/Bus Crashworthiness Systems – Occupant Retention," Paper IMECE2009-12424 *Proceedings of IMECE 2009, 2009 ASME International Mechanical Engineering Congress and Expo,* November 13-19, 2009, Lake Buena Vista, FL.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2009
"Numerical Analysis of Blast-Induced Wave Propagation Using FSI and ALE Multi-Material Formulations," *International Journal of Impact Engineering,* Vol.36, 1259-1275.

Ziejewski, M., Yliniemi, E. M. – 2009
"Prediction of Head Acceleration and Neck Loading In Vertical Impact," Paper #98, *4th Asia-Pacific Congress on Sports Technology,* Honolulu, HI, September 21-22,2009

Ziejewski, M., G. Karami, W. Orrison, E. Hanson – 2009
"Dynamic Response of Head Under Vehicle Crash Loading," www-nrd.nhtsa.dot.gov/pdf/esv/esv21/09-0432.pdf  Paper #09-0432-W, *21st International Technical Conference on the Enhanced Safety of Vehicles,* Sponsored by Mercedes Benz and the National Highway Traffic Safety Administration (NHTSA), Stuttgart, Germany, June 15-18th, *SAE International, Head Injury Biomechanics,* Vol. 1, 2011, edited by J.A. Pike , pp. 177 – 187, 2011.

Abolfathi, N., A. Syed, G. Karami, M. Ziejewski – 2009
"Micromechanics Modeling of Axonal Injury in Brain White Matter," *Proceedings of ESB 2009 Workshop,* Movement Biomechanics and Sport European Society of Biomechanics 2009 Workshop, Zurich Switzerland, June 7-9, p. 59.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2009
"An Integrated FE Model for Blast Waves-Human Head Biomechanics Interactions," *Proceedings of ESB 2009 Workshop,* Movement Biomechanics and Sport European Society of Biomechanics 2009 Workshop, Zurich Switzerland, June 7-9, 2009, p. 66.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2009
"Computation of Blast-Induced Traumatic Brain Injury," Paper # SBC 2009-204882, *Proceedings of the ASME 2009 Summer Bioengineering Conference*, Lake Tahoe, CA, June 17-21,2009.

Abolfathi, N., A. Syed, G. Karami, M. Ziejewski – 2009
"Biomechanics Injury Analysis of Brain White Matter Using Cohesive Zone Method," Paper # SBC2009-206293, *Proceedings of the ASME 2009 Summer Bioengineering Conference*, Lake Tahoe, CA, June 17-21.2009.

Sotudeh Chafi, M., V. Dirisala, G. Karami, M. Ziejewski – 2009
"Effects of CSF Properties on Brain Response Under Impact Loading," Paper # SBC2009-204885, *Proceedings of the ASME 2009 Summer Bioengineering Conference*, Lake Tahoe, CA, June 17-21, 2009.

Abolfathi, N., A. Naik, G. Karami, M. Ziejewski, M. Sotudeh Chafi – "A Micromechanical Procedure for Modeling the Anisotropic Mechanical Properties of Brain White Matter," *Computer Methods in Biomechanics and Biomedical Engineering*, Vol. 12, No., 3, June, 2009, 249-262.

Karami, G., N. Grundman, N. Abolfathi, A. Naik, M. Ziejewski – 2008
"A Micromechanical Hyperelastic Modeling of Brain White Matter Under Large Deformation," *Journal of the Mechanical Behavior of Biomedical Materials, 2:243-254.*

Batzer, S., G. Herndon, P. Semones, C. Thorbole, M. Ziejewski, R. Hooker – 2008
"Automotive Side Glazing Ejection Mechanisms Part I – Model Development," Paper IMECE2008-68482 *Proceedings of IMECE 2008, 2008 ASME International Mechanical Engineering Congress and Expo,* October 31 – November 6, 2008, Boston, MA.

Batzer, S., G. Herndon, P. Semones, C. Thorbole, M. Ziejewski, R. Hooker – 2008
"Automotive Side Glazing Ejection Mechanisms Part II – Review of Recent Glazing Literature," Paper IMECE2008-68483 *Proceedings of IMECE 2008, 2008 ASME International Mechanical Engineering Congress and Expo,* October 31 – November 6, 2008, Boston, MA.

Ziejewski, M. – 2008
"A Critical Review of Current Perspectives on Brain Injury Tolerances," *Journal of Head Trauma Rehabilitation*, Vol. 23, No. 5, p. 343, 2008. (Abstract)

Naik, A., N. Abolfathi, G. Karami, M. Ziejewski – 2008
   "Micromechanical Viscoelastic Characterization of Fibrous Composites," *Journal of Composite Materials*, Vol. 42, No. 12, pp. 1179-1204, 2008.

Abolfathi, N., A. Naik, M. Sotudeh Chafi, G. Karami , M. Ziejewski– 2008
    "Diffuse Axonal Injury and Degradation In Mechanical Characteristics of Brain White Matter," Paper # 192251, *Proceedings of the ASME 2008 Summer Bioengineering Conference*, Marco Island, FL, June 25-29.

Sotudeh Chafi, M., N. Abolfathi, A. Naik, V. Dirisala, G. Karami, M. Ziejewski – 2008
   "A Multi-Scale Finite Element Model for Shock-Wave Induced Axonal Brain Injury," Paper # 192342, *Proceedings of the ASME 2008 Summer Bioengineering Conference*, Marco Island, FL, June 25-29.

Kou, Z., M. Ziejewski – 2008
   "Current Issues in Blast Injury:  Brain injury predictors for low-to-moderate severity motor vehicle crashes—biomechanical perspective," *Brain Injury* (22)1, 44-45.

Abolfathi N., G. Karami and M. Ziejewski – 2008
   "Biomechanical Cell Modeling under Impact Loading," *International Journal of Modeling and Simulation*. 28(4): 471-476.

Ziejewski, M., Z. Kou, K. Doetkett – 2007
   "Biomechanical Factors in Mild Traumatic Brain Injuries Based on American Football and Soccer Players," In: Fuss, F.K., Subi A. and Ujihashi S (Eds.) The Impact of Technology on Sport II, pp. 51-57.  Taylor& Francis Group, London.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2007
   "Simulation of Blast-Head Interactions to Study Traumatic Brain Injury," Paper IMECE2007-41629, *Proceedings of IMECE 2007, 2007 ASME International Mechanical Engineering Congress and R&D Expo*, November 11-15, 2007 Seattle, WA.

Abolfathi N., G. Karami and M. Ziejewski – 2007
   "Micromechanical Analysis of Tissues – The effect of cell adhesion to extra Cellular Matrix (ECM)," *Proceedings of the ASME 2007 Summer Bioengineering Conference (SBC2007)* June 20-24, Keystone Resort & Conference Center, Keystone, CO.

Sotudeh Chafi, M., G. Karami, M. Ziejewski – 2007
   "An Assessment of Primary Blast Injury in Human Brains – A Numerical Simulation," SBC2007-176155, *Proceedings of the ASME 2007 Summer Bioengineering Conference*, Keystone CO, June 20-24.

Naik, A., N. Abolfathi, G. Karami, M. Ziejewski – 2007
   "Micromechanical Viscoelastic Characterization of Composites," *Proc. International Plasticity Conference*, Alaska USA, June 2-7.

Kou, Z., M. Ziejewski – 2007
   "Development of a Biomechanical Knowledge System to Identify Brain Injuries in Emergency Department," *The IPSI BgD Transactions on Advanced Research Journal*, 3(1), 47-54.

Ziejewski, M., G. Karami, I. Akhatov – 2007
   "Selected Biomechanical Issues of Brain Injury Caused by Blasts," *Brain Injury Professional*, 4(1), 10-15.

Yliniemi E., M. Ziejewski and C. Perry – 2006
   "Head Rotation during Vertical Impact Predicted Using Initial Head Angle and Anthropometry," Aviation, Space and Environmental Journal, October 2006, 77:1041-1048.

Li, D., M. Ziejewski and G. Karami – 2006
   "Parametric studies of Brain Materials in the Analysis of Head Impact," Paper IMECE2006-15596, *Proceedings of IMECE 2006,2006 ASME International Mechanical Engineering Congress and R&D Expo*, November 5-10, 2006,  Chicago, IL.

Kou, Z., M. Ziejewski, C. Doetkett – 2006
   "A Comprehensive Statistical Approach to Assessing Biomechanical Parameters for Mild Traumatic Brain Injury," *Journal of Neurotrauma*, 23(5), 741-742.

Kou Z., M. Ziejewski, G. Bjerke – 2005
   "A Tele-Medical Approach to Using Brain Biomechanics for Brain Injury Identification," *2nd United States National Committee on Biomechanics (USNCB) Frontiers in Biomechanics Symposium*, Vail, CO. (Received *Merit Certificate of Recognition* from the US National Committee on Biomechanics.)

Ziejewski M., R. Danescu, M. Stewart – 2005
   "Modified Methodology to Determine Head Acceleration in Head-to-Ball Collisions in Soccer," *International Society of Biomechanics and American Society of Biomechanics 2005 Joint Congress*, Cleveland, OH.

Kou Z., M. Ziejewski – 2005
   "A Comprehensive Approach to Studying Mild Traumatic Brain Injuries in Motor Vehicle Crashes," *International Society of Biomechanics and American Society of Biomechanics 2005 Joint Congress*, Cleveland, OH. (*Peer-reviewed abstract*)

Kou Z., M. Ziejewski – 2005
   "A Biomechanical Approach to Identifying Mild Traumatic Brain Injuries in Emergency Department," *ASME 2005 Summer Bioengineering Conference*, Vail, CO.

Ziejewski, M., Z. Kou, M. Stewart – 2004
    "Predicting the Forces in a Neck Injury Caused by an Underwater Collision," Proceedings of the 15th IASTED International
    Conference on Modeling and Simulation, Marina Del Ray, CA.
LaPlaca M., M. Ziejewski – 2004
    "Biomechanics of Traumatic Brain Injury (TBI): A Review," *Brain Injury Professional,* 1(1), 10-30.
Ziejewski, M. – 2004
    "The Biomechanical Assessment of Traumatic Brain Injury," *Brain Injury Professional,* 1(1), 26-29.
Danescu, R., M. Ziejewski, M. Stewart – 2003
    "Practical Parameter for Characterizing the Head-to-Ball Impact and Measuring the Effectiveness of Protective Headgears in
    Soccer," 5th International Engineering of Sport Conference, UC Davis.
Ziejewski, M. – 2002
    "Selected Sources for Head Impact Kinematics Useful for Validation of ATB Results," ATB Model Users' Group Conference
    sponsored by the US Air Force Research Laboratory, Patuxent Naval Air Station, Patuxent River, MD.
Yliniemi, E., M. Ziejewski, C. Perry – 2000
    "The Effect of Initial Head Pitch and Subject Size on Head X-Acceleration and Head/Neck Rotation During +Gz Impact
    Acceleration," Biomechanics Research: Experimental and Computational, Proceedings of the Twenty-Seventh International
    Workshop, National Highway Traffic Safety Administration, Atlanta, GA.
Ziejewski, M., E. Yliniemi, S. Ramaswamy – 2000
    "Modeling of Head/Neck Response to Low Severity Head Impacts," ATB Model Users' Group Conference sponsored by US
    Air Force Research Laboratory, Wichita, KS.
Ziejewski, M., L. Obergefell, C. Perry, B. Anderson – 1998
    "Modes of Human Head/Neck Response to Vertical Impact," *Models for Aircrew Safety Assessment: Uses, Limitations and
    Requirements.* RTO-MP-20, NATO/RTO Specialist Meeting 3.1-3.10, Dayton, OH.
Ziejewski, M., J. Song – 1998
    "Generation of Integrated Brain-Skull Helmet Model," 5th International LS-DYNA Users Conference, Detroit, MI.
Ziejewski, M., J. Song – 1998
    "Assessment of Brain Injury Potential in Design Process of Children's Helmet Using Rigid Body Dynamics and Finite
    Element Analysis," ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Dayton, OH.
Anderson, B., M. Ziejewski, H. Goettler – 1998
    "Method to Predict the Energy Absorption Rate Characteristics for a Structural Member," SAE Paper #982388, Detroit, MI.
Pan, X., M. Ziejewski, H. Goettler – 1998
    "Force Response Characteristics of Square Columns for Selected Materials at Impact Loading Conditions Based on FEA,"
    SAE Paper #982418, Detroit, MI.
Ziejewski, M. – 1997
    "Characterization of Human Head/Neck Response in Z-Direction in Terms of Significant Anthropomorphic Parameters,
    Gender, Helmet Weight and Helmet Center of Gravity in a +Gz Acceleration," Air Force Office of Scientific Research,
    Research & Development Laboratories, F49620-93-C-0063, Culver City, CA.
Anderson, B., C. Perry, L. Obergefell, A. Rizer, M. Ziejewski – 1997
    "Modeling of Human Neck Response to Vertical Impact," SAFE Symposium, Phoenix, Arizona.
Ziejewski, M., B. Anderson – 1997
    "Effect of Initial Body Rotation on Human Body Dynamics in Frontal Collisions," #971369, Ninth International Pacific
    Conference on Automotive Engineering (IPC-9), IATO (SAE)-Indonesia.
Ziejewski, M., B. Anderson, L. Obergefell – 1997
    "ATB Deformable Neck Option for +Gz Acceleration," ATB Model Users' Group Conference sponsored by US Air Force
    Armstrong Laboratory, Charlottesville, VA.
Ziejewski, M., B. Anderson, L. Obergefell – 1996
    "Validation of the Deformable Neck Model for a +Gz Acceleration," Aerospace Medical Association Annual Scientific
    Meeting in Chicago, IL.
Ziejewski, M. – 1996
    "Validation of the Deformable Neck Model for a +Gz Acceleration," Armstrong Aerospace Medical Research Laboratory,
    Human System Division, Wright-Patterson Air Force Base.
Ziejewski, M. B. Anderson – 1996
    "Effect of Structural Stiffness on Occupant Response for a -Gx Acceleration," SAE Paper #962374, São Paulo, SP, Brazil.
Ziejewski, M., H. Goettler – 1996
    "Effect of Structural Stiffness and Kinetic Energy on Impact Force," SAE Paper #961852, Indianapolis, IN.
Ziejewski, M., B. Anderson, M. Rao and M. Hussain – 1996
    "Energy Absorption for Short Duration Impacts," SAE Paper #961851, Indianapolis, IN.

Ziejewski, M, X. Pan – 1996
"Application of Ellipses, Ellipsoids, and Hyperellipsoids in Computer Modeling of Human Body and Interior Surfaces," 1996 ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Phoenix, AZ.

Ziejewski, M, D. Grangaard, B. Anderson – 1996
"3-D Animation Generated from ATB Output," 1996 ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Phoenix, AZ.

Dimitriu, D., M. Ziejewski and H.J. Goettler – 1993
"Apparatus for Premixed Combustion Analysis," SAE Paper #931675, Milwaukee, WI.

Dimitriu, D., M. Ziejewski and H.J. Goettler – 1993
"A Study of Energy Released During Premixed Combustion," SAE Paper #931676, Milwaukee, WI.

Ziejewski, M. and H.J. Goettler – 1992
"Design Modifications For Durability Improvements For Diesel Engines Operating on Plant Oil Fuels," SAE Paper #921630, Milwaukee, WI.

Ziejewski, M. S.I. Mehta – 1992
"Dual Fuel System: Instrumentation and Experimentation," ASEE Annual Conference Proceedings.

Ziejewski, M., B. Christenson and J. Hobstritt – 1991
"Computer Simulation of Fuel Nozzle Needle Dynamics," Twelfth Annual Conference, ADIUS, 1991.

Ziejewski, M., H.J. Goettler and D.G. Dimitriu – 1991
"Development of an Infrared Method for Ignition Delay Measurements," SAE Paper #910847, Detroit, MI.

Mehta, S.I., M. Ziejewski and K. Loke – 1991
"PC Based Data Acquisition and Analysis of a Diesel Engine," ASEE Annual Conference, New Orleans, LA.

Dimitriu, D.G., H.J. Goettler and M. Ziejewski – 1990
"Apparatus for the Measurement of Ignition Delay Times for Diesel Engine Fuels," SAE Paper #901617, Milwaukee, WI.

Ziejewski, M., S. Mehta, H. Goettler and S. Goplen – 1990
"Fast Data Acquisition For Internal Combustion Engines Laboratory," ASME Proceedings of the 1990 International Conference on Computers in Engineering, Vol. 2, Boston, MA.

Mehta, S.I., M. Ziejewski and S. Goplen – 1990
"Mechanical Engineering Laboratory Automation Using Personal Computers," ASME Proceedings of the 1990 International Conference on Computers in Engineering, Vol. 2, Boston, MA, Aug. 1990.

Ziejewski, M., J. Stanislao, S. Goplen and T. Wee – 1989
"A Study on New Centrifugal Pump For Slurries," SAE Paper #891942, Milwaukee, WI.

Ziejewski, M. and D.S. Gill – 1989
"Discharge Coefficients for Multi-Hole Fuel Injection Nozzle for Alternate Fuels," SAE Paper #890448, Detroit, MI.

Ziejewski, M. and D.S. Gill – 1988
"Simultaneous Test Procedure Approach to Alternate Fuels Performance Evaluation," SAE Paper #881333, Milwaukee, WI.

Ziejewski, M. and H.J. Goettler – 1988
"Effect of Lacquer Deposits from Sunflower Oil on Injection Needle Mobility For Different Needle Guide Clearances," SAE Paper #881336, Milwaukee, WI.

Ziejewski, M. and S.I. Mehta – 1988
"Numerical Optimization Approach to the Design of a Diesel Engine Fuel Injection Nozzle for Alternate Fuels," SAE Paper #880492, Detroit, MI.

Ziejewski, M. and H.J. Goettler – 1988
"Reduced Injection Needle Mobility Caused by Lacquer Deposits from Sunflower Oil," SAE Paper #880493, Detroit, MI.

Ziejewski, M. and D.S. Gill – 1987
"Simultaneous Test Procedure Approach to Alternate Fuels Residue Analysis," SAE Paper #872091, Toronto, Canada.

Ziejewski, M., R. Poulin – 1986
"Analysis of the Diesel Engine Performance Using the Statistical Analysis System Software," SAE Paper #861231, Milwaukee, WI.

Ziejewski, M., G.L. Pratt and H.J. Goettler – 1986
"Comparative Analysis of the Long-Term Performance of a Diesel Engine on Vegetable Oil Based Alternate Fuels," SAE Paper #860301, Detroit, MI.

Goettler, H.J., A.M. Knudson and M. Ziejewski – 1985
"Performance of a Diesel Engine Operating on Blends of Diesel Fuel and Crude Sunflower Oil at Normal and Elevated Fuel Temperatures," SAE Paper #852087, Tulsa, OK.

Ziejewski, M., H.J. Goettler and G.L. Pratt – 1985
"Fuel Injection Anomalies Observed During Long-Term Engine Performance Tests on Alternate Fuels," SAE Paper #852089, Tulsa, OK.

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                                    19

Ziejewski, M., D. Hertsgard and K.R. Kaufman – 1985
   "Statistical Aspects of Testing Alternate Fuels," SAE Paper #852088, Tulsa, OK.
Ziejewski, M., K.R. Kaufman, A.W. Schwab and E.H. Pryde – 1984
   "Diesel Engine Evaluation of a Nonionic Sunflower Oil-Aqueous Ethanol Microemulsion," *Journal of American Chemists Society* (JOACS), Vol. 61, No. 10.
Ziejewski, M., K.R. Kaufman and R.C. Tupa – 1984
   "Laboratory Endurance Testing of a 25/75 Sunflower Oil-Diesel Fuel Blend Treated with Fuel Additives," SAE Paper #840236, Detroit, MI.
Walicki, E., J. Sawicki, M. Ziejewski – 1978
   "Inertia Effect in Magnetic Through flow of Viscous Fluid in a Slot Between Fixed Surfaces of Revolution," *Rev. Roum. Sci. Tech. - Mecanique Appkiquee*, Tome 23, No. 6, p. 859-969, Bucarest.

## COMPUTER SOFTWARE/MODELS DEVELOPED
   "Anatomical Brain Model" – 2000 – Present
      The brain model simulates all essential anatomical features of a 50th percentile male head, specifically the falx, tentorium, dura, pia and scalp.  Validation was carried out against published cadaver tests.
   "Elliptical Brain Model" - 1993-1997
      A 3-dimensional finite element model representing a human brain.
   "Impact" - 1985-1990
      The program performs an analysis of single or two vehicle accidents.  The program determines the conditions of impact, including the speed of the vehicles at impact and the forces generated during the impact.
   "Post-Impact: - 1985-1990
      The program performs a simulation of single or two vehicle accidents.  The simulation program determines the vehicle trajectory and the rest position.
   "Expert System for Experimental Design and Statistical Analysis" - 1991
      For use by graduate students in all areas of engineering.

## PATENTS

   USA Patent Office, No. 6,726,623 (Principal Investigator) – 2004
      "Brain Injury Diagnostic System", registered by M. Ziejewski
   USA Patent Office, No. 4,823,756 (Principal Investigator) – 1989
      "Two Stage Fuel Injection Nozzle", registered by M. Ziejewski and H.J. Goettler.
   Poland Patent Office, No. P-2042821 (Principal Investigator) – 1979
      "Nonoil Cooling Mixture for Metalworking", registered by M. Ziejewski (rights acquired by Heavy Machinery Industry, Poland).


## PROFESSIONAL PRESENTATIONS
### EUROPE, AFRICA, AND ASIA
2017
   - "Computational Simulation of Impact – Induced Traumatic Brain Injury in Adults and Children," 2nd International Conference on Pediatric Acquired Brain Injury (IBIA), Rome, Italy (Printed online, http://www.internationalbrain.org)
2016
   - "Examination of the Effect of Mechanical Properties of Helmet Padding on the Blast-Induced Brain Injury," 11th World Congress on Brain Injury (IBIA), Netherlands
2015
   - "An Evaluation of the Riddell IQ HITS System in Prediction of an Athlete's Head Association," 7th Asia-Pacific Congress on Sports Technology, Barcelona, Spain
   - "Effects of Helmet Surface Geometry on Head Acceleration in High Velocity Watersports," 7th Asia-Pacific Congress on Sports Technology, Barcelona, Spain
2013
   - "Examination of the Blast-Induced Underwash Effect on a Helmeted Head and the Response of the Brain," *17th U.S. National Congress on Theoretical and Applied Mechanics,* Barcelona, Spain
2012
   - "Clinical Significance of Selected Results from Biomechanical Modeling of Human Brain", 9th World Congress on Brain Injury, International Brain Injury Association, Edinburgh, Scotland.

Mariusz Ziejewski, Ph.D., Inż. – Vita                                                                                20

- "A Study on the Influence of Neck on Brain Responses Under Blast Loading", 9th World Congress on Brain Injury, International Brain Injury Association, Edinburgh, Scotland.

2011
- "Examination of Brain Injury Under Impact with the Ground of Various Stiffness," 5th Asia-Pacific Congress in Sports Technology, Melbourne, Australia
- "Reducing Effect of Softball-to-Head Impact by Incorporating Slip-Surface in Helmet," 5th Asia-Pacific Congress in Sports Technology, Melbourne, Australia

2008
- Ziejewski, M., T. Trudel, "Current Issues in Blast Injury: From Modeling Brain Dynamics to Developing Models of Care," 7th World Congress on Brain Injury, International Brain Injury Association, Lisbon, Portugal.
- "Biomechanics: Use of Evidence Based Physics as a Foundation for Understanding the Nature of Traumatically Induced Brain Injury," 7th World Congress on Brain Injury, International Brain Injury Association, Lisbon, Portugal.

2007
- "Biomechanical Factors in Mild Traumatic Brain Injuries Based on American Football and Soccer Players," Asia-Pacific Congress on Sports Technology, Singapore.
- "Development of a Biomechanical Knowledge System to Identify Brain Injuries in Emergency Department," VIP Symposium of Internet Related Research, Venice Italy.

2006
- Ziejewski, M., Z. Kou, C. Doekett, "A Comprehensive Statistical Approach to Assessing Biomechanical Parameters for Mild Traumatic Brain Injury," Traumatic Brain Injury, Spinal Cord Injury – The Silent Epidemic of the 21st Century, 8th International Neurotrauma Symposium, Rotterdam, The Netherlands.

2003
- "Biomechanical Perspective on Low Energy Impacts Causing Serious Long Term Consequences," 5th World Congress on Brain Injury, International Brain Injury Association, Stockholm, Sweden.
- "State-of-the-Art Biomechanical Issues In Relation to Mild Traumatic Brain Injury," 5th World Congress on Brain Injury, International Brain Injury Association, Stockholm, Sweden.

2002
- "A Biomechanical Examination of Brain Dynamics As A Result of Minor Impacts," 6th Congress of the European Federation of Neurological Societies, Vienna, Austria.

1996
- "Human Brain Modeling," University of Cape Town, Department of Engineering, Rondebosch, South Africa as a part of the United States Engineering Education Delegation to the Republic of South Africa.
- "Human Brain Modeling," University of Witswatersrand, Department of Engineering, Johannesburg, South Africa as a part of the United States Engineering Education Delegation to the Republic of South Africa.

## UNITED STATES

2017
- "An examination of Brain Injury by Golf Ball Impacts," *Biomedical Engineering Society (BMES)*, Phoenix, AZ
- "Effect of Blast Direction on Shockwave Propagation in the Study of Primary Blast-Induced TBI," *Biomedical Engineering Society (BMES)*, Phoenix, AZ
- "Vibration of Skull and Cerebrospinal Fluid (CSF) Pressure in Noninvasive Intracranial Pressure Monitoring," *Biomedical Engineering Society (BMES)*, Phoenix, AZ
- "A Professional Life that Took a Non-Linear Path," *5th International Conference and Exhibition on Medical Biology & Bioengineering of 2nd World Summit on Bioengineering*, Chicago, IL
- "Trauma, Ambulance, ER and Biomechanics," *TBI Trilogy: Trauma, Technique and Trial Part 1 of 1 (AAJ)*, New York, NY
- "Approaches to the evaluation and Treatment of Concussion: a panel Discussion," *12th World Congress on Brain Injury (IBIA)* New Orleans, LA; Panelist Group: John J. Leddy, MD FACSM FACP University of Buffalo; COL Sidney R. Hinds II (DoD Brain Health Research Program Coordinator, DoD Blast Injury Research Program Coordinating Office and US Army Medical Research and Material Command); Michael McCrea, PhD, ABPP (Director of Brain Injury Research, Departments of Neurosurgery, Neurology & Psychiatry and Medical College of WI)

2016
- "New Developments in Recognizing and Proving Moderate Traumatic Brain Injuries," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury*, Tampa, FL
- "The Complexity of Mild TBI: Case Presentations and Panel Discussion," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury*, Tampa, FL
- "Severe Traumatic Brain Injury TBI: Case Presentations and Panel Discussion," *North American Brain Injury Society (NABIS) 13th Annual Conference on Brain Injury*, Tampa, FL

2015
- "A Comparative Study on the Protection Efficiency of Combat Helmets against Ballistic Impacts and Blast Waves," *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX
- "The Influence of Directionality of Correlating Kinematical Severity to Tissue Level Injury of the Human Head," *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX
- "Effect of Skull Deformation under Blunt Impact on the Level of Brain Injury, *North American Brain Injury Society (NABIS) 12th Annual Conference on Brain Injury,* San Antonio, TX

2014
- "Examination of the Blast-Induced Underwash Effect on a Helmeted Head on the Response of the Brain," *17th U.S. National Congress on Theoretical and Applied Mechanics (Michigan State University),* East Lansing, MI
- "A Study on the Influence of Directionality on Blast-Induced Brain Injury," *11th World Congress on Computational Mechanics (WCCMXI)* East Lansing, MI

2013
- "Numerical Study of the Underwash Phenomenon of the Helmeted-Human-Head under Blast Waves," *10th World Congress on Brain Injury,* San Francisco, CA

2012
- Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2012 "Helmet-Head Interactions under the Blast", North American Brain Injury Society (NABIS) 10th Annual Conference on Brain Injury, Miami, FL. (Conference's Basic Research-Human Section)
- Rezaei, A., G. Karami, M. Ziejewski – 2012 "Determination of the Constitutive Viscoelastic Formula for Brainstem" North American Brain Injury Society (NABIS) 10th Annual Conference on Brain Injury, Miami, FL. (Conference's Basic Research-Animal Section)
- Ziejewski, M., and Karami, G. – 2012 "TBI Assessment Based on Biomechanical Modeling of Brain Tissue at the Cellular Level Under Blast Loading", North American Brain Injury Society (NABIS) 10th Annual Conference on Brain Injury, Miami, FL. (Medical Tract of Conference)
- Salimi, J., M., A. Rezaei, G. Karami, F. Azarmi, M. Ziejewski – 2012 "The Analysis of a Helmeted Human Head under Ballistic Impact Loads", American Society for Testing and Materials (ASTM) Symposium on the Mechanism of Concussion in Sports, Atlanta, GA
- Ziejewski, M., G. Karami  – 2012 "What We Have Learned from the Iraq War with Regard to Brain Injuries", Brain Injury Association, Salt Lake City, Utah
- Ziejewski, M., G. Karami  – 2012 "Biomechanics of Brain Trauma", Brain Injury Association of West Virginia Sports Concussions Seminar, Charleston, West Virginia

2011
- "Biomechanical Aspects of Brain Vulnerability," Conference Sponsored by California Brain Injury Association, Napa, CA.
- "Simulation of Mechanical Properties of the Brain Matter under Creep-Recovery Tests," North American Brain Injury Society 9th Annual Conference on Brain Injury, New Orleans, LA.
- "Helmet-Head Interactions under Ballistic Impacts – A Study on the Effects of Padding," North American Brain Injury Society 9th Annual Conference on Brain Injury, New Orleans, LA.

2010
- "Mechanisms of Concussion and Blast Injuries," North American Brain Injury Society and Alaska Brain Injury Network's Alaska Brain Injury Conference, Anchorage, AK.
- "Effect of Brain Tissue Undulation on Mechanical Properties," International Brain Injury Association 8th World Congress on Brain Injury, Washington, D.C.

2009
- "Understanding Biomechanical Phenomenon of mTBI in Wounded Soldiers," National VHA/DoD Conference: Sensory Impairment Issues in Traumatic Brain Injury, Chicago IL
- "Understanding Blast Related Brain Injuries Based on Macro-scale and Micro-scale Brain Tissue Modeling," Blast Panel, North American Brain Injury Society, Brain Injury Conference of the Americas, Austin, TX.
- "Micromechanics Application for Axonal Injury Analysis in Brain Tissue," North American Brain Injury Society, Brain Injury Conference of the Americas, Austin, TX.
- "Macro and Micro Scale Modeling for Understanding Blast Related Brain Injuries," Traumatic Brain Injury: The Treatment Imperative, New York Academy of Traumatic Brain Injury 12th Annual Conference, New York, New York.
- "Traumatic Brain Injury:  A Biomechanical Perspective," North Dakota State University Psychology Department Colloquium Series, Fargo, ND

2008
- "Blast Injuries – A Biomechanical Viewpoint," California Brain Injury Association State of the Art Medical and Rehabilitative Care in Brain Injury:  Clinical Implications, Napa, CA.

- "Biomechanics of TBI: Biomechanical Perspective on Cavitation Inception as a New Brain Injury Mechanism," Blast Brain Injuries: Military and Mining Conference, Brain Injury Association of West Virginia, South Charleston, WV.
- "Physics of Blast Related mTBI," Special Panel, Blast Injury Institute, North American Brain Injury Society, Brain Injury Conference of the Americas, New Orleans, LA.
- "A Critical Review of Current Brain Injury Tolerances," North American Brain Injury Society, Brain Injury Conference of the Americas, New Orleans, LA.
- "Biomechanics of TBI: Biomechanical Perspective on Cavitation Inception as a New Brain Injury Mechanism," Veteran's Health Administration's Visual Consequences of Traumatic Brain Injury Conference, Billerica, MA.
- "Pattern of Brain Injury Caused by Blast," The New York Academy of Traumatic Brain Injury, New York, NY.
- "Physics of Blast Related Traumatic Brain Injury," Traumatic Brain Injury Conference and Think Tank Session, College Station, TX.

2007
- "Physics of Blast Injury," North American Brain Injury Society, Brain Injury Conference of the Americas, San Antonio TX, September.
- "Finite Element-based Characterization of Blast-related Traumatic Brain Injury," North American Brain Injury Society, Brain Injury Conference of the Americas, San Antonio TX.
- "Brain Injury Due to Roof Crush," Emergency World Summit, An American Auto Safety Tragedy: Roof Crush, Washington, DC.
- "The Contribution of Biomechanical Factors Including Blast to Traumatic Brain Injury," The New York Academy of Traumatic Brain Injury, New York, NY.

2006
- Ziejewski, M. M. Pietrzak, MD (Col. USAF, MC, ret), D. Warden, MD (National Director, Defense and Veterans Brain Injury Center, Walter Reed Army Medical Center), L. French, PhD (Chief of Clinical Services, Defense and Veterans Brain Injury Center. Walter Reed Army Medical Center), and G. Grant, MD (Assistant Professor of Neurosurgery, Department of Surgery, Division of Neurosurgery, Duke University Medical Center) "Panel Discussion: Blast Injuries and Traumatic Brain Injury," North American Brain Injury Society, Brain Injury Conference of the Americas, Miami, FL.
- Ziejewski, M. "Biomechanics of Mild TBI," North American Brain Injury Society, Brain Injury Conference of the Americas, Miami, FL.
- Abolfathi, N., M. Ziejewski and G. Karami. "Dynamic Analysis of a Living Cell for Multiscale Traumatic Brain Injury (TBI) Analysis," Biomedical Engineering Society (BMES) Conference, Chicago.
- Li, D., M. Ziejewski and G. Karami. "Parametric studies of Brain Materials in the Analysis of Head Impact," ASME International Conference and Exhibition, Chicago.
- Ziejewski, M., I. Akhatov, G. Karami, "Brain Injury Caused by Blasts – Nanofilm Dynamics of Cavitation," Brain Injury Conference of the Americas, North American Brain Injury Society, Miami, FL

2005
- "Biomechanics of Traumatic Brain Injury – A Review," and "The Biomechanical Assessment of Traumatic Brain Injury," Spring 2005 Brain Injury Conference: "Biomechanics and Physiological Impact of Traumatic Brain Injury" and American Academy for the Certification of Brain Injury Specialists (AACBIS). Memphis, TN.

2004
- "Using ATB to Predict Mild Traumatic Brain Injury," ATB Model Users' Group Conference, Salt Lake City, UT.
- "Biomechanics of Brain Injury," Fifth Annual Managing Challenging Situations in Brain Injury Care, Bethesda Rehabilitation Hospital, Minneapolis, MN.
- "Biomechanical Evidence in Mild Brain Injury Case," Brain Injury Association of Indiana, Indianapolis, IN.
- "Biomechanics of TBI," 17th Annual Conference on Medical & Legal Issues in Brain Injury, North American Brain Injury Society & International Brain Injury Association, Beaver Creek, CO.

2003
- "The Biomechanics of Brain Injury," The Brain Injury Association of New York State, New York, NY.
- "The Biomechanics of Brain Injury," Brain Injury Association of America, Napa Valley, CA.
- "State-of-the-Art Biomechanical Issues in Relation to Mild Traumatic Brain Injury," North American Brain Injury Society Conference, Amelia Island, FL.
- "The Mechanism of Traumatic Brain Injury," Brain Injury Association of Utah, Salt Lake City, UT.

2002
- "Biomechanics of Traumatic Brain Injury-Identification of Patients at Risk of MTBI in ER Setting Using Biomechanical Analysis," Fourth Annual Brain Injury Association of America, Napa Valley, CA.
- "Selected Sources for Head Impact Kinematics Useful for Validation of ATB Results," ATB Model Users' Group Conference sponsored by the US Air Force Research Laboratory, Patuxent Naval Air Station, Patuxent River, MD.

2001
- Case Specific Visualization and Assessment of Biomechanical Brain Modeling Based on MRI Data," Brain Injury Association of California, Napa Valley, CA.
- "A Biomechanical Examination of the Efficacy of Soccer Protective Headgear in Reducing Trauma to the Head from Low Impacts," The Brain Injury Association's, 20th Annual Symposium, Atlanta, GA.

2000
- "The Mechanism of Concussion," Sports Related Concussions Workshop, ASTM Subcommittee F08.51 on Medical Aspects and Biomechanics, Orlando, FL.
- "Biomechanical Issues Related to Reduction of Trauma to the Brain from Unanticipated Low Impacts in Soccer," Chairman's Roundtable Discussion on Head Injury and Youth Sports, United States Consumer Products Safety Commission, Washington, D.C.
- "The Biomechanics of Traumatic Brain Injury," The Brain Injury Association of New York State, New York, NY.
- "ATB Simulation vs. Experimental Data for Hybrid III Head and Neck in Frontal Impacts," ATB Users' Group Conference sponsored by US Air Force Research Laboratory, Wichita, KS.
- New NHTSA Standards and Injury Requirements for Biomechanics of Brain Injury for Model Year 2003-2005 Vehicles, Brain Injury Association of California, Napa Valley, CA.

1999
- "Biomechanical Perspective of Neuronal Damage Due to Brain Deformation," Brain Injury Conference, Bancroft NeuroHealth, Philadelphia, PA.

1998
- "Human Head/Neck Response Modes for Vertical Impact," NATO/RTO Specialist Meeting, Dayton, OH.
- "Generation of Integrated Skull-Brain Model," 5th International LS-DYNA Users Conference, Detroit, MI.
- "Assessment of Brain Injury Potential in Design Process of Children's Helmet Using Articulate Total Body and Finite Element Modeling," ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Dayton, OH.

1997
- "ATB Deformable Neck Option for +Gz Acceleration," ATB Model Users' Group Conference, Charlottesville, VA.

1996
- Human Brain Modeling," University of Pretoria, Department of Engineering, Pretoria, South Africa as a part of the United States Engineering Education Delegation to the Republic of South Africa.
- "Application of Ellipses, Ellipsoids, and Hyperellipsoids in Computer Modeling of Human Body and Interior Surfaces," 1996 ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Phoenix, AZ.
- "3-D Animation Generated from ATB Output," 1996 ATB Model Users' Group Conference sponsored by US Air Force Armstrong Laboratory, Phoenix, AZ.

1992
- "Design Modifications for Durability Improvements For Diesel Engines Operating on Plant Oil Fuels," International SAE Meeting, Milwaukee, WI.
- "Comparative Analysis of the Exhaust Emissions from Vegetable Oil Based Alternative Fuels," International SAE Congress, Detroit, MI.
- "Alternative Fuels for Diesel Engines," 8th SSTS Seminar, Fargo, ND.

1991
- "Development of an Infrared Method for Ignition Delay Measurements," International SAE Congress, Detroit, MI.

1989
- "Duel-Air Injection Nozzle for Diesel Engines," International SAE Off-Highway Meeting, Milwaukee, WI.
- "A Quantitative Analysis for a Slurry Centrifugal Pump," International SAE Off-Highway Meeting, Milwaukee, WI.
- "Discharge Coefficients for Flow-Through Multi-hole Fuel Injection Nozzle for Alternate Fuels," International Fuels and Lubricants Meeting, Portland, OR.

1988
- "Simultaneous Test Procedure Approach to Alternate Fuels Performance Evaluation," International SAE Off-Highway Meeting, Milwaukee, WI.
- "Numerical Optimization Approach to the Design of a Diesel Engine Fuel Injection Nozzle," International SAE Congress, Detroit, MI.

1987
- "Lubricant Performance and Turbochargers Analysis for Alternate Fuel Tests," International SAE Off-Highway Meeting, Milwaukee, WI.

1986
- Analysis of the Diesel Engine Performance Using the Statistical Analysis System Software," International Fuels and Lubricants Meeting, Philadelphia, PA.

- "Influence of Vegetable Oil Based Alternate Fuels on Residue Deposits and Components Wear in Diesel Engine," International SAE Congress, Detroit, MI.
- "Comparative Analysis of the Long Term Diesel Engine Performance on Vegetable Oil Based Alternate Fuels," International SAE Congress, Detroit, MI.

1985
- "Statistical Aspects of Testing Alternate Fuels," International Fuels and Lubricants Meeting, Tulsa, OK.
- "Performance of a Diesel Engine Operating on Blend of Diesel Fuel and Crude Sunflower Oil at Normal and Elevated Fuel Temperatures," International Fuels and Lubricants Meeting, Tulsa, OK.
- "Statistical Aspects of Testing Alternate Fuels," International Fuels and Lubricants Meeting, Tulsa, OK.

## CURRICULUM DEVELOPMENT
- ME 743, "Biomechanics of Impact"
- ME 793-01 Neuroscience I: Neuronal Cell Biology & Sensory Systems
  Collaboration with UND School of Medicine (Anatomy 522)
- ME 793-02 Neuroscience I: Motor Systems & Higher Functions
  Collaboration with UND School of Medicine (Anatomy 522)
- ME 496/696 "Fundamentals of Vehicle Dynamics."
- Developed laboratory (8 experiments) for ME 496/696 course "Fundamentals of Vehicle Dynamics."
  Development included: experimental setup of the experiment, experiment and data evaluation procedures, annotated bibliography of current related literature and reference list.

## SELECTED PEER RECOGNITION OF RESEARCH IN HUMAN BRAIN INJURY DIAGNOSES
- **The New England Journal of Medicine**
  Journal article (Reference a) identified our research work (Reference b) regarding mechanism for human brain injury.
  (a) MacDonald C., L., A. Johnson, D. Cooper, E. Nelson, N. Werner, J Shimony, A. Snyder, M. Raichle, J. Witherow, R. Fang, S. Flaherty, D. Brody
  "Detection of Blast-Related Traumatic Brain Injury in U.S. Military Personnel", pp. 2091 – 2100, 2011, Volume 364 Number 22.
  (b) Sotudeh Chafi, M., G. Karami, M. Ziejewski
  "Biomechanical Assessment of Brain Dynamic Responses Due to Blast Pressure Waves," *Annals of Biomedical Engineering*, 2010 38(2): 490-504.
- **National Highway Traffic Safety Administration (NHTSA)**
  Our research work on brain dynamic simulation in comparison to neuro-imaging outcome in automotive collisions is cited at www-nrd.nhtsa.dot.gov/pdf/esv/esv21/09-0432.pdf.
  (a) Ziejewski, M., G. Karami, W. Orrison, E. Hanson – 2009
  "Dynamic Response of Head Under Vehicle Crash Loading," Paper #09-0432-W, *21st International Technical Conference on the Enhanced Safety of Vehicles,* Sponsored by Mercedes Benz and the National Highway Traffic Safety Administration (NHTSA), Stuttgart, Germany, June 15-18th, 2010. Also printed in *SAE International, Head Injury Biomechanics,* Vol. 1, edited by J.A. Pike , pp. 177 – 187, 2011.

## AWARDS
- Received *Member Service Award* from SAE in recognition of 25 years of active membership with SAE International (2007).
- Received *Merit Certificate of Recognition* from the US National Committee on Biomechanics for the poster presentation, "A Telemedical Approach to Using Brain Biomechanics in Emergency Department" at *The Second US National Symposium on Frontiers in Biomechanics* (2005).
- United States Air Force Office of Scientific Research Award
  Selected for Summer Research Program in Occupant Biodynamics Modeling at the Armstrong Laboratory at Wright-Patterson Air Force Base, OH (1997)
- United States Air Force Office of Scientific Research Award
  Selected for Summer Research Program in Occupant Biodynamics Modeling at the Armstrong Laboratory at Wright-Patterson Air Force Base, OH (1996)
- Award for Outstanding Accomplishments in Research and Scholarly Activities, NDSU Colle0ge of Engineering (1990-1991)
- Selected by the Polish Academy of Science on behalf of the Polish government, with twelve other researchers, for research in a foreign country. The selection was made based on the national screening procedure including professional examinations and interviews. (1979)

ATTACHMENT "2"

**Mariusz Ziejewski, Ph.D., Inż.**
Professor
Department of Mechanical Engineering
Director of Impact Biomechanics Laboratory, College of Engineering
Director of Automotive Systems Laboratory, College of Engineering
North Dakota State University
and
Clinical Adjunct Associate Professor
Department of Clinical Neuroscience, School of Medicine
University of North Dakota

February 13, 2019

E. Todd Tracy
The Tracy Firm
4701 Bengal Street
Dallas, TX 75235

   *RE: Mr. Kendall Anderson*

Dear Mr. Tracy:

Pursuant to your request, I am setting forth my vehicle dynamics (accident reconstruction) and human body dynamics (biomechanics) opinions regarding the UTV incident on May 14, 2016, involving Mr. Kendall Anderson. This report details my opinions to date, the facts and data that I have been supplied and considered in forming said opinions, and the basis and reasons for my opinions.

Prior to stating my opinions, however, and although my attached CV more fully details my knowledge, skill, experience, training, and education, below is a summary synopsis of my background and qualifications to render my opinions.

A. <u>BACKGROUND AND EXPERIENCE:</u>

- Professor in College of Engineering, Director of the Impact Biomechanics Laboratory and Director of Automotive Systems Laboratory, North Dakota State University (NDSU).
- Clinical Faculty and Adjunct Professor, Department of Clinical Neuroscience, University of North Dakota (UND) School Of Medicine.
- Involved in research and education in the field of vehicle dynamics and biomechanics for over past 35 years.

*Vehicle Dynamics (Accident Reconstruction)*

- Accredited Accident Reconstructionist, Accreditation Commission for Traffic Accident Reconstruction (ACTAR) #1939
- Certified in Crash Data Analysis, Sponsored by GM, Vetronix and Texas Eng. Ext., Santa Barbara, CA, 2001.
- Researched Automotive Structures Impact Characteristics
- Performed Compliance Testing FMVSS 223 Rear Impact Guards & 224 Rear Impact Protection, B.L. Industries 2004-2005.

1

- Developed Computer Program "Impact" - 1985-1990 for analysis of single or two vehicle accidents, the conditions of impact including the speed of the vehicles at impact and the forces generated during the impact.
- Developed Computer Program "Post-Impact: - 1985-1990 for simulation of single or two vehicle accidents, the vehicle trajectory, and the rest position.

*Human Body Dynamics (Biomechanics)*

- Research focus on human body biomechanics for the last 20 years.
- Consulted, for past 20 years, in the area of biomechanics, with various governmental agencies including National Highway Traffic Safety Administration (NHTSA), United States Air Force (USAF), United States Army, Department of Defense (DoD), and United States Product Safety Commission (USCPSC).
- Selected to conduct research for USAF at Armstrong Aerospace Research Laboratory (AARL)/Human Systems Division, Wright-Patterson Air Force Base (WPAFB) Dayton, OH, that included laboratory studies of entire human body responses to impact, biodynamic modeling and development of biodynamics injury criteria; and received six (6) research contracts, from USAF that involved biomechanical analysis of over 900 full scale laboratory tests with male and female pilots.
- Two (2) most current research contracts (over $1M), supported by DoD have been in the area of biomechanical analysis of injury and injury protection for US soldiers returning from combat in Iraq and Afghanistan.
- Involved for several years in Emergency Room (ER) Biomechanical Brain Injury Evaluation Research, with Fargo-Moorhead (FM) Ambulance Service and MeritCare Trauma Center, sponsored, in part, by MeritCare Foundation, Fargo, ND.
- From 2007 to present, invited to chair three (3) scientific peer review committees, as well as serve as a scientific reviewer for numerous other committees for DoD Post Traumatic Stress Disorder/Traumatic Brain Injury (PTSD/TBI) Research Program.
- Current Chairman of the North American Brain Injury Society (NABIS).
- Named founding chair of Blast Injury Institute.
- Received additional specialized training with certifications in areas of Abbreviated Injury Scale (AIS) and Crash Data Analysis.
- Professor for over past 40 years, of a variety of subjects in the field of engineering including, biomechanics, vehicle dynamics, and dynamics.
- Invited to give many national and international presentations, including ones to governmental agencies such as USCPSC.
- Published four (4) book chapters on brain and neck injury and over one-hundred (100) peer-reviewed publications.

B. OBJECTIVE

To perform a vehicle dynamic analysis (accident reconstruction) and human body dynamics analysis (biomechanics) of the incident involving Kendall Anderson on May 14, 2016.

C. MATERIALS REVIEWED

1. Complaint
2. Amended Answer to Complaint, Crossclaim, Notice and Cross Claim for Apportionment of Fault and Jury Demand
3. Plaintiff's First Set of Interrogatories and First Request for Production of Documents to Polaris
4. Defendant's Discovery Responses *
5. Supplemental Disclosures
6. Records of Acadia Hospital

2

7. Records of Access Radiology
8. Records of Christus St. Patrick Hospital
9. Records of Jaeger ER Physicians
10. Records of LOS
11. Records of MSC Group
12. Records of Oshner Baptist Medical
13. Records of Park Place Surgical
14. Records of The Pathology Laboratory
15. Records of Tulane MUUT Specialty Clinic
16. Records of UMC New Orleans
17. Records of University of UT Adult Service
18. Records of University of Utah Health
19. Records of Anesthesia
20. Records of CIOX – LSU Uptown Multispecialty
21. Records of Louisiana Ortho Specialist
22. Records of LSU Healthcare Network
23. Deposition and Exhibits of Kendall Anderson
24. Deposition and Exhibits of Neda Imbimbo
25. Deposition of Jonathon Jones
26. Deposition and Exhibits of Cody Rhoades
27. Deposition and Exhibits of Jessie Wayment
28. Deposition of Steven Webb
29. Photographs

D. TASKS PERFORMED

For this analysis, I have done the following:

1. Studied the provided materials.
2. Obtained specifications for the 2015 Polaris Ranger 570 Crew.
3. Searched and measured an exemplar Polaris Ranger 570.
4. Performed surrogate fit analysis in exemplar Polaris Ranger 570.
5. Determined Mr. Kendall Anderson's segments' geometric and mass properties, and the joints' locations and range of motion characteristics using the Generator of Body Data (GEBOD) AL/WPAFB computer program.
6. Performed vehicle dynamics analysis
7. Performed Mr. Kendall Anderson's body dynamics analysis for selected phases of event.

E. ANALYSIS

On May 14, 2016, Kendall Anderson was riding a 2015 Polaris Ranger 570 Crew traveling on a pathway, in the course of his employment, when it rolled (driver side 1/4 roll as shown in Figure 1). Mr. Anderson was partly ejected causing serious injury to Mr. Anderson's left arm (Figure 2)

3



Figure 1 – Accident Scene Photograph



Figure 2 – Kendall Anderson's Injuries

**E-1  Vehicle Dynamics**

In the examination of the forensic evidence of the subject vehicle, I first familiarized myself with the vehicle components of the 2015 Ranger Polaris 570 Crew. Figures 3 and 4 are from the 2015 Polaris 570 Crew Service Manual.



Figure 3 – Vehicle Components of the 2015 Ranger Polaris 570



Figure 4 - 2015 Ranger Polaris 570 Crew Service Manual Photo

5

According to deposition testimony, doors were supplied at the time of purchase. The picture below shows how the doors looked when the vehicle was supplied from Polaris:



Below is deposition testimony from Mr. Rhoades regarding the Polaris UTV being delivered to Mr. Anderson's employer (BattleFrog) without doors:



ANDERSON vs POLARIS INDUSTRIES, INC
June 06, 2018                                            Cody Rhoades
                                                              27

```
 7     Q.    Now, when the vehicle came from Polaris,
 8   it had cab nets or doors, correct?
 9     A.    It had doors.
10     Q.    When it was delivered --
11     A.    We never did get nets.  We ordered them
12   with doors.
13     Q.    Fair enough.  When the vehicle was
14   delivered to BattleFrog, it had no doors, correct?
15     A.    Correct.
```

Shelly Wadsworth, RPR, CRR, CBC
DepomaxMerit Litigation Services

6

Photographs taken of the subject 2015 Polaris Ranger are shown in Figure 5. The driver seat was provided with seat belts and hip bars, but, again, the Polaris Ranger was not equipped with doors (or even cab nets) at the time of the incident involving Mr. Anderson.



Figure 5 – Select Photos of the Subject 2015 Ranger Polaris 570

The damage to the undercarriage of the 2015 Ranger Polaris 570 is shown in Figure 6.



Figure 6 – Undercarriage Damage to the 2015 Ranger Polaris 570

Front wheel distance and wheel base measurements are shown in Figures 7 and 8.



Figure 7 – Front Wheel of the 2015 Ranger Polaris 570



Figure 8 – Wheel Base Measurements of the 2015 Ranger Polaris 570

Selected photographs of the driver side front, center and rear are shown in Figures 9, 10, and 11.



Figure 9 – Driver Side Front and Center of the 2015 Ranger Polaris 570



Figure 10 – Driver Side Upper Rear of the 2015 Ranger Polaris 570

9



Figure 11 – Driver Side Lower Rear of the 2015 Ranger Polaris 570

Photographs of the passenger side and the roof of the 2015 Ranger Polaris 570 are shown in Figures 12 and 13.



Figure 12 – Passenger Side of the 2015 Ranger Polaris 570



Figure 13 – Roof of the 2015 Ranger Polaris 570

10

Photographs of the driver side seat belt are shown in Figures 14 and 15.



Figure 14 – Driver Side Seat Belt, Stowed, 2015 Ranger Polaris 570



Figure 15 – Driver Side Seat Belt, Bucked Position, 2015 Ranger Polaris 570

11

An exemplar Ranger Polaris 570 was located. The exterior and interior of the vehicle was measured and photographed (Figure 16).



Figure 16 – Driver Side Seat Belt 2015 Ranger Polaris 570

Analysis of published peer-reviewed scientific literature indicates vehicle acceleration at the center of gravity (CG) to be less than 10 g. experimentally measured acceleration at the CG of Chevrolet Malibu in rollover events have been published by Orlowski et al (1985). The peak resultant acceleration was found to be 6.1 g's as can be seen in Figure 6 on page 185 of that paper. Carter, et al (2002), reported similar data for Ford Econoline 15 passenger van. In Figure 15 on page 11, the peak acceleration measured at the center of gravity of the vehicle is seen to be approximately 7 g's.

> Orlowski, Kenneth F., R.T. Bundorf, and E.A. Moffatt, "Rollover Crash Tests – The Influence of Roof Strength on Injury Mechanics." SAE 851734, 1985

> Carter, Jarros W., J.L. Habberstad, and K. Croteau, "A Comparison of the Controlled Rollover Impact System (CRIS) with the J2114 Rollover Dolly." SAE 2002-01-0694, 2002

## E-2 **Human Body Dynamics**
Occupant kinematics in rollovers may best be described in three phases: lateral motion and trip phase, airborne phase and ground contact phase.

> Parenteau, C., et al, "Near and Far Side Adult Front Passenger Kinematics in a Vehicle Rollover", SAE #2001-01-0176.

During the rollover event, the passenger of the 2015 Polaris Ranger 570 (Mr. Anderson) would have moved upward and outward with respect to the vehicle interior unless the impact force from the vehicle structures contact with the ground is greater than the centripetal acceleration.

*Newberry, W., et al, "A Computational Analysis of the Airborne Phase of Vehicle Rollover: Occupant Head Excursion and Head-Neck Posture", SAE 2005-01-0943*

*Parenteau, C., et al, "Near and Far Side Adult Front Passenger Kinematics in a Vehicle Rollover", SAE #2001-01-0176.*

The structural impact with the ground results in a short acceleration pulse. The subject of dynamic progressive buckling has been extensively studied. There is a broad base of peer reviewed publications. For example:

*McNay, G. H. II, "Numerical Modeling of Tube Crush with Experimental Comparison", Society of Automotive Engineers #8808*

*Mahmood, H. F., et al, "Design of Thin Walled Columns for Crash Energy Management – Their Strength and Mode of Collapse", Society of Automotive Engineers #811302*

*Mahmood, H.F. et al, "Crash Analysis of Thin Walled Beam-Type Structures", Society of Automotive Engineers #880894*

*Schmueser, D. W., et al, "Front Impact of Primary Structural Components of a Composite Space Frame", Society of Automotive Engineers #88090*

*Tundermann, J. H. Et al, "The Application of Elastometric Buckling Columns in an Energy Management Bumper System", Society to Automotive Engineers #750011*

Personally, I was involved in biomechanical analysis of over 900 full scale laboratory tests with male and female pilots with nominal accelerations being at 10 g. Some of the tests had accelerations of approximately 15 g. No injuries resulted to any of the test subjects. Therefore, the level of acceleration measured at the vehicles' CG during a rollover event is within human tolerances.

The occupant's body motion delay is always present when an impact to the vehicle structure occurs. Published literature, as well as my own research work in structural component deformation, show the time duration of the acceleration pulse from a vehicle structural impact to be very short. *See my structural papers listed above (SAE #961851, 962374, 961852, 982388 and 982418).*

Published literature as well as my own research work in occupant motion (human body kinematics) indicates that there will be a time delay for the occupant's motion with respect to the structural deformation.

*Yliniemi, E., **M. Ziejewski** and C. Perry, "Head Rotation During Vertical Impact Predicted Using Initial Head Angle and Anthropometry. " Aviation, Space and Environmental Medicine, Vol. 77, No. 10, October 2006.*

***Ziejewski, M.,** B. Anderson, "The Effect of Structural Stiffness on Occupant Response for A -Gx Acceleration Impact." SAE #962374, São Paulo, SP, Brazil, 1996.*

***Ziejewski, M.,** "Finite Element Neck Model for Articulated Total Body Program." Final Report, Summer Faculty Research Program, Armstrong Laboratory, Wright Patterson Air Force Base, Dayton, OH, September 1996.*

***Ziejewski, M.,** "Characterization of Human Head/Neck Response In Z-Direction In Terms Of Significant Anthropomorphic Parameters, Gender, Helmet Weight and Helmet Center of Gravity In A +GZ*

*Acceleration." Final Report, Summer Faculty Research Program, Armstrong Laboratory, Wright Patterson Air Force Base, Dayton, OH, December 1997.*

Published literature indicates that about 97.4% of belted and 92.2% of unbelted occupants in rollovers had less than an AIS Level 3 injury. When partially or fully ejected from the vehicle, the risk of AIS Level 3+ increases. Funk et al (2012) shows that the risk of fatality is increased by a factor of 91 in occupants who are completely ejected from the vehicle in a rollover crash.

*NHTSA (National Highway Traffic Safety Administration) report prepared by Data Link for NHTSA, "Injuring Contacts in Light Vehicle Rollovers" January 1993*

*Summers, S. et al, 1996 Current Research in Rollover and Occupant Retention, 15th International Technical Conference on the Enhanced Safety of Vehicles, Melbourne, Australia*

*Moffatt, E.A. and Padmanaban, J., "The Relationship Between Vehicle Roof Strength and Occupant Injury in Rollover Crash Data", 39th AAAM Proceedings, 1995*

*Digges, K., "Summary Report of Rollover Crashes", National Crash Analysis Center, 2002.*

*Funk, et al, "Comparison of Risk Factors for Cervical, Spine, Head Serious and Fatal Injury in Rollover Crashes", Accident Analysis and Prevention, 45, 67 – 74, 2012.*

Based on my education, training and experience as well as my knowledge of testing of these principles, I can state that having a door on the UTV would have contained Kendall Anderson within the vehicle and lessened his injuries. Specifically, if the doors would have been available, Kendall Anderson would not have been partially ejected from the vehicle and his injuries would have been less.

In essence, what occurred here is very similar to a crashworthiness type case involving a motor vehicle. One of the five crashworthiness principles is to prevent ejection. Doors help to prevent ejection. Automobile manufacturers know how important doors are to providing proper occupant protection in the event of an accident or rollover.

The National Highway Traffic Safety Administration (NHTSA) has identified ejection mitigation as a top priority, issuing a notice of proposed ruling making (NPRM) for FMVSS 226, Ejection Mitigation, in December of 2009. Ejections have a significant impact on occupant injuries in motor vehicle crashes, representing 8,605 fatalities as well as 20,000 injuries in 2007.

*Dix, J., Koichi, S, et al., "A Study of Occupant Ejection Mitigation", Paper Number 11-0368.*

*Evans, N., Leigh, M, "FMVSS 226 Ejection Mitigation: A Review", SAE Technical Paper 2013-01-0468, 2013.*

Published literature found that for rollover collisions the door window was the primary ejection route (**door ranked second**) (Anderson, 1974). In a survey based on approximately 10,000 accidents involving Volvo cars in which 90 occupants were ejected, (Carlsson, 1983) found that in rollover impacts occupants travelling in the rear were ejected mainly through the rear window, and that **front seat occupants were ejected mainly through a door or side window**…

*Anderson, T.E., "Ejection Risk in Automobile Accidents", Calspan Corp., Buffalo, New York. Report No. ZQ-5276-V-2R (1974).*

14

*Carlsson, G., "Ejection – A Hazard in Traffic Accidents", International Journal of Vehicle Design, Vol. 4, No. 2 (1983).*

*Green, P.D., Robertson, N. K. B., et al., "Car Occupant Ejection in 919 Sampled Accidents in the UK – 1983-86", Society of Automotive Engineers, #870323.*

In addition to automobile manufacturers knowing how important doors are to providing proper occupant protection in the event of an accident or rollover. with respect to the subject Polaris UTV, Polaris itself mentions in the owner's manual the importance of the doors, and how the vehicle should always be used with doors (or cab nets). In fact, the owner's manual specifically says that "Riding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover." Below is this language from page 17 (Bates labeled Polaris 000019):



## Operator Safety
### Cab Nets

Riding in this vehicle without using the cab nets (or doors, if equipped) increases the risk of serious injury or death in the event of an accident or rollover. Always use the cab nets (or doors) while riding in this vehicle.

Additional information, including but not limited to, UTV's is provided below.

The U.S. Consumer Product Safety Commission has recommended half doors be installed on Rhinos for safety. U.S. Consumer Product Safety Commission, Release 09-296 states as follows:

*"CPSC believes that in order to provide a safer ride, all Rhinos must have half doors...."*

In Kendall Anderson's case, I performed an analysis using engineering principles and methodologies generally accepted in the scientific community. Example references are listed below:

*Hibbeler, R.C., "Engineering Mechanics – Dynamics", Twelfth Edition, Pearson Prentice Hall, Pearson Education, Inc. 2010*

*Nahum, A., Gomez M., "Injury Reconstruction: The Biomechanical Analysis of Accidental Injury", Society of Automotive Engineers, #940568.*

*Robbins, D.H., et al, "Biomechanical Accident Investigation Methodology Using Analytic Techniques", Society of Automotive Engineers, #831609.*

In the subject analysis, the GEBOD (AL/WPAFB) computer program was used to generate the body description. The input data used for Kendall Anderson were as follows:

- gender:    male
- height:    5'08"
- weight:    135 lb

As background information, a review of the medical records generated after the incident was performed to assess Kendall Anderson's injury patterns. The following is a brief summary of the injuries as documented in his medical records (Figure 17). For a complete description of the injuries, please see all medical records.



**Impression**
**Kendall Anderson**

**Age: 38    Gender: M    Height: 5'8"    Weight: 135 lb**

1.  LOC at scene (doc 11:15) [5/14/16]
2.  L orbital floor diastases with inferior bowing (doc 11:27) [5/14/16]
3.  Radial fx with pulseless extremity (doc 11:15) [5/14/16]
4.  Massive crush injury L forearm with ulnar nerve laceration involving highly comminuted fx of proximal ulna/radius (doc 11:20) [5/14/16]
5.  L Grade 3 open olecranon and radial shaft fx with extensive contamination (doc 11:23) [5/25/16]
6.  Comminuted proximal nasal bone and septum fx with overlying soft tissue swelling (doc 11:27) [5/14/16]
7.  Open, comminuted mid and proximal L forearm fx with intra-articular extension to elbow; olecranon process fx and dislocation to radial head (doc 11:27) [5/14/16]
8.  Oblique fx line still seen proximal ulna (doc 13:12) [2/1/17]
9.  L proximal forearm synostosis between head of radius and proximal ulna (doc 13:13) [2/1/17]
10. R comminuted posterior acetabular fx (doc 11:27) [5/14/16]

Figure 17 – Injury Pattern Analysis

The biomechanical assessments of Kendall Anderson's injuries are consistent with trauma resulting from a combination of linear and angular forces/accelerations as a consequence of the incident that took place on May 14, 2016.

The objective of a surrogate fit was to relate the geometrical dimensions of the 2015 Polaris Ranger 570 Crew to the height of Kendall Anderson of 68 inches. The surrogate in Figure 18 is wearing a seat belt and the surrogate is Figure 19 is not wearing a seat belt. Based on the geometry of the safety zone and the anthropometry of Mr. Anderson, it must be concluded the seat belt would not have prevented his upper extremity excursion.



Figure 18 – Surrogate Fit for Kendall Anderson **Wearing** Seat Belt



Figure 19 – Surrogate Fit for Kendall Anderson **Not Wearing** Seat Belt

There are two possible mechanisms for the left arm excursion through the side opening (side door area):

1. Yaw/roll induced lateral acceleration
2. Protective reflex mechanism

17

At the time of injury, the left arm position was outside the safe perimeter of the 2015 Polaris Ranger 570 Crew. Direct blunt trauma to Kendall Anderson's left arm was the result of interaction between the 2015 Polaris Ranger 570 Crew and the ground.

For illustration purposes, I would like to present a quasi-static roll test of a similar vehicle that I was personally involved in. The results from the test illustrates the ease of use of upper extremities excursion during lateral pull less than 1 g. Although the illustration is used with a lap belt only, the presence of a shoulder belt on the subject vehicle would not have made any difference for the left arm excursion.

On November 12, 2017, a quasi-static roll test with an exemplar Kawasaki Mule and surrogates were carried out at Impact Consulting Engineers facility. The input for the surrogates is as follows:

Surrogate 1
- gender: female
- height: 5 ft 0 in
- weight: 85.95 lb

Surrogate 2
- gender: female
- height: 5 ft 0 in
- weight: 190.6 lb

Kendall Anderson's weight of 135 fits between the weights of the surrogates. For Mr. Anderson being taller, 5'8", would make it more likely for his extremity excursion.

A quasi-static roll test was performed using two female surrogates of equal height. Analysis of various occupant protection effectiveness and containment was conducted using a rotisserie positioned at different roll and pitch angles. The tests were performed for roll angle of 0, 30, 60 and 90 degrees, corresponding to lateral acceleration of 0.0, 0.5, 0.87, and 1.0 g respectively. The variation in the pitch angle was 0, 5, 10, and 15 degrees corresponding to the forward acceleration of 0, 0.09, 0.17, and 0.26 g respectively. The tests were documented using five (5) cameras. Four (4) cameras were depicting the body kinematics, and the 5th camera recorded the roll angle. A table of tests completed for each surrogate is shown in Figure 20.



Figure 20 – Tests Matrix for Both Surrogates

Composite photographs from the perspective of the four cameras with roll angle of 60° and pitch of 5° for Surrogate 1 and 2 are shown in Figures 21 and 22 respectively. As can be seen, the roll event allows the arms and legs to leave the safety of the roll over protective structure (ROPS) even while wearing the provided lap belt.



Figure 21 – No Design Modifications, Roll Angle of 60° and Pitch of 5° (Surrogate 1)



Figure 22 – No Design Modifications, Roll Angle of 60° and Pitch of 5° (Surrogate 2)

F.  CONCLUSIONS:

My opinions are given to a reasonable degree of engineering and scientific certainty, i.e., on an engineering and scientific more-probable-than-not basis, that:

1.  There are two possible mechanisms for the left arm excursion through the side opening (side door area):
    a.  Yaw/roll induced lateral acceleration
    b.  Protective reflex mechanism
2.  At the time of injury, the left arm of Mr. Anderson was outside the safe perimeter of the 2015 Polaris Ranger 570 Crew, making him partially ejected and violating a fundamental principle of crashworthiness of preventing ejection.
3.  Direct blunt trauma to Kendall Anderson's left arm was the result of interaction between the 2015 Polaris Ranger 570 Crew and the ground.
4.  Usage of the available safety belt (lap and shoulder belt) would not have prevented the excursion of Kendall Anderson's left arm.
5.  Any structure in the door area that would provide support for the left arm would have been beneficial to Mr. Anderson, and in all probability prevented his partial ejection arm injury. This includes the doors for the subject Polaris that were furnished when new, but which were not present when the incident occurred.

I reserve the right to amend this report, to modify, to change and/or to alter my opinions predicated upon further discovery and upon receipt of any additional materials.

Mariusz Ziejewski, Ph.D., Inż.
Professor
Director of Impact Biomechanics Laboratory, College of Engineering
Director of Automotive Systems Laboratory, College of Engineering
North Dakota State University
and
Clinical Adjunct Associate Professor
Department of Clinical Neuroscience, School of Medicine
University of North Dakota